**Nos. 2025-1228, -1252 (consolidated)**

# United States Court of Appeals for the Federal Circuit

No. 2025-1228

JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA NV,
*Plaintiffs-Appellees,*

v.

TEVA PHARMACEUTICALS USA, INC.,
*Defendant-Appellant.*

Appeal from the U.S. District Court for the District of New Jersey,
Case No. 2:18-CV-734, Judge Claire C. Cecchi

---------------------------------

No. 2025-1252

JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA NV,
*Plaintiffs-Appellees,*

v.

MYLAN LABORATORIES LIMITED,
*Defendant-Appellant.*

Appeal from the U.S. District Court for the District of New Jersey,
Case No. 2:19-CV-16484, Judge Claire C. Cecchi

## APPELLANTS' OPENING BRIEF


Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
(212) 940-8776

Eric T. Werlinger
Timothy H. Gray
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
(202) 625-3500

Jillian M. Schurr
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
(312) 902-5200

*for Mylan Laboratories Limited, Appellant in No. 25-1252*

John C. O'Quinn
William H. Burgess
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave. NW
Washington, DC 20004
(202) 389-5000

Jeanna M. Wacker
Christopher T. Jagoe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Noah Frank
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7570

*for Teva Pharmaceuticals USA, Inc., Appellant in No. 25-1228*

## U.S. Patent No. 9,439,906, claims 1, 2, 8, 10, 11, 13, 19, 20, 21 (Appx174-175, emphases added)

**1.** A dosing regimen for administering paliperidone palmitate to a psychiatric patient in need of treatment for schizophrenia, schizoaffective disorder, or schizophreniform disorder comprising

> (1) administering intramuscularly in the deltoid of a patient in need of treatment a first loading dose of about 150 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;
>
> (2) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of about 100 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the 6th to about 10th day of treatment; and
>
> (3) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 150 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation a month (±7 days) after the second loading dose.

**2.** The dosing regimen of claim **1** wherein after administration of the first maintenance dose, subsequent maintenance doses of from about 25 mg-eq. to 150 mg-eq. are administered in the deltoid or gluteal muscle of the psychiatric patient in need of treatment at monthly (±7 days) intervals.

**8.** A dosing regimen for administering paliperidone palmitate to a renally impaired psychiatric patient in need of treatment for schizophrenia, schizoaffective disorder, or schizophreniform disorder comprising

(a) administering intramuscularly in the deltoid of a renally impaired psychiatric patient in need of treatment a first loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;

(b) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the 6th to about 10th day of treatment; and

(c) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 75 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation a month (±7 days) after the second loading dose.

**10.** The dosing regimen of claim **8** wherein the sustained release formulation is an aqueous nanoparticle suspension.

**11.** A dosing regimen for administering paliperidone palmitate to a renally impaired psychiatric patient in need of treatment for psychotic disorder comprising

(a) administering intramuscularly in the deltoid of a renally impaired psychiatric patient in need of treatment a first loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;

(b) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the eighth day of treatment; and

(c) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 50 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation a month (±7 days) after the second loading dose.

**13.** The dosing regimen of claim **11** wherein the psychiatric patient is in need of treatment for of a psychotic disorder wherein the psychotic disorder is schizophrenia.

**19.** The dosing regimen of claims **1**, **4**, **8** or **11** wherein the sustained release depot formulation is an aqueous nanoparticle suspension consists essentially of

(a) 156 mg/ml of the paliperidone palmitate having an average particle size (d50) of from about 1600 nm to about 900 nm;

(b) 12 mg/ml of polysorbate 20;

(c) one or more buffering agents sufficient to render the composition neutral to very slightly basic (pH 8.5);

(d) 30 mg/ml of a suspending agent wherein the suspending agent is polyethylene glycol 4000; and

(f) water q.s. ad 100%.

**20.** The dosage regimen of claim **19** wherein in the buffering agents contained in the aqueous nanoparticle suspension are citric acid monohydrate, disodium hydrogen phosphate anhydrous, sodium dihydrogen phosphate monohydrate, sodium hydroxide.

**21.** The dosage regimen of claim **19** wherein in the pH of the aqueous nanoparticle suspension is in the range of pH 7 to 7.5.

# CERTIFICATE OF INTEREST
# (Teva)

Counsel for appellant Teva Pharmaceuticals USA, Inc. certifies the following:

1. **Represented Entities (Fed. Cir. R. 47.4(a)(1)):** Teva Pharmaceuticals USA, Inc.

2. **Real Party in Interest (Fed. Cir. R. 47.4(a)(2)):** N/A

3. **Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)):** Teva Pharmaceutical Industries Ltd.

4. **Legal Representatives (Fed. Cir. R. 47.4(a)(4)):**

   **Walsh Pizzi O'Reilly Falanga LLP**: Liza M. Walsh, Christine I. Gannon, William T. Walsh, Jr. (no longer with firm)

   **Kirkland & Ellis LLP**: Matthew Lembo*, Justin Bova*, Mira Mulvaney*, Gregory Springsted*, Ashley Ross, Ashley Cade
   (* indicates no longer with Kirkland & Ellis)

5. **Related Cases (Fed. Cir. R. 47.5(a)).** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)? **Yes.** A separate Notice of Related Case Information has been filed under Rule 47.5(b), and that information remains accurate.

6. **Organizational Victims and Bankruptcy Cases (Fed. R. App. P. 26.1(b)-(c)):** N/A

# CERTIFICATE OF INTEREST
## (Mylan)

Counsel for appellant Mylan Laboratories Ltd. certifies the following:

1. **Represented Entities (Fed. Cir. R. 47.4(a)(1)):** Mylan Laboratories Ltd.

2. **Real Party in Interest (Fed. Cir. R. 47.4(a)(2)):** N/A

3. **Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)):** Mylan, Inc.; Viatris, Inc.

4. **Legal Representatives (Fed. Cir. R. 47.4(a)(4)):**

   **Saiber LLC**: Arnold B. Calmann, Jeffrey Soos, Katherine A. Escanlar

   **Katten Muchin Rosenman LLP**: Alissa A. Pacchioli, Guylaine Haché, Jitendra Malik

5. **Related Cases (Fed. Cir. R. 47.5(a)).** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)? **Yes.** A separate Notice of Related Case Information has been filed under Rule 47.5(b), and that information remains accurate.

6. **Organizational Victims and Bankruptcy Cases (Fed. R. App. P. 26.1(b)-(c)):** N/A

# TABLE OF CONTENTS

Table of Authorities ........ iv

Statement of Related Cases ........ vii

Introduction ........ 1

Statement of the Issues ........ 3

Statement of the Case ........ 4

A. Schizophrenia and Antipsychotic Drug Development ........ 5

B. Paliperidone Palmitate and Invega Sustenna ........ 6

C. Main Prior Art ........ 7

1. The ’544 Patent Disclosed Paliperidone Palmitate Formulations, Uses, Doses, Therapeutic Window, Injections, Particle Size, and Durational Efficacy. ........ 8

2. WO’384 Disclosed Invega Sustenna’s Formulation and Dosing Regimens. ........ 11

3. The ’548 Protocol Disclosed Loading Doses and Dosing Schedules. ........ 12

D. Loading Doses, Injection Sites, and Reduced Doses for Renally-Impaired Patients Were Well-Known. ........ 14

1. Loading Doses of Antipsychotic Drugs ........ 14

2. Intramuscular Injection Sites ........ 15

3. Reduced Doses for Renally-Impaired Patients ........ 16

E. Janssen’s Asserted ’906 Patent ........ 17

1. All Claims Recite Two Loading Doses, Then One or More Maintenance Doses. ........ 17

2. Claims 8, 11, and Dependents Recite Lower Doses for “Renally Impaired Patients.” ........ 19

3. Claims 19-21 Recite an “Average Particle Size.” ........ 20

F. The District Court Initially Rejects Defendants’ Obviousness Challenge; This Court Vacates and Remands. ........ 20

G. On Remand, the District Court Issues a New Opinion Reaching the Same Result. .......... 23

Summary of Argument .......... 26

Standard of Review .......... 30

Argument .......... 30

I. The District Court Erred by Upholding Claim 2 Based on "Unequal, Decreasing Loading Doses." .......... 30

A. The Court Should Reverse Because the District Court Legally Erred by Not Finding *Prima Facie* Obviousness. .......... 31

1. Claims to Values Within Prior-Art Ranges Are *Prima Facie* Obvious. .......... 31

2. The District Court Erred by Not Finding Claim 2 *Prima Facie* Obvious, as the Claimed Loading Dose Amounts are Undisputedly Within Prior-Art Ranges. .......... 33

3. Under the Proper Legal Standard, No Evidence Rebuts *Prima Facie* Obviousness. .......... 36

B. Regardless, the District Court Erred by Upholding Claim 2, Which Only Selects Dosing Regimens From Among Many Others All Known to Be Suitable. .......... 42

1. The District Court Repeated its Errors of "Presuming Significance" of the Unequal Loading Doses and Requiring Proof of a "Singular" Motivation to Pursue the Claimed Regimens. .......... 42

2. The District Court Repeated its Errors of Siloing Each Piece of Prior Art and Finding Nonobviousness Because No Single Reference Anticipates. .......... 46

3. The District Court's Consideration of Reasonable Expectation of Success Repeats Previous Errors. .......... 55

II. The District Court Erred by Upholding the Remaining Representative Claims. .......... 59

A. The Renal-Impairment Claims (10 and 13) are Obvious. ....... 59

1. The District Court Again Applied an Erroneously Narrow Test for Obviousness. ....... 60

2. The District Court Again Relied Erroneously on an Unclaimed "Mild" Limitation. ....... 61

3. The District Court's Motivation-to-Combine Findings Apply an Erroneous Conception of "Teaching Away." ....... 64

B. The Particle-Size Claims (20 and 21) are Obvious. ....... 67

III. Secondary Considerations Cannot Support the Judgment or Prevent Reversal. ....... 71

A. "Industry Praise" and "Skepticism" Evidence is Weak and Lacks Nexus. ....... 73

B. Blocking Patents Undermine Any "Long-Felt Need" or "Commercial Success." ....... 76

Conclusion ....... 80

# TABLE OF AUTHORITIES

## Cases

*Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310 (Fed. Cir. 2018) .......... 76

*Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952 (Fed. Cir. 2014) .......... 65, 66

*Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286 (Fed. Cir. 2013) .......... 56

*Almirall LLC v. Amneal Pharms., LLC*, 28 F.4th 265 (Fed. Cir. 2022) .......... 32

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) .......... 65

*AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325 (Fed. Cir. 2021) .......... 70

*Bayer Pharma AG v. Watson Lab'ys, Inc.*, 874 F.3d 1316 (Fed. Cir. 2017) .......... 69

*Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064 (Fed. Cir. 2015) .......... 46

*Celgene Corp. v. Hetero Labs Ltd.*, 2021 WL 3701700 (D.N.J. June 15, 2021) .......... 53

*Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010) .......... 67

*Concrete Pipe & Prods. of Cal. v. Constr. Laborers*, 508 U.S. 602 (1993) .......... 30

*Duramed Pharms., Inc. v. Watson Labs., Inc.*, 413 F.App'x 289 (Fed. Cir. 2011) .......... 46

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996 (Fed. Cir. 2018) .......... 32, 33, 36, 37, 41

*Engel Indus. v. Lockformer Co.*, 166 F.3d 1379 (Fed. Cir. 1999) .......... 62

*Forest Labs. LLC v. Sigmapharm Labs. LLC*,
918 F.3d 928 (Fed. Cir. 2019) .......................................................... 39

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
983 F.3d 1334 (Fed. Cir. 2020) ........................................................ 45

*Henny Penny Corp. v. Frymaster LLC*,
938 F.3d 1324 (Fed. Cir. 2019) ........................................................ 73

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
748 F.3d 1326 (Fed. Cir. 2014) ........................................................ 39

*In re Aller*, 220 F.2d 454 (CCPA 1955) ................................................ 35

*In re Applied Materials, Inc.*, 692 F.3d 1289 (Fed. Cir. 2012) .......... 35, 71

*In re Corkill*, 771 F.2d 1496 (Fed. Cir. 1985) ...................................... 56

*In re Cyclobenzaprine Hydrochloride Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ........................................................ 31

*In re Harris*, 409 F.3d 1339 (Fed. Cir. 2005) ........................................ 38

*In re Heck*, 699 F.2d 1331 (Fed. Cir. 1983) ...................................... 69, 70

*In re Kumar*, 418 F.3d 1361 (Fed. Cir. 2005) ........................................ 34

*In re Lintner*, 458 F.2d 1013 (CCPA 1972) .......................................... 43

*In re Peterson*, 315 F.3d 1325 (Fed. Cir. 2003) ...................................... 32

*In re Woodruff*, 919 F.2d 1575 (Fed. Cir. 1990) ..................................... 35

*Intel Corp. v. PACT XPP Schweiz AG*,
61 F.4th 1373 (Fed. Cir. 2023) .......................................................... 45

*Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982) .................... 30

*Janssen Pharms., Inc. v. Teva Pharm. USA, Inc.*,
97 F.4th 915 (Fed. Cir. 2024) ...................................................... passim

*Janssen Pharms., Inc. v. Tolmar, Inc.*,
718 F.Supp.3d 394 (D. Del. 2024) (*Tolmar I*) .................. 23, 24, 57, 79

*Janssen Pharms., Inc. v. Tolmar, Inc.*, No. 21-CV-1784,
2024 WL 2972832 (D. Del. June 13, 2024) (*Tolmar II*) .............. viii, 24

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
628 F.3d 1359 (Fed. Cir. 2010) .............................................. 65

*Ohio Willow Wood Co. v. Alps S. LLC*,
735 F.3d 1333 (Fed. Cir. 2013) .............................................. 72

*Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007) ......... 39, 40, 56

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007) .............................................. 67

*Sakraida v. Ag Pro, Inc.*, 425 U.S. 273 (1976) ................................ 72

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983) .............................................. 73

*Valeant Pharms. Int'l v. Mylan Pharms. Inc.*,
955 F.3d 25 (Fed. Cir. 2020) .............................................. 35, 44

**Statutes**

35 U.S.C. §103 .............................................................. 30

35 U.S.C. §271(e)(1) ........................................................ 79

**<u>Note</u>: All quoted emphasis is added unless otherwise indicated.**

## STATEMENT OF RELATED CASES

Two prior consolidated appeals have been taken from the lower court proceeding: Nos. 2022-1258 and 2022-1307. This Court vacated and remanded to the district court in *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915 (Fed. Cir. Apr. 1, 2014, opinion by Judge Prost, joined by Judges Dyk and Hughes). These appeals (Teva's No. 2025-1228, and Mylan's No. 2025-1252) arise from the district court's consolidated decision on remand. *See* Appx1-62.

Appellees are asserting the same patent at issue in this case (U.S. No. 9,439,906) in the following pending district court cases, which may directly affect or be directly affected by the Court's decision in this appeal: *Janssen Pharms., Inc. et al. v. Pharmascience Inc. et al.*, No. 2:19-CV-21590 (D.N.J.); *Janssen Pharms., Inc. et al. v. Accord Healthcare Inc.*, No. 2:22-CV-856 (D.N.J.); and *Janssen Pharms., Inc. et al. v. Qilu Pharm. Co., Ltd.* No. 2:24-CV-7094 (D.N.J.).

Appellees also asserted the same patent in *Janssen Pharms., Inc. v. Tolmar, Inc.*, No. 1:21-CV-1784 (D. Del.), which is on appeal as nos. 24-1699, -1700, -1980, -2020 (consolidated) in this Court. Janssen prevailed in the *Tolmar* district-court action, and has cited the *Tolmar* rulings to

support its arguments in this case. In February 2024, Janssen cited the *Tolmar* district court opinion to this Court, prior to this Court's earlier decision. *See* Janssen 28(j) Letter, Fed. Cir. No. 22-1258, ECF#68 (Mar. 1, 2024). On remand, the district court here acknowledged that *Tolmar* is a distinct case with a different factual record. Appx11. The *Tolmar* district court, in turn, denied Tolmar's motion for reconsideration (based on this Court's earlier decision in this case), emphasizing that Tolmar's presentation was "entirely different" from Teva's. *See Janssen Pharms., Inc. v. Tolmar, Inc.*, No. 21-CV-1784, 2024 WL 2972832, at *3 (D. Del. June 13, 2024) ("*Tolmar II*"). Appeals in that matter are pending, but have no bearing on these appeals.

## INTRODUCTION

This case returns to the Court after a remand, *Janssen Pharms., Inc. v. Teva Pharm. USA, Inc.*, 97 F.4th 915 (Fed. Cir. 2024), and concerns only obviousness of Janssen's dosing-regimen patent, U.S. No. 9,439,906. The '906 patent expires in 2031. It is the only patent standing in the way of public access to generic Invega Sustenna, an antipsychotic drug with net sales exceeding $1 billion annually. Janssen patented the active ingredient (paliperidone palmitate) in 1993. That patent is long expired. All of Janssen's other follow-on patents (*e.g.*, on injectable formulations, treatment methods) expired in 2018 or earlier.

The '906 patent recites a regimen of known dose amounts at known intervals, while claiming no particular (even relative) effectiveness. Critically, nothing in the record shows that *these* claimed regimens result in any meaningful difference from countless others—as the patent itself confirms. Instead, the claims pick and choose among known dosing ranges that overlap with the claimed regimen, rendering them *prima facie* obvious. Indeed, Janssen chose the regimen for business and regulatory reasons from among others that were *all expected to work*. In addition to the presumption of obviousness arising from the overlapping

ranges, the prior art supplies a POSA with all elements of the invention, motivation to combine, and a reasonable expectation of success. ANDA applicants like Teva are generally required to copy the NDA-holder's label. They cannot simply "design around" arbitrary dosing claims like these. The '906 patent is invalid and should not continue to bar lower-cost medicines from the patients who need them.

In earlier proceedings, the district court upheld the claims, and this Court vacated and remanded. It identified several fundamental errors, including **(1)** applying an overly rigid obviousness analysis; **(2)** misapprehending claim scope; **(3)** requiring safety and efficacy data to find a motivation to modify a prior-art reference; **(4)** treating alleged differences between claims and prior art as "material" without evidence, and **(5)** equating teaching alternatives with "teaching away." These and other errors in the original decision ran so deep that "the record [did] not contain" any untainted "obviousness factfindings" to review. 97 F.4th at 927.

On remand, Janssen treated this Court's mandate as an editing exercise. It urged the district court to "clarify" that it did not commit errors this Court identified, and otherwise to repackage the earlier analysis. The district court accepted that invitation, making many of the same

methodological mistakes to reach the same result. It continued to view prior-art references in isolation—dismissing the significance of individual prior-art references if they did not contain the *exact* same disclosures, as though this were anticipation instead of obviousness. At the same time, the court misapplied the "teaching away" doctrine, treating evidence that a skilled artisan would consider one approach as implicitly disparaging other approaches, thus allowing it to slice and dice away evidence of obviousness in a manner this Court previously criticized.

Affirmance would endorse these errors and effectively draw a roadmap for barring generic competition for extra decades or more with arbitrary dosing claims. Parties like Janssen would receive a windfall, with no contribution to the art in return, undermining the Hatch-Waxman Act's premise. It is long past time to allow generic competition and end Janssen's multibillion-dollar, decades-long hold over this medication for schizophrenic patients. The judgments should be reversed.

## STATEMENT OF THE ISSUES

**1.** Whether the legal conclusion of nonobviousness for claim 2 must be reversed because the district court: **(a)** erroneously declined to apply a presumption of obviousness, where claim 2 recites a regimen of

known dose amounts, at known intervals (without claiming any degree of effectiveness), that overlap with prior-art ranges, and where there is no evidence that the claimed values are critical or special and, regardless, **(b)** the district court's obviousness analysis commits the same methodological errors this Court identified previously.

**2.** Whether the legal conclusion of nonobviousness of the renal-impairment and particle-size claims must be reversed where the district court repeated its earlier methodological errors, again relied on an unclaimed "mild" limitation for the renal-impairment claims, again misapplied the law of teaching away, and failed to treat particle-size as a result-effective variable.

**3.** Whether Janssen's secondary-considerations evidence fails to support the judgments.

## STATEMENT OF THE CASE

The relevant facts are summarized in this Court's previous opinion, 97 F.4th at 918-24, and explained in greater detail below.

In 2018 and 2019, Janssen separately sued Teva and Mylan, alleging infringement of the '906 patent based on their respective ANDAs. Teva stipulated to infringement, and Janssen prevailed at a bench trial

on invalidity. Appx2201-2295 (571 F.Supp.3d 281). Janssen and Mylan agreed to be bound by the Teva case's result. On Teva and Mylan's consolidated appeals, this Court vacated and remanded for further proceedings on obviousness. Based on new briefing and the original *Teva* trial record, the district court again upheld the claims. Appx1-62 (opinion); Appx66-70 (judgments). These appeals arise from that decision.

### A. Schizophrenia and Antipsychotic Drug Development

Janssen's '906 patent recites dosing regimens for administering paliperidone palmitate to a patient needing treatment for schizophrenia or related disorders. Most relevant here, the claims recite two loading doses (150 mg-eq. and 100 mg-eq.), followed by one or more monthly maintenance doses (25-150 mg-eq.). Subsets of claims recite lower doses for renally-impaired patients, or specify a particle size.

Schizophrenia is typically treated with antipsychotic drugs. Appx10084(84:22-24). By the early 2000s, antipsychotics were widespread, and development followed a pattern. Developers would first identify an active molecule, then release an oral daily-use formulation, then a *long-acting injectable* ("LAI" or "depot") formulation. Appx10208-

10209(208:1-209:4); Appx10097(97:17-19). To convert an oral formulation to an LAI, developers typically link the active molecule to a fatty-acid to make an ester. *See* Appx10085-10086(85:17-86:4); Appx13248. Janssen's antipsychotic haloperidol followed that pattern. Janssen released an oral formulation first, Appx10746(746:1-6); Appx11899-11900(1899:11-1900:21), then an LAI form (haloperidol decanoate) in the 1980s. Appx12655(2709:14-18); Appx11892-11893(1892:16-1893:4).

### B. Paliperidone Palmitate and Invega Sustenna

This case concerns Janssen's Invega Sustenna, an LAI antipsychotic. Invega Sustenna contains paliperidone palmitate, a fatty-acid ester of the active molecule paliperidone.

Paliperidone is a metabolite of risperidone, an older antipsychotic. Janssen first released a daily-oral risperidone drug ("Risperdal"), Appx10096(96:8-9); Appx10165(165:8-17); Appx16244, then an LAI ("Risperdal Consta"). Appx10097(17-23); Appx12656(2710:3-5); Appx17911. Janssen found that some risperidone metabolized into paliperidone (9-hydroxy-risperidone),[1] and that risperidone and paliperidone

[1] Appx10210(210:2-7); Appx10275-10276(275:23-276:5); Appx10746 (746:1-13); Appx13238(1:54-65); Appx10096-10097(96:12-97:16); Appx10098(98:6-9); Appx10208-10209(208:1-209:4); Appx16271.

worked together to alleviate psychotic symptoms. Appx10166(166:21-24); Appx16250; Appx16271; Appx16279-16280.

Janssen patented the paliperidone compound in 1992, Appx18049; Appx18059(cl.1) (U.S. Patent 5,158,952); Appx12146-12147(2146:22-2147:10); Appx12660(2714:1-11); *see* Appx13300, and patented paliperidone palmitate in 1993 and 2000. Appx13292 (5,254,556, claiming "*$C_{2\text{-}20}$ alkanoic acid ester*"); Appx13239(3:56-64) (palmitic is "$C_{16}$"); Appx13297-13298 (6,077,843, cls.1-2).

Janssen released an oral paliperidone drug, Invega ER, in 2006, Appx10099-10100(99:23-100:4), and released Invega Sustenna (LAI paliperidone palmitate) in 2009. Appx11106(1106:10-19); Appx11.

### C. Main Prior Art

By the '906 patent's 2007 priority date, Janssen's paliperidone compound patents were more than 15 years into their terms. Appx18049. "[T]he safety of paliperidone, its efficacy for treating schizophrenia, and its recommended dosing were all well established." 97 F.4th at 921.

Paliperidone palmitate's chemistry and pharmacology had been well-explored in Janssen's follow-on patents and applications, which disclosed, *e.g.*, LAI formulations, injection sites, dosing regimens, methods

of treating schizophrenia, the importance and effect of particle size, and the "therapeutic window" in which a drug's blood-plasma concentration is associated with efficacy but not increased side effects.

To show obviousness, Teva relied primarily on three references: **(1)** a Janssen patent disclosing doses and LAI formulations of paliperidone palmitate ("'544 patent"), **(2)** a Janssen application disclosing the same claimed formulation and dose ranges as the '906 patent ("WO'384"), and **(3)** a published Phase III clinical protocol disclosing regimens with loading and maintenance doses of paliperidone palmitate ("'548 protocol").

#### 1. The '544 Patent Disclosed Paliperidone Palmitate Formulations, Uses, Doses, Therapeutic Window, Injections, Particle Size, and Durational Efficacy.

Janssen's '544 patent (Appx13237-13243) was in force from 2003 to 2018, and listed in the Orange Book for Invega Sustenna. Appx17768. It claimed LAIs of paliperidone palmitate with particles in the same nanoparticle-size range as claimed in the '906 patent. Appx13237. The specification also disclosed clinical aspects of paliperidone palmitate. 97 F.4th at 923-24.

***Formulation and Uses.*** The specification taught administering "therapeutically effective" amounts of paliperidone palmitate formulations to treat schizophrenia and other psychotic disorders, Appx13241(8:9-17); Appx2216 n.20, and disclosed a complete formulation for injection:

| Formulation (w/v) | |
|---|---|
| 9-hydroxyrisperidone palmitate | 7.02% (4.5% 9-hydroxyrisperidone) |
| polysorbate 20 | 1.1% |
| sodium carboxymethyl cellulose 30 mPa.s | 1% |
| benzyl alcohol parenteral | 1.5% |
| disodium hydrogen phosphate anhydrous | 0.9% |
| sodium dihydrogen phosphate monohydrate | 0.6% |
| water q.s. ad | 100% |

Appx13241-13242(8:60-9:8).

***Dose Amounts***. Therapeutic paliperidone palmitate doses "should range from about 2 to 4 mg/kg body weight." Appx13241(8:17-20); *see* 97 F.4th at 923 n.2; Appx10283(283:3-15); Appx10284(284:16-21).

***Therapeutic Window and Duration of Efficacy***. The specification disclosed a "therapeutic window" for paliperidone. Appx13238(2:43-50); Appx10285-10287(285:9-287:13); Appx11540(5-16); Appx14196. It "emphasize[d] the ability to space out administrations by three weeks to a month" based on "investigations into the development of an efficient,

well-tolerated, sustained or delayed release (depot) formulation of a [paliperidone] alkanoic acid ester which is therapeutically effective for at least three weeks or more." 97 F.4th at 923; *see also* Appx13238(2:38-43); Appx13241(8:17-19).

***Injections***. The disclosed formulations are "for administration by intramuscular or subcutaneous injection." Appx13239(3:11-17).

***Effect of Particle Size***. Paliperidone palmitate's pharmacokinetics—"absorption, distribution, metabolism and excretion," Appx10291-10292(291:20-292:4)—"*depend on the particle size* to a much larger extent than previously held possible." Appx13239(3:46-55). Micronized (larger than nano-sized) particles have an undesirable, "exceptionally longlasting effect in humans," Appx13239(3:46-55); *see* Appx10291(6-19); Appx11777(1777:3-21). To avoid that problem, the '544 specification explains, paliperidone palmitate LAIs should use nanoparticles below a certain size (4 $m^2$/g specific surface area, corresponding to approximately 2,000 nm average particle size). Appx13239(3:65-4:3); *see* Appx10294(294:2-17); Appx11522-11524(1522:22-1524:3).

***Control of Particle Size.*** The specification explains how to control particle size with conventional milling, Appx13240(6:10-17);

Appx10294(294:20-25); Appx11781(1781:17-19), and provides four example formulations:

| Formulation | Milling Time | Particle Size (nm) | | | SSA |
|---|---|---|---|---|---|
| | | d(10) | d(50) | d(90) | |
| Formulation A | 0 hours | 2510 | 6030 | 7640 | 1.3 |
| Formulation B | 4 hours | 620 | 1380 | 6830 | 6.5 |
| Formulation C | 7 hours | 520 | 740 | 1150 | 13.5 |
| Formulation D | 38 hours | 430 | 520 | 650 | >15 |

*See* Appx13241-13242(8:44-57, 9:24-31). Higher "SSA" (specific surface area) means smaller particles. "d()" represents percentage distributions. "d(10) 2510 nm" means 10% of particles are smaller than 2510 nm. *See* Appx10294-10296(294:2-296:21).

### 2. WO'384 Disclosed Invega Sustenna's Formulation and Dosing Regimens.

In 2006, Janssen filed WO'384, an international application disclosing improvements over the '544 patent. Appx13299-13323; Appx10300(300:15-22); Appx10302-10303(302:13-303:9).

WO'384 disclosed *the exact formulation* Janssen would later use for Invega Sustenna. Appx10304-10305(304:23-305:3); 97 F.4th at 924. WO'384 also disclosed monthly paliperidone palmitate dosing regimens and pre-filling syringes with target dose volumes of 0.25-1.50 mL of the

formulation, "depending on the dose needed." Appx13317(18:10-15). That range corresponds to 25-150 mg-eq. paliperidone. Appx10305(305:9-21); Appx12163(2163:8-20); *see* Appx10306-10307(306:5-307:9) (explaining conversion).

### 3. The '548 Protocol Disclosed Loading Doses and Dosing Schedules.

In 2005, the NIH published the '548 protocol (Appx13244-13245), a Janssen Phase III clinical study protocol, describing Janssen's "PSY-3003" clinical study. Appx10316(316:4-16); *see* Appx10300(300:23-25). Phase III studies are typically the last "phase," meant to *confirm* safety and efficacy by testing already-successful regimens on a wider population. *E.g.*, Appx10207(207:5-23); Appx10316-10317(316:17-317:2); Appx10758(758:6-25); Appx11124(1124:11-20); Appx11135(1135:5-11). Janssen's expert "testified that the Phase III studies were expected to meet safety and efficacy end-points because of the requisite preexisting Phase I and Phase II data." 97 F.4th at 922. "Teva's expert … similarly testified that a [POSA] would understand that Phase III studies 'us[ed] doses that are thought to be safe and effective.'" *Id.*

The '548 protocol treated schizophrenia patients with four equal injections of 50, 100, or 150 mg-eq. paliperidone palmitate, on days 1, 8, 36,

and 64. Appx13244; Appx10317(317:10-23); Appx10424-10425(424:18-425:7). All those doses are within WO'384's disclosed 25-150 mg-eq. range. Appx10305(9-21); Appx12163(2163:8-20).

The published protocol did not include results, nor are the results themselves prior art. 97 F.4th at 922. The protocol, run as clinical trial PSY-3003, Appx14, was carried out with a "randomization error," where "most patients who were supposed to receive the 150 mg-eq. doses mistakenly received placebo instead." 97 F.4th at 922-23. Janssen also unintentionally injected high-BMI patients' fat tissue instead of muscle. Appx11155-11156(1155:20-1156:23). Janssen called the trial a "failure" because "it did not believe it had sufficient data to obtain FDA approval." 97 F.4th at 923. Nonetheless, normal-BMI patients in the 50 mg-eq. and 100 mg-eq. arms demonstrated substantial efficacy compared to placebo. Appx36478. And the Invega Sustenna label refers to PSY-3003's 100mg-eq. arm as having produced statistically significant efficacy. Appx50081-50082; Appx11130(1130:6-23); Appx20270-20271 ("In another 13-week study (n=349).").

### D. Loading Doses, Injection Sites, and Reduced Doses for Renally-Impaired Patients Were Well-Known.

The ’906 patent claims recite loading doses and injection sites, and permit reduced doses for renally-impaired patients. All are basic concepts, well-known in prior art. Indeed, Janssen’s post-marketing data show most physicians do not follow the claimed regimen. Rather, they modify those known variables for individual patients. Appx17903; Appx11195-11199(1195:18-1199:7). The ’906 patent specification acknowledges that by 2007 skilled artisans “‘could easily determine the effective amount of paliperidone to administer,’ and that for purposes of the ’906 patent’s invention, ‘[t]he amount of paliperidone palmitate is provided in sufficient amount to provide the equivalent dose of paliperidone after the palmitic acid moiety is removed from the ester.’” 97 F.4th at 920.

#### 1. Loading Doses of Antipsychotic Drugs

Loading doses are a “commonly applied principle.” Appx10312(312:7-16); Appx10969(969:10-15). If the body processes a drug slowly, physicians may prescribe more to *start* treatment. This permits the drug to reach a target concentration in the bloodstream sooner,

hastening therapeutic effect. Subsequent "maintenance doses" are given to maintain the target concentration.

The '548 protocol discloses different paliperidone palmitate loading doses. §C.3, *supra*. Two related early-1990s articles, "Ereshefsky 1990" (Appx14113-14120) and "Ereshefsky 1993" (Appx14121-14129), explored loading doses of antipsychotics, and reported positive results treating patients with loading doses of LAI haloperidol decanoate. The FDA-approved Haldol (haloperidol) label taught *unequal* loading doses. Appx11966-11968(1966:1-1968:16); Appx16651-16652. Another article, "Karagianis" (Appx16199-16203), described using a high loading dose with a second-generation LAI antipsychotic, olanzapine.

### 2. Intramuscular Injection Sites

Prior art taught three typical sites for intramuscular injections: shoulder (deltoid), buttock (gluteus), or thigh (vastus lateralis). *See* Appx14133; Appx14183; *see also* Appx10556(6-11); Appx11719(15-17). Each had well-understood tradeoffs concerning factors like blood flow, pain, individual patient preferences, and acceptable needle length.[2]

[2] *See* Appx14133-14134; Appx14183; Appx10324(324:3-11); Appx10857(857:15-20); Appx11180-11181(1180:18-1181:2). Appx14134; Appx10398(398:7-12). Appx14133.

Prior-art paliperidone palmitate trials in 2005 and 2006 used deltoid and gluteal injections. Appx16204; Appx16206; Appx10280(1-15).

### 3. Reduced Doses for Renally-Impaired Patients

Prior art taught that for drugs metabolized by the kidneys—including paliperidone—patients with reduced kidney function should receive reduced doses. It was known by 2007 that paliperidone is excreted mainly through the kidneys. Appx16297(¶¶6,39); Appx10328-10329(328:25-329:6); Appx11585-11586(1585:20-1586:10). Patients with reduced kidney function metabolize paliperidone more slowly, risking over-accumulating if given the same dose as others. Appx14112; Appx10330(7-12); Appx10330-10331(330:24-331:5) (paliperidone exposure "basically doubl[es]" for renally-impaired patients). Prior art thus taught reduced paliperidone dosing for renally-impaired patients. Appx10331(331:6-9). Janssen's labels for Invega ER (oral paliperidone) and Risperdal (the risperidone compound that metabolizes to paliperidone)—both prior art—advise half-doses for renally-impaired patients. Appx16233; Appx10098(98:10-17); Appx17941-17942.

### E. Janssen's Asserted '906 Patent

The '906 patent issued in 2016 and expires in 2031. It claims priority to December 2007. Janssen asserted claims 1-21. The parties agreed claims 2, 10, 13, 20, and 21 were representative. 97 F.4th at 919.

#### 1. All Claims Recite Two Loading Doses, Then One or More Maintenance Doses.

Claims 1, 4, 8 and 11 are independent. Claim 1 recites "[a] dosing regimen for administering paliperidone palmitate *to a psychiatric patient* in need of treatment for schizophrenia" or related disorders. The regimen comprises two deltoid-injected "loading" doses: **(1)** "about 150 mg-eq." on the first day, and **(2)** "about 100 mg-eq. … on the 6th to about 10th day," then **(3)** a deltoid- or gluteal-injected "maintenance dose of about 25 mg-eq. to about 150 mg-eq. … a month (±7 days) after the second loading dose." Appx174.

Dependent claim 2 adds that "subsequent maintenance doses" are in the same 25-150mg-eq. range and likewise given "at monthly (±7 days) intervals." *Id.*

All other independent claims recite similar regimens. Claim 4 copies claim 1, with two changes: the patient needs treatment "for psychotic disorder," and the second loading dose is "on the eighth day of treatment."

In these claims, "loading" simply means the first two doses. The claimed maintenance doses can be the same amount as either loading dose. And all claimed "doses" are within prior-art ranges. The '548 protocol teaches the claimed loading-dose amounts. WO'384 teaches the same range of maintenance doses.

The '906 specification and other evidence confirm that Janssen selected the claimed regimens from among others that all worked as expected. The specification has no working examples of the claimed regimens. Nor does it suggest the claimed regimens are critical or even optimal. *Indeed, it states that numerous other "optim[al]" loading-dose regimens exist*, such as 100 mg-eq. on days 1 and 8, or 150 mg-eq. only on day 1, followed by 25, 100, or150 mg-eq. maintenance doses *starting on day 8*. Appx170(23:16-24).

The Detailed Description contains "examples" summarizing studies, including a portion that *copies verbatim* from WO'384's description of making the Invega Sustenna formulation and filling syringes with particular amounts. The '906 patent's tables 1, 2, and 3 are identical to WO'384's tables 5, 6, and 7. *Compare* Appx13315-13317(tbls.5-7), *with*

Appx165-166(tbls.1-3); *see also* Appx12136(2136:16-19); Appx10552(552:14-23); Appx10555(555:5-8).

Janssen chose to claim the 150/100 mg-eq. loading-dose regimen for regulatory and business reasons—the company's desire to "[b]alanc[e] getting enough patients into the therapeutic window and not pushing them over the top." Appx11038(1038:5-6); Appx11213(1213:8-14). The original claims recited first and second loading doses ranging from 100-150 mg-eq. *See* Appx18113(cl.1). After Janssen chose 150/100 for the commercial label, the claims were amended accordingly. Appx18613-18621.

#### 2. Claims 8, 11, and Dependents Recite Lower Doses for "Renally Impaired Patients."

Claims 8 and 11 copy claims 1 and 4, respectively, with three changes: **(a)** claims 8 and 11 recite "a *renally impaired* psychiatric patient," **(b)** both loading doses are "from about 75mg-eq." (instead of "about" 150 and 100), and **(c)** the maintenance dose range is "about 25 mg-eq. to about" either 75 mg-eq. (claim 8) or 50 mg-eq. (claim 11) (instead of about 25 to 150). *See* Appx174-175. Janssen selected the recommended dose for renally-impaired patients based on computer modeling, as it did not conduct a clinical study. Appx11214(1214:3-10).

#### 3. Claims 19-21 Recite an "Average Particle Size."

Claims 20 and 21 depend from claim 19. Claim 19 recites "[t]the dosing regimen of claims 1, 4, 8 *or* 11 wherein…" Appx175(34:32), and includes the following "particle size" limitation:

> 156 mg/ml of the paliperidone palmitate having *an average particle size* (d50) of from about 1600 nm to about 900 nm.

Appx175(34:35-37).

### F. The District Court Initially Rejects Defendants' Obviousness Challenge; This Court Vacates and Remands.

In 2018, after Teva submitted an ANDA for a generic version of Invega Sustenna, Janssen sued, asserting infringement of all claims (1-21) of the '906 patent. Teva stipulated to infringement, and the district court held a bench trial in October 2020 on invalidity, with claims 2, 10, 13, 20, and 21 agreed upon as representative. The district court ruled in Janssen's favor, Appx2201-2295, and Teva appealed.

In a parallel case, Janssen sued Mylan over Mylan's ANDA, and the parties agreed to be bound by the Teva case's disposition. Mylan's and Teva's appeals were consolidated.

In April 2024, this Court issued a unanimous, precedential opinion vacating the district court judgments, and remanding for further proceedings on obviousness. 97 F.4th 915. The district court's "analysis ran

afoul of *KSR*'s basic mandate in a number of ways," *id.* at 931, and the errors ran so deep that they "prevented" the district court "from carrying out its factfinding role." *id.* at 927-28.

*First*, the district court required Teva to prove obviousness of unwritten claim limitations. *Id.* at 926-27. "[M]isunderstanding[s] about the claims … affected the district court's analysis and factfinding" in numerous ways, for example distorting consideration of "unequal loading doses (even where the loading dosage *amounts* were undisputedly disclosed in the prior art, both as a particular dose and as a point within a disclosed range)," and "analysis of reasonable expectation of success," which had "minimal explanation." *Id.* at 926-27.

*Second*, "the district court's analysis was erroneously rigid" because it "analyzed the prior art without giving the needed weight to the perspective of a POSA capable of deducing what references fairly suggest or employing ordinary creativity" and "inflat[ed] the significance of minor variations between the prior art and the claims." *Id.* at 928. For example, the court erred by "simply discarding" the '548 protocol on the reasoning that "in the pharmaceutical context, if a prior art reference does not contain safety and efficacy data, there is no reason to combine it with other

prior art references." *Id.* The district court erroneously concluded the '548 protocol "simply would not be modified"—an error that "carried through the remainder of its obviousness analysis." *Id.* at 929-30. The same error led the court to "erroneous findings regarding modifications to loading doses and injection sites" by "presum[ing] significance based on the unequalness" without "considering whether the differences ... would be significant to a POSA." *Id.* at 930.

*Third*, the district court improperly discounted the full scope of the prior art's teachings to a POSA based on a determination that a reference's "failure to *expressly* teach ... was sufficient to reject Teva's arguments." *Id.* at 931 (internal quotations omitted).

Those were far from the only errors. Among others, the district court applied the wrong test for teaching away, *id.* at 931-32, applied the wrong reference point for unexpected results, *id.* at 933-34, provided no "analysis of nexus" for secondary considerations, *id.* at 935, and its "blocking-patent analysis rested on two faulty premises," *id.* at 936. For those reasons and more, this Court ordered a remand for further proceedings on obviousness.

### G. On Remand, the District Court Issues a New Opinion Reaching the Same Result.

On remand, the parties submitted new briefs limited to the original bench-trial record. Teva and Mylan contended that once the previous opinion's errors were corrected and the proper legal standards applied, the '906 patent's claims were obvious. For its part, Janssen downplayed the errors this Court identified. Where this Court did not explicitly address individual findings (unnecessary, given the vacatur and remand), Janssen labeled those findings not "disturbed." Appx2419; Appx2424; Appx2427; App2467; Appx2484; Appx2491. Janssen re-raised unsuccessful arguments from its earlier appellate brief, and urged the district court to "clarify" that it did not actually make certain errors this Court identified. Appx2438; Appx2451; Appx2453; Appx2455; Appx2458; Appx2482. In substance, Janssen urged the district court to reach the same result as before, for the same reasons.

Janssen also relied on the Delaware district court opinions in *Tolmar*—a separate case with different prior art, different evidence, and different arguments. *Janssen Pharms., Inc. v. Tolmar, Inc.*, 718 F.Supp.3d 394 (D. Del. 2024) ("*Tolmar I*"). Tolmar asserted obviousness based on "Kramer" and the '548 protocol. After the court concluded "Kramer" was

not prior art, *id.* at 412, 424, Tolmar was left relying on the ’548 protocol *alone*. *Id.* at 424. Tolmar’s challenge failed, in part because—unlike here—“Tolmar’s arguments regarding motivation and a reasonable expectation of success *depend[ed] heavily on Kramer*,” *id.* at 428. Tolmar’s presentation was “entirely different” from Teva’s. 2024 WL 2972832, at *3.

The district court here adopted Janssen’s approach. The court declared that its new opinion was “in accordance with the Federal Circuit’s instructions,” Appx4, and free of errors this Court identified. *E.g.*, Appx14; Appx30. But it reached the same result as before, on materially similar reasoning. Likewise, the court acknowledged that *Tolmar* involved a different record, Appx11, but nonetheless cited *Tolmar* to support narrow readings of prior art, effectively penalizing Teva and Mylan for apparent gaps in Tolmar’s evidence. *E.g.*, Appx33.

Although all of claim 2’s doses fall within prior-art ranges for the same drug, the district court declined to apply a presumption of obviousness. The court believed no presumption can apply when the claims have

more than one difference from prior art. Appx37. "[E]ven if the presumption of obviousness applied," the court added, "it would be rebutted by secondary considerations." Appx38.

The court did correct its earlier error of treating the deltoid injection site as a significant difference from prior art. Appx35-36. But for the claimed "loading doses," it doubled down on its earlier errors of "presum[ing] significance based on the unequalness itself," and "discount[ing] potential teachings related to unequal dosing generally because the references presented other dissimilarities from the claims." 97 F.4th at 930. It upheld claim 2 *entirely* because of what it called "unequal, decreasing" loading doses—presuming significance of the unequalness itself, *and* of the fact of the second dose being less than the first. Appx19-35. The court again discounted prior art for not teaching *exactly* the same thing as the claims. For example, (1) Ereshefsky taught "reduction of *maintenance* doses, not *loading* doses"; (2) Ereshefsky and the Haldol label used a different drug; and (3) the '548 protocol "*alone*" did not "establish a reasonable expectation of success." Appx24; Appx26-27; Appx31-32.

The court upheld the renal-impairment claims again, principally because those regimens were not an exact multiple of any individual

prior-art dosing regimen—a point it called "important." Appx42; Appx39. The court again limited its analysis to "mild" renal impairment. Appx39-40.

The court upheld the particle-size claims again, reasoning that the prior-art '544 patent implicitly "teaches away" from a formulation it explicitly discloses, by performing comparatively more testing on other formulations. Appx43-47.

Finally, the court again accepted all of Janssen's secondary-consideration arguments, while rejecting Defendants' blocking-patents arguments. Appx47-62. As before, the district court did not assign that evidence any meaningful weight, concluding that secondary considerations "reinforce, *but are not critical to*, the Court's previous finding of nonobviousness." Appx61.

The district court entered final judgments in both cases. Teva and Mylan appealed.

## SUMMARY OF ARGUMENT

**I.A.** The district court legally erred by not finding *prima facie* obviousness of claim 2 based on overlapping ranges. The claimed loading doses are a result-effective variable and within prior-art ranges disclosed,

*e.g.*, in the '548 protocol and WO'384. Claim 2's loading dose amounts are not "critical" or "optimal"; Janssen chose them subjectively, from among *many other* permutations that were *all* expected to work and did work. The district court incorrectly held that presumptive obviousness applies only when there is a *single difference* between the invention and the prior art. The claimed dosing values and intervals are presumptively obvious, and undisputed evidence shows the claimed values were not special or critical.

**I.B.** Alternatively, regardless of presumptive obviousness, the district court committed the same analytical errors this Court identified before. The '906 patent's claims are all directed to using a known drug, for a known purpose, at known intervals, in amounts known to be safe and effective, injected into one of three standard sites. The only patentable difference the district court identified between the claims and prior art was the "unequal, decreasing loading doses." Appx19-35. In finding them nonobvious, the district court wrongly presumed the significance of differences between claims and prior art; considered prior-art references in isolation; conflated prior-art teaching alternatives with implicit teaching away; required a degree of *precise* motivation for *specific* regimens with

no basis in the law; and effectively demanded a *guarantee* of success instead of a reasonable expectation. Correctly analyzed, on the undisputed facts, these claims are obvious.

**II.A.** The nonobviousness judgment should also be reversed for the renal-impairment claims. The district court again erroneously required *explicit disclosures* in individual references. Despite this Court's admonition that the claims had no "mild" limitation, the district court again assessed only motivation to reduce doses for "mild" impairment because that was purportedly "Teva's theory." That clearly misreads the record, and adopts an argument this Court rejected in the previous appeal. Finally, the court applied an improperly loose standard for "teaching away" that would transform prior-art *silence* into *nonobviousness*, despite other references explicitly encouraging reduced doses for mild impairment.

**II.B.** The nonobviousness judgment should also be reversed for the particle-size claims. Particle size is a result-effective variable; the prior art taught how it affects paliperidone performance and how to make those adjustments, rendering the claims obvious. The district court's contrary ruling depends on finding that the prior-art '544 patent "teaches

away," even though it undisputedly discloses *and claims* the same particle size. This Court previously admonished that the correct inquiry is whether prior art "criticize[d], discredit[ed], or otherwise discourage[d]" the claimed invention. 97 F.4th at 932. On remand, the district court again found "teaching away" from alternatives and silence. And in any event, disclosing lesser-preferred but still workable options—as the prior-art '544 patent does—is not "criticism, discrediting, or discouragement."

**III.** This Court need not reach secondary considerations to reverse, as the district court found they only "reinforce[d]" and were "not critical to" its nonobviousness conclusion. In any event, the secondary-considerations analysis is wrong on the substance and provides additional grounds for reversal. Janssen's "industry praise" consists of two articles, which both lack nexus to the claims. Janssen's "skepticism" examples principally concern regulatory review and approval, not medical use of the regimen. And Janssen's touted "long-felt need" and "commercial success" are weak on their own and undermined by Janssen's thick layer of blocking-patent protection that prevented anyone else from meeting any "need" for paliperidone palmitate with any "commercial" product.

## STANDARD OF REVIEW

Obviousness is a question of law, based on underlying facts. 97 F.4th at 925. Following a bench trial, legal conclusions are reviewed *de novo*, and factual findings are reviewed for clear error. *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982). If "the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed," then the finding is clearly erroneous, even if there is "evidence to support it." *Concrete Pipe & Prods. of Cal. v. Constr. Laborers*, 508 U.S. 602, 622 (1993). "[I]f the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Inwood*, 456 U.S. at 855 n.15.

## ARGUMENT

### I. The District Court Erred by Upholding Claim 2 Based on "Unequal, Decreasing Loading Doses."

Obviousness compares the claimed invention as a whole to the prior art. If the "differences … would have been obvious" to a POSA at the patent's critical date, the claim is invalid. 35 U.S.C. §103. Obviousness generally requires proof that a POSA "would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and

… a reasonable expectation of success." *In re Cyclobenzaprine Hydrochloride Patent Litig.*, 676 F.3d 1063, 1069 (Fed. Cir. 2012).

Here, the differences between the claims and prior art are trivial. The closest prior art—the '548 protocol—differs from claim 2 in two ways: the first two ("loading") doses are **(1)** injected into the deltoid (not the gluteus), and **(2)** are 150mg, then 100mg (not 150-150, 100-100, or 50-50). The district court correctly concluded the injection site was a distinction without a difference. Appx35-36. It upheld claim 2 based *solely* on "unequal, decreasing loading doses." Appx19-39. This Court should reverse for either or both of two reasons.

### A. The Court Should Reverse Because the District Court Legally Erred by Not Finding *Prima Facie* Obviousness.

#### 1. Claims to Values Within Prior-Art Ranges Are *Prima Facie* Obvious.

*KSR* rejected a "rigid" approach to obviousness that unduly limits the prior art and a POSA's motivation to modify it. 550 U.S. at 415. The proper analysis is "expansive and flexible," not "confined by…overemphasis on the importance of published articles and the explicit content of issued patents." *Id.* at 415, 419. Courts must "take account of the inferences and creative steps that a [POSA] in the art would employ." *Id.* at

418; *see* 97 F.4th at 925. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416.

Consistent with *KSR*, this Court and its predecessor "recognize[] that 'where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation.'" *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed. Cir. 2018) (collecting cases). That is because "the normal desire of scientists or artisans to improve upon what is already generally known *provides the motivation*" to discover optimum or workable values. *In re Peterson*, 315 F.3d 1325, 1329-30 (Fed. Cir. 2003). Applying that principle, precedent holds that claims to values within *prior-art ranges* are "prima facie" obvious—sometimes called a "presumption of obviousness." *DuPont*, 692 F.3d at 1006; *see Almirall LLC v. Amneal Pharms., LLC*, 28 F.4th 265, 272 (Fed. Cir. 2022).

The presumption "does not shift the burden of persuasion to the patentee," but it recognizes that absent "evidence indicating that there is *something special or critical about the claimed range*, an overlap suffices

to show that the claimed range was disclosed in—and therefore obvious in light of—the prior art." *DuPont*, 692 F.3d at 1008.

#### 2. The District Court Erred by Not Finding Claim 2 *Prima Facie* Obvious, as the Claimed Loading Dose Amounts are Undisputedly Within Prior-Art Ranges.

The district court should have found claim 2 *prima facie* obvious. The '548 protocol is undisputedly the closest prior art. Appx17. As noted, claim 2 differs from the '548 protocol in two ways: the "loading" doses' injection site, and their amounts. The district court correctly concluded the injection site was an obvious distinction. Appx35-36. That left only the claimed *amounts* (150mg-eq/100mg-eq).

This Court recognized that "the loading dosage *amounts* were undisputedly disclosed in the prior art, *both as a particular dose and as a point within a disclosed range*." 97 F.4th at 926 (original first emphasis). The '548 protocol specifically discloses both loading-dose amounts. Appx13244; Appx10317(317:10-23); Appx10424-10425(424:18-425:7). WO'384 bolsters that disclosure by teaching the range from 25-150mg-eq. Appx13317; *see* Appx10305(305:9-21); Appx12163(2163:8-20). Together, *at least* those references are sufficient for *prima facie* obviousness.

Moreover, undisputed evidence confirmed that "the general conditions" of LAI paliperidone palmitate dosing were well-known to skilled artisans such that it cannot have been inventive to choose a workable regimen. Prior art taught to base dose amounts on body weight. *E.g.*, Appx13241(8:17-20); Appx10283-10284(283:3-15, 284:16-21). *See* 97 F.4th at 923 n.2. Indeed, Janssen's expert Dr. Sinko admitted that a POSA would "be able to figure out what an optimal dosing regimen whould be." Appx12202(2202:9-19).

The district court reasoned, however, that "the presumption cannot apply because the dosage amounts are not the '*only* difference from the prior art.'" Appx38 (quoting *In re Kumar*, 418 F.3d 1361, 1366 (Fed. Cir. 2005)). Pointing to the claimed "sequence" (150mg then 100mg) and injection site, the court held that the presumption cannot apply if there are multiple differences between a claim and prior art. Appx38.

That was legal error. *Kumar* says: "A *prima facie* case of obviousness *may be made* when the only difference from the prior art is a difference in the range or value of a particular variable." 418 F.3d at 1366. That is an example, not a limit.

Since at least 1955, precedent has applied the doctrine even when there are multiple differences between the claims and prior art. *In re Aller*, 220 F.2d 454, 456 (CCPA 1955) ("[A] change in temperature, or in concentration, *or in both* would be an unpatentable modification."). Modern precedent is the same. *Valeant Pharms. Int'l v. Mylan Pharms. Inc.*, 955 F.3d 25, 31-33 (Fed. Cir. 2020) reversed a nonobviousness judgment, and applied the presumption where prior art recited a pH range *for different drugs* than the claimed drug. *Applied Materials* rejected arguments that multiple differences between the claims and prior art defeated *prima facie* obviousness as a matter of law. 692 F.3d at 1298 ("The mere fact that multiple result-effective variables were combined does not necessarily render their combination beyond the capability of a [POSA]."); *id.* (other variables did not defeat obviousness). *In re Woodruff*, 919 F.2d 1575 (Fed. Cir. 1990) (Rich, J.), likewise applied overlapping-range precedent to uphold an obviousness rejection, though the claimed range was one of "*two differences between the claimed invention and the prior art*." *Id.* at 1578.

In any event, the other purported "differences" are illusory. As the district court correctly found, the deltoid injection site is not a material

difference. Appx35-36. The reference to "sequence" merely double-counts the difference between the two loading dose amounts, and doubles down on the error of "presuming significance based on the unequalness itself." 150 is indeed greater than 100. But the '548 protocol already discloses a "sequence" of first and second loading doses on days 1 and 8, Appx13244-13245, and teaches a "range" of 50-150mg doses that includes both amounts. Other prior art, moreover, disclosed "unequal" loading doses. *E.g.*, Appx16650-16652 (Haldol).

#### 3. Under the Proper Legal Standard, No Evidence Rebuts *Prima Facie* Obviousness.

The district court also ruled that "even if the presumption of obviousness applied, it would be rebutted by secondary considerations." Appx38. That was error. The presumption is rebuttable by evidence that the claimed values are "*special or critical*"—generally **(1)** the claimed values "produce[] a new and unexpected result which is different in kind and not merely in degree" from prior art, **(2)** teaching away from claimed values, **(3)** the claimed parameter was not recognized as "result-effective," or **(4)** the prior-art range is "very broad" so does "not invite routine optimization." *DuPont*, 904 F.3d at 1006. There is no contention that prior-art ranges were "very broad," or that loading-dose amount was not a

known result-effective variable. This Court previously rejected Janssen's "start low and go slow" teaching-away theory. 97 F.4th at 933-34.

That leaves "unexpected results," which must be "different *in kind and not merely in degree*" from prior art. *DuPont*, 904 F.3d at 1006; *Galderma*, 737 F.3d at 739. The point is to demonstrate that the claimed values are *critical*, not merely "optimum or workable." *DuPont*, 904 F.3d at 1006. The question is "whether, as of the priority date, using the claimed dosing regimens yielded unexpected results when compared with a POSA's expectations based on the state of the prior art." 97 F.4th at 934.

Under the proper analysis, there are no unexpected results. The "results" referred to, *e.g.*, at Appx54-55, are *predictions* generated by computer *simulations*, not actual results experienced by patients. Appx41907. On their face, the "predictions" show that the regimen closest to the claims differed from others only in *degree*, not kind. As shown below, the "simulation results" had *all regimens* achieve "concentration threshold … at 1 week" for some patients. Appx41907.

| **Dosing Regimen** | **% of Patients at concentration threshold levels** | |
|---|---|---|
| | **Deltoid** | **Gluteus** |
| 25/100 mg-eq. Days 1/8 | 20% | 8% |
| 50/100 mg-eq., Days 1/8 | 49% | 26% |
| 100/100 mg-eq., Days 1/8 | 73% | **52%** |
| 150/100 mg-eq., Days 1/8 | **84%** | **66%** |

Because the model simulated administering the second dose on day 8, it is only predicting the first dose's effect. The difference between 84% (the claimed first loading dose) and 66% or 52% (the '548 protocol's first loading doses) is only a matter of degree. *See In re Harris*, 409 F.3d 1339, 1344 (Fed. Cir. 2005) (32-43% increase is not a "difference in kind.").

A Janssen presentation showing simulated results at day 36 is no different (Appx54693, showing 84% versus 76%):

**Estimated % of patients in each scenario that exceed 7.5 ng/mL on Day 8 & Day 36**

| Regimen | Day 8 | Day 36 |
|---|---|---|
| 75 / 75 Day 1/8 deltoid | 64 % | 68 % |
| 100/100 Day 1/8 deltoid | 73 % | 76 % |
| 150/100 Day 1/8 deltoid | 84 % | 84 % |

The '906 patent specification indicated that *only unclaimed* dosing regimens actually achieved day-8 efficacy, and characterized multiple such

regimens as "optimized" and better than placebo. Appx170(23:16-24); Appx170(23:26-24:26); Appx172(28:3-7); Appx174(31:30-49).

The proper question is whether the claimed regimen's results *relative to other regimens* in the prior-art range, if different in kind, were "unexpected." *E.g.*, *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1334 (Fed. Cir. 2014); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1370-71 (Fed. Cir. 2007). On the undisputed facts, the answer is no.

The district court found "unexpected results" by asking a different question. Appx54-57 & n.39. Because the '548 protocol had no results, the court reasoned that a POSA would expect *nothing* from *any* of that protocol's dosing regimens other than some safety and efficacy, and nothing about *onset* of efficacy. Appx54. From that artificially-lowered baseline, the court reasoned that *any* "results" of rapid efficacy and extended tolerability would be "surprising to a POSA." Appx55. Precedent rejects that reasoning. *Pfizer*, 480 F.3d at 1371 ("We will not presume that the [POSA] would have expected … the same characteristics as [prior art] because, as Pfizer asserts, its properties are not absolutely predictable."); *Forest Labs. LLC v. Sigmapharm Labs. LLC*, 918 F.3d 928, 937 (Fed. Cir. 2019) (similar, vacating nonobviousness). By that standard, even if every

imaginable permutation of dosing regimens performed *identically*, Janssen could still call its results "unexpected" on the reasoning that a POSA would expect nothing and be surprised by anything.

It is no answer that Janssen's internal testing is not prior art. Appx57 n.39. Janssen's simulations were *Janssen's evidence* of "unexpected results." Teva was not using Janssen's internal data as prior art, but to show the results were not different *in kind* and thus not evidence of non-obviousness. *See Pfizer*, 480 F.3d at 1371.

The district court also contended "[t]he benefits of injecting these high loading doses in the deltoid," as compared to the gluteus, "would have been particularly surprising to a POSA because they would have viewed the deltoid and gluteus as interchangeable." Appx56. That reasoning is inconsistent with its ruling elsewhere that a POSA would be motivated to try deltoid injections and reasonably expect success. Appx35-36. And "interchangeable" in this context means suitable for its intended purpose. All three injection sites were well-known in the prior art, and presented known *tradeoffs*. *Supra* pp.15-16. No evidence suggests a POSA expected *identical* performance and would be surprised by variation.

References to side effects and increased adherence assume the wrong comparison. Appx55-56. The court cited only testimony that other LAI drugs *had* side effects, not that a POSA would have *expected* "intolerable side effects" from the *claimed* regimen involving *this drug*, let alone prior art. The '906 patent's description of prior art admits that monthly LAI dosing (including paliperidone palmitate) was known to "enhance compliance." Appx159(1:58-61); Appx3. On this record, it was error to find "unexpected results" rebutting the presumption of obviousness.

Finally, the district court's passing reference to "other pertinent secondary considerations," Appx38, also cannot rebut the presumption. The court never explained how any purported commercial success, industry praise, or long-felt need constitutes "evidence indicating that there is *something special or critical about the claimed range*." *Dupont*, 692 F.3d at 1008. In any event, as explained below, §III, that evidence is weak in its own right, and cannot support the nonobviousness judgment.

### B. Regardless, the District Court Erred by Upholding Claim 2, Which Only Selects Dosing Regimens From Among Many Others All Known to Be Suitable.

Regardless of *prima facie* obviousness, the decision must be reversed. The *only* patentable difference the district court identified between the claims and prior art was the so-called "unequal, decreasing loading doses." Appx19-35. On the undisputed facts, that is a trivial modification to the prior art. The district court only avoided that result by requiring Teva to show that a POSA would pick Janssen's precise claimed regimen *as opposed to any other specific dosing regimen*, and by repeating its earlier analytical errors.

#### 1. The District Court Repeated its Errors of "Presuming Significance" of the Unequal Loading Doses and Requiring Proof of a "Singular" Motivation to Pursue the Claimed Regimens.

On remand, the district court doubled down on its error of "presum[ing] significance based on [] unequalness itself," 97 F.4th at 930. The court presumed significance based on **(1)** "unequal[ness]" of 150mg-eq. and 100mg-eq., **(2)** "decrease" from 150 to 100, and **(3)** its view that the maintenance doses are "*independent of* the loading doses." Appx18. It dismissed the '548 protocol, for example, as *"requir[ing] the maintenance*

*doses to be equivalent with the loading doses*." Appx18. That repeats earlier errors and adds an unwritten "independence" requirement to the claims. The '548 protocol's regimens doses *are* equal, but it was error to presume a *"requirement"* to that effect.

Similarly, claim 2 recites loading dose *amounts*, then maintenance dose *ranges*. It does not thereby require "*independence*" between the two, nor is that a basis to distinguish prior art. Indeed, by reciting ranges, claim 2 *includes* regimens where the maintenance doses are the same as a loading dose, *e.g.*, 150/100/100/100, or 150/100/150/150. Each differs from the '548 protocol's regimens (150/150/150/150 and 100/100/100/100), only by a single dose. If a skilled artisan would modify *one* dose of the '548 protocol by 50mg-eq., then claim 2 is obvious. *See In re Lintner*, 458 F.2d 1013, 1015 (CCPA 1972) ("Claims which are broad enough to read on obvious subject matter are unpatentable even though they also read on nonobvious subject matter.").

The district court's continued focus on "unequal, decreasing" loading doses, and new focus on "independence," repeat earlier errors. For any numerical sequence, an observer can contrive comparisons or patterns. For example, the sequence 150→100 can be described in any of the

following ways: unequal, decreasing, decreasing by 33%, decreasing by 50, a multiple of three followed by a square number, change of only the tens-place digit, et cetera. But unless a POSA would find such comparisons significant *in the context of the patent* (*e.g.,* if intrinsic evidence or prior art ascribes significance), they do not count as "differences" between a numerical claim element and prior art that must be overcome to show obviousness. *Cf. Valeant*, 955 F.3d at 30 (rejecting similar "basic math" argument).

The district court similarly erred by requiring "motivation … to reach the *specific* dosing regimen of Claim 2." Appx18. It emphasized claim 2's "specific" regimens throughout, while faulting Teva for not showing that a POSA would choose the claimed regimens *over others*. *E.g.*, *id.*; Appx18n.9; Appx27 ("*motivated to achieve the specific sequence* and dosing amounts of Claim 2"); Appx32 (similar, reasonable expectation of success). It is true that obviousness compares prior art to *the claims*, but that does not mean the POSA must be *singularly motivated* to pursue the claims. 97 F.4th at 930 ("[a] POSA can be motivated to do more than one thing… and Teva did not need to show that a POSA would be *singularly motivated to use*" the claimed combination). That is because

obviousness does not require that the claims are the *only* obvious solution, or *more* obvious than others, only "suitable." *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1381 (Fed. Cir. 2023); *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1351 (Fed. Cir. 2020). Everything within a range can be obvious, for example.

It is enough that the highly-developed prior art, *cf.* 97 F.4th at 921, would render obvious most or all regimens that use doses of between 50 and 150 mg-eq. on days 1, 8, 36, and 64. Claim 2 is within that set and therefore invalid. Were it otherwise, patentees could easily evade obviousness by claiming any subjectively-chosen new unique combination of dose amounts from a general teaching in the prior art, and asserting it is not obvious if a POSA would not be motivated *specifically* to select the same combination. If the law worked as the district court applied it, then *any* new regimen—say, 137 mg-eq. followed by 113 mg-eq.—would be separately patentable *today* unless one could find a motivation *specific* to that combination.

### 2. The District Court Repeated its Errors of Siloing Each Piece of Prior Art and Finding Nonobviousness Because No Single Reference Anticipates.

Although Defendants argued that the prior art as a whole taught the claimed regimens, the district court reframed those arguments as a series of siloed, single-reference theories. *See* Appx20; Appx24; Appx26; Appx28 (section headings categorizing "motivations"). It then treated obviousness like multiple-reference anticipation, and dismissed individual prior-art references if they did not contain *exact* disclosures of claim elements. Appx17-35. That was legal error, for the same reasons this Court identified before. 97 F.4th at 928; *e.g.*, *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076-77 (Fed. Cir. 2015); *Duramed Pharms., Inc. v. Watson Labs., Inc.*, 413 F.App'x 289, 294-95 (Fed. Cir. 2011).

#### a. The District Court Erroneously Siloed the Paliperidone-Palmitate-Specific Prior Art.

The district court dismissed WO'384 and the '544 patent because "neither reference discloses a loading dose regimen." Appx19. For that reason alone, the court concluded, "neither … would motivate a POSA to modify the 548 protocol to achieve the loading dose regimen of Claim 2." Appx20. This takes the same rigid, inflexible approach this Court re-

jected. A POSA does not require an *express disclosure* of a specific "loading dose regimen," Appx19, to make trivial modifications to an existing loading dosing regimen.

On this record, the error is egregious. All agreed, and the court found, that a POSA is highly experienced and educated. Appx13. In 2007, selecting paliperidone palmitate doses was not a new frontier. 97 F.4th at 921-22. The '544 patent and WO'384 are closely-related, paliperidone-palmitate-specific references with comprehensive disclosures about *dosing* LAI paliperidone palmitate for schizophrenia. *Supra* pp.8-12; 97 F.4th at 923-24. Among other things, the '544 patent teaches how to calibrate dosing to body weight, and describes the results of "investigations into the development of an efficient, well-tolerated, sustained or delayed release (depot) formulation." *Id.* at 923 (quoting '544 patent).

WO'384 improved on the '544 patent, teaching pre-filled syringes of an LAI paliperidone palmitate formulation in volumes *corresponding to a range of 25 to 150 mg-eq. of paliperidone*. *Id.* at 924; Appx16-17. Specific target volumes would be prepared "depending on the dose needed." Appx13317(18:10-11); Appx10319-10322(322:7-13, 319:17-320:12).

Janssen's expert Dr. Sinko correctly admitted that a POSA with the '544 patent and WO'384 "could look at all the factors in the '544," and "come up with an optimal dosage regimen for a specific patient using '544." Appx11743(1743:7-23). Considering the art as a whole, from a POSA's perspective, the claims are obvious.

**b. The District Court Erroneously Siloed Other Pertinent Prior Art (Ereshefsky, Haldol, Karagianis).**

The district court committed similar errors in its dismissiveness of more general prior-art teachings. The Ereshefsky references comprehensively explain loading-dose principles, and apply them to LAI antipsychotics. *Supra* p.15; *see* Appx11569-11570(1569:24-1570:5); Appx11789 (1789:19-25) (Janssen expert testimony). Karagianis (Appx16199-16203) confirms that loading doses were known for LAI antipsychotics, including "second-generation" drugs (like paliperidone). Appx10313-10314(313:9-314:22). The Haldol label discloses administering two unequal loading doses of a similar LAI antipsychotic. Appx16651-16652. They collectively demonstrate a POSA's "background knowledge," 97 F.4th at 928; inform how a POSA would view other prior art; and confirm that these claims

are "the predictable use of prior art elements according to their established functions." *KSR*, 550 U.S. at 417. They similarly confirm that a loading-dose approach was at least obvious to try by 2007. The district court minimized those references by applying the same erroneous approach, and at times by misreading the record.

***Ereshefsky.*** The district court dismissed the significance of the Ereshefsky references (together referred to as "Ereshefsky," Appx22) for two reasons.

*First*, the court contended Ereshefsky would teach a POSA "that LAIs did not work fast enough to treat *acute conditions*," because in Ereshefsky all patients received oral haloperidol for two weeks "before starting the depot regimen." Appx22. That is error on multiple levels.

For one, neither party contended that a POSA in 2007 would believe LAIs "did not work fast enough." Janssen's expert testified that "speeding onset of efficacy for an antipsychotic drug would be a known important goal … in 2007," and that a POSA looking "to speed onset" would "consider … loading doses." Appx11792-11793(1792:17-23, 1793:2-5). Witnesses on both sides agreed on the need for sufficiently high LAI loading doses to treat acutely ill patients. *E.g.*, Appx12379(2379:4-13 (Kahn));

Appx11212(1212:10-16 (Gopal)). Use of other drugs and strategies in emergencies is not inconsistent, Appx21-22, as POSAs can be motivated to do multiple things, and teaching multiple alternatives is not teaching away. 97 F.4th at 930.

Nor did Ereshefsky's use of oral supplementation somehow teach away from loading doses of LAI antipsychotics. Ereshefsky 1990 taught the loading-dose principle, in the plainest terms: "use a larger initial dose to 'load' the patient, so that therapeutic effects are achieved more rapidly." Appx14115. Ereshefsky 1993 likewise taught administering two *loading doses* of a depot injection. Appx14124; *see* Appx10312-10313(312:1-313:8); Appx10320-10323(320:5-323:1).

Moreover, the district court's "not … fast enough to treat acute conditions" characterization, Appx22, is clear error. Ereshefsky 1990 gives a specific example of a patient who was readmitted to a hospital with severe psychotic symptoms, and given a 100-mg LAI injection "*stat*." Appx14117. Ereshefsky 1993 describes Ereshefsky 1990 as "an earlier study with *acutely* ill patients." Appx14128. Teva's argument was not limited to treating "acutely agitated patients," in any event.

*Second,* the district court dismissed Ereshefsky 1993 because it "teaches the reduction of *maintenance* doses, not *loading* doses." Appx24. But it did not stand alone, and Defendants were not making an anticipation argument. Had the district court "fully assess[ed] the teachings in toto" rather than "tackling the express statements of each reference one-by-one," 97 F.4th at 928, it would have recognized Ereshefsky's teaching of reduced doses as further confirmation that *varying dose amounts* within a regimen was well-known to skilled artisans. In other words, the "unequal, decreasing" refrain describes a distinction without a difference. Indeed, the '906 patent's specification itself at times calls the second dose a "maintenance" dose. Appx170(23:15-24).

***Haldol Label:*** Haloperidol decanoate is an LAI antipsychotic. Appx16640. The FDA-approved Haldol label (Appx16640-16653) explained how to calibrate loading and maintenance doses, and taught that an injectable dose should be approximately 10 to 20 times the daily oral dose—depending on a patient's risk and history, and whether the dose is a loading or maintenance dose. Appx16650-16652. Further, the label instructs that a patient should not receive more than 100mg at once. Thus, if the patient needs "more than 100mg … as an initial dose, that dose

should be *administered in two injections*, *i.e.*, a maximum of 100mg initially, *followed by the balance in 3 to 7 days*." Appx16651-16652. In other words, for any patient who initially needs between 100 and 199mg, the label explicitly contemplates *unequal, decreasing loading doses*. Appx16651-16652; *see* Appx11966-11968(1966:2-1968:16).

The district court, however, read the Haldol label's teachings as strictly limited to the particular drug and the specific numbers on the label, concluding it "*only* recommends multiplying the oral medication by 20 times *if* a patient received more than 10 milligrams a day of the oral equivalent." Appx29. The court dismissed the unequal, decreasing loading dose teaching because—in the court's view—the label potentially *also taught* "the second loading dose would increase." Appx29; *see* Appx28 (finding Haldol label teaches upward dose adjustment, and therefore "teaches the opposite of Claim 2's dosing regimen."). Again, the district court improperly limited the Haldol label to certain of its express teachings, improperly assumed that a reference can teach only one thing, and ultimately discarded the reference because it did not *alone* show obviousness.

Properly analyzed, the Haldol label informs "a POSA's understanding of, or motivation to modify, *the primary references*." 97 F.4th at 928. The label is evidence that, for at least one LAI antipsychotic, skilled artisans knew how to derive injectable dose amounts from oral dose amounts, and that "unequal, decreasing loading doses" was not new or significant. Considering the '548 protocol in that light should have led the district court to invalidate these claims.[3]

***Karagianis:*** Karagianis provides a prior-art example of a high loading dose with a second-generation LAI antipsychotic, olanzapine. Appx16199-16203. The district court dismissed Karagianis in passing, citing Dr. Wermeling's reference to "rapid neuroleptization" and asserting that other testimony "undermine[d] Wermeling's theory." Appx22.

---

[3] The district court's footnoted suggestion that Teva "failed to comply with Local Patent Rule 3.3," Appx26 n.21, is dictum, not an alternative ruling, and need not be addressed. It is unfounded in all events.

The Haldol Label (DTX-149, Appx16640-16653) was on the pretrial exhibit list, introduced during trial without objection, and admitted without objection. Appx11966-11968(1966:2-1968:2); Appx12015(2015:14-17). In the joint pretrial order, Teva indicated it would rely on prior-art "antipsychotic products and their use"; and that "[d]osing regimens of an antipsychotic medication comprising two unequal loading doses were known to be beneficial by a POSA from the prior art." *See* Appx1073-1075. Teva did not fail to comply with Rule 3.3, which does not require all *evidence of motivation* to be disclosed in contentions. *See Celgene Corp. v. Hetero Labs.*, 2021 WL 3701700 *2-3 (D.N.J. June 15, 2021).

That was clear error. Wermeling did not testify that Karagianis taught using olanzapine "to achieve" "neuroleptization." He was explaining what the term "neuroleptization" meant, Appx10313-10314(313:11-314:22) (cited Appx22), and Karagianis itself specifically rejects that treatment. Appx16202(col.2). The quoted Kahn testimony concerns a different reference ("Altamura," *see* Appx12381-12384(2381:14-2384:11)) and does not "undermine Dr. Wermeling's theory." Appx22.

Finally, the district court dismissed prior-art loading-dose teachings more broadly, reasoning that *because* **[1]** both sides experts testified that a POSA would be motivated to modify the particle size, **[2]** a POSA would therefore *not* modify the dose amount. Appx23. That is clear error. The quoted Sinko testimony refers to $T_{max}$ (time to peak plasma concentration)—a parameter describing the body's rate of absorption for a drug, independent of dose. That testimony does not actually "reject the idea that one can 'reach the therapeutic threshold faster' simply by increasing the dose." Appx33. Rather, Sinko agreed that "*increasing the amount of the dose*, you could get into that therapeutic window *faster than with some lower dose*." Appx12113(2113:19-13); *see* Appx12111(2111:17-22).

More fundamentally, the court's reasoning is legal error. A teaching or motivation to modify particle size does not implicitly disparage increasing the dose. Appx23. As the court all but acknowledges, that is a fallacy flagged in the last appeal. "A POSA can be motivated to do more than one thing." Appx23 n.20 (citing 97 F.4th at 930). Obviousness of modifying the dose amount is not negated or diminished by obviousness of modifying the particle size.

#### c. The District Court Did Not Consider the Prior Art as a Whole.

Finally, the district court's errors are not cured by subtitling part of the opinion "Prior Art's Teachings on Motivation in Toto." Appx29. That section merely summarizes and repeats the conclusions drawn earlier by considering each reference in isolation. Appx29-30.

### 3. The District Court's Consideration of Reasonable Expectation of Success Repeats Previous Errors.

This Court admonished in the previous appeal that the district court improperly raised the bar for "success" by asking the wrong question. 97 F.4th at 927. The question is not whether a POSA would expect "success" in the FDA approval process, or success achieving safety and efficacy goals for a generalized "average population of patients." *Id.* Rather, the question concerns "success … for administering paliperidone

palmitate to *a* patient according to the dosing regimen claimed." *Id.* (original emphasis).

The test, moreover, requires "only a reasonable expectation of success, not a guarantee." *Pfizer*, 480 F.3d at 1364. Reasonable expectation of success is not negated by general "unpredictability associated with developing drug formulations," *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013), or that an invention's performance cannot be predicted in advance without testing. *Pfizer*, 480 F.3d at 1364 (citing *In re Corkill*, 771 F.2d 1496, 1500 (Fed. Cir. 1985)). A rule "equating unpredictability to patentability … cannot be the proper standard." *Id.*

Despite acknowledging *Pfizer* and this Court's earlier decision, the district court again did what those cases instruct not to do.

*First*, the court equated "success" with Janssen's FDA-approval goals, emphasizing "the drug development process is very difficult" and "drug trials routinely fail." Appx31. General "difficulty" of the "development process" is exactly what *Allergan* said does not count. 726 F.3d at 1292. And the claims recite nothing about safety, efficacy, or regulatory approval. A trial may "fail" to advance the sponsor's regulatory goals, but that does not negate "success … for administering paliperidone palmitate

to *a* patient according to the dosing regimen claimed," the criterion here. 97 F.4th at 927.

*Second*, the court observed that the claimed regimens are "more complicated" because they use multiple doses. Appx33. That cannot be dispositive, particularly where, as here, prior art also disclosed multi-dose regimens, and all claimed doses are within prior-art ranges. The '548 protocol disclosed three multi-dose regimens. The '544 patent disclosed the therapeutic window, duration of efficacy, the correlation between body weight and therapeutic dose, and numerous other clinical properties. Considering the prior art *as a whole*—including general principles in Ereshefsky and examples in Haldol and Karagianis—a POSA can only have expected "success" from using a known drug, for a known purpose, at known intervals, in amounts known to be safe and effective, injected into one of three standard sites.

It is no answer that the '548 protocol had no results, so "what a POSA can infer from it is limited." Appx33 (citing *Tolmar I*). That may be true of the '548 protocol *alone*, but unlike in *Tolmar* the '548 protocol did not stand alone in *this* record. It bears repeating that two of the '548 protocol's regimens would fall within claim 2 if one loading dose changes

by 50mg-eq. If a POSA would expect success from 150/150/150/150 and 100/100/100/100, there is no reason to expect a different result from 150/100/150/150 or 150/100/100/100 (both within claim 2).

Nor is it responsive to observe that some evidence would support a POSA "utiliz[ing] a *low and increasing* dosing regimen." Appx33. All agree the prior art also taught other regimens. It may be that "severe symptoms occurred more frequently at higher doses," but that is a known tradeoff of higher doses, not an implicit teaching about the relationship between doses in a sequence. More fundamentally, the district court continued to assume that a POSA can only do one thing, and that obviousness of *any unclaimed* regimen somehow negates obviousness of the claims. Precedent is to the contrary. *E.g.*, 97 F.4th at 930. And in all events, the prior art shows that loading doses, including initial low doses, are at least obvious to try depending on *a* patient's needs. On the proper analysis, claim 2—a basic dosing regimen with no safety and efficacy limitations—is obvious.

## II. The District Court Erred by Upholding the Remaining Representative Claims.

The district court's disposition of the renal-impairment claims (Appx39-43) and particle-size claims (Appx43-47) repeats errors this Court corrected in the previous appeal.

### A. The Renal-Impairment Claims (10 and 13) are Obvious.

Claims 10 and 13 mirror claim 2, except that the patient is "renally impaired" and the doses may be lower. The "loading" doses are both "*from* about" 75mg-eq. The "maintenance" doses are within prior-art ranges: "about" 25-75mg-eq. (claim 10) or "about" 25-50mg-eq. (claim 13). The district court even "acknowledge[d] that prior art would have taught a POSA that a dose reduction may be needed for a patient with renal impairment." Appx41 n.26. Prior art undisputedly taught that paliperidone was metabolized through the kidneys. Calibrating paliperidone palmitate doses for renally-impaired patients—generally by lowering the doses—was well-explored in prior art like the Invega ER label and Cleton 2007, which recommend reducing doses for *any* level of impairment. *See* Appx16233; Appx14112; Appx41 n.27. The Invega ER label gives specific numerical doses for patients with mild, moderate, and severe renal impairment. *See* 97 F.4th at 931. Furthermore, as with claim 2, the loading

doses are result-effective variables and thus presumptively obvious. *Supra* §§I.A.2-3*;* 97 F.4th at 931 & n.7.

### 1. The District Court Again Applied an Erroneously Narrow Test for Obviousness.

*KSR* admonished that a POSA is "a person of ordinary creativity, not an automaton." 550 U.S. at 421. This Court cautioned against applying a "siloed and inflexible approach" that "inflated the significance of minor variations between the prior art and the claims." 97 F.4th at 928. The district court nonetheless took such an approach to obviousness on remand, limiting prior art to express disclosures and disregarding a POSA's motivation to make minor changes. The analysis's beginning paragraph repeats, *four times*, that claim 13 is not exactly "50 percent" of any individual '548 protocol regimen. Appx39. Then three pages later: "*[i]mportantly*, reducing any of the '548 Protocol's dosing regimens by 75 percent does not result in the claimed dosing regimens." Appx42.

By requiring Teva and Mylan to identify a specific prior-art regimen that is exactly double or quadruple the claimed regimens, the district court contravened both admonitions. Only an automaton would take the siloed, inflexible approach of considering *only* expressly-disclosed prior-art regimens and *only* alterations that mechanically multiplied all doses

by the same number. Not even Janssen went that far. Its expert Dr. Sinko acknowledged the Invega ER label expressly taught dose reduction for renal impairment, Appx11587-11588, and that "it's not just a straight 50 percent," but "more detailed than that." Appx11588(1588:5-6). A POSA would recognize from prior art—including undisputed teachings about dose calibration for renally-impaired patients—that doses between 25 and 75mg, administered on the schedule of the '548 protocol, would be appropriate for renally-impaired patients.

#### 2. The District Court Again Relied Erroneously on an Unclaimed "Mild" Limitation.

This Court vacated and remanded because the district court erroneously "understood the claims themselves to require administration to patients with *mild* renal impairment." 97 F.4th at 927. This Court explained "there is no such requirement in the claims," and "remanded for the district court to analyze obviousness without a 'mild' limitation added…" *Id.*

Despite acknowledging this Court's reasoning, the district court again limited its analysis to "mild" renal impairment—this time stating

that "Teva's theory of motivation, as presented by its expert Dr. Wermeling at trial, was directed to mild renal impairment." Appx39. That is wrong for at least two reasons.

*First*, this Court rejected that same argument in the previous appeal. Janssen urged this Court to affirm because, according to Janssen, the district court was not adding an unwritten "mild" limitation to the claims, but merely "rejecting Teva's theory of motivation." Janssen Resp. Br., No. 22-1258 ECF#39 at 35-36, 53-54 (Sept. 6, 2022). This Court disagreed, and vacated and remanded. *See* 97 F.4th at 927.

Undaunted, Janssen made the same argument on remand. Appx2453, and the district court adopted it. *Compare* Appx39-40, *with* Janssen 22-1258 Resp. Br. at 36, 53. That was error. This Court necessarily rejected Janssen's argument for affirmance when it vacated and remanded the judgment. Under the mandate rule, that should have been the end of the matter, *see Engel Indus. v. Lockformer Co.*, 166 F.3d 1379, 1382-84 (Fed. Cir. 1999), and is reason enough to reverse.

*Second*—as Defendants explained in the previous appeal, and on remand—Janssen (and now the district court) clearly misread the record. The district court contends Dr. Wermeling "testified that a POSA would

not be motivated to use this medication for a patient with moderate or severe renal impairment." Appx39 (citing Appx10332(332:10-15). Not true. The quoted testimony says nothing about "*motivation*," nor can it be fairly read to limit Teva's obviousness theory to mild renal impairment. When Wermeling said "patients with moderate to severe renal impairment are not to receive this medication," Appx10332(332:10-15), "*this medication*" self-evidently meant Invega Sustenna, whose label says precisely that (Appx13118; Appx13120):

> INVEGA® SUSTENNA™ is not recommended in patients with moderate or severe renal impairment (creatinine clearance < 50 mL/min).

He was not referring to prior-art Invega ER, whose label says the opposite:

> Renal Impairment
> Dosing must be individualized according to the patient's renal function status. For patients with mild renal impairment (creatinine clearance ≥ 50 to < 80 mL/min), the maximum recommended dose is 6 mg once daily. For patients with moderate to severe renal impairment (creatinine clearance 10 to < 50 mL/min), the maximum recommended dose of INVEGA™ is 3 mg once daily.

Indeed, the district court acknowledged in a footnote that the Invega ER label, and Cleton 2007 (discussed on the preceding pages, Appx10330-10331(330:19-331:14)) "*recommend reducing the doses for patients with moderate to severe renal impairment.*" Appx41 n.27. That should have

been a red flag indicating Janssen was misreading Wermeling's testimony and misstating Teva's position. Instead, the court characterized Wermeling as "seemingly ignor[ing]" the very teachings he discussed on the cited pages. *Id.* That was clear error.

Regardless of how one parses that snippet of testimony, it cannot fairly be understood as limiting *Teva's obviousness argument* ("motivation" or otherwise) to *mild* renal impairment. Teva specifically relied on broader prior-art teachings—including on the very pages the district court cites. Particularly in the previous appeal, "mild renal impairment" was *Janssen*'s gambit to avoid prior art, not Teva's position. It should not be used as a "gotcha" to defeat a clear case of obviousness.

#### 3. The District Court's Motivation-to-Combine Findings Apply an Erroneous Conception of "Teaching Away."

The district court "credited" Dr. Sinko's "testimony that Cleton 2007 teaches no dose reduction for those with mild renal impairment," Appx41 & n.26 (citing Appx11586(1586:14-20)), and concluded that prior art *taught away* from reducing doses for patients with mild renal impairment. Appx42. That is legally erroneous.

To "teach away," a reference must "criticize, discredit, or otherwise discourage" the claimed invention. 97 F.4th at 932 (quoting *Galderma*, 737 F.3d at 739). "*Silence* does not imply teaching away," nor does teaching a mere *preference* for other alternatives. *Id.* (quoting *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 964 (Fed. Cir. 2014)). If prior art points in two directions, it generally teaches *both*, not neither. A district court errs when it concludes otherwise, and cannot shield that error from review by purporting to "credit" testimony urging the error. *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985); *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1381 (Fed. Cir. 2010).

That is what the district court did here. Even crediting Sinko's testimony, there can be no "teaching away" as a matter of law. The quoted testimony is only that "*one of the conclusions* [Cleton 2007] came to was for mild renal impairment, that they would not be -- *not needed* to reduce the dose. So no dose reduction for mild renal impairment." Appx11586(586:14-20) (partially quoted Appx41). Where undisputed prior art teaches reducing doses for renal impairment (including mild, as in the Invega ER label), and one reference teaches merely that dose reduction is "not *needed*"—that is not "conflicting references" or "teaching

away." Appx40. It is multiple alternatives. "Not needed," moreover, is not the same as "don't do it." Even as Sinko described it, Cleton 2007 does not "criticize, discredit, or otherwise discourage" dose reduction for mild renal impairment.

Besides, Cleton 2007 does not even *say* dose reduction is "not needed." Even on the district court's account, Sinko conjured that conclusion from textual *silence*. Appx41. Cleton studied all three levels of renal impairment, and only explicitly recommended dose reduction for moderate and severe renal impairment. Appx41. Silence is not teaching away, *Allergan*, 754 F.3d at 964, and expert testimony declaring silence to be teaching away cannot make it so.

Cleton 2007 nowhere *rejects* dose reduction for patients with mild renal impairment. Indeed, like other prior art, it undisputedly recognizes that patients with mild renal impairment metabolize paliperidone more slowly. Appx14112. As Wermeling explained, "[t]wo measures of exposure" are "basically doubling for patients who have renal impairment"—*any* renal impairment. Appx10330-10331(330:24-331:5). None of this was disputed. Reducing the dose of a known renally-metabolized drug for renally-impaired patients is obvious.

### B. The Particle-Size Claims (20 and 21) are Obvious.

The particle-size claims are dependent and recite: "an average particle size (d50) of from about 1600 nm to about 900 nm." Appx175(34:35-37). The '544 patent undisputedly describes and enables a "Formulation B" within that range. Appx13241(8:44-57) (d(50) of 1380nm). The '544 patent's *claims*, moreover *all* include a particle-size limitation ("effective average particle size of less than 2000 nm"). Appx13242(10:28-29). The district court nevertheless held that the '544 patent teaches away by identifying other formulations for further research. Appx43-47. The new opinion is substantively no different from the old, *compare* Appx2230-2233*, with* Appx43-47, and this Court should reverse.

*First*, Janssen told the FDA under oath, and stipulated at trial, that the '544 patent's claim 7 covers Invega Sustenna (average particle size 1600nm-900nm). *See* Appx56412-56414(4.1-4.2b); Appx11759-11760(1759:11-1760:5). Those statements are binding, conclusive, and foreclose "teaching away." *See Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 676-78 (2010); *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007). As Defendants explained below, the '544 patent cannot simultaneously *claim* the Invega Sustenna particle size,

*and* implicitly disparage it. *E.g.*, Appx2545-2546; Appx2589 & n.11; Appx1420-1421 n.4. That is reason enough to reverse.

*Second*, the district court again fails to "apply the correct test for teaching away." 97 F.4th at 932. It recited the right test this time, *e.g.*, Appx44-45, but its analysis is substantively unchanged.

It is undisputed that the '544 patent identifies four formulations (A-D); that formulation B discloses the particle-size limitation at issue here; that all four formulations were tested on beagles; and that the patent does not *explicitly* discourage formulation B. *See* Appx13242(9:33-55); Appx11533(1533:12-18); Appx11785(1785:7-13). Janssen's teaching-away argument was (and is) that the patent *implicitly* teaches away from formulation B and its particle size because its inventors selected formulations C and D for further research and it recites a "preferred" d(90) value. *E.g.*, Appx2231-2232 (previous district court opinion); 22-1258 Janssen Resp. Br. at 52. The district court previously accepted that argument, "credit[ing]" Janssen's expert testimony to that effect. Appx2232. This Court vacated, observing "[a] teaching that a d(90) value of 2000nm was optimal is not a criticism of all other particle sizes," and

"[t]hat the '544 patent did not disclose a preferred d(50) value does not amount to a teaching away." 97 F.4th at 932.

On remand, the district court does nothing different. Janssen made the same argument, and the district court "credited" the same expert testimony that "a POSA would infer…having a d90 of less than 2,000 nm is one of the 'critical components'" and "would have understood that *the choice to further study formulations C and D* indicated that only those particle sizes provide certain properties" satisfying it. Appx45-46.

That is error—again—because disclosing a "lesser preferred but still workable option" is not teaching away. *Bayer Pharma AG v. Watson Lab'ys, Inc.*, 874 F.3d 1316, 1327 (Fed. Cir. 2017). The district court quoted Sinko's testimony that formulation B lacked "critical parameters." Appx45-46. As Sinko explained, the import of that testimony was that formulation B "d[id]n't meet the *criteria that the inventors* of the '544 patent set out for their process or their invention." Appx11785(1785:2-6). But prior art must be read for all it teaches, not limited to what the inventors preferred or described as their inventions. *See In re Heck*, 699 F.2d 1331, 1333 (Fed. Cir. 1983). This Court's remand required more

than reciting the correct test before recapitulating the same erroneous analysis.

What is more, Sinko effectively admitted that the '544 patent does not teach away. He did not dispute that formulation B *was* tested, even *after* the C and D stability studies. Appx13242(9:45-55). He could not identify anywhere the '544 patent "say[s] that Formulation B cannot be used in an aqueous nanoparticle suspension for intramuscular injection." Appx11785(1785:7-13). And he acknowledged the specification would allow POSAs "outside of this patent" to "try" formulation B. *Id.* The facts are not substantially disputed. Under the proper test, the '544 patent cannot "teach away." The district court erred by holding otherwise.

*AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325 (Fed. Cir. 2021), which the district court cited, Appx47, is not to the contrary. There, unlike here, there was evidence that the specific prior-art values "*were not suitable*" and "*clearly don't work*." *Id.* at 1336. The claimed particle sizes were also *different* from prior art, and the prior-art sizes were unsuitable for inhalation. *Id.*; *see also id.* at 1337. There is nothing similar here. Indeed, as Janssen told the FDA, claim 7 of the '544 patent covers Invega Sustenna.

*Finally*, the claims are also obvious because particle size is a result-effective variable. The district court did not reach this argument, Appx47 n.34, but elsewhere observed that "both sides' experts agreed that a POSA seeking to achieve rapid therapeutic effects would be motivated to modify the particle size." Appx23.[4] The '544 patent and WO'384 disclosed that particle size is a result-effective variable, how particle size affects results, and *how* to adjust particle size. *E.g.*, Appx13239(3:46-55); *Statement of the Case §C.1, supra*. "[I]t is not inventive to discover the optimum or workable ranges by routine experimentation," and the claims' overlap with the '544 patent's disclosures is alone "sufficient motivation to optimize." *Applied Materials,* 692 F.3d at 1295.

## III. Secondary Considerations Cannot Support the Judgment or Prevent Reversal.

The district court's remand opinion reached the same conclusions on secondary considerations as its previous opinion.[5] As before, the district court uncritically accepted Janssen's arguments, but did not ultimately give the evidence significant weight—secondary considerations

[4] As explained, *supra* pp.54-55, the district court drew an erroneous conclusion from that premise—that a POSA would *not also* be motivated to alter the dose amount.
[5] Janssen declined to reargue "copying" on remand. Appx48 n.35.

"reinforce, but are not critical to, the Court's finding of nonobviousness." Appx61. The court also did not analyze or explain *how* that evidence could rebut the obviousness presumption for overlapping ranges, wrongly reasoning that the mere existence of secondary considerations rebutted any presumption. Appx38; *see supra* §I.A.3.

Secondary considerations "without invention will not make patentability." *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 283 (1976) (quotation marks omitted); *e.g.*, *Ohio Willow Wood Co. v. Alps S. LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013) (affirming summary judgment of obviousness despite secondary considerations); *Janssen* 97 F.4th at 932-33 (citing cases). Despite this Court's guidance, 97 F.4th at 932-36, the district court committed the same errors again on remand.[6] This Court need not reach secondary considerations; if it does, they only present additional reasons to reverse.

[6] "Unexpected results" are addressed above. *Supra* §I.A.3.

### A. "Industry Praise" and "Skepticism" Evidence is Weak and Lacks Nexus.

Secondary-considerations evidence is relevant only to the extent it illuminates "the origin of the *subject matter sought to be patented*." *Graham*, 383 U.S. at 17-18. A nexus is required "between the merits of the claimed invention" and secondary considerations. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983). Janssen bears the burden of showing a nexus. *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019). Where secondary considerations "result from something other than what is both *claimed* and *novel*, there is no nexus." *Janssen*, 97 F.4th at 933.

The district court's industry-praise analysis cites two articles. Appx57-58, and is not meaningfully different from the previous analysis, except that it (correctly) omits most of Janssen's other purported "industry praise." *Compare* Appx57-58 (citing "PTX-133" and "PTX-131"), *with* Appx2247-2248 (same). The remaining articles are weak evidence and lack nexus.

*First*, the *Neuropsychiatric Disease* article (Appx20544-20562), even as described, only "reviews Invega Sustenna and concludes that *pal-*

*iperidone palmitate* is an 'important treatment option.'" Appx57. *Paliperidone palmitate* is the active ingredient. Its use as a "treatment option" for schizophrenia is undisputedly in the prior art, including Janssen's patent No. 6,077,843 (issued in 2000; expired in 2017). The article references "importance of the initial loading doses," Appx57 (quoting Appx20560), but both "loading doses" were known in the prior art, *e.g.*, the '548 protocol.

In any event, the article's "praise" is faint at best. It says only that Invega Sustenna's performance was "not statistically significant[ly]" worse than haloperidol decanoate. Appx20551; Appx12412(2412:9-23); Appx12443-12444(2443:8-2444:4); Appx57. To say that a drug is an "important treatment option" and not statistically significantly worse than another common drug is not significant evidence of nonobviousness of a dosing patent.

*Second*, for the *Psychiatric News* article (Appx20540-20543), the district court found nexus only because the article mentions "Invega Sustenna" by name. Appx58. That cannot count. "Invega Sustenna" is not coextensive with the '906 patent's claims. Undisputed evidence confirmed that Invega Sustenna's label recommended dosing intervals outside the

claims. Appx13119; Appx11989-11991(1989:16-1991:14). More than half of healthcare providers did not use the claimed deltoid site for the first loading dose (as the article authors recognized, Appx20560). Appx17903; Appx11195-11199(1195:18-1199:15).

As this Court observed, but the district court overlooked, "praise related to Invega Sustenna" is insufficient. 97 F.4th at 935 n.11. The "praise" here is only that Invega Sustenna has "better adherence" than oral medications. But as the district court acknowledges, the article states "better adherence … is an advantage of *LAIs generally*." Appx58. The '906 patent admits the same thing when describing prior art. Appx159(1:60-61). Whether for lack of nexus, overall weakness, or both, the article citations cannot prevent reversal.

For "skepticism," the district court observed only that **(1)** outside experts recommended to Janssen to "start[] with 100mg-eq." rather than 150mg-eq. because of "lesser risk," **(2)** that FDA recommended starting with 75mg-eq., and **(3)** even after FDA approval, psychiatrists expressed "concern." Appx58-59. This, too, is weak and lacks nexus.

The '548 protocol itself was a Phase III protocol that taught beginning treatment with *two* 150-mg-eq. doses. A POSA would understand

that Janssen believed that regimen was likely safe and effective. Appx15. That alone should negate any purported "skepticism"—especially alleged "concern" by psychiatrists.

That some people "recommended" lower doses means only that Janssen considered alternatives. Like "teaching away," suggesting alternatives is not "skepticism." Nowhere did the FDA criticize 150 mg-eq. doses. Appx20375. Indeed, after Janssen formally applied for that dose, the FDA approved it without pushback. Appx11106(1106:15-19). "Lower risk," moreover, referred to doubts *about FDA approval* without a clinical trial. Appx11075(1075:13-16); Appx11079-11080(1079:7-11, 1080:5-23); Appx11347-11348(1347:4-1348:10). Internal "skepticism" about regulatory filings has no relevance to *obviousness of these claims*.

### B. Blocking Patents Undermine Any "Long-Felt Need" or "Commercial Success."

If a patented product is "commercially successful" and meets a "long-felt need," then failure of others to develop the invention sooner *may* be evidence of nonobviousness. In this Hatch-Waxman case over Janssen's last remaining Orange Book patent on Invega Sustenna, such evidence has little force. *See Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1337-42 (Fed. Cir. 2018); *Galderma*, 737 F.3d at 740.

The ’906 patent’s critical date is 2007. Since *1993*, Janssen’s broader paliperidone palmitate patents legally barred anyone other than Janssen from entering the market. The patents’ scope and blocking force are not substantially disputed. As shown below, Janssen patented the *compound* itself in 1993, then added **(1)** esters including paliperidone palmitate (5,254,556); **(2)** aqueous paliperidone palmitate formulations (6,077,843); and **(3)** methods of treating schizophrenia (the ’544 patent):




In 2007, all those patents were in force. Anyone other than Janssen who tried to meet a “need” for these claims with a commercial product would have been liable for damages and subject to injunctive remedies (some automatic). It follows that, *in this case*, any long-felt need or commercial

success concerning Invega Sustenna are not strong evidence of nonobviousness.

The district court's previous opinion resisted that conclusion on reasoning this Court rejected. 97 F.4th at 936. This Court instructed that on remand, "consideration of the impact of the blocking patents" must "focus[] on the blocked space *relating to Invega Sustenna* because that is what Janssen contended was commercially successful and filling an unmet need." *Id.* The district court's new opinion commits the same errors.

*First*, the court observed Teva applied for a patent on a manufacturing process for paliperidone palmitate. Appx60. But Teva's work in Israel says nothing about whether, for example, Janssen's '544 patent blocked Teva and others from competing in the United States with Invega Sustenna through 2018, when it was achieving commercial success.

*Second*, the court observed that it "takes ten years or more" to develop a drug, Appx60, suggesting a competitor might start work before the patent's 2007 priority date knowing that the compound patent would expire in 2013. That does not account for Janssen's layers of blocking patents. Even in 2003 (ten years before the compound patent expired),

Janssen already had three additional patents securing its monopoly to November 2018.

*Third*, the district court invoked *Tolmar I*, without discussing the opinion's reasoning. Appx61. As explained above, *Tolmar I* is irrelevant, as it concludes only that a different party (Tolmar) failed to prove obviousness with a different theory and record. In any event, *Tolmar* cannot support the judgment here. The cited analysis rests exclusively on the "statutory 'safe harbor' provision for research and development." 718 F.Supp.3d at 430 (citing 35 U.S.C. §271(e)(1)). This Court rejected that reasoning in this case, holding "to the extent the determination of no deterrence rested on the existence of the safe harbor provision alone, that was error." 97 F.4th at 936.

Because the claims are obvious, the Court need not determine whether Janssen's blocking patents *negated* or merely *undermined* already-weak secondary-considerations evidence. Should the Court reach the issue, though, the district court again contravened this Court's mandate.

## CONCLUSION

The judgments should be reversed.

December 20, 2024

*/s/ Deepro R. Mukerjee*
(signed with permission)

Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
(212) 940-8776

Eric T. Werlinger
Timothy H. Gray
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave. NW
Suite 800
Washington, DC 20006
(202) 625-3500

Jillian M. Schurr
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
(312) 902-5200

*Counsel for Appellant Mylan Laboratories Limited*

Respectfully submitted,

*/s/ John C. O'Quinn*

John C. O'Quinn
William H. Burgess
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave. NW
Washington, D.C. 20004
(202) 389-5000

Jeanna M. Wacker
Christopher T. Jagoe
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
(212) 446-4800

Noah Frank
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7570

*Counsel for Appellant Teva Pharmaceuticals USA, Inc.*

# ADDENDUM

Opinion (Nov. 21, 2024)
D.N.J. 2:18-CV-734 Dkt. 332 /
D.N.J. 2:18-CV-16484 Dkt. 114 .......................................... Appx1-62

Order (Nov. 21, 2024)
D.N.J. 2:18-CV-734 Dkt. 333 /
D.N.J. 2:18-CV-16484 Dkt. 115 ........................................ Appx63-65

Final Judgment (Nov. 22, 2024)
D.N.J. 2:18-CV-734 Dkt. 334 .......................................... Appx66-68

Final Judgment (Dec. 2, 2024)
D.N.J. 2:19-CV-16484 Dkt. 116 ....................................... Appx69-70

U.S. Patent No. 9,439,906
D.N.J. 2:18-CV-734 DTX-1............................................ Appx152-175

**<u>Opinion (Nov. 21, 2024), Appx1-62</u>**

D.N.J. 2:18-CV-734 Dkt. 332 / D.N.J. 2:18-CV-16484 Dkt. 114


I. BACKGROUND ..... Appx2
  A. The ’906 Patent ..... Appx3
  B. Antipsychotic Drugs and Research ..... Appx7
    1. Antipsychotic Drugs ..... Appx7
    2. Janssen’s Research and Clinical Trials ..... Appx7
      i. Phase I ..... Appx8
      ii. Phase II ..... Appx9
      iii. Phase III ..... Appx9
  C. *Janssen v. Tolmar* ..... Appx11
  D. Prior Art Summary ..... Appx11
II. DISCUSSION ..... Appx12
  A. Applicable Law ..... Appx12
  B. Person of Ordinary Skill in the Art ..... Appx13
  C. The Prior Art ..... Appx14
    1. The ’548 Protocol ..... Appx14
    2. The ’544 Patent ..... Appx15
    3. The WO’384 Publication ..... Appx16
  D. Obviousness of Claim 2 ..... Appx17
    1. Unequal, Decreasing Loading Doses ..... Appx19
      i. Motivation Based on Treating an Acutely Agitated Patient and Bringing the Patient into the Therapeutic Window Faster ..... Appx20
      ii. Motivation Based on Excessive Accumulation ..... Appx24
      iii. Motivation Based on the 20 Times Multiplier ..... Appx26
      iv. Motivation Based on the Haldol Label’s Dosing ..... Appx28
      v. Prior Art’s Teachings on Motivation in Toto ..... Appx29
      vi. Reasonable Expectation of Success ..... Appx30
    2. Deltoid Injection Site ..... Appx35
      i. Motivation ..... Appx35
      ii. Reasonable Expectation of Success ..... Appx35
  E. Claim 2 Presumption of Obviousness ..... Appx36
  F. Obviousness of Claims 10 and 13 ..... Appx39
  G. Obviousness of Claims 20 and 21 ..... Appx43
  H. Objective Indicia of Nonobviousness ..... Appx47
    1. Long-Felt But Unsolved Need ..... Appx49
    2. Commercial Success ..... Appx51
    3. Unexpected Results ..... Appx53
    4. Industry Praise ..... Appx57
    5. Skepticism ..... Appx58
    6. Blocking Patents ..... Appx59
III. CONCLUSION ..... Appx62

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANSSEN PHARMACEUTICALS, INC. and JANSSEN PHARMACEUTICA NV,<br>Plaintiffs,<br>v.<br>TEVA PHARMACEUTICALS USA, INC.,<br>Defendant. | Civil Action Nos.:<br>2:18-00734<br>2:19-16484<br>**OPINION** |
| JANSSEN PHARMACEUTICALS, INC. and JANSSEN PHARMACEUTICA NV,<br>Plaintiffs,<br>v.<br>MYLAN LABORATORIES LTD.,<br>Defendant. | |

**CECCHI, District Judge.**

Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica NV (collectively, "Janssen" or "Plaintiffs") sued Teva Pharmaceuticals USA, Inc. ("Teva" or "Defendant") for infringing U.S. Patent No. 9,439,906 (the "'906 Patent"). ECF No. 133 ("Final Pretrial Order" or "FPTO") at 2–3. Teva stipulated to infringement of the '906 Patent but challenged the patent's validity. *Id.* Specifically, Teva asserted that all representative claims were invalid as obvious and that several claims were also invalid as indefinite. *Id.* This Court held an eleven-day bench trial[1] and

[1] The bench trial was held on various days between October 13, 2020, and October 30, 2020. ECF Nos. 135–37, 140–41, 145–49, 151. Closing arguments were held on March 5, 2021. ECF No. 199.

concluded that Teva had not proven invalidity through obviousness or indefiniteness. *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.* ("*Teva I*"), 571 F. Supp. 3d 281 (D.N.J. 2021). Following an appeal by Teva, ECF No. 275, the Federal Circuit affirmed this Court's holding on indefiniteness[2] but vacated and remanded its obviousness determination. *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.* ("*Teva II*"), 97 F.4th 915, 918 (Fed. Cir. 2024).[3]

This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The findings of fact are based on the Court's observations and credibility determinations of the witnesses who testified at trial and a review of the evidence admitted. Although the Court has reviewed all the evidence presented, this Opinion only includes references to the evidence most pertinent to its analysis.[4] For the reasons set forth below, the Court finds that the '906 Patent has not been proven invalid.

## I. BACKGROUND

Janssen sells Invega Sustenna, which is an injectable paliperidone palmitate medication used to treat schizophrenia in adults. FPTO at 2. Teva filed an Abbreviated New Drug Application ("ANDA") in 2017 seeking approval from the Food and Drug Administration ("FDA") to

---

[2] Therefore, indefiniteness will not be discussed in this Opinion.

[3] Janssen also sued Mylan Laboratories Ltd. ("Mylan," together with Teva, "Defendants") in a separate action before this Court, No. 19-16484. In that case, the parties stipulated to be bound by the final judgment in the instant matter with respect to infringement and validity. No. 19-16484, ECF No. 71. Arguments presented by Teva are "presented by both Teva and Mylan." Def. Br. at 1 n.1. Mylan was also an appellant in the appeal before the Federal Circuit. *See Teva II*, 97 F.4th 915, 918 n.1 (Fed. Cir. 2024).

[4] The parties submitted post-trial briefs and proposed findings of fact and conclusions of law in December 2020, after the conclusion of the bench trial. ECF Nos. 164 ("Pltf. Post Trial Br."), 165 ("PFOF"), 167 ("Def. Post Trial Br."), 167-1 (corrected at 168-1 ("DFOF")). The parties submitted responsive briefs in January 2021. ECF Nos. 188 ("Pltf. Post Trial Reply Br."), 189 ("Def. Post Trial Reply Br."). The parties agree that the issues to be determined on remand should be based on the existing trial record. ECF No. 293 at 2. The parties have also submitted post-remand briefing. ECF Nos. 299 ("Def. Br."), 300 ("Pltf. Br."), 311 (corrected at 314 ("Pltf. Reply Br.")), 312 ("Def. Reply Br."). The Court also considered Plaintiffs' Notice of Supplemental Authority (ECF No. 313) and Defendants' response (ECF No. 318). Unless otherwise noted, the Court will refer to the corrected documents submitted by the parties.

manufacture and sell a generic version of Janssen's Invega Sustenna. *Id.* In response, Janssen sued for patent infringement under the Hatch-Waxman Act, asserting various claims of the '906 Patent. ECF No. 1. The '906 Patent discloses dosing regimens of paliperidone palmitate and is listed in the FDA's "Orange Book" as covering Invega Sustenna-brand paliperidone palmitate extended-release suspension products. FPTO at 2.

Schizophrenia is a psychotic disorder typified by disorganized speech and behavior, delusions and hallucinations. PFOF ¶ 11. Individuals diagnosed with schizophrenia often struggle to adhere to treatment regimens, particularly those that require daily intake of oral medication. *Id.* ¶ 14. This failure to take medication often leads to psychotic episodes that result in further difficulty complying with treatment. *Id.*

In order to help solve this adherence problem, long-acting injectables ("LAIs")—otherwise known as "depots"—were developed. *Id.*; DFOF ¶¶ 57–58. LAIs deposit a large amount of drug into the body which is then slowly released. PFOF ¶ 14; DFOF ¶ 58. This slow release allows for the administration of medication once or twice a month, versus the daily administration required when taking the oral versions. PFOF ¶ 14; DFOF ¶ 59. Therefore, LAIs, including Invega Sustenna, "may greatly enhance compliance with dosing." PTX/DTX 1 at 1:58–61.

**A. The '906 Patent**

The '906 Patent is titled "Dosing Regimen Associated with Long Acting Injectable Paliperidone Esters." *Id.* at 1. It was filed on December 17, 2008, and claims the benefits of provisional applications filed on December 19, 2007, and December 5, 2008. *Id.* Although Teva previously contended that the priority date of the '906 Patent was "no earlier than December 5, 2008," DFOF at 112 ¶ 2, it has since revised this position. Def. Br. at 67 ("The priority date of Janssen's '906 Patent is 2007.").

The parties agree that claims 2, 10, 13, 20 and 21 are representative. FPTO at 9. The asserted claims relate to "[a] dosing regimen for administering paliperidone palmitate to a psychiatric patient in need of treatment for schizophrenia."[5] PTX/DTX 1 at 32:11–13. Claim 2 relates to a dosing regimen for a psychiatric patient without renal impairment, claims 10 and 13 relate to a dosing regimen for a psychiatric patient with renal impairment and claims 20 and 21 relate to the characteristics of the paliperidone palmitate formulation. PFOF ¶¶ 7–9.

The Court underscores that the '906 Patent's claims relate to dosing regimens for *a* patient, not to generalized dosing regimens. Further, the renal impairment claims themselves do not specify a level of renal impairment. Finally, the claims do not include any safety and efficacy requirement. The analysis conducted throughout this Opinion recognizes these distinctions and is in accordance with the Federal Circuit's instructions.

Turning to the claims, Claim 2 depends from Claim 1 and relates to a dosing regimen for a psychiatric patient without renal impairment. Most notably, the claims disclose a loading dose regimen consisting of an initial 150 mg-eq.[6] dose followed by a 100 mg-eq. dose, both injected in the deltoid, and subsequent maintenance doses of 25 to 150 mg-eq. injected in the deltoid or the gluteus. The claims are reproduced in full below.

> 1. A dosing regimen for administering paliperidone palmitate to a psychiatric patient in need of treatment for schizophrenia, schizoaffective disorder, or schizophreniform disorder comprising
>
> (1) administering intramuscularly in the deltoid of a patient in need of treatment a first loading dose of about 150 mg-eq. of paliperidone as

---

[5] Some claims discuss treatment for a different psychiatric disorder. However, the parties' arguments focus on schizophrenia, so this Opinion does the same. *See Teva II*, 97 F.4th 915, 925 n.3 (Fed. Cir. 2024).

[6] Paliperidone palmitate is converted to paliperidone once it is introduced into the body. PFOF ¶ 6; DFOF ¶ 80. As such, doses are not expressed in terms of their actual weight, but rather in terms of the equivalent amount of paliperidone they contain. PFOF ¶ 6. This measurement is referred to as a "milligram-equivalent" or "mg-eq." for short. *Id.*

paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;

(2) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of about 100 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the 6th to about 10th day of treatment; and

(3) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 150 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation a month (±7 days) after the second loading dose.

2. The dosing regimen of claim 1 wherein after administration of the first maintenance dose, subsequent maintenance doses of from about 25 mg-eq. to 150 mg-eq. are administered in the deltoid or gluteal muscle of the psychiatric patient in need of treatment at monthly (±7 days) intervals.

PTX/DTX 1 at 32:11–36.

Claim 10 depends from Claim 8 and relates to a dosing regimen for a psychiatric patient with renal impairment. Among other things, the claims disclose a loading dose regimen consisting of two 75 mg-eq. injections in the deltoid and a subsequent maintenance dose of between 25 mg-eq. and 75 mg-eq. injected in the deltoid or the gluteus. The claims are reproduced in full below.

8. A dosing regimen for administering paliperidone palmitate to a renally impaired psychiatric patient in need of treatment for schizophrenia, schizoaffective disorder, or schizophreniform disorder comprising

(a) administering intramuscularly in the deltoid of a renally impaired psychiatric patient in need of treatment a first loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;

(b) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the 6th to about 10th day of treatment; and

(c) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 75 mg-eq. of paliperidone as paliperidone palmitate in a

> sustained release formulation a month (±7 days) after the second loading dose.
>
> 10. The dosing regimen of claim 8 wherein the sustained release formulation is an aqueous nanoparticle suspension.

*Id.* at 32:66–33:20, 33:26–27. Claim 13 primarily differs from Claim 10 by disclosing a maintenance dose of between 25 mg-eq. and 50 mg-eq. *Id.* at 33:26–52.

Claims 20 and 21 are only representative as they depend from claims 1 or 8. Both claims further depend from Claim 19, which is reproduced below. Most relevant is the particle-size limitation of Claim 19 (italicized below).

> 19. The dosing regimen of claims *1*, 4, *8* or 11 wherein the sustained release depot formulation is an aqueous nanoparticle suspension consists essentially of
>
> (a) *156 mg/ml of the paliperidone palmitate having an average particle size (d50) of from about 1600 nm to about 900 nm*;
>
> (b) 12 mg/ml of polysorbate 20;
>
> (c) one or more buffering agents sufficient to render the composition neutral to very slightly basic (pH 8.5);
>
> (d) 30 mg/ml of a suspending agent wherein the suspending agent is polyethylene glycol 4000; and
>
> (f) water q.s. ad 100%.

*Id.* at 34:32–43 (emphasis added).[7]

The '906 Patent describes several different dosing regimens for administering paliperidone palmitate. *See generally* PTX/DTX 1. For a patient without renal impairment, the patent discloses a first loading dose of 150 mg-eq. of paliperidone palmitate, followed by a second loading dose of 100 mg-eq. of paliperidone palmitate, both injected in the deltoid. *Id.* at 32:11–24. The specification explains that "deltoid injections result in a faster rise in initial plasma concentration"

[7] Subsection (e) of Claim 19 is omitted in the patent. *See* PTX/DTX 1 at 34:32–43.

and that injecting the loading doses in the deltoid "facilitate[s] patients' attaining a rapid therapeutic concentration of paliperidone." *Id.* at 5:2–8. The two loading doses are followed by maintenance doses of 25 mg-eq. to 150 mg-eq of paliperidone palmitate, injected in either the deltoid or the gluteal muscle. *Id.* at 32:25–30. For a patient with renal impairment, the '906 Patent adjusts the dosing regimen so that the two loading doses are both 75 mg-eq., and the maintenance dose ranges from 25 mg-eq. to 75 mg-eq. *Id.* at 32:66–33:20.

The history leading up to this invention is discussed below for helpful context.

### B. Antipsychotic Drugs and Research

#### 1. Antipsychotic Drugs

Schizophrenia patients are treated with antipsychotic medication, such as Invega Sustenna, to control and treat their symptoms. PFOF ¶ 12; DFOF ¶ 53. The "first generation" of antipsychotics that were developed included dozens of oral medications and a few LAIs. PFOF ¶ 15. However, first-generation medications were plagued by serious side effects such as tremors, stiffness and cognitive symptoms like mental dulling and impaired functioning. *Id.* ¶ 16. Consequently, these medications were mostly used with chronically ill patients. *Id.* ¶ 17. Seeking to improve upon the side effects profile, "second-generation" antipsychotics were subsequently developed. *Id.* ¶ 19. These medications were an improvement over their predecessors, significantly reducing the severity and likelihood of side effects. *Id.*

#### 2. Janssen's Research and Clinical Trials

Many second-generation oral antipsychotics were developed, including Janssen's risperidone product, Risperdal. *Id.* However, the only second-generation LAI available before Invega Sustenna was Janssen's Risperdal Consta—an injectable form of risperidone. *Id.* ¶¶ 19–20. But Risperdal Consta is not rapidly effective, and thus requires oral supplementation during

the first three weeks of treatment. *Id.* ¶ 20. In addition, the drug requires subsequent dosing every two weeks. *Id.* This short dosing interval contributes to treatment nonadherence and the problems that ensue. *Id.* Janssen set out to overcome these shortcomings by developing a second-generation LAI that required *monthly* dosing and was rapidly effective without the need for oral supplementation. *Id.* ¶ 21.

*i. Phase I*

Recognizing the problems with injectable risperidone, Janssen began research into paliperidone palmitate. *Id.* ¶¶ 20–21. Janssen's first Phase I study looked at a *single* 50 mg-eq. dose injected in the gluteus. *Id.* ¶ 27. Results of the study showed that the paliperidone palmitate released too slowly to allow for the desired once-monthly dosing. *Id.* Hypothesizing that smaller particle size would provide for a quicker release, Janssen developed several formulations with smaller particle sizes. *Id.* Janssen later finalized one of those formulations, which is used in Invega Sustenna and meets the elements of claims 20 and 21. *Id.*

Janssen next undertook Phase I studies evaluating loading doses. *Id.* ¶ 28. One clinical trial tested two potential loading dose regimens: (1) a larger dose on day one and (2) smaller, equal doses on days one and eight. *Id.* The larger dose on day one proved more effective and tolerable, and was chosen for further study. *Id.* Meanwhile, Janssen also researched the effects of the injection site. *Id.* ¶ 29. Based on the prior art, Janssen believed that the main injection sites—the deltoid and the gluteus—would be interchangeable. *Id.* However, Janssen found that deltoid injections led to a 45 percent higher peak plasma concentration of the drug. *Id.* Because higher plasma concentrations increase the risk of severe side effects, Janssen utilized gluteal injections for future studies. *Id.*

*ii. Phase II*

Based on its Phase I results, Janssen conducted a Phase II clinical trial studying equal doses of either 50 or 100 mg-eq. in the gluteus on days 1, 8 and 36. *Id.* ¶ 30. Results of the study were "very promising"—both dose amounts proved rapidly effective and were superior to placebo on the eighth day of treatment without the need for oral supplementation. *Id.* ¶ 31. Janssen decided to build on these favorable results with several Phase III trials. *Id.* ¶ 32.

*iii. Phase III*

Ultimately, Janssen considered the pertinent Phase III trials (PSY-3003 and PSY-3004) to be failures. The results showed no dose amounts in either study were effective in subjects in the United States. *Id.* ¶¶ 34–35. Janssen responded to this "crisis moment" by organizing a "task force" of clinical, pharmaceutical and other specialists. *Id.* ¶¶ 36, 38. The task force explored several possible explanations for the failures, as well as potential solutions including doses as high as 400 mg-eq. *Id.* ¶ 39. After undertaking advanced modeling led by Dr. An Vermeulen, co-inventor of the '906 Patent, the task force determined that body weight and the injection site had impacted the efficacy of the treatment regimen. *Id.* ¶¶ 42–43. The task force then modeled numerous solutions to this problem before recommending a dosing strategy consisting of an initial 150 mg-eq. dose in the deltoid on day one, followed by doses of either 25, 50, 100 or 150 mg-eq. in the deltoid or the gluteus on day eight and monthly thereafter. *Id.* ¶ 43.

Based on this recommendation, Janssen designed two additional Phase III studies: PSY-3006 and PSY-3007. *Id.* ¶ 44. Both studies began with a 150 mg-eq. deltoid injection on day one. *Id.* ¶¶ 44–45. PSY-3007 then used 25, 100 or 150 mg-eq. deltoid or gluteal injections while PSY-3006 used 50 mg-eq. deltoid or gluteal injections on day eight and flexible dosing afterwards. *Id.* The PSY-3007 study compared the regimens to placebo, whereas the PSY-3006 study compared to Risperdal Consta. *Id.*

Dr. Mahesh Samtani, one of the co-inventors of the ’906 Patent, worked to improve upon the modeling previously conducted under Dr. Vermeulen. *Id.* ¶ 48. As part of this work, Dr. Samtani determined that the absorption of paliperidone palmitate proceeds in two phases (biphasic): for the first two weeks, there is a steady, fast input into the blood circulation. *Id.* ¶ 49. After those two weeks, the "slow process takes over." *Id.* (quoting Tr. 1349:16–20, 1351:6–9 (Samtani)). Additionally, Dr. Samtani discovered that higher doses of paliperidone palmitate do not result in proportionally higher increases in peak concentration in the body, and that with higher doses there is a longer half-life. *Id.* (citing Tr. 1353:23–25 (Samtani)). Dr. Samtani then used the updated model to run simulations of different dosing regimens to determine the optimum sequence, dosage, and administration site for paliperidone palmitate. *Id.* ¶ 50.

As Dr. Samtani was working with the model, Janssen received the results from its earlier PSY-3002 study. *Id.* ¶ 52. The PSY-3002 study failed to show that paliperidone palmitate was an improvement on Risperdal Consta. *Id.* After a "heated debate" regarding how to respond to this failure, Janssen employees decided to modify the PSY-3006 study to increase the injection on day eight to 100 mg-eq. and to require its administration in the deltoid—thus resulting in the patented regimen. *Id.* ¶ 53. This determination was made based upon the modeling and simulations previously conducted. *Id.*

As PSY-3006 and PSY-3007 continued, Dr. Samtani worked to update his model, conducting internal and external validation processes. *Id.* ¶ 55. Dr. Samtani's simulations ultimately showed that the 150/100 mg-eq. loading dose regimen would be safe and effective. *Id.* This finding was confirmed by the results of PSY-3006 and PSY-3007, which demonstrated that the loading dose regimen achieved rapid and long-term efficacy without oral supplementation. *Id.*

¶¶ 55, 60. In short, Janssen achieved what it had set out to do. *See id.* ¶ 21. The FDA approved Invega Sustenna and the claimed dosing regimen in 2009. *Id.* ¶ 60.

**C. *Janssen v. Tolmar***

While Teva's appeal was pending in this matter, Federal Circuit Judge William C. Bryson, sitting by designation in the District of Delaware, presided over a case involving an obviousness challenge to the '906 Patent, the same patent at issue here. After consideration of the prior art reference NCT00210548, a protocol for one of Janssen's Phase III clinical trials (the "'548 Protocol" or "NCT 548"), which is also the closest prior art in this case, Judge Bryson concluded that the '906 Patent had not been proven invalid. *Janssen Pharms., Inc. v. Tolmar, Inc.* ("*Tolmar I*"), 718 F. Supp. 3d 394 (D. Del. 2024). Following the Federal Circuit's decision in *Teva II*, Tolmar filed a motion for reconsideration asserting, *inter alia*, that Judge Bryson's opinion was inconsistent with the Federal Circuit's opinion. Judge Bryson denied Tolmar's motion. *Janssen Pharms., Inc. v. Tolmar, Inc.* ("*Tolmar II*"), No. CV 21-1784, 2024 WL 2972832 (D. Del. June 13, 2024).

Regardless, the Court acknowledges that Judge Bryson reached his decision based on the record presented to him. The findings and conclusions in this Opinion are based on the record presented and discussed herein.

**D. Prior Art Summary**

To demonstrate obviousness of the claims discussed above, Teva relies on three primary prior art references. Def. Br. at 9. These include: (1) the '548 Protocol; (2) U.S. Patent No. 6,555,544, a patent owned by Janssen describing a single dose of LAI formulations of paliperidone palmitate (the "'544 Patent") and (3) International Publication No. WO 2006/114384,

a patent application by Janssen disclosing the formulation and a single dose of paliperidone palmitate (the "WO '384").[8]

## II. DISCUSSION

Issued patents are presumed valid. *See* 35 U.S.C. § 282(a). To rebut this presumption, a defendant bears the burden of proving invalidity by clear and convincing evidence. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009) ("Because of this presumption, an alleged infringer who raises invalidity as an affirmative defense has the ultimate burden of persuasion to prove invalidity by clear and convincing evidence, as well as the initial burden of going forward with evidence to support its invalidity allegation.").

### A. Applicable Law

To prove that a patent claim is invalid as obvious, a party must show that the "differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art." 35 U.S.C. § 103; *see also Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360–61 (Fed. Cir. 2007). In particular, the "party seeking to invalidate a patent as obvious must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so.'" *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 973 (Fed. Cir. 2014) (quoting *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009)). This determination is a question of law based on underlying findings of fact,

[8] To the extent Teva relies on additional prior art references throughout its arguments, they will be discussed in the relevant sections.

*see Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966), including "the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and any relevant secondary considerations." *Galderma Lab'ys, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 736 (Fed. Cir. 2013) (citing *Graham*, 383 U.S. at 17–18).

"The obviousness analysis should not be conducted 'in a narrow, rigid manner,' but should instead focus on whether a claimed invention is merely 'the result[] of ordinary innovation,' which is not entitled to patent protection." *Pernix Ir. Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 595 (Fed. Cir. 2018) (alteration in original) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427–28 (2007)). The analysis is "expansive and flexible" and "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR Int'l Co.*, 550 U.S. at 415, 418.

**B. Person of Ordinary Skill in the Art**

The parties offer slightly different definitions of a person of ordinary skill in the art (a "POSA"). Janssen asserts that a POSA would have "an M.D., Ph.D., PharmD, or equivalent work experience in drug formulation, pharmacy, pharmacokinetics, or medicine." PFOF ¶ 77 n.7 (citation omitted). Teva argues that "[a] POSA is a person who would have an advanced degree such as an M.D., Ph.D., PharmD, master's degree, or other advanced degree in an area related to chemistry, pharmaceutics, medicine or biology, with several years of experience in the pertinent field and be capable of working in a team comprising others in the field or related fields." DFOF ¶ 136 (internal quotation marks and citation omitted). However, the parties agree that any differences are "not meaningful for purposes of this case." ECF No. 200 at 122:9–123:10 (Closing Argument).

**C. The Prior Art**

As noted above, Teva relies on three primary prior art references to show that the representative claims of the '906 Patent would have been obvious to a POSA: (1) the '548 Protocol; (2) the '544 Patent and (3) the WO '384. Def. Br. at 9. These references are further described below.

1. The '548 Protocol

The '548 Protocol is a summary of the protocol for Janssen's PSY-3003 clinical trial with the brief title: "A Study to Evaluate the Effectiveness and Safety of 3 Doses of Paliperidone Palmitate in Treating Subjects with Schizophrenia." *See* PTX 54/DTX 55 at 1; PFOF ¶ 89. It does not contain results or data, but rather details a 14-week study designed to test the hypothesis that three fixed-dose regimens of paliperidone palmitate would be more effective than placebo. Tr. 1578:25–1579:15 (Sinko); PFOF ¶ 89; PTX 54/DTX 55 at 1. Participants would receive equal doses of either 50, 100 or 150 mg-eq. in the gluteal muscle on days 1, 8, 36 and 64. Tr. 1579:17–1580:1 (Sinko); PTX 54/DTX 55 at 1; PFOF ¶ 91. Thus, for example, a patient who received a 50 mg-eq. dose on day one would continue to receive a 50 mg-eq. dose for each subsequent dose.

The '548 Protocol presents a unique situation—it merely proposes a hypothesis. Both sides agree that the protocol contains no information about the study's results. Tr. 480:16–20 (Wermeling), 1579:8–15 (Sinko). To be clear, the Court does not discard the teachings of the '548 Protocol because it lacks both data and results. Instead, the Court considers what a POSA would infer from the '548 Protocol in light of its lack of data and results. Courts must consider prior art "not only for what it expressly teaches, but also for what it fairly suggests" to a POSA. *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019) (quoting *In re Baird*, 16 F.3d 380, 383 (Fed. Cir. 1994)); *accord KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). A

POSA will typically "view a reference, understand its strengths and weaknesses, its advantages and deficiencies, and attempt to overcome the flaws in the prior art by employing ordinary creativity, related references, and general background knowledge." *Tolmar I*, 718 F. Supp. 3d 394, 426 (D. Del. 2024); *see also Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, 25 F.4th 1354, 1365 (Fed. Cir. 2022).

A POSA would know that Janssen likely would not have pursued the '548 Protocol and invested significant funds in a Phase III clinical trial without a belief that its hypothesis was correct. But without the data and results from the clinical trial, which were only known to Janssen, a POSA would have only understood that Janssen believed the dosing regimens were likely safe and effective. *Tolmar II*, No. CV 21-1784, 2024 WL 2972832, at *2 (D. Del. June 13, 2024) (explaining that a POSA would have "credit[ed] Janssen's hypothesis that the NCT 548 dosing regimens would be safe and effective based on the regimen's status as a phase III clinical trial").

In the end, Janssen developed a novel dosing strategy that differed from the '548 Protocol dosing regimens in several ways, including the dose sequence, dose amount, relationship between loading doses and maintenance doses, and injection site.

2. <u>The '544 Patent</u>

The '544 Patent is an expired patent owned by Janssen titled "Aqueous Suspensions of Submicron 9-Hydroxyrisperidone Fatty Acid Esters." PTX 55/DTX 54. Granted in 2003, the patent discloses a "pharmaceutical composition suitable as a depot formulation for administration by intramuscular or subcutaneous injection, comprising" among other things, a "therapeutically effective amount" of paliperidone palmitate. *Id.* at 9:65–10:4; *see* Tr. 276:21–277:2 (Wermeling). The '544 Patent taught administration of a single dose of paliperidone palmitate that is effective for approximately three weeks or longer. *See* PTX 55/DTX 54 at 8:17–19. It does not teach

loading doses to initiate treatment, discuss a multi-dose regimen or address the complexities that present themselves when administering multiple doses of varying amounts at different times. Tr. 1538:2–1539:2, 2256:12–14 (Sinko); Tr. 506:24–507:1 (Wermeling).

The ’544 Patent discusses particle size, describing an “effective average particle size of less than 2,000 nm.” PTX 55/DTX 54 at 10:28–29; Tr. 294:2–11 (Wermeling). In the ’544 Patent, “effective average particle size” refers to a d90 value, meaning at least 90 percent of the particles are smaller than the size indicated. *See* PTX 55/DTX 54 at 5:15–21. The ’544 Patent also discloses an experiment using four formulations of paliperidone palmitate—termed A, B, C and D—that range in particle size. *See id.* at 9:25–31; Tr. 295:3–8 (Wermeling). All four formulations were “administered to four beagle dogs intramuscularly,” *see* PTX 55/DTX 54 at 9:48–51, but only formulations C and D “were put on a three month stability test” for further study, *id.* at 9:33–35; Tr. 1529:24–1530:8 (Sinko). Notably, Formulation B—one of the formulations *not* chosen for further study—is the only formulation within the range disclosed in the ’906 Patent. Tr. 1795:5–18 (Sinko).

3. The WO ’384 Publication

International Publication WO ’384 is a patent application by Janssen published in 2006, titled “Preparation of Aseptic 3-[2-[4-(6-Fluoro-1,2-Benzisoxazol-3-yl)-1-Piperidinyl]Ethyl]-6,7,8,9-Tetrahydro-9-Hydroxy-2-Methyl-4H-Pyridio[1,2-a]Pyrimidin-4-One Palmitate Ester.” PTX 66/DTX 72. The WO ’384 does not disclose a dosing regimen like the ’906 Patent. Tr. 1548:23–1549:5 (Sinko). The invention relates to “a process for preparing aseptic crystalline” paliperidone palmitate. PTX 66/DTX 72 at 1:5–9. Among other things, in an example in the application, it discloses specific amounts of active and inactive ingredients for an LAI paliperidone palmitate formulation. The example states that the “suspension was filled aseptically into sterile

syringes" in dose volumes corresponding to a range of 25 to 150 mg-eq. of paliperidone. *See id.* at 18:10–15; Tr. 305:9–21 (Wermeling).

**D. Obviousness of Claim 2**

The parties agree that the closest prior art is the '548 Protocol. Def. Br. at 24–25, 37; Pltf. Br. at 16, 51 n.11. Teva alleges that based on various pieces of prior art discussed herein, "a POSA would have found it obvious to modify the '548 Protocol" to reach Claim 2. Def. Br. at 25. The '548 Protocol discusses three regimens of four equal doses of 50, 100 or 150 mg-eq. As discussed above, in light of its lack of results, a POSA would only have inferred that Janssen believed its hypothesis would result in safe and effective dosing regimens.

Teva must show by clear and convincing evidence that a POSA "would have had reason to combine the teaching of the prior art references to achieve the claimed invention" and "would have had a reasonable expectation of success from doing so." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068–69 (Fed. Cir. 2012) (quoting *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009)). The prior art references must not be analyzed in isolation, but with consideration of their "interrelated teachings." *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). In short, the obviousness analysis must not proceed "in a narrow, rigid manner." *Id.* at 427–28.

A POSA would not have known merely from the '548 Protocol itself which, if any, of the many aspects of the protocol should be altered. *See Tolmar I*, 718 F. Supp. 3d 394, 428 (D. Del. 2024). "[A] conclusion of obviousness does not follow from merely 'vary[ing] all parameters or try[ing] each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful." *Grunenthal GmbH*

*v. Alkem Lab'ys Ltd.*, 919 F.3d 1333, 1345 (Fed. Cir. 2019) (second and third alterations in original) (quoting *In re Kubin*, 561 F.3d 1351, 1359–60 (Fed. Cir. 2009)). This is especially true in the pharmaceutical field, where each clinical trial testing any slight modification yields extremely high costs. *Tolmar I*, 718 F. Supp. 3d at 428. Instead, Teva must prove that a POSA would have had a motivation to modify or combine the teachings from the prior art to reach the specific dosing regimen in Claim 2, and have a reasonable expectation of success in doing so.[9] *See KSR Int'l Co.*, 550 U.S. at 418 ("[I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements *in the way the claimed new invention does*." (emphasis added)).

Specifically, Teva must prove that a POSA would have been motivated and have a reasonable expectation of success in modifying the '548 Protocol to address the following distinctions between the '548 Protocol and the '906 Patent's Claim 2. The '548 Protocol discusses equal doses throughout the treatment plan, PTX 54/DTX 55 at 1, whereas the '906 Patent discloses a high, unequal, decreasing loading dose regimen of 150 mg-eq. followed by 100 mg-eq., *see, e.g.*, PTX/DTX 1 at 32:11–30. Further, the maintenance doses in the '906 Patent are independent of the loading doses and can range from 25 mg-eq. to 150 mg-eq., PTX/DTX 1 at 32:25–30, whereas the '548 Protocol requires the maintenance doses to be equivalent with the loading doses, PTX 54/DTX 55 at 1 (disclosing regimens of 150 mg-eq., 100 mg-eq. and 50 mg-eq.). The '548 Protocol also calls for gluteal injections, *id.*, whereas the '906 Patent discloses loading doses administered in the deltoid, PTX/DTX 1 at 32:15, 32:20.

[9] Contrary to Teva's arguments regarding loading doses (Def. Br. at 26–29), Teva must prove that a POSA would have been motivated to change or combine the prior art to arrive at the specific dosing regimen of Claim 2. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–19 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.").

Ultimately, as discussed in detail below, Teva's arguments are unsupported by the record, contradicted by the prior art and inconsistent with its own expert's testimony. Teva is unable to overcome these deficiencies to prove the obviousness of Claim 2.

1. Unequal, Decreasing Loading Doses

In an attempt to carry its burden to prove obviousness by clear and convincing evidence, Teva puts forth several unavailing arguments as to why a POSA would be motivated to modify the '548 Protocol to achieve the high, unequal, decreasing loading dose regimen (150/100 mg-eg.) of Claim 2. *See* Def. Br. at 29–35. Given that Teva's arguments center around a motivation to *modify* the '548 Protocol, and because a motivation need not originate from the reference to be modified, Teva relies on various other pieces of prior art. *See Tolmar I*, 718 F. Supp. 3d at 427 ("In the absence of a reason to modify the NCT dosing regimens, NCT 548 would not render the '906 claims obvious.").

Although Teva includes the WO '384 and the '544 Patent in its disclosed obviousness combinations, FPTO at 11, these pieces of prior art do not provide a motivation to achieve Claim 2's dosing regimen. As Teva's expert in pharmacokinetics, Dr. Daniel Paul H. Wermeling,[10] acknowledged, neither reference discloses a loading dose regimen. *See* Tr. 512:5–8 (Wermeling) ("Q: Does WO '384 give you a reason to give a Day 1 dose of 150 mg equivalents in the deltoid and a second dose in the deltoid of 100 mg equivalents on Day 6 to 10? A: It does not."), 506:24–507:1 (Wermeling) ("Q: And the '544 patent doesn't say anything about giving any doses on Day 1 and Day 8, right? A: Correct. There's nothing about that kind of schedule.");

[10] Dr. Wermeling is a named author on over 35 peer-reviewed publications related to pharmacokinetics, pharmacodynamics and bioavailability. FPTO at 41–42. He has also worked as a clinical investigator on studies related to pharmacokinetics and pharmacodynamics, has received over 60 grants for such studies and is a named inventor on six U.S. patents. *Id.*

*see also* Tr. 2256:12–14 (Sinko) (testifying that the ’544 Patent would not have “taught or suggested to a skilled artisan to use a loading dose regimen”). Thus, neither piece of prior art would motivate a POSA to modify the ’548 Protocol to achieve the loading dose regimen of Claim 2.[11]

Teva also relies on two articles by Dr. Larry Ereshefsky et al. from 1990 (“Ereshefsky 1990”) and 1993 (“Ereshefsky 1993”) (collectively, the “Ereshefsky References”),[12] a 2001 article by Dr. James L. Karagianis et al. (“Karagianis”)[13] and a May 2007 label for Haldol Decanoate (“Haldol Label”).[14] Teva asserts these pieces of prior art provide a motivation to reach the 150/100 mg-eq. loading dose regimen, and its arguments are addressed in turn below.[15]

*i. Motivation Based on Treating an Acutely Agitated Patient and Bringing the Patient into the Therapeutic Window Faster*

Teva argues that a POSA would be motivated by the prior art to select an initial loading dose of 150 mg-eq. because it was the “maximum effective and safe dose” from the ’548 Protocol. Def. Br. at 30 (citation omitted). At trial, Dr. Wermeling testified regarding a POSA’s motivation to modify the first dose related to treatment of an “acutely agitated” patient. *See, e.g.*, Tr. 321:11–

---

[11] Teva’s argument regarding modification to the loading dose regimen based on a patient’s body weight, relying on the ’544 Patent (Def. Br. at 30–31), is unpersuasive. Teva does not provide sufficient support in the record for this theory, and as discussed above, the ’544 Patent does not provide a motivation to arrive at Claim 2’s dosing regimen.

[12] Larry Ereshefsky et al., *Kinetic and Clinical Evaluation of Haloperidol Decanoate Loading Dose Regimen*, 26 Psychopharmacology Bull. 108 (1990); Larry Ereshefsky et al., *A Loading-Dose Strategy for Converting From Oral to Depot Haloperidol*, 44 Hosp. & Cmty. Psychiatry 1155 (1993).

[13] James L. Karagianis et al., *Rapid Tranquilization With Olanzapine in Acute Psychosis: A Case Series*, 62 (suppl. 2) J. Clinical Psychiatry 12 (2001).

[14] Haldol is the brand name for LAI haloperidol decanoate. Def. Br. at 16.

[15] The Court notes that the parties presented minimal testimony and evidence on the Janicak and Revill prior art references at trial. On remand, Teva only mentions the Janicak reference once, in passing as a cumulative citation (Def. Reply Br. at 12), and does not mention the Revill reference. Nonetheless, the Court has considered these references and finds that they do not alter the Court’s obviousness analysis. *See* PFOF ¶¶ 118–19; DFOF ¶¶ 232–33, 264–67.

22, 426:6–8 (Wermeling). Now, Teva appears to pivot to a revised theory that a POSA would choose an initial high loading dose to bring a patient "into the therapeutic window as quickly as possible." Def. Br. at 30 (citation omitted). However, Teva's arguments rely on Dr. Wermeling's testimony that is both contradicted and unpersuasive, as well as prior art that does not support its contentions. Without credible evidence, Teva's motivation theories as to the first loading dose are unavailing.

Dr. Wermeling explained that a POSA would have been motivated to use a high first loading dose in "life-threatening circumstance[s]." Tr. 321:11–16 (Wermeling). But the premise of Dr. Wermeling's argument—that a POSA would use an LAI to treat a patient in an acute situation—was contradicted by Teva's own psychiatrist expert, Dr. René Kahn.[16] Dr. Kahn testified that LAIs would *not* be used for an acutely agitated patient. Tr. 90:12–19 (Kahn) (Q: "And do you use long-acting injectable medications in emergency situations? A: No, one doesn't. Q: Why not? A: Because long-acting injectables are not designed to be used in emergency situations. They don't work fast enough."). Dr. Kahn explained that an LAI, as indicated by its name, is "long acting," and in an "emergency situation, it is much more important to acutely and immediately control the symptoms." Tr. 90:20–23 (Kahn). Janssen's expert on the treatment of psychotic disorders, Dr. Christian G. Kohler,[17] agreed, stating that "short-acting medications" are "*always*" used for the "treatment of acute agitation." Tr. 1931:23–1932:1

---

[16] Dr. Kahn is the Esther and Joseph Klingenstein Professor and System Chair of Psychiatry at the Icahn School of Medicine at Mount Sinai. FPTO at 40–41. Dr. Kahn has conducted extensive research on schizophrenia and its treatment, has published over 900 research papers and has been awarded multiple honors for his work in the field of psychiatry. *Id.*

[17] Dr. Kohler is the Clinical Director of Neuropsychiatry in the Neuropsychiatry Division of the Department of Psychiatry at the Perelman School of Medicine at the University of Pennsylvania. FPTO at 37–38. Dr. Kohler has over twenty years of experience teaching psychiatry to medical students and residents in medical schools and hospitals, has extensive research experience in neuropsychiatric disorders and is the author of over 80 peer-reviewed research publications. *Id.*

(Kohler) (emphasis added). Prior art also supports this testimony. For example, one reference explains that "[i]n the acute phase of schizophrenia, short-acting injections may be required because of their quick action." PTX 64 at 282.

Teva also relies on the Ereshefsky References as teaching a POSA to "increase the first dose." Def. Br. at 34. But in the Ereshefsky References, all patients were required to be "stabilized for at least two weeks on oral haloperidol before starting the depot regimen," and the study reported a drop in plasma concentration of haloperidol in the first 14 days. PTX 60/DTX 89 at 1157 (Ereshefsky 1993); Tr. 1568:21–1569:13 (Sinko) (discussing Ereshefsky 1990 and noting that those "patients were established and stabilized on oral haloperidol, and then they were switching them to the haloperidol decanoate"). Thus, a POSA analyzing the Ereshefsky References would understand that LAIs did not work fast enough to treat acute conditions. Although Dr. Wermeling also relied on Karagianis at trial, his testimony on this prior art is similarly unavailing. Dr. Wermeling testified that Karagianis was "relevant" because it taught to use "loading strategies" with oral doses of olanzapine to achieve "rapid neuroleptization," which is related to treating an "agitated patient." Tr. 313:11–314:22 (Wermeling). However, Dr. Kahn explained that rapid neuroleptization "has nothing to do with the use of long-acting injectables." Tr. 2382:8–2384:11 (Kahn). In short, Dr. Kahn's testimony and the prior art undermine Dr. Wermeling's theory regarding a POSA's motivation to give the maximum safe and effective dose to an acutely agitated patient.

On remand, Teva reframes its argument and contends that a POSA would choose to employ this "maximum effective and safe dose" to bring a patient "into the therapeutic window as quickly as possible." Def. Br. at 30 (citing ECF No. 167-1 ¶ 343). The only testimony cited by Teva in support of this argument is Dr. Wermeling explaining his acute agitation theory. *Id.* (citing ECF

No. 167-1 ¶ 343, which in turn cites Tr. 321:1–22, 426:2–8 (Wermeling)). But as described above, the acute agitation theory was unpersuasive, and therefore Teva's revised motivation theory fares no better.

Furthermore, Janssen's expert in pharmacokinetics, Dr. Patrick J. Sinko,[18] rejected the idea that one can "reach the therapeutic threshold faster" simply by increasing the dose of paliperidone palmitate. Tr. 2109:22–2110:04 (Sinko). Dr. Sinko explained that increasing the dose may "get[] more drug into the body, but it's not occurring more quickly." Tr. 1592:22–1594:25 (Sinko); *see also* Tr. 2111:6–13 (Sinko) (recommending "a faster formulation [rather] than an increased dose" to reach a concentration sooner), 1779:22–1780:1 (Sinko). Indeed, Dr. Wermeling testified that to adjust the release characteristics of the drug, a POSA would change the *particle size*. *See* Tr. 299:7–8 (Wermeling) ("The particle sizes in the formulation are managed to provide release characteristics that are desirable."), 293:23–24 (Wermeling) ("[P]harmacokinetic properties can be altered by altering the particle sizes made in the formulation."), 291:15–19 (Wermeling). Reinforcing this testimony, Dr. Sinko credibly conveyed that the Goodman and Gilman reference ("Goodman & Gilman")[19] explains that the "formulation is controlling the absorption." Tr. 1536:8–21 (Sinko). Thus, contrary to Teva's assertion, both sides' experts agreed that a POSA seeking to achieve rapid therapeutic effects would be motivated to modify the particle size of paliperidone palmitate, not its dose size.[20] *See* Tr. 581:24–582:2 (Block) ("[S]maller particles,

---

[18] Dr. Sinko is a Distinguished Professor of Pharmaceutics in the Ernest Mario School of Pharmacy at Rutgers. FPTO at 36–37. Dr. Sinko has over thirty years of research experience in drug formulation, drug delivery technology and drug targeting. *Id.* Dr. Sinko has given over 160 invited lectures, has published 175 articles in scientific journals and serves as a grant reviewer for the National Institute of Health. *Id.*

[19] Goodman & Gilman's The Pharmacological Basis of Therapeutics (Laurence L. Brunton ed., McGraw-Hill, 11th ed. 2006).

[20] The Court acknowledges that a POSA can be motivated to do more than one thing. *See Teva II*, 97 F.4th 915, 930 (Fed. Cir. 2024). Here, however, the evidence demonstrates a POSA would be motivated

having a larger surface area, provide a more substantial release rate than larger particles, which have a relatively smaller surface area. And dissolution or release . . . is surface area dependent.”).

In sum, Teva’s argument that a POSA would be motivated to modify the initial loading dose of the ’548 Protocol is unpersuasive; it is not sufficiently supported by Teva’s own expert testimony and is contradicted by the prior art.

*ii. Motivation Based on Excessive Accumulation*

Teva further argues that a POSA would be motivated to select a second loading dose of 100 mg-eq. because reducing the second dose would avoid excessive accumulation of paliperidone palmitate. Def. Br. at 31. However, the prior art does not support Teva’s asserted motivation.

Ereshefsky 1993 teaches the reduction of *maintenance* doses, not *loading* doses, to avoid excessive accumulation. *See* PTX 60/DTX 89 at 1156. Teva’s expert Dr. Wermeling acknowledged as much, stating that Ereshefsky 1993 teaches reduced *maintenance* dosages of haloperidol decanoate in the “second and third months” of the study “to avoid this excessive accumulation.” Tr. 322:17–323:1 (Wermeling). As Dr. Wermeling recognized on several occasions, loading doses and maintenance doses are distinct concepts. *See* Tr. 372:15–24 (Wermeling) (testifying that FDA guidance that is “true for maintenance dosing” is “not correct as applied to” loading doses), 211:8–12 (Wermeling) (stating that loading doses are given “more frequently than” maintenance doses), 312:12–13 (Wermeling) (explaining that a “loading dose is the use of higher doses than maintenance at a shorter dosing interval”). A POSA would not infer that Ereshefsky’s teachings on maintenance doses would apply equally to loading doses. *See* PTX 59/DTX 88 at 109 (Ereshefksy 1990 explaining that “[a] loading-dose regimen is used to obtain

---

to modify the particle size to achieve therapeutic effects more rapidly, and there is insufficient evidence to support that a POSA would be motivated to modify the loading dose size to achieve the same.

therapeutic steady-state [plasma concentrations] earlier in the course of therapy. . . . then subsequent doses reflect maintenance treatment to maintain the desired steady-state [plasma concentrations]"); PTX 65 at 26–27 (explaining different equations for calculating loading and maintenance dose amounts); *see also Endo Pharms. Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1385 (Fed. Cir. 2018) (recognizing distinction in prior art teachings towards maintenance versus loading doses).

Of course, a motivation "does not have to be found explicitly in the prior art," *In re Kahn*, 441 F.3d 977, 987 (Fed. Cir. 2006), and a POSA can employ "inferences and creative steps" to get from the prior art to the claimed invention, *KSR Int'l Co.*, 550 U.S. at 418. But Teva has the burden to show by clear and convincing evidence *how* the prior art would motivate a POSA to achieve the claimed regimen. Here, Teva points to the reduced maintenance doses of Ereshefsky 1993 and asserts that a POSA would accordingly be "motivated to select a 100 mg-eq. dose for the second loading dose." Def. Br. at 31. Missing from Teva's argument is a credible explanation of *how* a POSA would reasonably infer from the reduction of a *maintenance* dose a motivation to reduce a second *loading* dose. *See In re Magnum Oil Tools, Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016) ("[T]he ultimate burden of persuasion of obviousness must remain on the patent challenger.").

Teva also argues that a POSA would select a 100 mg-eq. second loading dose to "avoid possible overexposure" in "patients with smaller bodies or milder symptoms." Def. Br. at 31. However, Teva does not point to persuasive testimony to establish its point. Teva's cited testimony does not even appear to mention smaller bodies or milder symptoms. *See id.* (citing Tr. 148:17–19 (Kahn); Tr. 321:1–323:1, 474:20–475:22 (Wermeling)). Moreover, Teva does not explain why a "smaller patient" or one with "milder symptoms" would require a reduced *second* loading dose

while still maintaining the *initial*, high 150 mg-eq. dose. Indeed, Teva's expert testimony regarding reduction of doses for a renally-impaired patient advocated for a reduction in *both* loading doses, not just the second dose. *See* Tr. 148:13–16 (Kahn). Teva's assertion that a POSA would be motivated to reduce dosage for a "smaller patient" or one with "milder symptoms" appears to be attorney argument without sufficient support in the record. *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017) ("Attorney argument is not evidence.").

Therefore, Teva's argument that a POSA would be motivated to reduce the second loading dose of the '548 Protocol to achieve the claimed regimen is unpersuasive.

*iii. Motivation Based on the 20 Times Multiplier*

In another attempt to prove motivation, Teva asserts that the Ereshefsky References, as well as the Haldol Label, provide guidance to arrive at the 150/100 mg-eq. loading dose regimen in Claim 2. *See* Def. Br. at 32.[21] Specifically, Teva argues that the Ereshefsky References and the Haldol Label teach a POSA to multiply the *oral* dose of haloperidol by 20 times to reach the *injectable* dose. Def. Br. at 32. Applying this 20 times multiplier to the maximum recommended dose of Invega ER, which is oral paliperidone (12 mg), PTX 57 at 25, Teva argues that a POSA would be motivated to use a 240 mg-eq. loading dose of paliperidone palmitate to treat a patient, Def. Br. at 32. According to Teva, the 240 mg-eq. dosage amount "could be approximated" into the 150/100 mg-eq. dosing regimen of Claim 2. *Id.*

The record does not support that a POSA would take the specific dosing recommendations from these references and apply them to reach Claim 2. The Ereshefsky References and the Haldol

[21] As Janssen points out (Pltf. Reply Br. at 24 n.10), the Haldol Label was not disclosed in the Final Pretrial Order, including the Final Pretrial Order's obviousness combinations, and Teva failed to comply with Local Patent Rule 3.3. *See Celgene Corp. v. Hetero Labs Ltd.*, No. 17-3387, 2021 WL 3701700 (D.N.J. June 15, 2021). Regardless, even considering the Haldol Label, the Court finds Teva's arguments regarding such to be unsubstantiated.

Label study haloperidol decanoate, not paliperidone palmitate. PTX 59/DTX 88; PTX 60/DTX 89. Haloperidol decanoate has a different pharmacokinetic profile than paliperidone palmitate. Tr. 513:17–24 (Wermeling); *see also* Tr. 515:9–21 (Wermeling) (noting that the drugs are "inherently" different, in part because "one is a solution and one is a particle, so you have different rate processes"). Dr. Sinko explained that because each drug acts differently in a patient, studies on drugs with different pharmacokinetics cannot be directly correlated. Tr. 1566:18–1567:11 (Sinko). Although a POSA would not disregard the teachings of the Ereshefsky References and the Haldol Label because they study a different drug, Teva's argument requires a POSA to be motivated to apply the specific quantitative amounts recommended based on haloperidol decanoate to paliperidone palmitate.[22] Teva does not provide sufficient evidence as to *why* a POSA would do so.

Further, in testimony cited by Teva in support of this argument, Dr. Wermeling does not explain why a POSA would be motivated to achieve the specific sequence and dosing amounts of Claim 2. *See* Def. Br. at 32 (citing ECF No. 167-1 ¶ 352, which in turn cites Tr. 557:16–22 (Wermeling)). Although Dr. Wermeling explains generally the teachings of the Ereshefsky References and that "20 times 12" is "240," Tr. 557:16–22 (Wermeling), this testimony does not credibly support how a POSA would be motivated to choose the size of the two loading doses at each point in time. Despite presenting attorney argument regarding the Haldol Label, Teva does not cite any persuasive testimony supporting its argument. This is unsurprising, given that Teva did not identify the Haldol Label as prior art in the Final Pretrial Order. FPTO at 11. Instead,

[22] Indeed, as the Federal Circuit acknowledged when discussing references involving different antipsychotic LAIs, "the specific *amounts* of medication given in these references would not correlate to the amount of paliperidone palmitate claimed." *Teva II*, 97 F.4th 915, 930 (Fed. Cir. 2024) (emphasis in original).

Teva relies on its already-rejected reasoning that a POSA would seek to rapidly achieve the "therapeutic window" before decreasing dosage to avoid "excessive accumulation." Def. Br. at 32. As discussed above, these arguments are unavailing because they are not sufficiently supported by the record and misconstrue the prior art. Therefore, Teva's argument that a POSA would be motivated to select the dosing amounts from the '906 Patent based on the 20 times multiplier contained in the prior art is unpersuasive.

*iv. Motivation Based on the Haldol Label's Dosing*

Teva advances another argument regarding the Haldol Label and its recommendation to multiply the oral dose by 20 times to reach the injectable dose. As an initial matter, although a POSA would recognize the prior art's teachings, a patent challenger must show that the prior art "suggest[s] that the *specified elements* should be selected and combined." *Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1273 (Fed. Cir. 2018) (emphasis added). The Haldol Label instructs to "begin with lower initial doses and to adjust the dose upward as needed," *see* Tr. 2392:19–2393:1 (Kahn); DTX 149 at 12, whereas the '906 Patent's dosing regimen starts higher and decreases. As presented by Teva, the Haldol Label teaches the opposite of Claim 2's dosing regimen. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007) (noting evidence presented must be considered in its "totality").

Teva cites to a hypothetical presented to Janssen's expert, Dr. Kohler, that is inconsistent with the Haldol Label. Def. Br. at 16, 33–34. The hypothetical inquired about the loading dose regimen under the Haldol Label's teachings if 180 mg was being administered. Given that the Haldol Label recommends a maximum first loading dose of 100 mg, DTX 149 at 12–13, Dr. Kohler agreed, following the hypothetical, that the Haldol Label would instruct a 100/80 mg loading dose regimen. Tr. 1967:24–1968:15 (Kohler). But as Janssen points out, the premise of

the hypothetical presented to Dr. Kohler is contrary to the Haldol Label. The Haldol Label only recommends multiplying the oral medication by 20 times if a patient received *more than 10 milligrams* a day of the oral equivalent. Pltf. Reply Br. at 26; DTX 149 at 12. Therefore, if applying the Haldol Label's 20 times conversion, a patient receiving an injectable would receive *more than* 200 mg, split into two doses: a first loading dose of 100 mg, and a second loading dose of more than 100 mg. Since the Haldol Label recommends a maximum 100 mg initial dose, the *second* loading dose would increase (not the first) as the overall dosage amount increased. In short, applying the Haldol Label's 20 times conversion instructs an increasing regimen that is unlike the decreasing regimen of Claim 2. Thus, Teva's argument is unpersuasive.

*v. Prior Art's Teachings on Motivation in Toto*

Considering the evidence discussed in detail above *in toto*, Teva fails to prove by clear and convincing evidence that a POSA would be motivated to employ Claim 2's loading dose regimen.

Beginning with the '548 Protocol, as many of Teva's arguments do, a POSA would credit Janssen's hypothesis that the doses tested are likely to be safe and effective. However, this would not provide a motivation to achieve the novel, high, unequal, decreasing loading dosing regimen of Claim 2. Teva then turns to other theories purportedly grounded in the prior art to establish a motivation to modify the '548 Protocol. Teva asserts that a POSA would be motivated to increase the initial loading dose to achieve therapeutic effects more rapidly. However, the Goodman & Gilman reference and expert testimony explain that a POSA would change the particle size, not dosing amounts, to reach the therapeutic window faster. Next, Teva asserts that a POSA would be motivated by the prior art to decrease the second loading dose to avoid excessive accumulation. Once again, this theory is unsupported by the prior art, which teaches a reduction in *maintenance* doses, not loading doses. Teva also points to the Ereshefsky References and the Haldol Label but

does not adequately explain why a POSA would straightforwardly apply the specific values from haloperidol decanoate in those studies to paliperidone palmitate. In any event, the Haldol Label in fact appears to teach *increasing* loading doses, directly contrary to Claim 2.

Of course, Teva could always show that a POSA would be able to use "inferences and creative steps" to get from these prior art references to the claimed regimen. *KSR Int'l Co.*, 550 U.S. at 418. But as discussed above, Teva's arguments are unpersuasive, misconstrue the prior art or are contradicted by the record. And although a motivation "does not have to be found explicitly in the prior art," there must still be "some articulated reasoning . . . to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d at 987–88. Combining the teachings from the prior art references, a POSA would understand that Janssen believed the '548 Protocol's regimens would be safe and effective, and that the prior art taught to reduce maintenance doses (not loading doses) or an increasing loading dose regimen—contrary to the dosing regimen of Claim 2. Therefore, Teva has failed to meet its burden.

*vi. Reasonable Expectation of Success*

Teva's failure to establish that a POSA would be motivated to achieve Claim 2's dosing regimen is fatal to its obviousness argument. *See Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367–68 (Fed. Cir. 2016) (noting that it is patent challenger's burden to establish both motivation and reasonable expectation of success). Nonetheless, the Court will address a POSA's reasonable expectation of success.

The Court notes that the below discussion, as well as this entire Opinion, analyzes whether Teva proves that a POSA would possess a reasonable expectation of success in administering paliperidone palmitate to *a* patient according to the claimed dosing regimen. Additionally, the Court acknowledges that there is no safety and efficacy limitation in the '906 Patent itself.

Efficacy data is not "always required for a reasonable expectation of success," *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019), and obviousness does not require "[c]onclusive proof of efficacy," *Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1333 (Fed. Cir. 2018) (alteration in original) (quoting *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014)). But "[u]nclaimed factors relevant to the feasibility of creating a useful claimed invention can impact the motivation to combine analysis if a skilled artisan would reasonably consider them." *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1378 (Fed. Cir. 2024) (holding there was no clear error in the district court's findings on motivation or reasonable expectation of success where the court referenced unclaimed factors). Indeed, Dr. Wermeling explained that a POSA would be motivated to use a dosing regimen that is safe and effective. *See, e.g.*, Tr. 320:5–12, 324:18–325:11, 426:6–12 (Wermeling). Further, the fact that the '548 Protocol does not contain safety and efficacy data, as discussed above, surely impacts what the protocol would suggest to a POSA. *See OSI Pharms.*, 939 F.3d at 1385 (noting that presence of "no efficacy data" impacts the "reasonable expectation of success" to be drawn from references).

In arguing for expectation of success, Teva points to the three primary prior art references—the '548 Protocol, the '544 Patent and the WO '384. Def. Br. at 36–38. The '548 Protocol alone does not establish an expectation of success in achieving the dosing regimen of Claim 2 for a patient. Although a POSA would credit Janssen's hypothesis and the '548 Protocol's Phase III status, drug trials routinely fail. *See* Tr. 543:7–10 (Wermeling) (explaining that "most drugs fail" and that the drug development process is "very difficult"). The '548 Protocol, even as a Phase III clinical trial, was only a hypothesis. *See OSI Pharms.*, 939 F.3d at 1378, 1384–85 (finding no reasonable expectation of success because creating drugs

to treat cancer is a "highly unpredictable art" and a Phase II clinical trial had "no efficacy data or any other reliable indicator of success" for claims directed to treating "a mammal").

Additionally, the '548 Protocol is different from the claimed dosing regimen. For example, the '548 Protocol only discloses equal doses whereas the claimed regimen discloses high, unequal and decreasing doses. A clinical trial protocol for a *different* dosing regimen does not establish a reasonable expectation of success for the Claim 2 dosing regimen. Even if a POSA would expect the '548 Protocol to succeed because it was a Phase III clinical trial, that does not demonstrate an expectation of success in achieving the specific dosing regimen of Claim 2. *See Salix Pharms., Ltd. v. Norwich Pharms. Inc.*, 98 F.4th 1056, 1062 (Fed. Cir. 2024) (finding that the disclosure of a Phase II "clinical trial plan" was not enough, standing alone, to render obvious a distinct dosing regimen "that was not included within the planned clinical trial").

Teva also argues that the WO '384 and the '544 Patent create a reasonable expectation of success because both "disclose effective treatment options." Def. Br. at 38. However, these prior art references only disclose the use of a single dose. *See* PTX 55/DTX 54 at 8:18–20; PTX 66/DTX 72 at 2; Tr. 1538:2–6 (Sinko) (explaining that the '544 Patent "does not" include loading doses), 511:15–17 (Wermeling) (agreeing that the WO '384 "does not disclose anything about a dosing regimen"). Single-dose regimens are not as complex or unpredictable as multi-dose regimens, such as the '906 Patent, which encounter difficulties such as potentially toxic "accumulat[ion]" and "fluctuation between administrations" that single-dose regimens do not. Tr. 1597:21–1600:10 (Sinko); *see also Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1349 (Fed. Cir. 2021) ("Unpredictability of results equates more with nonobviousness rather than obviousness.") (quoting *Honeywell Int'l Inc. v. Mexichem Amanco*

*Holding S.A. DE C.V.*, 865 F.3d 1348, 1356 (Fed. Cir. 2017)). Therefore, these references fall short of providing a reasonable expectation of success for treating *a* patient.

Considered altogether, the evidence discussed above still does not create a reasonable expectation of success. The ’548 Protocol’s dosing regimens are different than Claim 2’s regimen, and a clinical trial for a different dosing regimen, without more, does not create an expectation of success. When evaluating the ’548 Protocol, a POSA would also take into consideration that most drugs fail during the development process. Tr. 543:7–10 (Wermeling); *see also KSR Int’l Co.*, 550 U.S. at 418. Further, neither the ’544 Patent nor the WO ’384 provides information that is critical to achieving a multi-dose regimen. *See Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021) (noting that “reasonable-expectation-of-success analysis” must be “frame[d] . . . around th[e] specific dosage” claimed). Multi-dose regimens are unpredictable in ways that single-dose regimens are not. With multi-dose regimens, as discussed, a POSA must account for “accumulation” of the drug in a patient’s body, Tr. 1598:16–1599:1 (Sinko), “fluctuations” in blood levels, Tr. 1597:17–1599:14 (Sinko), and avoiding “adverse effects” from too much of the drug, Tr. 1597:17–1599:14 (Sinko). These concepts are inherently “more complicated” with a dosing regimen like Claim 2, Tr. 1600:21–1601:10 (Sinko), because there are different dose amounts being given at different intervals to a patient. Although the ’548 Protocol includes multi-dose regimens, without results, what a POSA can infer from it is limited. *See Tolmar I*, 718 F. Supp. 3d at 426 (“But without knowing the results of the Phase III clinical trial, a person of ordinary skill in the art would have learned nothing from NCT 548 beyond crediting Janssen’s hypothesis.”).

Moreover, Teva fails to overcome evidence in the record that a POSA would likely utilize a *low and increasing* dosing regimen when administering an antipsychotic medication, contrary to

the dosing regimen of Claim 2.[23] Dr. Kahn explained that a POSA would understand that the recommended dosing for antipsychotics is to start at a low dose before "adjust[ing] the dose upward as needed" or "slowly work[ing] up to a higher dose." *See* Tr. 2392:19–2393:1, 168:19–169:5 (Kahn). This is because it was known that severe symptoms occurred more frequently at higher doses. *See* Tr. 2392:19–2393:1 (Kahn); Tr. 1903:6–1905:24 (Kohler); DTX 93 at 313 ("Low doses of risperidone have been reported to attenuate negative symptoms of schizophrenia with a low incidence of extrapyramidal side effects. Extrapyramidal effects are commonly seen, however, with doses of risperidone in excess of 6 mg/day."); PTX 808 at s122 ("[A]typical antipsychotics should be used as first-line therapy, commencing with a low dose and titrating upwards very slowly over a period of several weeks."). In consideration of this evidence, contrary to the premise of Teva's arguments, a POSA would not likely start with the 150 mg-eq. loading dose, nor have a reasonable expectation of success in doing so. *See Pfizer, Inc.*, 480 F.3d at 1360 ("The trial court has the responsibility to determine whether the challenger has met its burden by clear and convincing evidence by considering the totality of the evidence, *including any rebuttal evidence presented by the patentee*." (emphasis added)).

In sum, Teva fails to carry its burden to prove that a POSA cognizant of the prior art would have a reasonable expectation of success in achieving the claimed dosing regimen.

---

[23] The conventional wisdom is relevant to the background knowledge of a POSA. Regardless, even if the Court did not consider this conventional wisdom, the Court's conclusion would remain the same: a POSA would not have a reasonable expectation of success in achieving the claimed dosing regimen. But as instructed by the Federal Circuit in *Teva II*, 97 F.4th 915, 933–34 (Fed. Cir. 2024), the Court will not compare the results of the claimed dosing regimens to the conventional wisdom when discussing unexpected results in its analysis of secondary considerations. *See supra* § II.H.3.

2. Deltoid Injection Site

Having determined that the loading dose regimen is not obvious, the Court concludes that Claim 2 is not obvious "when considered 'as a whole.'" *Jones v. Hardy*, 727 F.2d 1524, 1529 (Fed. Cir. 1984) (quoting 35 U.S.C. § 103); *see also In re Kotzab*, 217 F.3d 1365, 1370 (Fed. Cir. 2000) (noting that patent challenger must establish obviousness of "the specific combination that was made by the applicant"). Nevertheless, the Court will analyze the obviousness of the deltoid as the injection site.

*i. Motivation*

It was known that sites for intramuscular injections included the deltoid, the gluteus and the thigh. Tr. 278:7–11, 280:16–21 (Wermeling); Tr. 1719:15–17 (Sinko). Although deltoid injections may be more painful than gluteal injections, *see* Tr. 398:10–12 (Wermeling), and result in a greater fluctuation in drug content, *see* Tr. 397:12–16 (Wermeling), 1604:11–1605:14 (Sinko), witnesses from both parties agreed that a patient may prefer the deltoid site for modesty reasons. Tr. 324:7–11 (Wermeling), 857:23–858:3 (Vermeulen). As one of Teva's witnesses put it, a patient may prefer the deltoid because they would not have to "pull down [their] pants." Tr. 1180:20–25 (Gopal). The Court acknowledges that a POSA "can be motivated to do more than one thing," *Teva II*, 97 F.4th 915, 930 (Fed. Cir. 2024), and thus, a POSA would have been motivated to use the deltoid injection site. *See Tolmar I*, 718 F. Supp. 3d at 425 (holding a POSA "would have been motivated to develop a long-acting injectable that is administrable in the deltoid").

*ii. Reasonable Expectation of Success*

As both parties' experts acknowledged, a POSA would know that intramuscular injections are most commonly administered in either the deltoid or the gluteus. *See* Tr. 280:16–21

(Wermeling), 1719:15–17 (Sinko) (agreeing that the "two most common" sites for "intramuscular injection of drugs" are "the gluteal and the deltoid"). A POSA would have also known intramuscular administration could be used with paliperidone palmitate specifically, as the '544 Patent discloses as much. Tr. 277:22–278:2 (Wermeling). A POSA would thus understand that paliperidone palmitate could be injected in either the gluteus or the deltoid—*i.e.*, the two injection sites were interchangeable. For these reasons, a POSA would have a reasonable expectation of success in achieving the deltoid injection site of Claim 2. *See Tolmar I*, 718 F. Supp. 3d at 425 (holding a POSA "would . . . have had a reasonable expectation of success in administering the NCT 548 injections to the deltoid"). Even though a POSA would have expected interchangeability of—and thus similar results from—the injection sites, *very favorable* results from the use of the deltoid were unexpected and are relevant to this Court's consideration of the objective indicia of nonobviousness.

However, the obviousness of the deltoid injection site does not render Claim 2 obvious; Teva fails to establish that a POSA would be motivated to, and have an expectation of success in, achieving the claimed dosing regimen, as discussed in detail above. *See supra* § II.D.1; *see also Tolmar I*, 718 F. Supp. 3d at 425–26, 435 (holding the '906 Patent to be nonobvious despite holding that a POSA would be motivated to use the deltoid and have a reasonable expectation of success in doing so); *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 717 (Fed. Cir. 1991) ("When analyzing a patent claim for obviousness, the claim should be considered as a whole, but the differences between the claim and the prior art need to be identified . . . .").

**E. Claim 2 Presumption of Obviousness**

Teva argues that the loading doses of Claim 2 fall within the range of loading dose amounts discussed in the '548 Protocol. Specifically, Teva contends that the '548 Protocol includes a range

of total loading doses from 200 mg-eq. (two loading doses of 100 mg-eq.) to 300 mg-eq. (two loading doses of 150 mg-eq.). *See* Tr. 321:5–10 (Wermeling). Teva argues that the 250 mg-eq. total loading doses from Claim 2 (150/100 mg-eq.), therefore, fall within the '548 Protocol's range. *See* Def. Br. at 36.[24]

"A *prima facie* case of obviousness typically exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (quoting *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003)). "[S]uch overlap creates a presumption of obviousness." *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed. Cir. 2018). Importantly, the presumption may be rebutted "with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations." *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015) (quoting *Galderma Lab'ys, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013)). But the presumption of obviousness only applies "when the *only difference* from the prior art is a difference in the range or value of a particular variable." *In re Kumar*, 418 F.3d 1361, 1366 (Fed Cir. 2005) (emphasis added) (citing *In re Peterson*, 315 F.3d at 1329); *see also Tris Pharma, Inc. v. Actavis Lab'ys FL, Inc.*, 503 F. Supp. 3d 183, 203 (D. Del. 2020) ("But the presumption attaches only when the range or value of a particular variable is *the* difference between the claimed invention and the prior art." (emphasis in original, internal quotation marks and citation omitted)), *aff'd*, No. 2021-1495, 2022 WL 2525318 (Fed. Cir. July 7, 2022).

---

[24] Teva frames its argument as the total amount of the first two loading doses. *See* Def. Br. at 36. Even if Teva argued that the individual doses fell within the range disclosed in the '548 Protocol, however, the analysis in this section applies to either argument.

Here, Teva acknowledges that Claim 2 differs from the '548 Protocol because of the dosage amounts, claimed dosing sequence and requisite deltoid injections. *See* Def. Br. at 25, 38. Therefore, even considering Teva's characterization that the dosage amounts are included in the range utilized in the '548 Protocol, the presumption cannot apply because the dosage amounts are not the "only difference from the prior art." *In re Kumar*, 418 F.3d at 1366. Indeed, the specific dosing sequence of a larger initial loading dose followed by a smaller second loading dose (150/100 mg-eq.) is not taught in the prior art. *See Pharmacyclics LLC v. Alvogen Pine Brook LLC*, 556 F. Supp. 3d 377, 408 (D. Del. 2021) (holding the presumption of obviousness did not apply because "there are many differences . . . including the . . . route of administration, and number of administrations per day"), *aff'd sub nom. Pharmacyclics LLC v. Alvogen, Inc.*, No. 2021-2270, 2022 WL 16943006 (Fed. Cir. Nov. 15, 2022) (affirming district court's holding that the presumption of obviousness was not applicable where there were "additional differences between the prior art and [the] claim"). As such, the presumption is not applicable to Claim 2 and it remains Teva's burden to prove obviousness. *See Tolmar I*, 718 F. Supp. 3d 394, 429 (D. Del. 2024) ("Even if I were to agree with Tolmar's characterization of NCT 548 as disclosing ranges of paliperidone to be included in each dose, there can be no prima facie case of obviousness because the claimed method requires administration to the deltoid rather than to the gluteal muscle.").

Nonetheless, as discussed below, the Court finds that unexpected results and other pertinent secondary considerations favor nonobviousness. Thus, even if the presumption of obviousness applied, it would be rebutted by secondary considerations. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1369 (Fed. Cir. 2007) ("Evidence of unexpected results can be used to rebut a prima facie case of obviousness.").

**F. Obviousness of Claims 10 and 13**

The '906 Patent discloses dosing regimens for a renally impaired patient, which include loading doses of 75/75 mg-eq. and a maintenance dose of between 25 mg-eq. to 75 mg-eq. (Claim 10) or 25 mg-eq. to 50 mg-eq. (Claim 13). Teva asserts that a POSA would be motivated to apply a 50 percent reduction to each dose of the 150/150/150/150 mg-eq. regimen of the '548 Protocol for a renally-impaired patient, thus achieving the dosing regimens of claims 10 and 13. Def. Br. at 44. Contrary to Teva's assertion, however, a 50 percent reduction to the 150 mg-eq. regimen of the '548 Protocol would not achieve Claim 13. If a 50 percent reduction is applied to the 150 mg-eq. dosing regimen of the '548 Protocol, the maintenance dose would be 75 mg-eq., but Claim 13 discloses a maintenance dose of 25 mg-eq. to 50 mg-eq. PTX/DTX 1 at 33:42–47, 33:50–52. In fact, Claim 13 cannot be achieved by a 50 percent reduction to any regimen of the '548 Protocol. If a 50 percent reduction is applied to the 100 mg-eq. dosing regimen of the '548 Protocol, then the loading doses would be 50 mg-eq., not 75 mg-eq. as disclosed in Claim 13. Regardless, Teva fails to prove a motivation to reduce dosage by 50 percent to achieve either claim.

The Court acknowledges that claims 10 and 13 do not contain a specific level of renal impairment, as noted by the Federal Circuit. However, Teva's theory of motivation, as presented by its expert Dr. Wermeling at trial, was directed to mild renal impairment. Indeed, Dr. Wermeling testified that a POSA would *not* be motivated to use this medication for a patient with moderate or severe renal impairment. Tr. 332:10–15 (Wermeling) ("[P]atients with moderate to severe renal impairment are not to receive this medicine."). Given that it is Teva's burden to prove a motivation to reach the claimed dosing regimen, the Court's analysis below addresses Teva's motivation theory regarding mild renal impairment. *See Immunex Corp. v. Sandoz, Inc.*, 964 F.3d 1049, 1067

(Fed. Cir. 2020) (explaining that although "the claims at issue do not require any therapeutic effect," because "[t]he focus of [defendants'] motivation to combine argument remained the therapeutic benefits of the claimed invention, . . . it was not error for the district court to frame its analysis accordingly"); *Intelligent-Bio Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368 (Fed. Cir. 2016) (noting that although the claims "do not require quantitative deblocking at all, it is central to a finding of no motivation to combine" due to petitioner's argument). Nonetheless, the Court also finds Teva's arguments about *any* level of renal impairment unpersuasive.

All teachings in the prior art must be considered in the obviousness determination, "including that which might lead away from the claimed invention." *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988). Indeed, "[e]vidence suggesting reasons to combine cannot be viewed in a vacuum apart from evidence suggesting reasons not to combine." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1363 (Fed. Cir. 2017). When considering apparently conflicting references, the factfinder must weigh each reference "for its power to suggest solutions to an artisan of ordinary skill . . . consider[ing] the degree to which one reference might accurately discredit another." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (alterations in original) (quoting *In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991)).

At trial, Dr. Wermeling looked to the Invega ER label and a meeting abstract from 2007 ("Cleton 2007"),[25] which purportedly teach a 50 percent dose reduction for a patient with mild

[25] A. Cleton, *Effects of Renal Impairment on the Pharmacokinetic Profile of Paliperidone Extended-Release Tablets*, 81 (suppl. 1) Clinical Pharmacology & Therapeutics S63 (2007).

renal impairment.[26] Tr. 333:6–12 (Wermeling).[27] Notwithstanding the focus of Dr. Wermeling's testimony, Cleton 2007 studied subjects with mild, moderate and severe renal impairment. PTX 56/DTX 84; *see also* Tr. 1586:22–1587:8 (Sinko) (explaining that Cleton 2007 included data on "three different levels of renal impairment"). Cleton 2007's conclusion was that a lower dose "should be considered for subjects with moderate and severe renal impairment." PTX 56/DTX 84. Dr. Sinko credibly testified that Cleton 2007, therefore, teaches *no* dose reduction for a patient with mild renal impairment. Undermining Dr. Wermeling's theory, Dr. Sinko explained that "one of the conclusions that [Cleton 2007] came to was for mild renal impairment . . . they would not . . . need[] to reduce the dose." Tr. 1586:14–20 (Sinko).

Weighing the prior art and the expert testimony on the subject, the Court finds Dr. Sinko's testimony to be persuasive and credible. *See* Tr. 1586:14–20 (Sinko). Although Teva argues that Cleton 2007 is not instructive as to a dose reduction for mild renal impairment, Def. Reply Br. at 52, its argument is unconvincing in light of Dr. Sinko's testimony.[28] *See Perfect Web Techs.,*

---

[26] Teva also relies on U.S. Application No. 2007/0197591 (the "'591 Application") and the WO '384 for the general proposition that some dose reduction may be needed for a patient with renal impairment. Def. Br. at 43–44; Tr. 328:25–330:15 (Wermeling). The Court acknowledges that the prior art would have taught a POSA that a dose reduction may be needed for a patient with renal impairment. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (explaining the court should consider the "background knowledge possessed by a person having ordinary skill in the art"). However, this knowledge does not render the specific, claimed dosing regimens obvious and does not outweigh Dr. Sinko's credible testimony that Cleton 2007 teaches no dose reduction for those with mild renal impairment.

[27] Dr. Wermeling explained that a patient with "moderate to severe renal impairment [is] not to receive this medicine." Tr. 332:13–15 (Wermeling). This testimony seemingly ignores that the Invega ER label and Cleton 2007 recommend reducing the doses for patients with moderate to severe renal impairment. *See* DTX 102 at 25; PTX 56/DTX 84.

[28] Insofar as Teva cites to the record at all, it points to the reference itself which includes data regarding levels of paliperidone clearance for renally impaired patients. Def. Reply Br. at 52 (citing PTX 56). However, what these various levels of paliperidone clearance would suggest to a POSA regarding the dosing of paliperidone is not "easily understandable" such that expert testimony regarding the reference is not required. *See Wyers v. Master Lock Co.*, 616 F.3d 1231, 1242 (Fed. Cir. 2010). As such, the Court looks to expert testimony to explain the import of this data to the dosing of a patient with mild renal impairment, and credible testimony on that topic is provided by Dr. Sinko. *See In re Brimonidine Patent*

*Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 (Fed. Cir. 2009) (explaining how a party's position was "merely attorney argument lacking evidentiary support"). Based on Dr. Sinko's testimony and a review of the prior art, the Court is persuaded that a POSA "would be led in a direction divergent from the path that was taken in the claim." *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1337 (Fed. Cir. 2021) (internal quotation marks omitted) (quoting *Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017)); *see also Arctic Cat Inc.*, 876 F.3d at 1360–63 (finding jury's determination that there was no motivation was supported by substantial evidence and noting obviousness "requires consideration of all the facts" including where "the prior art . . . contain[s] one reference suggesting a combination and others critiquing or otherwise discouraging the same"). Therefore, Teva fails to meet its burden to prove a motivation to combine the references to achieve the dosing regimens for a mild renally-impaired patient.

Turning to a patient with moderate or severe renal impairment, Dr. Wermeling—Teva's own expert witness—testified that a POSA would *not* be motivated to use this medication for a patient with moderate or severe renal impairment. Tr. 332:13–15 (Wermeling). Notwithstanding that testimony, Teva now asserts that a POSA would be motivated to use this medication for a patient with any severity of renal impairment, including moderate or severe. But even considering Teva's revised argument, it is unpersuasive and lacks support in the record. Specifically, the label for Invega ER teaches a 75 percent dose reduction for a patient with moderate or severe renal impairment. DTX 102 at 26; *see also* Tr. 1588:1–4 (Sinko). Importantly, reducing any of the '548 Protocol's dosing regimens by 75 percent does not result in the claimed dosing regimens.

---

*Litig.*, 643 F.3d 1366, 1376 (Fed. Cir. 2011) ("[I]t is well within a trial judge's discretion to require expert testimony supporting technical references that are relied on to establish obviousness.").

Teva attempts to overcome the conflicting teachings of the prior art by pointing to the label for risperidone-based LAI medication Risperdal Consta.[29] Teva argues that the label for Risperdal Consta teaches half-doses for a renally impaired patient. Def. Br. at 44. However, Teva did not rely on this argument at trial, and accordingly does not cite any testimony explaining how a POSA would have applied the specific numerical teachings of Risperdal Consta to paliperidone palmitate. Teva's cited testimony from Dr. Kahn does not fill this gap, *id.* (citing Tr. 98:10–17 (Kahn)), and without testimony to establish this link, Teva's argument is unavailing. *See Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony.").[30] Further, the Risperdal Consta label does not change the Court's conclusion and weighing of the evidence as discussed above.

In sum, because Teva fails to prove a motivation to achieve claims 10 and 13, and obviousness requires both a motivation to combine and a reasonable expectation of success, Teva does not carry its burden to show that the claims are obvious. *See Intelligent Bio-Sys., Inc.*, 821 F.3d at 1367–68.

**G. Obviousness of Claims 20 and 21**

Claims 20 and 21 concern the particle size used in paliperidone palmitate. PTX/DTX 1 at 34:32–51. Initially, these claims are nonobvious because they depend from claims this Court has already found to be nonobvious. *See In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("[D]ependent claims are nonobvious if the independent claims from which they depend are

[29] As with the Haldol Label, Janssen points out that the label for Risperdal Consta was not disclosed in the obviousness combinations in the Final Pretrial Order. Pltf. Reply Br. at 39; *see supra* n.21. Nonetheless, Teva's arguments regarding the Risperdal Consta label are unpersuasive.

[30] Attorney argument is particularly insufficient given that the label for Risperdal Consta explains that "patients with renal impairment were not studied" with Risperdal Consta. DTX 408 at 6.

nonobvious. . . ."); *In re Fine*, 837 F.2d 1071, 1076 (Fed. Cir. 1988); *Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008). Claims 20 and 21 depend from Claim 19, which depends from claims 1, 4, 8 or 11. PTX/DTX 1 at 34:32–51. This Court has already determined that Claim 2, which is representative of claims 1 and 4, *see* FPTO at 9, is nonobvious. This Court has also determined that claims 10 and 13, which are representative of claims 8 and 11, *see id.*, are nonobvious. Therefore, because claims 2, 10 and 13 are nonobvious, dependent claims 20 and 21 are also nonobvious. *See Tolmar I*, 718 F. Supp. 3d 394, 431 (D. Del. 2024) (holding that the formulation claims of the '906 Patent were nonobvious because the independent claims they depend from were also nonobvious); *see also In re Lemay*, 660 F. App'x 919, 927–28 (Fed. Cir. 2016). Nonetheless, the Court will address Teva's arguments regarding claims 20 and 21.

Claims 20 and 21 disclose, among other things, a paliperidone palmitate formulation "having an average particle size (d50)[31] of from about 1600 nm to about 900 nm."[32] PTX/DTX 1 at 34:35–37. Teva asserts that these claims are obvious in light of the '544 Patent. Def. Br. at 48. Insofar as Teva also relies on the WO '384 patent application, the Court notes that Teva has previously acknowledged that the WO '384 "made no new disclosure on particle size" beyond that already found in the '544 Patent. *See* Def. Post Trial Br. at 23. The '544 Patent discloses an experiment in which four paliperidone palmitate formulations ranging in particle size (A, B, C and D) were "administered to four beagle dogs." PTX 55/DTX 54 at 9:25–51. Janssen argues that

---

[31] "d50" denotes that 50 percent of the particles are below the indicated size, whereas "d90," as previously discussed, denotes that 90 percent of the particles are below the indicated size. Tr. 588:1–4 (Block); *see also* Tr. 296:6–15 (Wermeling).

[32] "nm" is shorthand for "nanometer." Tr. 272:9–12 (Wermeling).

the ’544 Patent does not provide a motivation to achieve claims 20 and 21 because it teaches away from Formulation B, the only formulation with a d50 within the range of the claims. Pltf. Br. at 65.

“[A] reference that ‘teaches away’ from a given combination may negate a motivation to modify the prior art to meet the claimed invention.” *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1308 (Fed. Cir. 2006). “A reference does not teach away, however, if it merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the invention claimed.” *Galderma Lab’ys, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013) (quoting *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009)). Rather, “[a] reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.” *Id.* (quoting *DePuy Spine, Inc.*, 567 F.3d at 1327).

“[T]he fact that there may be reasons a skilled artisan would prefer one [option] over the other does not amount to a teaching away from the lesser preferred but still workable option.” *Bayer Pharma AG v. Watson Lab’ys, Inc.*, 874 F.3d 1316, 1327 (Fed. Cir. 2017). The evidence at trial, however, demonstrated that a POSA would not have viewed Formulation B as merely unpreferred. Instead, a POSA looking at the ’544 Patent as a whole would have been “discouraged from following the path set out in the reference,” here Formulation B. *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1337 (Fed. Cir. 2021) (holding that the prior art taught away where district court held the reference “cut against the very goal a [POSA] would have been trying to achieve—a stable product”).

Indeed, Dr. Sinko credibly explained that a POSA would infer from the ’544 Patent that having a d90 of less than 2,000 nm is one of the “critical components” of the ’544 Patent’s

invention. Tr. 1522:24–1523:13 (Sinko). As a result, because Formulation B lacked these "critical parameters," a POSA would be motivated by the teachings of the '544 Patent to "exclude" and "eliminate" Formulation B. Tr. 1783:21–1785:1 (Sinko). Furthermore, the '544 Patent states that "formulations should be stable," but reports that only formulations C and D were subject to further studies to understand their stability. PTX 55/DTX 54 at 3:8–10, 9:33–35; Tr. 1525:8–16 (Sinko). As Dr. Sinko testified, a POSA would have understood that the choice to further study formulations C and D indicated that only those particle sizes provide certain properties that meet the requirements of the '544 Patent. Tr. 1784:7–1785:13 (Sinko) (explaining that "within the bounds of the '544 patent," Formulation B would be "excluded"); *see also* Tr. 1778:21–1779:13, 1525:8–16 (Sinko); *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1308–09 (Fed. Cir. 2010) (holding the prior art taught away where the modification was "unsuitable"); *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1366 (Fed. Cir. 2017) (holding the prior art taught away because the modification "would have been unattractive" to a POSA). In short, the '544 Patent did not merely demonstrate a preference, but taught away from the use of Formulation B. A POSA would have been discouraged from investigating formulations having the attributes of Formulation B. *See AstraZeneca AB*, 19 F.4th at 1337–38 (finding implicit disparagement and teaching away where expert testified "that a person of ordinary skill in the art would have known that the . . . formulations were unsuitable for further experimentation, thus discouraging investigation into these formulations" (internal quotation marks omitted)); *see also Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1360 (Fed. Cir. 2017) (noting that teaching away "need not" be explicit).

The only testimony Teva cites to rebut this teaching away is a conclusory statement by Dr. Wermeling. Def. Br. at 50 (quoting ECF No. 167-1 ¶ 161 which in turn quotes Tr. 546:6–9

(Wermeling)).[33] However, Dr. Wermeling admitted that Formulation B was outside the range of particle size that the '544 Patent taught was "desired." Tr. 294:2–11, 490:25–491:3, 496:2–25 (Wermeling). Dr. Wermeling's testimony therefore fails to persuasively counter Dr. Sinko's credible testimony and does not carry Teva's burden. *See Apple Inc. v. MPH Techs. Oy*, 28 F.4th 254, 263 (Fed. Cir. 2022) (noting that an "expert's contrary testimony" may be "properly disregarded as conclusory"). Thus, Teva fails to prove that claims 20 and 21 are obvious because the '544 Patent's teaching away negates any motivation to achieve the claims.[34] *See AstraZeneca AB*, 19 F.4th at 1336 (holding that teaching away "on its own is sufficient to sustain" nonobviousness).

### H. Objective Indicia of Nonobviousness

The Court now turns to Janssen's arguments regarding secondary considerations of nonobviousness, which are also known as "objective indicia of nonobviousness." *Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1417 (Fed. Cir. 2022); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406–07 (2007). Objective indicia of nonobviousness are categories of evidence that are relevant to the extent they "give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Such evidence is important because it is used to "guard against slipping into use of hindsight . . . and to resist the temptation to read into the prior art the teachings of the invention in issue." *Id.* at 36 (internal citation and quotation marks omitted). Here, Janssen has presented

[33] Dr. Wermeling's cited testimony is as follows: "Q: Is there anything in the '544 patent that would tell a person of ordinary skill in the art to not use Formulation B from this table? A: There's nothing that directs that, no." Tr. 546:6–9 (Wermeling).

[34] Teva also argues that particle size is a "result-effective" variable such that a POSA would achieve the '906 Patent's particle size by optimization. Def. Br. at 50–51. However, because the Court finds that the '544 Patent teaches away, it does not address this argument. *See Teva II*, 97 F.4th 915, 932 (Fed. Cir. 2024) (noting that where teaching away is found, a court may "deem[] it unnecessary to address optimization").

evidence regarding long-felt but unsolved need, commercial success, unexpected results, industry praise and skepticism. *See* Pltf. Br. at 82–100.[35]

A court need not find that all the indicia are present to determine that the objective indicia support a finding of nonobviousness. *See Graham*, 383 U.S. at 17–18. And although objective indicia of nonobviousness can be some of the most probative evidence of nonobviousness, the absence of such indicia does not tend to show obviousness. *See Medtronic Inc. v. Intermedics, Inc.*, 799 F.2d 734, 739 n.13 (Fed. Cir. 1986) ("[T]he absence of objective evidence is a neutral factor . . . ."); *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013) (noting that the presence of objective indicia of nonobviousness "can be the most probative evidence of nonobviousness") (citation omitted).

In addressing the indicia of nonobviousness below, the Court determines whether each one relates to "claimed and novel" aspects of the patent. *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 837 (Fed. Cir. 2015). This is necessary because Janssen must establish a nexus between the claimed dosing regimen for a patient and the proffered objective indicia. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983) ("A nexus is required between the merits of the claimed invention and the evidence offered, if that evidence is to be given substantial weight enroute to conclusion on the obviousness issue.").

Having determined that the '906 Patent is not obvious, the Court now also holds that the evidence of objective indicia—particularly of long-felt but unsolved need, commercial success and unexpected results—reinforces the Court's finding of nonobviousness.

[35] On remand, Janssen does not advance any arguments regarding copying. Therefore, the Court will not address it herein.

1. Long-Felt But Unsolved Need

"The existence of a long-felt but unsolved need that is met by the claimed invention is . . . objective evidence of non-obviousness." *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1369 (Fed. Cir. 2017). As the Federal Circuit has noted, if a solution were obvious, the need likely would not have persisted. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1332 (Fed. Cir. 2016). In this case, the evidence demonstrates that (1) there was a persistent need for a second-generation LAI antipsychotic that did not require oral supplementation and (2) the novel dosing features of the '906 Patent solved this need.

First, the record shows that there was a long-standing need for a second-generation LAI antipsychotic that could initiate treatment without requiring oral medication. Janssen's expert (Dr. Kohler) testified that previous treatment options forced doctors to rely on oral supplementation. Tr. 1910:7–12 (Kohler). Teva's expert (Dr. Kahn) agreed, conceding that no second-generation antipsychotics were available for monthly dosing without oral supplementation. Tr. 2410:8–17 (Kahn). Dr. Kohler also highlighted the problems caused by oral antipsychotics, such as patients not adhering to their treatment and thus suffering from "marked deterioration" and loss of independence. Tr. 1887:14–1889:20 (Kohler). Therefore, the ability to avoid oral supplementation is crucial; it ensures patients are consistently receiving their medication. Tr. 1046:4–11 (Gopal); *see also Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 471 F.3d 1369, 1380 (Fed. Cir. 2006) (finding "need for a safer . . . more effective" treatment provides basis for unmet need).

Second, the '906 Patent's novel dosing addressed this need. Dr. Kohler testified that Claim 2's dosing regimen delivers quick benefits and eliminates the need for oral supplementation. Tr. 1916:2–14 (Kohler); *see also* Tr. 1921:1–3 (Kohler) (stating that the same benefits flowed from

the dosing regimen for renally-impaired patients). As a result, patients are more likely to adhere to the medication regimen compared to previous LAI antipsychotics. *See* Tr. 1912:8–19 (Kohler). Given that the solution to the long-felt need results from the claimed and novel dosing regimens, nexus to the claimed invention is established. *See Merck & Cie*, 808 F.3d at 837. Teva counters that the lack of oral supplementation and rapid efficacy are not expressly included in the claims, but a patent can solve a long-standing need even if it does not explicitly claim the benefits of its invention. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (noting that courts can, when making their nonobviousness determination, consider a feature that "was not expressly included in the claims"); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1056–57 (Fed. Cir. 2016) (upholding jury finding that "a solution to the pocket dialing problem" satisfied long-felt need, even though the patent at issue did not explicitly identify the pocket dialing problem); *WBIP, LLC*, 829 F.3d at 1332 (upholding jury finding that claimed invention "solved the problem of carbon monoxide poisoning" despite claim not mentioning carbon monoxide).

Teva also argues that the '548 Protocol had already solved this long-felt need. Def. Br. at 66. But the '548 Protocol "is not an available product," and thus could not have been the solution. *Millennium Pharms., Inc.*, 862 F.3d at 1369 (holding it was clear error to find that long-felt need was solved by a prior art compound that was not commercially available). In addition, it is somewhat inconsistent for Teva to argue that there was a motivation to *modify* the '548 Protocol to meet a need for rapid efficacy and that the protocol somehow already provided for rapid efficacy. *See* Def. Br. at 28, 66; Def. Reply Br. at 67 ("[T]here was no long-felt need because that need was already met."); *see also Adapt Pharma Operations Ltd. v. Teva Pharms. USA, Inc.*, 25 F.4th 1354, 1376 (Fed. Cir. 2022) ("[W]e fail to see how, on the one hand the [prior art] and its

known drawbacks can provide a skilled artisan with the motivation to arrive at the claimed invention and, on the other hand, satisfy an unmet need in the prior art.”).

Accordingly, the Court finds that the evidence of a long-felt but unsolved need supports its finding of nonobviousness.

2. Commercial Success

“The commercial response to an invention is significant to determinations of obviousness. . . .” *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988). It shows how the invention is perceived in the marketplace by those “directly interested in the product.” *Id.* As with other indicia, a finding of nexus between the claimed and novel aspect of the patent and the commercial success is required. *See Ormco Corp. v. Align Tech, Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).

Invega Sustenna is an undisputed commercial success. Since its launch, the size and annual growth of its sales, revenue and market share have contributed to its “blockbuster status in the pharmaceutic[al] industry.” Tr. 2579:11–2580:1 (Mulhern) (net sales grew annually and exceeded one billion dollars); PTX 806B at 3, 91–92 (revenue accounted for over half of all LAI antipsychotic revenue); *id.* at 37 (market share is more than double that of its closest competitor when measured by days of treatment). As Janssen’s expert in the economic analysis of intellectual property, Carla S. Mulhern,[36] explained, “Invega Sustenna has achieved substantial success in the marketplace no matter how you look at it, sales or market penetration.” Tr. 2586:2–5 (Mulhern). Even Teva’s pharmaceuticals economics expert, Ivan T. Hofmann,[37] did not dispute this sales data

[36] Ms. Mulhern is a Managing Principal at Analysis Group, a global economic consulting firm. FPTO at 38–39. Her specialty is “the application of microeconomic principles to the analysis of economic issues arising in complex litigation, with a substantial focus on intellectual property matters.” *Id.*

[37] Mr. Hofmann is a Vice President and Managing Director at Gleason IP, an economic, accounting and financial consulting firm. FPTO at 43–45. He leads the firm’s Intellectual Property Practice. *Id*

and acknowledged that Invega Sustenna is the top-selling LAI antipsychotic by revenue in the United States. Tr. 2741:24–2742:7, 2836:18–22 (Hofmann).

Turning to the nexus analysis, the success of Invega Sustenna is closely tied to its unique dosing features. *See Tolmar I*, 718 F. Supp. 3d 394, 430 (D. Del. 2024) (holding "that the commercial success of Janssen's product was mainly attributable [to] the claimed dosage regimen in the '906 patent"). Indeed, Janssen's marketing prominently highlighted the dosing regimens. PTX 416 at 32. As Ms. Mulhern explained, this marketing indicated these features were key in distinguishing Invega Sustenna from its competitors. Tr. 2594:5–21 (Mulhern). Market research confirmed that healthcare providers saw the unique dosing regimens and the resulting benefits as major advantages. Tr. 2597:8–24 (Mulhern). Even Teva's expert, Mr. Hofmann, did not contest that the dosing regimens' benefits drove the demand for Invega Sustenna. Tr. 2852:17–2853:10 (Hofmann).

Teva contends that Invega Sustenna's commercial success is instead due to its marketing strategies, including a large sales force and high spending on promotions. Def. Br. at 66–67. Janssen's promotional spending on Invega Sustenna, however, was actually less than or equal to its competitors and less than the industry average. *See* Tr. 2665:23–2666:4 (Mulhern); PTX 806B at 9, 122–24; Tr. 2615:9–24 (Mulhern). Further, Ms. Mulhern confirmed that discounts and rebates for Invega Sustenna matched industry standards, Tr. 2615:25–2616:20 (Mulhern), and Teva's expert conceded that he had no evidence to challenge this statement, Tr. 2848:17–22 (Hofmann). At best, Teva's evidence suggests that Janssen's marketing had a "marginal effect" on Invega Sustenna's significant commercial success. *See Tolmar I*, 718 F. Supp. 3d at 430 (finding that other factors "may have had some marginal effect in the market, but not enough to negate the probative force of the huge commercial success of Invega Sustenna"). Regardless,

Janssen has provided ample evidence to demonstrate that "the commercial success of Janssen's product was mainly attributable [to] the claimed dosing regimens in the '906 Patent." *Id.*; *see also Cont'l Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991) (noting the patented invention need not be "solely responsible for the commercial success" for nexus to be found regarding commercial success).

Accordingly, the Court finds that the evidence of commercial success supports its finding of nonobviousness.

3. Unexpected Results

When evaluating unexpected results, courts look to whether the claimed invention exhibits properties or benefits that a POSA "would have found surprising or unexpected." *Forest Laby's, LLC v. Sigmapharm Laby's, LLC*, 918 F.3d 928, 937 (Fed. Cir. 2019) (quoting *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995)). This is because if something is surprising to a POSA, it would not have been obvious. *In re Soni*, 54 F.3d at 750 ("[T]hat which would have been surprising to a person of ordinary skill in a particular art would not have been obvious."). The unexpected results inquiry focuses on a comparison between the claimed invention and the closest prior art—here, the '548 Protocol. *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014).

Typically, the analysis compares the results obtained from the claimed invention and those obtained from the closest prior art. *Tolmar II*, No. CV 21-1784, 2024 WL 2972832, at *3 (D. Del. June 13, 2024). In this case, however, the closest prior art contains no results. Consequently, the analysis instead looks to whether "the claimed dosing regimens yielded unexpected results when compared with a POSA's *expectations* based on the state of the prior art." *Teva II*, 97 F.4th 915, 934 (Fed. Cir. 2024) (emphasis added). Thus, this Court must determine what a

POSA's expectations for the '548 Protocol dosing regimens were and compare those to the actual results of the claimed dosing regimens "to determine whether the claimed dosing regimen yielded results that would have been surprising to a [POSA]." *Tolmar II*, 2024 WL 2972832, at *3 (internal citations and quotation marks omitted).

As directed by the Federal Circuit, this Court must first determine what a POSA would have expected the results of the '548 Protocol to be "based on what was known in the art at the time." *Id.* (explaining that the proper inquiry is to evaluate "the expected results of NCT 548 based on what was known in the art at the time"); *see also Teva II*, 97 F.4th at 935 (noting that the "correct comparison" is "between expectations based on information available to a POSA and the claimed regimens' results"). As previously discussed, a POSA would only have known that the '548 Protocol was for a Phase III clinical trial and that Janssen would be unlikely to invest significant funds in a Phase III clinical trial without a belief that its hypothesis was correct.[38] *See supra* § II.C.1. Accordingly, a POSA would have understood that Janssen believed the dosing regimens were likely safe and effective. *Tolmar II*, 2024 WL 2972832, at *2 (explaining that a POSA would have "credit[ed] Janssen's hypothesis that the NCT 548 dosing regimens would be safe and effective").

A POSA's expectation must then be compared to the results of the claimed dosing regimens, which achieved rapid efficacy while maintaining a patient in the therapeutic window.

[38] Any purported failures in the Phase III studies that Teva points to are "irrelevant to [the unexpected results] inquiry," Def. Br. at 58, because "a POSA would not have been aware of [the '548 Protocol] results" or any failures in the Phase III studies. *Teva II*, 97 F.4th 915, 933 (Fed. Cir. 2024). In any event, the asserted randomization errors "affected only one arm of one of the failed Phase III studies." *Tolmar I*, 718 F. Supp. 3d 394, 430 (D. Del. 2024); Tr. 1168:20–1169:15 (Gopal). And any alleged needle length error is speculative because the record does not prove that using 2-inch needles to inject paliperidone palmitate into the gluteal muscle would have produced a different clinical outcome in the Phase III clinical trials, especially given that Janssen's Risperdal Consta, which uses 2-inch needle injections into the gluteal muscle, *see* PTX 283 at 30, did not achieve rapid efficacy in the same way that Invega Sustenna did, *see* Tr. 163:2–10 (Kahn); DTX 408 at 2. *See also* PFOF ¶ 72.

*See* Tr. 1361:18–1362:12, 1431:2–20 (Samtani) (explaining the strength of the claimed dosing regimens' results); PTX 278A at 118–19 (demonstrating favorable drug concentration effects of the claimed dosing regimens). Specifically, the claimed dosing regimens brought patients into the therapeutic window "within a week," and sustained them there until the maintenance doses began. Tr. 1361:18–1362:12 (Samtani). And it did so while avoiding the "intolerable side effects" that a POSA would have understood to be more likely to occur when using high loading doses. Tr. 1910:7–1911:22 (Kohler). By safely achieving this rapid and lasting efficacy, the claimed dosing regimens resulted in better treatment adherence. *See* Tr. 1910:7–1912:19 (Kohler). Importantly, improved adherence leads to significant clinical benefits for patients, especially because "nonadherence is the biggest factor of relapse in psychosis and schizophrenia." Tr. 1887:11–1889:20 (Kohler) (noting that nonadherence can lead to loss of agency, "marked deterioration," inability to "make decisions about what [a patient] want[s] to do," loss of ability to "function independently" and loss of "family relationships").

These results would have been surprising to a POSA. A POSA would have understood from the prior art that the use of higher LAI loading doses may lead to increased risk of side effects. *See* Tr. 1903:6–1905:24 (Kohler) (noting that a POSA would begin dosing of LAI antipsychotics at a lower initial dose to ensure patients did not experience extrapyramidal side effects). In light of these expectations, a POSA would have been surprised to discover that the '906 Patent's dosing regimens achieved "rapid onset of the therapeutic effects of the drug" without thereby producing adverse side effects in a patient. *Tolmar I*, 718 F. Supp. 3d at 430. This constitutes a dramatic difference between the '548 Protocol's expected results and the claimed dosing regimens—a difference that a POSA would not have foreseen. *See* Tr. 321:23–322:6 (Wermeling); *see also Tolmar I*, 718 F. Supp. 3d at 430 ("The surprising efficacy and safety of large initiation doses of

paliperidone palmitate supports Janssen's nonobviousness argument."); Tr. 1910:7–1912:19 (Kohler) ("[N]one of the previous long-acting injectables were able to provide all these benefits."). The benefits of injecting these high loading doses in the deltoid in the '906 Patent—as opposed to the gluteus in the '548 Protocol—would have been particularly surprising to a POSA because they would have viewed the deltoid and gluteus as interchangeable "standard injection sites." Def. Br. at 39; Tr. 278:7–11 (Wermeling), 1719:15–17 (Sinko). Contrary to this understanding, the '906 Patent explained that deltoid injections had superior therapeutic benefits. PTX/DTX 1 at 5:2–5 ("It was also discovered that deltoid injections result in a faster rise in initial plasma concentration, facilitating a rapid attainment of potential therapeutic concentrations."). As Judge Bryson explained in *Tolmar I*, "[w]hile ordinary artisans would have a motivation to explore the deltoid as an injection site and an expectation of interchangeability, they would not have expected the markedly superior results that the claimed dosing regimens delivered relative to the NCT 548 protocols." 718 F. Supp. 3d at 425.

In short, the evidence at trial showed that Invega Sustenna improved patient treatment adherence through its use of high initial loading doses that rapidly achieved therapeutic concentrations of paliperidone palmitate and monthly loading doses which maintained these concentrations. *See* Tr. 1910:7–1912:19 (Kohler) (providing a detailed and persuasive analysis of the benefits of Invega Sustenna). Such a "difference between an effective and safe drug and one with significant side effects that caused many patients to discontinue treatment" has been found to "constitute an unexpected difference in kind." *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1307 (Fed. Cir. 2015). Here too, the clinical benefits of increased adherence that result from the claimed dosing regimens demonstrate a difference in kind and establish a nexus between the asserted unexpected results and the claimed invention. *See Merck & Cie*, 808 F.3d at 837; *see also*

Tr. 1887:14–1889:20 (Kohler) (improved adherence resulting from claimed dosing regimens improves agency, "family relationships" and ability to "function independently").[39]

Accordingly, the Court finds that the evidence of unexpected results supports its finding of nonobviousness.

4. Industry Praise

"Evidence that the industry praised a claimed invention . . . weighs against an assertion that the same claim would have been obvious" because "[i]ndustry participants, especially competitors, are not likely to praise an obvious advance over the known art." *WBIP, LLC*, 829 F.3d at 1334. Janssen identifies several instances of industry praise.

For example, Janssen points to an article published in the journal Neuropsychiatric Disease, which reviews Invega Sustenna and concludes that paliperidone palmitate is an "important treatment option." PTX 133 at 221; Tr. 2412:9–15 (Kahn). Teva counters that the article only states that Invega Sustenna is comparable to haloperidol decanoate. Def. Br. at 62. But the article specifically touts "the importance of the initial loading doses" which provide "rapid onset of action, thereby circumventing the need for oral supplementation." PTX 133 at 221.[40] Thus, the praise relates to the "novel dose initiation procedure," *id.* at 205, which establishes a nexus to the "claimed invention." *Stratoflex, Inc.*, 713 F.2d at 1539.

[39] Teva argues that the differences were in degree rather than in kind. But to the extent this argument compares the results of the claimed dosing regimens to Janssen's non-prior-art internal testing, it focuses on the wrong comparison. *See* Def. Br. at 56–57. Unexpected results must be "different in kind and not merely in degree from *the results of the prior art*." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004) (emphasis added).

[40] Teva notes that Emsley—one of two authors on the article—previously received research funding from Janssen. DFOF ¶ 623 (citing PTX 133 at 221). However, Teva has not provided a sufficient basis to doubt the credibility of this peer-reviewed study. *See* PTX 133 at 223 (explaining the journal is an "international, peer-reviewed journal of clinical therapeutics and pharmacology").

Janssen also points to an article in the trade publication Psychiatric News that praises Invega Sustenna as "more effective than oral antipsychotics at delaying incidents," including "hospitalization, or intentional discontinuation of treatment." PTX 131 at 1. The article explains that the "improvements seen were due in part to better adherence rates." *Id.* at 3. As Dr. Kohler testified, "improved adherence" is a result of the '906 Patent's novel dosing regimens. Tr. 1910:7–1912:13 (Kohler). Teva responds that the Psychiatric News article merely "praises the benefits of LAIs generally." Def. Br. at 62. Although this article initially states that "better adherence . . . is an advantage of LAIs" generally, it goes on to specifically note the 95.2 percent adherence rate for study participants receiving Invega Sustenna. PTX 131 at 3.

Accordingly, the Court finds that the evidence of industry praise supports its finding of nonobviousness.

5. <u>Skepticism</u>

"If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness." *WBIP, LLC*, 829 F.3d at 1335. To establish skepticism, it is enough to provide evidence that third parties were concerned or surprised by the patented claim. *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1378 (Fed. Cir. 2019) (citing *Circuit Check Inc. v. QXQ Inc.*, 795 F.3d 1331, 1337 (Fed. Cir. 2015)).

Here, Janssen has proffered ample evidence of third-party skepticism. For instance, a group of outside experts reviewing Janssen's proposed initial 150 mg-eq. loading dose recommended instead "starting with 100 mg-eq." because it was "of lesser risk." PTX 92 at 1. Similarly, the FDA recommended Janssen decrease its initial loading dose to as low as 75 mg-eq. *See* PTX 94 at PDF page 59. Meanwhile, Dr. Kohler testified that even after FDA approval,

psychiatrists remained "concerned" about the patented dosing regimens. Tr. 1907:7–1908:4 (Kohler); *see also Tolmar I*, 718 F. Supp. 3d at 429 (noting that "physicians reacted with skepticism and were reluctant to use such a high initiation dose"). In short, Janssen established that "experts in the field were skeptical" of the patented dosing claims. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1367 (Fed. Cir. 2012) (affirming finding of skepticism because "leading experts in the field were skeptical that the counterintuitive [patented] device could work") (internal quotation marks omitted). Given that this skepticism was aimed directly at novel aspects of the claimed dosing regimen, it has a nexus to the patented invention. *See e.g.*, Tr. 1907:7–1908:4 (Kohler) (explaining that psychiatrists were "concerned" with the "unusual" nature of the claimed unequal and decreasing dosing regimens because they were more "comfortable with" a regimen "starting with a smaller dose and then ramping up"); PTX 92 at 1 (recommending decreasing initial loading dose of the claimed dosing regimen); PTX 94 at PDF page 59 (recommending decreasing both loading doses of the claimed dosing regimen).

Accordingly, the Court finds that the evidence of skepticism supports its finding of nonobviousness.

6. Blocking Patents

Seeking to discount the evidence of long-felt need and commercial success, Teva argues that competing paliperidone palmitate products were prevented from entering the market because of blocking patents. Def. Br. at 67. Teva specifically identifies the '556, '843 and '544 patents, each of which is owned by Janssen. DFOF ¶ 416. In its analysis of whether blocking patents undermine the evidence of long-felt need and commercial success, the Court focuses on the allegedly blocked space related to Invega Sustenna because that is what was commercially successful and what filled the unmet need. *See Teva II*, 97 F.4th at 936.

Evidence of long-felt need and commercial success is undermined when a blocking patent precludes "market entry by others." *Galderma Lab'ys, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013) (quoting *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1377 (Fed. Cir. 2005)). A patent is considered a blocking patent "where practice of a later invention would infringe the earlier patent." *Acorda Therapeutics*, *Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1337 (Fed. Cir. 2018). But "the mere existence" of blocking patents alone is not necessarily enough to undermine evidence of long-felt need and commercial success. *Id.* at 1338 (citing *Merck Sharp & Dohme Corp. v. Hospira, Inc.*, 874 F.3d 724,731 (Fed. Cir. 2017)). Instead, whether this evidence should be discounted because of a blocking patent is "a fact-specific inquiry." *Merck Sharp & Dohme Corp.*, 874 F.3d at 731. In performing this analysis, courts look to whether competitors were deterred by the alleged blocking patents "from investing the resources needed to make, develop, and market" the later-patented invention. *Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1379 (Fed. Cir. 2021) (quoting *Acorda Therapeutics, Inc.*, 903 F.3d at 1337).[41]

In this case, a competitor was incentivized to and did invest the resources to develop a competing paliperidone palmitate product during the allegedly blocked period. Specifically, Teva itself filed a patent application involving preparation and purification of paliperidone palmitate in January 2008—prior to the expiration of the alleged blocking patents (2013, 2017 and 2018). PTX 813 at PDF page 9; Tr. 2840:8–20 (Hofmann). Moreover, given that drug development takes "ten years or more," a competitor seeking to introduce an LAI paliperidone palmitate product following the expiration of the blocking patents would have necessarily begun development of such a product prior to the '906 Patent's December 2007 priority date. Tr. 2629:1–15 (Mulhern).

[41] The inquiry into the incentives to develop the later-patented invention thus focuses on the development period leading up to the '906 Patent's priority date—December 2007. *See Acorda Therapeutics*, 903 F.3d at 1327 (looking to period preceding patent-at-issue's priority date to determine effect of blocking patents).

This aligns with credible testimony presented by Janssen that there *were* indeed incentives to develop a competing LAI paliperidone palmitate product prior to the priority date, *see* Tr. 2628:3–2631:5 (Mulhern), and testimony from Teva's own expert, Tr. 2829:4–10 (Hofmann) ("Q: . . . [T]here certainly would be an incentive to conduct R&D in paliperidone palmitate as of December 2007, right? A: Yeah.").

Teva's patent application involving paliperidone palmitate and Janssen's credible testimony contradict Teva's expert testimony that "[n]o one would have an economic motivation to try and research and discover . . . the alleged novelties of the '906 patent" because of Janssen's alleged "patent fortress around paliperidone palmitate for the treatment of schizophrenia." Tr. 2752:20–24 (Hofmann). The record thus shows that the alleged blocking patents did not deter the development of LAI paliperidone palmitate products.

When considering the same patent and the same alleged blocking patents, Judge Bryson likewise found that the patent challenger "failed to show that [the three alleged blocking] patents prevented competitors from developing a competing paliperidone palmitate product before the priority date of the '906 patent." *Tolmar I*, 718 F. Supp. 3d at 430. For the foregoing reasons, this Court continues to credit Janssen's evidence of commercial success and long-felt but unsolved need.

In conclusion, all of the objective indicia of nonobviousness discussed above (*see supra* §§ II.H.1–6) reinforce, but are not critical to, the Court's previous finding of nonobviousness.

## III. CONCLUSION

For the reasons set forth above, the Court finds that Defendants have failed to prove, by clear and convincing evidence, that the '906 Patent, or any claim of that patent, is invalid. An appropriate Order accompanies this Opinion.

Date: November 21, 2024

**CLAIRE C. CECCHI, U.S.D.J.**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANSSEN PHARMACEUTICALS, INC. and JANSSEN PHARMACEUTICA NV,<br><br>Plaintiffs,<br><br>v.<br><br>TEVA PHARMACEUTICALS USA, INC.,<br><br>Defendant. | Civil Action Nos.:<br>2:18-00734<br>2:19-16484<br><br>**ORDER** |
| JANSSEN PHARMACEUTICALS, INC. and JANSSEN PHARMACEUTICA NV,<br><br>Plaintiffs,<br><br>v.<br><br>MYLAN LABORATORIES LTD.,<br><br>Defendant. | |

**CECCHI, District Judge.**

This matter was brought by Plaintiffs Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica NV (collectively, "Janssen") against Defendant Teva Pharmaceuticals USA, Inc. ("Teva"). It appearing that:

1. Teva has asserted invalidity of claims 1–21 of U.S. Patent No. 9,439,906 (the "'906 Patent").

2. Teva does not contest infringement of claims 1–21 in accordance with the June 8, 2020, Stipulation and Order based on Teva's submission of Abbreviated New Drug Application No. 211149 which seeks United States Food and Drug Administration approval to market generic versions of Invega Sustenna. ECF No. 88 at 1–2.

3. The Court held an eleven-day bench trial in this matter that was held on various days between October 13, 2020, and October 30, 2020. ECF Nos. 135–37, 140–41, 145–49, 151. The parties submitted post-trial briefing and proposed findings of fact and conclusions of law in December 2020. ECF Nos. 164, 165, 167, 167-1 (corrected at 168-1). On January 8, 2021, the parties submitted responsive briefs. ECF Nos. 188, 189. Closing arguments were held on March 5, 2021. ECF No. 199.
4. On October 8, 2021, this Court held that Teva had failed to carry its burden of proving that any claim of the ’906 Patent is invalid as obvious or indefinite. ECF Nos. 267, 271.
5. On April 1, 2024, following an appeal by Teva, ECF No. 275, the Federal Circuit affirmed this Court’s holding on indefiniteness but vacated and remanded its obviousness determination, ECF Nos. 281–82.
6. Both parties filed post-remand opening briefs, ECF Nos. 299–300, and post-remand responsive briefs, ECF Nos. 311 (corrected at 314), 312–13, 318. The parties agreed that the issues to be determined on remand should be based on the existing trial record. ECF No. 293 at 2.
7. Janssen also sued Mylan Laboratories Ltd. (“Mylan”) in a separate action before this Court, No. 19-16484. In that case, the parties stipulated to be bound by the final judgment in the instant matter with respect to infringement and validity. No. 19-16484, ECF No. 71. Post-remand arguments presented by Teva are “presented by both Teva and Mylan.” ECF No. 299 at 1 n.1. Mylan was also an appellant in the appeal before the Federal Circuit. *See Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915 (Fed. Cir. 2024).

Accordingly, for the reasons set forth in this Court’s accompanying Opinion,

**IT IS** on this 21st day of November, 2024,

**ORDERED** that no finding of invalidity shall issue as to the ’906 Patent; and it is further

**ORDERED** that pursuant to the June 8, 2020, Stipulation and Order of Infringement, ECF No. 88 at 1–2, Teva infringes claims 1–21 of the ’906 Patent; and it is further

**ORDERED** that pursuant to the May 28, 2021, Stipulation and Order, No. 19-16484, ECF No. 71, Mylan is bound by the final judgment in this matter and thus infringes claims 1–21 of the ’906 Patent; and it is further

**ORDERED** that the parties are directed to submit a joint proposed form of judgment consistent with this Order and the accompanying Opinion within thirty (30) days of the date of this Order; and it is further

**ORDERED** that an unredacted version of this Court’s Opinion shall be filed under temporary seal and the parties shall submit a joint submission indicating the portions of this Court’s Opinion that they seek to have redacted, as well as a statement of reasons as to why each redaction is necessary, within fourteen (14) days of the date of this Order.

**SO ORDERED.**

**CLAIRE C. CECCHI, U.S.D.J.**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANSSEN PHARMACEUTICALS, INC. and JANSSEN PHARMACEUTICA NV,<br>Plaintiffs,<br><br>v.<br><br>TEVA PHARMACEUTICALS USA, INC.,<br>Defendant. | Civil Action No.<br>2:18-00734 (CCC)(LWD) |

## FINAL JUDGMENT AFTER REMAND

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1. This Court has jurisdiction over Plaintiffs Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica NV (collectively, "Janssen") and Defendant Teva Pharmaceuticals USA, Inc. ("Teva")[1] and the subject matter of this action.

2. For the reasons set forth in the Court's Opinion dated November 21, 2024 (D.I. 332), and as reflected in the Court's Order of the same date (D.I. 333), Final Judgment is entered in favor of Janssen and against Teva on all claims and counterclaims with respect to infringement and validity of United States Patent No. 9,439,906 ("the '906 patent") and Teva's products that are the subject of ANDA No. 211149.

[1] Pursuant to the Stipulation and Order Dismissing Without Prejudice Defendant Teva Pharmaceutical Industries Ltd. and Amending Caption in the Action to Reflect Same (D.I. 26 ¶ 2), Teva Pharmaceutical Industries, Ltd. is bound by this Final Judgment, as well as any Judgment, Order, or decision, including any injunction, rendered as to Teva in this Action.

3. Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any approval of Teva's ANDA No. 211149 shall be no earlier than the date of expiration of the '906 patent (currently January 26, 2031).

4. Pursuant to 35 U.S.C. § 271(e)(4)(B), Teva and its affiliates, successors, partners, officers, agents, servants, employees, and attorneys, and other persons or entities in active concert or participation with any of them, are hereby enjoined from commercially manufacturing, using, offering to sell, or selling within the United States, or importing into the United States, the products that are the subject of ANDA No. 211149 until no earlier than the expiration of the '906 patent (currently January 26, 2031).

5. For the avoidance of doubt, this Final Judgment does not address and shall have no effect on any regulatory exclusivities to which Janssen may become entitled after its entry.

6. In accordance with 21 C.F.R. § 314.107(e), Teva shall submit a copy of this Final Judgment to the FDA within fourteen (14) days of the date of entry of this Final Judgment by the Court.

7. Pursuant to Fed. R. Civ. P. 54, L. Civ. R. 54.1, and 28 U.S.C. § 1920, Janssen may seek its costs, subject to Paragraphs 8 and 9, in an amount to be determined by the Clerk of the Court.

8. In the event that a party appeals this Final Judgment, any motion for attorney fees and/or costs, including any bill of costs or motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed and served within 60 days after the expiration of the time to petition for certiorari to the United States Supreme Court or, if the appeal is withdrawn or dismissed, within 60 days after such withdrawal or dismissal.

9. In the event that no party appeals this Final Judgment, any motion for attorney fees and/or costs, including any bill of costs or motion that this case is exceptional under 35 U.S.C. § 285, shall be considered timely if filed and served within 60 days after the expiration of the time for filing a notice of appeal under Fed. R. App. P. 3 and 4.

10. This is a final, appealable judgment.

**IT IS SO ORDERED**, on this 22nd day of November, 2024

Hon. Claire C. Cecchi
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JANSSEN PHARMACEUTICALS, INC. and JANSSEN PHARMACEUTICA NV,<br><br>*Plaintiffs*,<br><br>v.<br><br>MYLAN LABORATORIES LIMITED,<br><br>*Defendant*. | Civil Action No. 2:19-16484 (CCC)(LDW) |

**FINAL JUDGMENT**

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1. This Court has jurisdiction over Plaintiffs Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica NV (collectively, "Janssen") and Defendant Mylan Laboratories Limited ("Mylan") and the subject matter of this action.

2. Pursuant to the Stipulation and Order in this Action entered May 28, 2021 (D.I. 71 ¶ 4), Janssen and Mylan are bound by the Final Judgment in *Janssen Pharmaceuticals, Inc. v. Teva Pharmaceuticals USA, Inc.*, Civil Action No. 2:18-cv-00734 (the "Teva Action"), as if Mylan had fully participated in the Teva Action.

3. For the reasons set forth in the Court's Opinion in the Teva Action dated November 21, 2024 (Teva Action, D.I. 332), and as reflected in the Court's Order of the same date (Teva Action, D.I. 333), Final Judgment is entered in favor of Janssen and against Mylan on all claims and counterclaims with respect to infringement and validity of United States Patent No. 9,439,906 ("the '906 patent") and Mylan's products that are the subject of ANDA No. 213124.

4. Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any approval of Mylan's ANDA No. 213124 shall be no earlier than the date of expiration of the '906 patent (currently

January 26, 2031).

5. Pursuant to 35 U.S.C. § 271(e)(4)(B), Mylan and its affiliates, successors, partners, officers, agents, servants, employees, and attorneys, and other persons or entities in active concert or participation with any of them, are hereby enjoined from offering to sell or selling within the United States the products that are the subject of ANDA No. 213124 until no earlier than the expiration of the '906 patent (currently January 26, 2031). As used in this paragraph 5, "offering to sell" means to make an "offer for sale" or "offer to sell" as those terms are defined in 35 U.S.C. § 271(i).

6. In accordance with 21 C.F.R. § 314.107(e), Mylan shall submit a copy of this Final Judgment to the FDA within fourteen (14) days of the date of entry of this Final Judgment by the Court.

7. For the avoidance of doubt, this Final Judgment does not address and shall have no effect on any regulatory exclusivities to which Janssen may become entitled after its entry.

8. Each party shall bear its own fees and costs.

9. This is a final, appealable judgment.

**IT IS SO ORDERED**, on this 2nd day of December, 2024.

Hon. Claire C. Cecchi
United States District Judge

US009439906B2

(12) **United States Patent**
**Vermeulen et al.**

(10) **Patent No.: US 9,439,906 B2**
(45) **Date of Patent: Sep. 13, 2016**

(54) **DOSING REGIMEN ASSOCIATED WITH LONG ACTING INJECTABLE PALIPERIDONE ESTERS**

(75) Inventors: **An Vermeulen**, Beerse (BE); **Alfons Wouters**, Beerse (BE)

(73) Assignee: **Janssen Pharmaceutica NV** (BE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 770 days.

(21) Appl. No.: **12/337,144**

(22) Filed: **Dec. 17, 2008**

(65) **Prior Publication Data**

US 2009/0163519 A1 Jun. 25, 2009

**Related U.S. Application Data**

(60) Provisional application No. 61/014,918, filed on Dec. 19, 2007, provisional application No. 61/120,276, filed on Dec. 5, 2008.

(51) **Int. Cl.**

| | |
|---|---|
| ***C07D 471/04*** | (2006.01) |
| ***A61K 31/445*** | (2006.01) |
| ***A61K 31/41*** | (2006.01) |
| ***A61K 31/42*** | (2006.01) |
| ***A61K 31/519*** | (2006.01) |

(52) **U.S. Cl.**
CPC .................................. ***A61K 31/519*** (2013.01)

(58) **Field of Classification Search**
CPC . A61K 31/519; A61K 9/0019; A61K 9/0024
USPC ................................ 514/257, 323, 360, 379
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,804,663 | A | 2/1989 | Kennis et al. |
| 5,158,952 | A | 10/1992 | Janssen et al. |
| 5,254,556 | A | 10/1993 | Janssen et al. |
| 5,453,425 | A | 9/1995 | Francois et al. |
| 5,612,346 | A | 3/1997 | Mesens et al. |
| 6,077,843 | A | 6/2000 | François et al. |
| 6,555,544 | B2 | 4/2003 | François et al. |
| 6,577,545 | B2 | 6/2003 | Kim et al. |
| 2002/0082245 | A1 | 6/2002 | Yelle |
| 2003/0157180 | A1 | 8/2003 | Francois et al. |
| 2007/0197591 | A1 | 8/2007 | Boom et al. |
| 2009/0163519 | A1 | 6/2009 | Vermeulen et al. |
| 2011/0105536 | A1 | 5/2011 | Lewyn-Briscoe et al. |
| 2012/0263795 | A1 | 10/2012 | Francois et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 2004/010981 | 2/2004 |
| WO | WO 2006/114384 | 11/2006 |
| WO | 2008/021342 | 2/2008 |
| WO | 2009/025859 | 2/2009 |
| WO | 2009/047499 | 4/2009 |
| WO | 2009/080651 | 7/2009 |
| WO | 2011/053829 | 5/2011 |

OTHER PUBLICATIONS

Alphs L, Bossie C, Sliwa JK, Ma YW, Haskins T Tolerability of Paliperidone Palmitate Initiation Doses in Subjects With Recently Diagnosed Schizophrenia. Poster No. NR6-21 at the 163rd Annual Meeting of the American Psychiatric Association (APA), New Orleans, Louisiana, USA, May 22-26, 2010.

Alphs L, Haskins, Bossie C, Sliwa JK, Gopal S, Hough D, Davis J Long-term Metabolic Outcomes With Paliperidone Palmitate, A Once-Monthly Long-Acting Injectable Antipsychotic Agent, in the Treatment of Subjects With Schizophrenia. Poster No. 204 at the 48th Annual Meeting of the American College of Neuropsychopharmacology (ACNP), Hollywood, Florida, USA, December 6-10, 2009.

Cleton A, Rossenu S, Crauwels H, Berwaerts J, Hough D, Gopal S, Eerdekens M, Vandebosch A, Rosso Fernandez C Assessment of the Dose Proportionality of Paliperidone Palmitate 25, 50, 100 and 150 mg eq., A New Long-Acting Injectable Antipsychotic, Following Administration in the Deltoid or Gluteal Muscles. Poster at the 2008 Annual Meeting of the American Society for Clinical Pharmacology and Therapeutics (ASCPT), Orlando, Florida, USA, Apr. 2-5, 2008.

Coppola D, Liu Y, Gopal S, Remmerie B, Samtani M, Pandina G, Hough D, Nuamah I, Sulaiman A Long-Term Safety, Tolerability and Pharmacokinetics of Paliperidone Palmitate 234 mg (150 mg eq.), The Highest Marketed Dose: A One-Year Open-Label Study in Patients With Schizophrenia. Poster No. PI-49 at the 2010 Annual Meeting of the American Society for Clinical Pharmacology and Therapeutics (ASCPT), Atlanta, Georgia, USA, Mar. 17-20, 2010.

Gopal S, Berwaerts J, Nuamah I, Akhras K, Coppola D, Daly E, Hough DW, Palumbo JM Efficacy and Safety of Long-Acting Injectable Paliperidone Palmitate Relative to Long-Acting Haloperidol, Bromperidol and Fluphenazine Decanoate for Long-Term Treatment in Patients With Schizophrenia Using Number Needed to Treat and Number Needed to Harm. Poster at the 65th Annual Convention and Scientific Program of the Society of Biological Psychiatry (SOBP), New Orleans, Louisiana, USA, May 20-22, 2010.

Gopal S, Gassmann-Mayer C, Palumbo J, Samtani MN, Shiwach R, Alphs L, Practical Guidance for Dosing and Switching Paliperidone Palmitate Treatment in Patients with Schizophrenia, Current Medical Research and Opinion 26 (2), p. 377-387, 2010.

Gopal S, Hough DW, Xu H, Lull JM, Gassmann-Mayer C, Remmerie BM, Eerdekens MH, Brown DW, Efficacy and Safety of Paliperidone Palmitate in Adult Patients with Acutely Symptomatic Schizophrenia: A Randomized, Double-Blind, Placebo-Controlled, Dose-Response Study, International Clinical Psychopharmacology, pp. 247-256 (2010).

Gopal S, Lindenmayer JP, Hough D, Melkote R, Lim P, Eerdekens M, Safety and Tolerability of the Investigational Antipsychotic Paliperidone Palmitate Injected in the Deltoid or Gluteus Muscle in Patients with Schizophrenia, 63rd Annual Convention and Scientific Program of the Society of Biological Psychiatry (SOBP), Washington, DC. USA, May 1-3, 2008, Biological Psychiatry 63 (7, Suppl. 7), p. 285S, 2008.

Gopal S, Vijapurkar U, Lim P, Morozova M, Eerdekens M Long-Term Efficacy, Safety and Tolerability of Paliperidone Palmitate in Patients with Schizophrenia. Poster No. 20 at the 12th Annual Meeting of the College of Psychiatric and Neurologic Pharmacists (CPNP), Jacksonville, Florida, Apr. 19-22, 2009.

(Continued)

*Primary Examiner* — Sreeni Padmanabhan
*Assistant Examiner* — Jody Karol

(57) **ABSTRACT**

The present invention provides a method of treating patients in need of treatment with long acting injectable paliperidone palmitate formulations.

**21 Claims, 3 Drawing Sheets**

**DTX-1**
**JANSSEN v. TEVA**
**C.A. No. 18-CV-734-CCC-MF**

JANUS00000001

**DTX-1.0001**

(56) **References Cited**

OTHER PUBLICATIONS

Haskins JT, Sliwa JK, Ma YW, Pandina GJ, Palumbo J Efficacy and Safety of 234 mg Initation Dose and 3-Fixed Maintenance Doses of Paliperidone Palmitate—A Once-Monthly Injectable Atypical Antipsychotic. Poster No. 123 at the 22nd US Psychiatric and Mental Health Congress (USPMHC), Las Vegas, Nevada, USA, Nov. 2-5, 2009.

Hough D, Gopal S, Vijapurkar U, Lim P, Morozova M, Eerdekens M Paliperidone Palmitate, an Atypical Injectable Antipsychotic, In Prevention of Symptom Recurrence in Patients with Schizophrenia: A Randomized, Double-Blind, Placebo Controlled Study. Poster at the 63rd Annual Convention and Scientific Program of the Society of Biological Psychiatry (SOBP), Washington, DC, USA, May 1-3, 2008.

Hough D, Gopal S, Vijapurkar U, Lim P, Morozova M, Eerdekens M, Paliperidone Palmitate in Prevention of Symptom Recurrence in Patients with Schizophrenia: A Randomized, Double-Blind, Placebo-Controlled Study, 161st Meeting of the American Psychiatric Association (APA), Washington, DC, USA, May 3-8, 2008, Proceedings/AbstractBook, p. 173, No. NR4-029, 2008.

Hough D, Lindenmayer JP, Gopal S, Melkote R, Lim P, Herben V, Yuen E, Eerdekens M, Safety and Tolerability of Deltoid and Gluteal Injections of Paliperidone Palmitate in Schizophrenia, Progress in Neuro-Psychopharmacology and Biological Psychiatry 33 (6), p. 1022-1031, 2009.

Kozma C, Dirani R, Nicholl D, Akhras K Evaluation of the Relationships Among Change in Function, Symptoms, and Duration of Schizophrena. Poster No. NR6-4 at the 163rd Annual Meeting of the American Psychiatric Association (APA), New Orleans, Louisiana, USA, May 22-26, 2010.

Kramer M, Litman R, Hough D, Lane R, Lim P, Eerdekens M A 9-Week, Placebo-Controlled Study in Schizophrenia Patients: Efficacy and Safety of the Long-Acting Injectable Agent, Paliperidone Palmitate. Poster No. 4-072 at the 161st Meeting of the American Psychiatric Association (APA), Washington, DC, USA, May 3-8, 2008.

Kramer M, Litman R, Lane R, Lim P, Hough D, Palumbo J, Eerdekens M Efficacy and Tolerability of Two Fixed Dosages of Paliperidone Palmitate in the Treatment of Schizophrenia: Results of a 9-Week Placebo-Controlled Trial. Poster at the 20th US Psychiatric and Mental Health Congress (USPMHC), Orlando, Florida, USA, Oct. 11-14, 2007.

Pandina G, Lane R, Gopal S, Gassmann-Mayer C, Hough D, Remmerie B, Simpson G A Randomized, Double-Blind, Comparative Study of Flexible Doses of Paliperidone Palmitate and Risperidone Long-Acting Therapy in Patients with Schizophrenia. Poster at the 48th Annual Meeting of the American College Neuropsychopharmacology (ACNP), Hollywood, Florida, USA, Dec. 6-10, 2009.

Pandina GJ, Lindenmayer JP, Lull J, Lim P, Gopal S, Kusumakar V, Yuen E, Palumbo J A Randomized, Placebo-Controlled Study to Assess the Efficacy and Safety of Three Doses of Paliperidone Palmitate in Adults with an Acute Exacerbation of Schizophrenia. Poster at the 12th International Congress on Schizophrenia Research (ICOSR), San Diego, California, USA, Mar. 28-Apr. 1, 2009.

Pandina GJ, Lindenmayer JP, Lull J, Lim P, Gopal S, Kusumakar V, Yuen E, Palumbo J A Randomized, Placebo-Controlled Study to Assess the Efficacy and Safety of Three Doses of Paliperidone Palmitate in Adults with an Acute Exacerbation of Schizophrenia. Poster at the 12th Annual Meeting of the College of Psychiatric and Neurologic Pharmacists (CPNP), Jacksonville, Florida, Apr. 19-22, 2009.

Samtani MN, Gopal S, Kern Sliwa J, Haskins JT, Alphs L, Stuyckens K, Vermeulen A Management of Missed Paliperidone Palmitate Doses Based on Pharmacokinetic Modeling and Simulation. Poster at the 49th Annual Meeting of the New Clinical Drug Evaluation Unit (NCDEU) of the National Institute of Mental Health (NIMH), Hollywood, Florida, USA, Jun. 29-Jul. 2, 2009.

Samtani MN, Gopal S, Kern Sliwa J, Haskins JT, Alphs L, Stuyckens K, Vermeulen A, Switching to Paliperidone Palmitate From Other Antipsychotics: Guidance Based on Pharmacokinetic Modeling and Simulation, 49th Annual Meeting of the New Clinical Drug Evaluation Unit (NCDEU) of the National Institute of Mental Health (NIMH), Hollywood, Florida, USA, Jun. 29-Jul. 2, 2009, Proceedings/AbstractBook, p. 68, 2009.

Samtani MN, Gopal S, Kern Sliwa J, Haskins T, Alphs L, Stuyckens K, Vermeulen A Paliperidone Palmitate Dosing in Special Patient Populations Including the Elderly and Those With Renal Impairment or Differing Body Mass Index: Guidance Based on Pharmacokinetic Modeling and Simulation. Poster at the American Conference on Pharmacometrics, Mashantucket, Connecticut, USA, Oct. 4-7, 2009.

Samtani MN, Haskins JT, Alphs L, Sliwa JK, Stuyckens K, Herben V, Vermeulen A Maintenance Dosing of Once-Monthly (4-Weekly) Paliperidone Palmitate in Schizophrenia: Pharmacokinetic Rationale Based on Population Simulations. Poster No. 21 at the 12th Annual Meeting of the College of Psychiatric and Neurologic Pharmacists (CPNP), Jacksonville, Florida, Apr. 19-22, 2009.

Samtani MN, Haskins JT, Gopal S, Sliwa JK, Alphs L, Stuyckens K, Vermeulen A Dosing Information for Paliperidone Palmitate—A Once-Monthly Injectable Atypical Antipsychotic—Based on Population Pharmacokinetic Analysis. Poster No. 310 at the 22nd US Psychiatric and Mental Health Congress (USPMHC), Las Vegas, Nevada, USA, Nov. 2-5, 2009.

Samtani MN, Sliwa JK, Haskins JT, Alphs L, Stuyckens K, Herben V, Vermeulen A Initiation Dosing of Deltoid Intramuscular Paliperidone Palmitate in Schizophrenia: Pharmacokinetic Rationale Based on Modeling and Simulation. Poster No. 19 at the 12th Annual Meeting of the College of Psychiatric and Neurologic Pharmacists (CPNP), Jacksonville, Florida, Apr. 19-22, 2009.

Samtani MN, Vermeulen A, Stuyckens K, Population Pharmacokinetics of Intramuscular Paliperidone Palmitate in Patients with Schizophrenia A Novel Once-Monthly, Long-Acting Formulation of an Atypical Antipsychotic, Clinical Pharmacokinetics 48 (9), p. 585-600, 2009.

Sikirica M, Crivera C, Dirani R, Cost-Effectiveness of Paliperidone Palmitate Versus Oral Atypicals in the US. Poster No. NR6-5 at the 163rd Annual Meeting of the American Psychiatric Association (APA), New Orleans, Louisiana, USA, May 22-26, 2010.

Turner N, Bossie CA, Haskins JT, Kern Sliwa J, Ma YW, Alphs L Effects of Paliperidone Palmitate in Acutely ill Subjects With a Marked to Severe Exacerbation of Schizophrenia. Poster No. NR6-26 at the 163rd Annual Meeting of the American Psychiatric Association (APA), New Orleans, Louisiana, USA, May 22-26, 2010.

Alphs et al., "Are the Long-Acting Intramuscular Formulations of Risperidone or Paliperidone Palmitate Associated with Post-Injection Delirium/Sedation Syndrome? An Assessment of Safety Databases", Current Drug Safety, 2011, 6, 43-45.

Alphs et al., "Paliperidone Palmitate Versus Risperidone Long-Acting Therapy in Markedly to Severely ill Subjects With Schizophrenia", Poster presented at the 23rd Annual US Psychiatric and Mental Health Congress; Supported by Ortho-McNeil Janssen Scientific Affairs, LLC Nov. 18-21, 2010; Orlando, FL, USA.

Alphs et al., "Tolerability of Paliperidone Palmitate Initiation Doses in Subjects with Recently Diagnosed Schizophrenia", Poster handout presented at The Scientific Program of XXVII CINP Congress, Hong Kong. Jun. 6-10, 2010.

Alphs et al., "Tolerability of Paliperidone Palmitate Initiation Doses in Subjects with Recently Diagnosed Schizophrenia", Poster presented at The Scientific Program of XXVII CINP Congress, Hong Kong. Jun. 6-10, 2010.

Cleton et al., Clinical Pharmacology & Therapeutics, Mosby-Year Book, St. Louis, MO, US, vol. 81, No. Suppl. 1, p. S63 (2007).

Cockcroft et al., Prediction of creatinine clearance from serum creatinine, Nephron, 16:31-41, 1976.

Fleischhacker, W. Wolfgang et al., "A randomized trial of paliperidone palmitate and risperidone long-acting injectable in schizophrenia", International Journal of Neuropsychopharmacology, pp. 1-12, CINP 2011.

(56) **References Cited**

OTHER PUBLICATIONS

Gopal et al., "A 52-week open-label study of the safety and tolerability of paliperidone palmitate in patients with schizophrenia", *J Psychopharmacol.* 2010; First View: 1-13.
Gopal et al., "Dosing Information for Paliperidone Palmitate—A Once-Monthly Injectable Atypical Antipsychotic—Based on Population Pharmacokinetic Analysis", Poster presented at The Scientific Program of XXVII CINP Congress, Hong Kong. Jun. 6-10, 2010.
Gopal et al., "Efficacy and safety of paliperidone palmitate in adult patients with acutely symptomatic schizophrenia: a randomized, double-blind, placebo-controlled, dose-response study", International Clinical Psychopharmacology 2010, vol. 25 No. 5, pp. 247-256.
Gopal et al., Risk of Cardiovascular Morbidity and Sudden Death with Risperidone and Paliperidone Treatment: Analysis of 64 Randomized, Double-Blind Trials, NR 10-24 Presented at the 164th Annual Meeting—American Psychiatric Association, May 14-18, 2011; Honolulu, Hawaii.
Hough et al., "Paliperidone palmitate maintenance treatment in delaying the time-to-relapse in patients with schizophrenia: A randomized, double-blind, placebo-controlled study", Schizophrenia Research 116 (2010) 107-117.
Hough et al., "Safety and tolerability of deltoid and gluteal injections of paliperidone palmitate in schizophrenia", *Prog Neuropsychopharmacol Biol Psychiatry.* 2009;33:1022-1031.
Li et al., "A Comparative Randomized, Open-label, Rater-blinded Study of Paliperidone Palmitate and Risperidone Long-Acting Injectable Therapy in Patients with Schizophrenia", Poster No. P-11-005 presented at the XXVII CINP Congress, Jun. 6-10, 2010; Hong Kong.
Nasrallah et al., "A Controlled, Evidence-Based Trial of Paliperidone Palmitate, A Long-Acting Injectable Antipsychotic, in Schizophrenia", Neuropsychopharmacology (2010) 35, 2072-2082.
Pandina et al., "A double-blind study of paliperidone palmitate and risperidone long-acting injectable in adults with schizophrenia", Progress in Neuro-Psychopharmacology & Biological Psychiatry 2011:35:218-226.
Pandina et al., "A randomized, placebo-controlled study to assess the efficacy and safety of 3 doses of paliperidone palmitate in adults with acutely exacerbated schizophrenia", *J Clin Psychopharmacol.* 2010;30:235-244.
Revill et al., Drugs of the Future, Prous Science, ES, vol. 31, No. 7, pp. 579-584 (2006).
Samtani et al., "Dosing and Switching Strategies for Paliperidone Palmitate", CNS Drugs 2011; 25(10): 829-845.
Samtani et al., "Expansion of Paliperidone Palmitate Day 8 Dose Window from ± 2 Days to ± 4 Days: Model-Based Pharmacokinetic Simulation and Safety Data", Poster presented at the 24th Annual U.S. Psychiatric and Mental Health Congress Meeting, Nov. 7-10, 2011, Las Vegas, Nevada.
Samtani et al., "Expansion of Paliperidone Palmitate Day 8 Dose Window from ± 2 Days to ± 4 Days: Model-Based Pharmacokinetic Simulation and Safety Data", Poster handout presented at the 24th Annual U.S. Psychiatric and Mental Health Congress Meeting, Nov. 7-10, 2011, Las Vegas, Nevada.
Samtani et al., "Switching to Paliperidone Palmitate[1,2] from Other Depot Antipsychotics Guidance Based on Pharmacokinetic Simulations", Population Approach Group in Europe, Applications—CNS (Group IV) Abstr 1839, Berlin, Germany. Jun. 8-11, 2010.
Samtani, Mahesh N., "Use of Model Based Simulations to Support the Paliperidone Palmitate Label", AAPS Workshop on Facilitating Oral Product Development and Reducing Regulatory Burden through Novel Approaches to Assess Bioavailability/Bioequivalence, Oct. 22-23, 2011, Washington.
Sheehan et al., "The Management of Antipsychotic Treatment Discontinuation and Interruptions Using Model-Based Simulations", Poster presented at the 51st Annual NCDEU New Research Approaches for Mental Health Interventions Meeting, Jun. 13-16, 2011, Boca Raton, Florida.
Sliwa et al., "Tolerability and Efficacy of Paliperidone Palmitate vs Risperidone Long-acting Injection in Subjects with Recently Diagnosed Schizophrenia", Presented at the 13th International Congress on Schizophrenia Research; Apr. 2-6, 2011; Colorado Springs, Colorado, USA.
Alen et al., Ansel's Pharmaceutical Dosage Forms and Drug Delivery Systems, 8th Edition, 2005; pp. 260-263, 652-653, 682.
Guidance Document: Patented Medicines (Notice of Compliance) Regulations, Health Canada, Nov. 12, 2010.
New Drug Application (NDA) dated Oct. 25, 2007 submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Invega Sustenna (paliperidone palmitate) 39mg, 78mg, 117mg, 156mg, and 234 mg extended-release injectable suspension, date of letter is Jul. 31, 2009.
Supplemental New Drug Application (sNDA) dated Mar. 14, 2011, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FDCA) for Invega Sustenna (paliperidone palmitate) extended-release injectable suspension, 39 mg, 78 mg, 117 mg, 156 mg, and 234 mg.
Alphs et al. Annals of General Psychiatry 2011, 10:12.
Altamura et al., Intramuscular preparations of antipsychotics: uses and relevance in clinical practice. Drugs. 2003; 63(5): 493-512.
Berwaerts et al., Journal of Affective Disorders 138 (2012) 247-258.
Canuso et al. 2010, Expert Opinion Pharmacother., vol. 11 (15), pp. 2557-2567.
Cleton et al., Assessment of the Dose Proportionality of Paliperidone Palmitate 25, 50, 100 and 150 MG EQ., A New Long-Acting Injectable Antipsychotic Following Administration in the Deltoid or Gluteal Muscles, PI-74, Clinical Pharmacology & Therapeutics, vol. 83, Supplement 1, Mar. 2008, S31.
Ereshefsky L., Pharmacokinetics and drug interactions: update for new antipsychotics. J Clin Psychiatry. 1996;57 Suppl 11:12-25.
Gefvert et al. Pharmacokinetics and D2 receptor occupancy of long-acting injectable risperidone (Risperdal Consta) in patients with schizophrenia. Int J Neuropsychopharmacol. 2005; 8(1): 27-36.
Kane et al., Guidelines for depot antipsychotic treatment in schizophrenia. European Neuropsychopharmacology Consensus Conference in Siena, Italy. Eur Neuropsychopharmacol. 1998; 8(1): 55-66.
Levron et al., Clinical pharmacokinetics of haloperidol decanoate. Comparison with other prolonged-action neuroleptics. Encephale. 1987; 13(2): 83-7 [see English Summary as provided].
Markowitz et al., "Benefit-Risk Assessment of Maintenance Therapy in Schizophrenia Comparing Long-Acting Injectable (LAI) Paliperidone Palmitate with Paliperidone ER", Presented at the 164th Annual Meeting of the American Psychiatric Association, May 14-18, 2011, Honolulu, HI, USA.
Mauri et al., Clinical pharmacokinetics of atypical antipsychotics: a critical review of the relationship between plasma concentrations and clinical response. Clin Pharmacokinet. 2007;46(5):359-88.
Pandina et al., Progress in Neuro-Psychopharmacology & Biological Psychiatry 35 (2011) 218-226.
Sheehan et al., Comparison of the Peak-to-trough Fluctuation in Plasma Concentration of Long-acting Injectable Antipsychotics and Their Oral Equivalents, *Innov Clin Neurosci.* 2012;9(7-8):17-23.
Vermeir et al., Absorption, metabolism, and excretion of paliperidone, a new monoaminergic antagonist, in humans. Drug Metab Dispos. Apr. 2008;36(4):769-79.
Lewyn-Briscoe et al., U.S. Appl. No. 13/903,638.
International Search Report Re: International Application No. PCT/US2010/054807 dated Jan. 11, 2011.
Office Action mailed Feb. 28, 2013 in U.S. Appl. No. 12/916,910.
Kazuo Yamada et al., Future Potentiality of Pharmacotherapy for Schizophrenia in Acute Phase, Clinical Psychopharmacology, vo. 8, No. 10 (2005), pp. 1563-1568.
Takashi Yoshio, Sustained-release Antipsychotic Drugs (depot drugs), Psychiatric Nursing, vol. 33, No. 4 (2006), pp. 64-67.
Gibaldi's Drug Delivery Systems in Pharmaceutical Care. edited by Mary Lee, Archana Desai, American Society of Health-System Pharmacists, Inc. (2007), pp. 103-108.
Third Party Observations filed during prosecution of corresponding EP Appl No. 08863534.7.

(56) **References Cited**

OTHER PUBLICATIONS

Australian Patent Opposition for AU Patent Appl No. 2008340101 dated May 20, 2015.
Statement of Grounds and Particulars dated Aug. 19, 2015 re: Australian Patent Opposition for AU Patent Appl No. 2008340101.
Cleton A, Rossenu S, Crauwels H, et al. A single-dose, open-label, parallel, randomized, dose-proportionality study of paliperidone after intramuscular injections of paliperidone palmitate in the deltoid or gluteal muscle in patients with schizophrenia. *J Clin Pharmacol.* 2014;54(9):1048-1057.
Cleton A, Rossenu S, Hough D, Crauwels H, Vandebosch A, Berwaerts J, Eerdekens M, Francetic. I. "Evaluation of the pharmacokinetic profile of gluteal versus deltoid intramuscular Injections of paliperidone palmitate 100 mg equivalent in patients with schizophrenia" *Clin.Pharmacal. Therapeutics.* Published Mar. 2008.
Cockshott WP, Thompson GT, Howlett LJ, Seeley ET. Intramuscular or intralipomatous injections? *N Engl J Med.* 1982;307(6):356-358.
Haramati N, Lorans R, Lutwin M, Kaleya RN. Injection granulomas. Intramuscle or intrafat? *Arch Fam Med.* 1994;3(2):146-148.
Janicak, P. G. and Winans, E. A. "Paliperidone ER: a review of the clinical trial data" *Neuropsychiatr. Dis. Treat.* Dec. 3, 2007(6): 869-897 Published Jan. 15, 2008.
Rosen, H, and Abribat, T. "The rise and rise of drug delivery" *Nat. Rev. Drug Discov.* May 4, 2005(5): 381-5.
Rossenu S, Cleton A, Hough D, et al. Pharmacokinetic profile after multiple deltoid or gluteal intramuscular injections of paliperidone palmitate in patients with schizophrenia. *Clinical Pharmacology in Drug Development.* 2015;4(4):270-278.
Samtani MN, Vermeulen A, Stuyckens K. Population pharmacokinetics of intramuscular paliperidone palmitate in patients with schizophrenia: a novel once-monthly, long-acting formulation of an atypical antipsychotic. *Clin Pharmacokinet.* 2009;48(9):585-600.
Synopsis of the Phase III clinical study described at Example 8 of the opposed application accessed at http://yoda.yale.edu/sites/default/files/nct00590577.pdf on Aug. 17, 2015, Issue Date: Sep. 12, 2008.
Yin J, Collier AC, Barr AM, Honer WG, Procyshyn RM. Paliperidone Palmitate Long-Acting Injectable Given Intramuscularly in the Deltoid Versus the Gluteal Muscle: Are They Therapeutically Equivalent? *J Clin Psychopharmacol.* 2015;35(4):447-449.
Kreyenbuhi, et al., "Adding or Switching Antipsychotic Medications in Treatment-Refractory Schizophrenia", Psychiatr Serv., Jul. 2007, pp. 983-990, vol. 58(7).
Third Party Observations dated Jan. 28, 2016 filed during prosecution of EP Application No. 10773821.3.
Office Action mailed Mar. 24, 2015 in U.S. Appl. No. 13/903,638.
Final Office Action mailed Oct. 22, 2015 in U.S. Appl. No. 13/903,638.
Cirincione, et al., "Population pharmacokinetics of paliperidone ER in healthy subjects and patients with schizophrenia", clinical Pharmacology & Therapeutics, vol. 81, Issue Supplement SI, P. S19 (published in Mar. 2007).

FIG. 1


Plasma Concentration
ng/ml
250
100
40
20
7.5
3.5
1
0.3
0.1
1
8
22
36
50
64
78
92
106
120
Days

FIG. 2


Plasma Concentration
ng/ml
250
100
40
20
7.5
3.5
1
0.3
0.1
1
8
22
36
50
64
78
92
106
120
Days

FIG. 3


Plasma Concentration
ng/ml
250
100
40
20
7.5
3.5
1
0.3
0.1
1
8
22
36
50
64
78
92
106
120
Days

# DOSING REGIMEN ASSOCIATED WITH LONG ACTING INJECTABLE PALIPERIDONE ESTERS

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application 61/014,918, filed on Dec. 19, 2007 and U.S. Provisional Application 61/120,276, filed on Dec. 5, 2008.

## FIELD OF THE INVENTION

This invention relates to a method of treating patients in need of treatment with long acting injectable paliperidone palmitate formulations.

## BACKGROUND OF THE INVENTION

Antipsychotic medications are the mainstay in the treatment of schizophrenia, schizoaffective disorder, and schizophreniform disorders. Conventional antipsychotics were introduced in the mid-1950s. These typical or first generation drugs are usually effective in controlling the positive symptoms of schizophrenia, but are less effective in moderating the negative symptoms or the cognitive impairment associated with the disease. Atypical antipsychotics or second generation drugs, typified by risperidone and olanzapine, were developed in the 1990s, and are generally characterized by effectiveness against both the positive and negative symptoms associated with schizophrenia.

Paliperidone palmitate is the palmitate ester of paliperidone (9-hydroxy-risperidone), a monoaminergic antagonist that exhibits the characteristic dopamine $D_2$ and serotonin (5-hydroxytryptamine type 2A) antagonism of the second-generation, atypical antipsychotic drugs. Paliperidone is the major active metabolite of risperidone. Extended release (ER) osmotic controlled release oral delivery (OROS) paliperidone, as a tablet formulation, is marketed in the United States (U.S.) for the treatment of schizophrenia and maintenance of effect.

Paliperidone palmitate is being developed as a long-acting, intramuscular (i.m.), injectable aqueous nanosuspension for the treatment of schizophrenia and other diseases that are normally treated with antipsychotic mediations. Because of extreme low water solubility, paliperidone esters such as paliperidone palmitate dissolve slowly after an i.m. injection before being hydrolyzed to paliperidone and made available in the systemic circulation.

Many patients with these mental illnesses achieve symptom stability with available oral antipsychotic medications; however, it is estimated that up to 75% have difficulty adhering to a daily oral treatment regimen, i.e. compliance problems. Problems with adherence often result in worsening of symptoms, suboptimal treatment response, frequent relapses and re-hospitalizations, and an inability to benefit from rehabilitative and psychosocial therapies.

Paliperidone palmitate injection has been developed to provide sustained plasma concentrations of paliperidone when administered once monthly, which may greatly enhance compliance with dosing. Paliperidone palmitate was formulated as an aqueous nano suspension as is described in U.S. Pat. Nos. 6,577,545 and 6,555,544. However, after the data was analyzed from the clinical trials of this formulation it was discovered that the absorption of paliperidone from these injections was far more complex than was originally anticipated. Additionally, attaining a



potential therapeutic plasma level of paliperidone in patients was discovered to be dependent on the site of injection until steady state concentration is reached. Due to the challenging nature of ensuring an optimum plasma concentration-time profile for treating patients with paliperidone it is desirable to develop a dosing regimen that fulfills this goal in patients in need of treatment.

## SUMMARY OF THE INVENTION

In one embodiment of the present invention there is provided a dosing regimen for administering paliperidone esters to a psychiatric patient in need of treatment comprising administering intramuscularly in the deltoid a first loading dose from about 100 mg-eq. to about 150 mg-eq. of paliperidone as a paliperidone palmitate formulated in a sustained release formulation on the first day of treatment; administering intramuscularly a second loading dose from about 100 mg to about 150 mg-eq of paliperidone as a paliperidone palmitate formulated in a sustained release formulation between about the 6th to 10th day of treatment; and administering intramuscularly in the gluteal a maintenance dose of about 25 to about 150 mg-eq. of paliperidone as a paliperidone ester in a sustained release formulation on between about the 34th and about the 38th day of treatment.

In one embodiment of the present invention there is provided a dosing regimen for administering paliperidone esters to a psychiatric patient in need of treatment comprising administering intramuscularly in the deltoid a first loading dose from about 100 mg-eq. to about 150 mg-eq. of paliperidone as a paliperidone palmitate formulated in a sustained release formulation on the first day of treatment; administering intramuscularly a second loading dose from about 100 mg to about 150 mg-eq of paliperidone as a paliperidone palmitate formulated in a sustained release formulation between about the 6th to 10th day of treatment; and administering intramuscularly in the gluteal a maintenance dose of about 25 to about 150 mg-eq. of paliperidone as a paliperidone ester in a sustained release formulation approximately monthly from the date of the second loading dose.

In another embodiment of the present invention there is provided a dosing regimen for administering paliperidone palmitate to a psychiatric patient in need of treatment comprising administering intramuscularly in the deltoid of a patient in need of treatment a first loading dose from about 100 mg-eq. to about 150 mg-eq of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment; administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose from about 100 mg-eq. to about 150 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the eighth day of treatment; and administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a maintenance dose of about 25 mg-eq. to about 75 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation on between about the 34th day and the 38th day of treatment.

In another embodiment of the present invention there is provided a dosing regimen for administering paliperidone palmitate to a psychiatric patient in need of treatment comprising administering intramuscularly in the deltoid of a patient in need of treatment a first loading dose of about 150 mg-eq of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment; administering intramuscularly in the deltoid muscle of

the patient in need of treatment a second loading dose from about 100 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the eighth day of treatment; and administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a maintenance dose of about 25 mg-eq. to about 75 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation approximately monthly from the date of the second loading dose.

In another embodiment of the present invention there is provided a dosing regimen for administering paliperidone palmitate to a psychiatric patient in need of treatment comprising administering intramuscularly in the deltoid of a patient in need of treatment a first loading dose of about 150 mg-eq of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment; administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose from about 100 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the eighth day of treatment; and administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a maintenance dose of about 75 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation approximately monthly from the date of the second loading dose.

In yet another embodiment of the present invention there is provided a dosing regimen for administering paliperidone esters to a renally impaired psychiatric patient in need of treatment comprising administering intramuscularly in the deltoid a first loading dose of about 75 mg-eq of paliperidone as a paliperidone palmitate formulated in a sustained release formulation on the first day of treatment; administering intramuscularly a second loading dose of about 75 mg-eq of paliperidone as a paliperidone palmitate formulated in a sustained release formulation between about the 6th to 10th day of treatment; and administering intramuscularly in the gluteal a maintenance dose of about 25 mg-eq. to about 75 mg-eq of paliperidone as a paliperidone palmitate in a sustained release formulation on between about the 34th and about the 38th day of treatment.

In yet another embodiment of the present invention there is provided a dosing regimen for administering paliperidone esters to a renally impaired psychiatric patient in need of treatment comprising administering intramuscularly in the deltoid a first loading dose of about 100 mg-eq of paliperidone as a paliperidone palmitate formulated in a sustained release formulation on the first day of treatment; administering intramuscularly a second loading dose of about 75 mg-eq of paliperidone as a paliperidone palmitate formulated in a sustained release formulation between about the 6th to 10th day of treatment; and administering intramuscularly in the gluteal a maintenance dose of about 25 mg-eq. to about 75 mg-eq of paliperidone as a paliperidone palmitate in a sustained release formulation approximately monthly from the date of the second loading dose.

In a further embodiment of the present invention there is provided a dosing regimen for administering paliperidone palmitate to a psychiatric patient in need of treatment comprising administering intramuscularly in the deltoid of a patient in need of treatment a first loading dose of about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment; administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of about 75 mg-eq of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the eighth



day of treatment; and administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a maintenance dose of from about 25 mg-eq. to about 50 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation on about the 34th day and the 38th day of treatment.

In one embodiment of the present invention there is provided a dosing regimen for administering paliperidone esters to a psychiatric patient in need of treatment comprising administering intramuscularly in the deltoid a first loading dose of about 150 mg-eq. of paliperidone as a paliperidone palmitate formulated in a sustained release formulation on the first day of treatment; thereafter administering intramuscularly a second maintenance dose of from about 25 mg-eq. to about 100 mg-eq of paliperidone as a paliperidone palmitate formulated in a sustained release formulation between about the 6th to 10th day of treatment; and administering intramuscularly in the gluteal a maintenance dose of about 25 to about 100 mg-eq. of paliperidone as a paliperidone palmitate in a sustained release formulation on between about the 34th and about the 38th day of treatment.

In a further embodiment of the present invention there is provided a dosing regimen for administering paliperidone palmitate to a psychiatric patient in need of treatment comprising administering intramuscularly in the deltoid of a patient in need of treatment a first loading dose from about 150 mg-eq. of paliperidone as a paliperidone palmitate ester in a sustained release formulation on the first day of treatment; thereafter administering intramuscularly in the deltoid muscle of the patient in need of treatment a maintenance dose from about 25 mg-eq. to about 100 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the eighth day of treatment; and administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a maintenance dose of about 25 mg-eq. to about 100 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation on about the 34th day and the 38th day of treatment.

This and other objects and advantages of the present invention may be appreciated from a review of the present applications.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** shows the observed versus the population pharmacokinetics model simulation for plasma paliperidone concentrations for paliperidone palmitate 150 mg eq. in the deltoid on day 1, followed by 25 mg eq. in either the deltoid or gluteus on days 8, 36, and 64.

FIG. **2** shows the observed versus the population pharmacokinetics model simulation for plasma paliperidone concentrations for paliperidone palmitate 150 mg eq. in the deltoid on day 1, followed by 100 mg eq. in either the deltoid or gluteus on days 8, 36, and 64.

FIG. **3** shows the observed versus the population pharmacokinetics model simulation for plasma paliperidone concentrations for paliperidone palmitate 150 mg eq. in the deltoid on day 1, followed by 150 mg eq. in either the deltoid or gluteus on days 8, 36, and 64.

## DETAILED DESCRIPTION

We have discovered after extensive analysis of the clinical data that paliperidone palmitate due to its dissolution rate-limited absorption exhibits flip-flop kinetics, where the apparent half-life is controlled by the absorption rate con-

stant. Additionally the volume of injected drug product also impacts the apparent rate constant. It was also discovered that deltoid injections result in a faster rise in initial plasma concentration, facilitating a rapid attainment of potential therapeutic concentrations. Consequently, to facilitate patients' attaining a rapid therapeutic concentration of paliperidone it is preferred to provide the initial loading dose of paliperidone palmitate in the deltoids. The loading dose should be from about 100 mg-eq. to about 150 mg-eq. of paliperidone provided in the form of paliperidone palmitate. After the first or more preferably after the second loading dose injection patients will be approaching a steady state concentration of paliperidone in their plasma and may be injected in either the deltoid or the gluteal muscle thereafter. However, it is preferred that the patients receive further injections in the gluteal muscle.

In view of these discoveries the recommended dosing regimen for patients to attain a therapeutic plasma level of paliperidone is for patients to receive the first dose of paliperidone palmitate on day 1 of treatment, followed by a second dose between days 6 to 10 of treatment, then a third dose between days 34 to 38 of treatment or monthly ±7 days after the second dose. More preferably the patients will be administered a first dose on day 1, a second dose on day 8 and a third dose on or about day 36 of treatment or approximately monthly ±3 days after the second dose. The first two doses will preferably be injected in the deltoid muscle. Thereafter paliperidone palmitate will be administered by injection approximately once a month (e.g. monthly ±7 days or approximately once every four weeks) thereafter. To assure that a potential therapeutic plasma level of paliperidone is attained at least a first loading dose of 150 mg-eq of paliperidone as a paliperidone palmitate ester should be administered on day one of treatment. Preferably the first two doses will be loading dose of between from about 100 mg-eq. to about 150 mg-eq. of paliperidone as a paliperidone palmitate ester to assure that a potential therapeutic plasma level of paliperidone is attained by the patient. The subsequent doses thereafter will drop to a therapeutic maintenance dose of from about 25 mg-eq. to 150 mg-eq. per month (±7 days). Preferably the maintenance dose will be from about 25 mg eq. to about 100 mg eq; more preferably the maintenance dose will be from about 25 mg eq. to about 75 mg eq; and most preferably the maintenance dose initially will be about 50 mg eq., or more preferably the maintenance dose initially will be about 75 mg eq. which may be administered intramuscularly into the deltoid or gluteal muscle, but more preferably will be administered in the gluteal muscle. Those of ordinary skill in the art will understand that the maintenance dose may be titrated up or down in view of the patients condition (response to the medication and renal function).

Since paliperidone is mainly eliminated through the kidneys, patients with renal impairment will have a higher total exposure to paliperidone after i.m. injections of paliperidone palmitate. For patients with renal impairment it would desirable to adjust the loading doses to account for the increased exposure levels of patients with renal impairment. For patients with mild renal impairment the loading doses should be reduced to 75 mg-eq. for the first two loading doses. The maintenance doses should range from about 25 mg-eq. to about 75 mg-eq. and more preferably with range from about 25 mg-eq. to about 50 mg-eq. The doses would be administered on day 1 of treatment, followed by a second dose between days 6 to 10 of treatment, then a third dose between days 34 to 38 of treatment. More preferably the patients will be administered a first dose on day 1, a second dose on day 8 and a third dose on day 36 of treatment. The first two doses will preferably be injected in the deltoid muscle. Thereafter paliperidone palmitate will be administered by injection approximately once a month (e.g. one a month ±7 days or once every four weeks) thereafter. For the purpose of this patent application renal function is estimated by glomerular filtration rate (GFR) usually measured by the creatinine clearance (best calculated from a 24-hour urine collection). Creatine clearance may be estimated by the Cockcroft and Gault method based on serum creatinine concentration, as described in Prediction of creatinine clearance from serum creatinine. Nephron 1976; vol 16. pages 31-41. Patients with mild renal impairment have a creatinine clearance of 50 to <80 mL/minute.



It is recommended that the second initiation dose of paliperidone palmitate be given about one week (6-10 days) after the first dose. To avoid a missed dose, patients may be given the second dose 2 days before or after the one-week time point. Similarly, the third and subsequent injections after the initiation regimen are recommended to be given monthly. To avoid a missed monthly dose, patients may be given the injection up to 7 days before or after the monthly time point.

After initiation, the recommended injection cycle of paliperidone palmitate is monthly. If less than 6 weeks have elapsed since the last injection, then the previously stabilized dose should be administered as soon as possible, followed by injections at monthly intervals.

If more than 6 weeks have elapsed since the last injection, reinitiation with the same dose the patient was previously stabilized to should be resumed in the following manner: 1) a deltoid injection as soon as practically possible, followed by 2) another deltoid injection one week later, and 3) resumption of either deltoid or gluteal dosing at monthly intervals.

If more than 6 months have elapsed since the last injection, it is recommended to re-initiate dosing as described above.

Additionally, in this patient population needle length and BMI index are two related variables that need to be considered to assure patients attain therapeutic concentration of paliperidone in the desired time frame. Patients with high BMI had lower plasma concentration of paliperidone and a lessened treatment response. The lower initial plasma concentration in high BMI patients was likely due to unintended partial or complete injection into adipose tissue, instead of deep injection into muscle. However, once steady-state plasma concentration are attained BMI no longer influenced plasma concentrations or clinical efficacy. From these observations it was determined that for patients weighing <90 kg (<200 lb) a 1-inch needle will be of adequate length to use in injections to reach the muscle tissue for deltoid injections with preferably a 23 gauge needle. However, for patients with high BMIs, ≥90 kg (≥200 lb) a 1.5-inch needle should be used for deltoid injections. For gluteal muscle injections a 1.5-inch needle should be used. Preferably the 1.5-inch needle will be a 22-gauge needle.

Paliperidone esters are psychotic agents belonging to the chemical class of benzisoxazole derivatives, which contains a racemic mixture of (+)- and (−)-paliperidone, which are described in U.S. Pat. No. 5,254,556 (incorporated herein by reference). The chemical name for paliperidone palmitate is (±)-3-[2-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]ethyl]-6,7,8,9-tetrahydro-2-methyl-4-oxo-4H-pyrido[1,2-α]pyrimidin-9-yl hexadecanoate. The structural formula is:



(±)

Paliperidone esters may be formulated with pharmaceutical excipients into injectable dosage forms as described in U.S. Pat. No. 5,254,556 and U.S. Pat. No. 6,077,843 (incorporated herein by reference). Injectable formulations may be formulated in aqueous carriers.

Currently it is preferred to administer paliperidone palmitate in a once monthly aqueous depot. Suitable aqueous depot formulations are described in U.S. Pat. No. 6,077,843 (incorporated herein by reference). The aqueous formulation would preferably be a nano particle suspension of wherein the nano particles would be of an averages size of less than 2000 nm to about 100 nm. Preferably the nano particles would have an average particle size (d50) of from about 1600 nm to 400 nm and most preferably about 1400 nm to 900 nm. Preferably the d90 will be less than about 5000 nm and more preferably less than about 4400 nm. As used herein, an effective average particle size (d50) of less than 2,000 nm means that at least 50% of the particles have a diameter of less than 2,000 nm when measured by art-known conventional techniques, such as sedimentation field flow fractionation, photon correlation spectroscopy or disk centrifugation. With reference to the effective average particle size, it is preferred that at least 90%, e.g. 5,000 nm. Most preferably, 90% of the particles have a size of less than 4,400 nm.

Suitable aqueous nano particle depot formulations are described in U.S. Pat. No. 6,555,544 (incorporated herein by reference). In one embodiment of the present invention the formulation would comprise nanoparticles, a surfactant, a suspending agent, and optionally one or more additional ingredients selected from the group consisting of preservatives, buffers and an isotonizing agents.

Useful surface modifiers are believed to include those that physically adhere to the surface of the active agent but do not chemically bond thereto.

Suitable surface modifiers can preferably be selected from known organic and inorganic pharmaceutical excipients. Such excipients include various polymers, low molecular weight oligomers, natural products and surfactants. Preferred surface modifiers include nonionic and anionic surfactants. Representative examples of excipients include gelatin, casein, lecithin (phosphatides), gum acacia, cholesterol, tragacanth, stearic acid, benzalkonium chloride, calcium stearate, glyceryl monostearate, cetostearyl alcohol, cetomacrogol emulsifying wax, sorbitan esters, polyoxyethylene alkyl ethers, e.g., macrogol ethers such as cetomacrogol 1000, polyoxyethylene castor oil derivatives, polyoxyethylene sorbitan fatty acid esters, e.g., the commercially available TWEENS™, polyethylene glycols, polyoxyethylene stearates, colloidal silicon dioxide, phosphates, sodium dodecylsulfate, carboxymethylcellulose calcium, carboxymethylcellulose sodium, methylcellulose, hydroxyethylcellulose, hydroxypropylcellulose, hydroxypropylmethylcellulose phtalate, noncrystalline cellulose, magnesium aluminate silicate, triethanolamine, polyvinyl alcohol (PVA), poloxamers, tyloxapol and polyvinylpyrrolidone (PVP). Most of these excipients are described in detail in the Handbook of Pharmaceutical Excipients, published jointly by the American Pharmaceutical Association and The Pharmaceutical Society of Great Britain, the Pharmaceutical Press, 1986. The surface modifiers are commercially available and/or can be prepared by techniques known in the art. Two or more surface modifiers can be used in combination.

Particularly preferred surface modifiers include polyvinylpyrrolidone; tyloxapol; poloxamers, such as PLURONIC™. F68, F108 and F127 which are block copolymers of ethylene oxide and propylene oxide available from BASF; poloxamines, such as TETRONIC™ 908 (T908) which is a tetrafunctional block copolymer derived from sequential addition of ethylene oxide and propylene oxide to ethylenediamine available from BASF; dextran; lecithin; Aerosol OT™ (AOT) which is a dioctyl ester of sodium sulfosuccinic acid available from Cytec Industries; DUPONOL™ P which is a sodium lauryl sulfate available from DuPont; TRITON™ X-200 which is an alkyl aryl polyether sulfonate available from Rohm and Haas; TWEEN™. 20, 40, 60 and 80 which are polyoxyethylene sorbitan fatty acid esters available from ICI Specialty Chemicals; SPAN™ 20, 40, 60 and 80 which are sorbitan esters of fatty acids; ARLACEL™ 20, 40, 60 and 80 which are sorbitan esters of fatty acids available from Hercules, Inc.; CARBOWAX™ 3550 and 934 which are polyethylene glycols available from Union Carbide; CRODESTA™ F110 which is a mixture of sucrose stearate and sucrose distearate available from Croda Inc.; CRODESTA™ SL-40 which is available from Croda, Inc.; hexyldecyl trimethyl ammonium chloride (CTAC); bovine serum albumin and SA90HCO which is $C_{18}H_{17}CH_2(CON(CH_3)CH_2(CHOH)_4CH_2OH)_2$. The surface modifiers which have been found to be particularly useful include tyloxapol and a poloxamer, preferably, Pluronic™ F108 and Pluronic™ F68.

Pluronic™ F108 corresponds to poloxamer 338 and is the polyoxyethylene, polyoxypropylene block copolymer that conforms generally to the formula $HO[CH_2CH_2O]_x[CH(CH_3)CH_2O]_y[CH_2CH_2O]_zH$ in which the average values of x, y and z are respectively 128, 54 and 128. Other commercial names of poloxamer 338 are Hodag NONIONIC™ 1108-F available from Hodag, and SYNPERONIC™ PE/F108 available from ICI Americas.

The optimal relative amount of paliperidone palmitate and the surface modifier depends on various parameters. The optimal amount of the surface modifier can depend, for example, upon the particular surface modifier selected, the critical micelle concentration of the surface modifier if it forms micelles, the surface area of the antipsychotic agent, etc. The specific surface modifier preferably is present in an amount of 0.1 to 1 mg per square meter surface area of the paliperidone palmitate. It is preferred in the case of paliperidone palmitate (9-hydroxyrisperidone palmitate) to use PLURONIC™ F 108 as a surface modifier, a relative amount (w/w) of both ingredients of approximately 6:1 is preferred.

The particles of this invention can be prepared by a method comprising the steps of dispersing paliperidone palmitate in a liquid dispersion medium and applying mechanical means in the presence of grinding media to reduce the particle size of the antipsychotic agent to an effective average particle size of less than 2,000 nm. The

particles can be reduced in size in the presence of a surface modifier. Alternatively, the particles can be contacted with a surface modifier after attrition.

A general procedure for preparing the particles of this invention includes (a) obtaining paliperidone palmitate in micronized form; (b) adding the micronized paliperidone palmitate to a liquid medium to form a premix; and (c) subjecting the premix to mechanical means in the presence of a grinding medium to reduce the effective average particle size.

The paliperidone palmitate in micronized form may be prepared using techniques known in the art. It is preferred that the particle size of the micronized paliperidone palmitate be less than about 100 μm as determined by sieve analysis. If the particle size of the micronized paliperidone palmitate is greater than about 100 μm, then it is preferred that the particles of paliperidone palmitate be reduced in size to less than 100 μm.

The micronized paliperidone palmitate can then be added to a liquid medium in which it is essentially insoluble to form a premix. The concentration of paliperidone palmitate in the liquid medium (weight by weight percentage) can vary widely and depends on the selected antipsychotic agent, the selected surface modifier and other factors. Suitable concentrations of paliperidone palmitate in compositions vary between 0.1 to 60%, preferably is from 0.5 to 30%, and more preferably, is approximately 7% (w/v). It is currently preferred to use a concentration of about 100 mg eq of paliperidone per ml or about 156 mg of paliperidone palmitate per ml.

A more preferred procedure involves the addition of a surface modifier to the premix prior to its subjection to mechanical means to reduce the effective average particle size. The concentration of the surface modifier (weight by weight percentage) can vary from 0.1% to 90%, preferably from 0.5% to 80%, and more preferably is approximately 7% (w/v).

The premix can be used directly by subjecting it to mechanical means to reduce the effective average particle size in the dispersion to less than 2,000 nm. It is preferred that the premix be used directly when a ball mill is used for attrition. Alternatively, the antipsychotic agent and, optionally, the surface modifier, can be dispersed in the liquid medium using suitable agitation such as, for example, a roller mill or a Cowles type mixer, until a homogeneous dispersion is achieved.

The mechanical means applied to reduce the effective average particle size of the antipsychotic conveniently can take the form of a dispersion mill. Suitable dispersion mills include a ball mill, an attritor mill, a vibratory mill, a planetary mill, media mills—such as a sand mill and a bead mill. A media mill is preferred due to the relatively shorter milling time required to provide the desired reduction in particle size. For media milling, the apparent viscosity of the premix preferably is anywhere between 0.1 and 1 Pa·s. For ball milling, the apparent viscosity of the premix preferably is anywhere between 1 and 100 mPa·s.

The grinding media for the particle size reduction step can be selected from rigid media preferably spherical or particulate in form having an average size less than 3 mm and, more preferably, less than 1 mm. Such media desirably can provide the particles of the invention with shorter processing times and impart less wear to the milling equipment. The selection of the material for the grinding media is believed not to be critical. However, 95% ZrO stabilized with magnesia, zirconium silicate, and glass grinding media provide particles having levels of contamination which are accept-



able for the preparation of pharmaceutical compositions. Further, other media, such as polymeric beads, stainless steel, titania, alumina and 95% ZrO stabilized with yttrium, are useful. Preferred grinding media have a density greater than 2.5 g/cm.sup.3 and include 95% ZrO stabilized with magnesia and polymeric beads.

The attrition time can vary widely and depends primarily upon the particular mechanical means and processing conditions selected. For rolling mills, processing times of up to two days or longer may be required.

The particles must be reduced in size at a temperature which does not significantly degrade the antipsychotic agent. Processing temperatures of less than 30° C. to 40° C. are ordinarily preferred. If desired, the processing equipment may be cooled with conventional cooling equipment. The method is conveniently carried out under conditions of ambient temperature and at processing pressures which are safe and effective for the milling process.

The surface modifier, if it was not present in the premix, must be added to the dispersion after attrition in an amount as described for the premix above. Thereafter, the dispersion can be mixed by, for example, shaking vigorously. Optionally, the dispersion can be subjected to a sonication step using, for example, a ultrasonic power supply.

Aqueous compositions according to the present invention conveniently further comprise a suspending agent and a buffer, and optionally one or more of a preservative and an isotonizing agent. Particular ingredients may function as two or more of these agents simultaneously, e.g. behave like a preservative and a buffer, or behave like a buffer and an isotonizing agent.

Suitable suspending agents for use in the aqueous suspensions according to the present invention are cellulose derivatives, e.g. methyl cellulose, sodium carboxymethyl cellulose and hydroxypropyl methyl cellulose, polyvinylpyrrolidone, alginates, chitosan, dextrans, gelatin, polyethylene glycols, polyoxyethylene- and polyoxy-propylene ethers. Preferably sodium carboxymethyl cellulose is used in a concentration of 0.5 to 2%, most preferably 1% (w/v). Suitable wetting agents for use in the aqueous suspensions according to the present invention are polyoxyethylene derivatives of sorbitan esters, e.g. polysorbate 20 and polysorbate 80, lecithin, polyoxyethylene- and polyoxypropylene ethers, sodium deoxycholate. Preferably polysorbate 20 is used in a concentration of 0.5 to 3%, more preferably 0.5 to 2%, most preferably 1.1% (w/v).

Suitable buffering agents are salt of weak acids and should be used in amount sufficient to render the dispersion neutral to very slightly basic (up to pH 8.5), preferably in the pH range of 7 to 7.5. Particularly preferred is the use of a mixture of disodium hydrogen phosphate (anhydrous) (typically about 0.9% (w/v)) and sodium dihydrogen phosphate monohydrate (typically about 0.6% (w/v)). This buffer also renders the dispersion isotonic and, in addition, less prone to flocculation of the ester suspended therein.

Preservatives are antimicrobials and anti-oxidants which can be selected from the group consisting of benzoic acid, benzyl alcohol, butylated hydroxyanisole, butylated hydroxytoluene, chlorbutol, a gallate, a hydroxybenzoate, EDTA, phenol, chlorocresol, metacresol, benzethonium chloride, myristyl-gamma-piccolinium chloride, phenylmercuric acetate and thimerosal. In particular, it is benzyl alcohol which can be used in a concentration up to 2% (w/v), preferably up to 1.5% (w/v).

Isotonizing agents are, for example, sodium chloride, dextrose, mannitol, sorbitol, lactose, sodium sulfate. The suspensions conveniently comprise from 0 to 10% (w/v)

isotonizing agent. Mannitol may be used in a concentration from 0 to 7% More preferably, however, from about 1 to about 3% (w/v), especially from about 1.5 to about 2% (w/v) of one or more electrolytes are used to render the suspension isotonic, apparently because ions help to prevent flocculation of the suspended ester. In particular, electrolytes of the buffer serve as isotonizing agent.

A particularly desirable feature for an injectable depot formulation relates to the ease with which it can be administered. In particular such an injection should be feasible using a needle as fine as possible in a span of time which is as short as possible. This can be accomplished with the aqueous suspensions of the present invention by keeping the viscosity below about 75 mPa·s, preferably below 60 mPa·s. Aqueous suspensions of such viscosity or lower can both easily be taken up in a syringe (e.g. from a vial), and injected through a fine needle (e.g a 21 G 1½ inch, 22 G 2 inch, 22 G 1¼ inch or 23 G 1 inch needle). The preferred needles for injection are 22 G 22 G 1½ inch regular wall and 23 G 1½ inch regular wall needles.

Ideally, aqueous suspensions according to the present invention will comprise as much prodrug as can be tolerated so as to keep the injected volume to a minimum, and as little of the other ingredients as possible. In particular, such a composition will comprise by weight based on the total volume of the composition: (a) from 3 to 20% (w/v) of the prodrug; (b) from 0.5 to 2% (w/v) of a wetting agent; (c) one or more buffering agents sufficient to render the composition neutral to very slightly basic (pH 8.5); (d) from 0.5 to 2% (w/v) of a suspending agent; (e) up to 2% (w/v) preservatives; and (f) water q.s. ad 100%. Preferably the aqueous suspension will be made under sterile conditions and no preservatives will be used. Appropriate methods to aseptically prepare paliperidone palmitate are described in WO 2006/114384 which is hereby incorporated by reference herein.

The preferred aqueous dosage form contains inactive ingredients that are polysorbate 20, polyethylene glycol 4000, citric acid monohydrate, disodium hydrogen phosphate anhydrous, sodium dihydrogen phosphate monohydrate, sodium hydroxide, and water for injection. The mg of compound delivered in such a dosage form to the patient may be from 25 to about 150 mg (e.g. 25 mg, 50 mg, 75 mg, 100 mg, 150 mg) injectable dosage form.

The term "psychiatric patient" as used herein, refers to a human, who has been the object of treatment, or experiment for a "mental disorder" and "mental illness" refer to those provided in the Diagnostic and Statistical Manual (DSM IV), American Psychological Association (APA). Those of ordinary skill in the art will appreciate that paliperidone esters (e.g. paliperidone palmitate), can be administered to psychiatric patients for all the known uses of risperidone. These mental disorders include, but are not limited to, schizophrenia; bipolar disorder or other disease states in which psychosis, aggressive behavior, anxiety or depression is evidenced. Schizophrenia refers to conditions characterized as schizophrenia, schizoaffective disorder and schizophreniform disorders, in DSM-IV-TR such as category 295.xx. Bipolar Disorder refers to a condition characterized as a Bipolar Disorder, in DSM-IV-TR such as category 296.xx including Bipolar I and Bipolar Disorder II. The DSM-IV-TR was prepared by the Task Force on Nomenclature and Statistics of the American Psychiatric Association, and provides clear descriptions of diagnostic categories. Pathologic psychological conditions, which are psychoses or may be associated with psychotic features include, but are not limited to the following disorders that have been characterized in the DSM-IV-TR. Diagnostic and



Statistical Manual of Mental Disorders, Revised, 3rd Ed. (1994). The numbers in parenthesis refer to the DSM-IV-TR categories. The skilled artisan will recognize that there are alternative nomenclatures, nosologies, and classification systems for pathologic psychological conditions and that these systems evolve with medical scientific progress. Examples of pathologic psychological conditions which may be treated include, but are not limited to, Mild Mental Retardation (317), Moderate Mental Retardation (318.0), Severe Mental Retardation (318.1), Profound Mental Retardation (318.2), Mental Retardation Severity Unspecified (319), Autistic Disorders (299.00), Rett's Disorder (299.80), Childhood Disintegrative Disorders (299.10), Asperger's Disorder (299.80), Pervasive Developmental Disorder Not Otherwise Specified (299.80), Attention-Deficit/Hyperactivity Disorder Combined Type (314.01), Attention-Deficit/Hyperactivity Disorder Predominately Inattentive Type (314.00), Attention-Deficit/Hyperactivity Disorder Predominately Hyperactive-Impulsive Type (314.01), Attention-Deficit/Hyperactivity Disorder NOS (314.9), Conduct Disorder (Childhood-Onset and Adolescent Type 312.8), Oppositional Defiant Disorder (313.81), Disruptive Behavior Disorder Not Otherwise Specified (312.9), Solitary Aggressive Type (312.00), Conduct Disorder, Undifferentiated Type (312.90), Tourette's Disorder (307.23), Chronic Motor Or Vocal Tic Disorder (307.22), Transient Tic Disorder (307.21), Tic Disorder NOS (307.20), Alcohol Intoxication Delirium (291.0), Alcohol Withdrawal Delirium (291.0), Alcohol-Induced Persisting Dementia (291.2), Alcohol-Induced Psychotic Disorder with Delusions (291.5), Alcohol-Induced Psychotic Disorder with Hallucinations (291.3), Amphetamine or Similarly Acting Sympathomimetic Intoxication (292.89), Amphetamine or Similarly Acting Sympathomimetic Delirium (292.81), Amphetamine or Similarly Acting Sympathomimetic Induced Psychotic with Delusions (292.11), Amphetamine or Similarly Acting Sympathomimetic Induced Psychotic with Hallucinations (292.12), Cannabis-Induced Psychotic Disorder with Delusions (292.11), Cannabis-Induced Psychotic Disorder with Hallucinations (292.12), Cocaine Intoxication (292.89), Cocaine Intoxication Delirium (292.81), Cocaine-Induced Psychotic Disorder with Delusions (292.11), Cocaine-Induced Psychotic Disorder with Hallucinations (292.12), Hallucinogen Intoxication (292.89), Hallucinogen Intoxication Delirium (292.81), Hallucinogen-Induced Psychotic disorder with Delusions (292.11), Hallucinogen-Induced Psychotic disorder with Delusions (292.12), Hallucinogen-Induced Mood Disorder (292.84), Hallucinogen-Induced Anxiety Disorder (292.89), Hallucinogen-Related Disorder Not Otherwise Specified (292.9), Inhalant Intoxication (292.89), Inhalant Intoxication Delirium (292.81), Inhalant-Induced Persisting Dementia (292.82), Inhalant-Induced Psychotic Disorder with Delusions (292.11), Inhalant-Induced Psychotic with Hallucinations (292.12), Inhalant-Induced Mood Disorder (292.89), Inhalant-Induced Anxiety Disorder (292.89), Inhalant-Related Disorder Not Otherwise Specified (292.9), Opioid Intoxication Delirium (292.81), Opioid-Induced Psychotic Disorder with Delusions (292.11), Opioid Intoxication Delirium (292.81), Opioid-Induced Psychotic Disorder with Hallucinations (292.12), Opioid-Induced Mood Disorder (292.84), Phencyclidine (PCP) or Similarly Acting Arylcyclohexylamine Intoxication (292.89), Phencyclidine (PCP) or Similarly Acting Arylcyclohexylamine Intoxication Delirium (292.81), Phencyclidine (PCP) or Similarly Acting Arylcyclohexylamine Induced Psychotic Disorder with Delusions (292.11), Phencyclidine (PCP) or Similarly Acting Arylcyclohexylamine Induced Psychotic Disorder with Hallucinations (292.12), Phencyclidine (PCP) or Similarly Acting Arylcyclohexylamine Mood Disorder (292.84), Phencyclidine (PCP) or

Similarly Acting Arylcyclohexylamine Induced Anxiety Disorder (292.89), Phencyclidine (PCP) or Similarly Acting Arylcyclohexylamine Related Disorder Not Otherwise Specified (292.9), Sedative, Hypnotic or Anxiolytic Intoxication (292.89), Sedation, Hypnotic or Anxiolytic Intoxication Delirium (292.81), Sedation, Hypnotic or Anxiolytic Withdrawal Delirium (292.81), Sedation, Hypnotic or Anxiolytic Induced Persisting Dementia (292.82), Sedation, Hypnotic or Anxiolytic-Induced Psychotic Disorder with Delusions (292.11), Sedation, Hypnotic or Anxiolytic-Induced Psychotic Disorder with Hallucinations (292.12), Sedation, Hypnotic or Anxiolytic-Induced Mood Disorder (292.84), Sedation, Hypnotic or Anxiolytic-Induced Anxiety Disorder (292.89), Other (or Unknown) Substance Intoxication (292.89), Other (or Unknown) Substance-Induced Delirium (292.81), Other (or Unknown) Substance-Induced Persisting Dementia (292.82), Other (or Unknown) Substance-Induced Psychotic Disorder with Delusions (292.11), Other (or Unknown) Substance-Induced Psychotic Disorder with Hallucinations (292.12), Other (or Unknown) Substance-Induced Mood Disorder (292.84), Other (or Unknown) Substance-Induced Anxiety Disorder (292.89), Other (or Unknown) Substance Disorder Not Otherwise Specified (292.9), Obsessive Compulsive Disorder (300.3), Post-traumatic Stress Disorder (309.81), Generalized Anxiety Disorder (300.02), Anxiety Disorder Not Otherwise Specified (300.00), Body Dysmorphic Disorder (300.7), Hypochondriasis (or Hypochondriacal Neurosis) (300.7), Somatization Disorder (300.81), Undifferentiated Somatoform Disorder (300.81), Somatoform Disorder Not Otherwise Specified (300.81), Intermittent Explosive Disorder (312.34), Kleptomania (312.32), Pathological Gambling (312.31), Pyromania (312.33), Trichotillomania (312.39), and Impulse Control Disorder NOS (312.30), Schizophrenia, Paranoid Type, (295.30), Schizophrenia, Disorganized (295.10), Schizophrenia, Catatonic Type, (295.20), Schizophrenia, Undifferentiated Type (295.90), Schizophrenia, Residual Type (295.60), Schizophreniform Disorder (295.40), Schizoaffective Disorder (295.70), Delusional Disorder (297.1), Brief Psychotic Disorder (298.8), Shared Psychotic Disorder (297.3), Psychotic Disorder Due to a General Medical Condition with Delusions (293.81), Psychotic Disorder Due to a General Medical Condition with Hallucinations (293.82), Psychotic Disorders Not Otherwise Specified (298.9), Major Depression, Single Episode, Severe, without Psychotic Features (296.23), Major Depression, Recurrent, Severe, without Psychotic Features (296.33), Bipolar Disorder, Mixed, Severe, without Psychotic Features (296.63), Bipolar Disorder, Mixed, Severe, with Psychotic Features (296.64), Bipolar Disorder, Manic, Severe, without Psychotic Features (296.43), Bipolar Disorder, Manic, Severe, with Psychotic Features (296.44), Bipolar Disorder, Depressed, Severe, without Psychotic Features (296.53), Bipolar Disorder, Depressed, Severe, with Psychotic Features (296.54), Bipolar II Disorder (296.89), Bipolar Disorder Not Otherwise Specified (296.80), Personality Disorders, Paranoid (301.0), Personality Disorders, Schizoid (301.20), Personality Disorders, Schizotypal (301.22), Personality Disorders, Antisocial (301.7), and Personality Disorders, Borderline (301.83).

The following non-limiting examples are provided to further illustrate the present invention.

The term "therapeutically effective amount" as used herein, means that amount of active compound or pharmaceutical agent that elicits the biological or medicinal response in human that is being sought by a researcher, medical doctor or other clinician, which includes alleviation of the symptoms of the disease or disorder being treated.

Those of skill in the treatment of diseases could easily determine the effective amount of paliperidone to administer for the treatment of the diseases listed above. In general it is contemplated that an effective amount of paliperidone for the treatment of mental disorders would be from about 0.01 mg/kg to about 2 mg/kg body weight. For the present invention it is preferred to dose patients with 25 mg-eq. to about 150 mg eq. paliperidone. The amount of paliperidone palmitate is provided in sufficient amount to provide the equivalent dose of paliperidone after the palmitic acid moiety is removed from the ester (e.g. 156 mg corresponds to paliperidone 100 mg). In one embodiment of present invention wherein paliperidone palmitate is administered by intramuscular injection once per month is preferred.

## EXAMPLE 1

### Paliperidone Palmitate Formulations

a) Crystallization in Stainless Steel Reactor of 50 L

All equipment was sterilized using dry heat sterilization.

A stainless steel reactor was charged with 3-[2-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]ethyl]-6,7,8,9-tetrahydro-9-hydroxy-2-methyl-4H-pyrido[1,2-a]-pyrimidin-4-one palmitate ester and ethanol parenteral grade (8 L/kg) and heated to reflux temperature (78-79° C.) while stirring. The product dissolved at about 70° C. The solution was filtered at 76° C. over a sterile 0.22 μm filter into a sterile crystallization reactor. The sterile filter was then washed with heated ethanol (1 L/kg).

The filtrate was reheated to reflux and then cooled to room temperature whereupon the product crystallized. The thus obtained suspension was reheated again. The solution was cooled using differing cooling gradients (in consecutive experiments, the mixture was reheated and cooled again; after each cooling gradient, a sample was taken and isolated using a filter. The crystals were dried in vacuo at 50° C. in Tyvek bags so as to prevent dust formation and the particle characteristics were determined.

Different batches were run, yielding product with a particle size distribution measured by laser diffraction as shown in Table 1.

TABLE 1

| | Crystallization | | | | | Particle size distribution | | |
|---|---|---|---|---|---|---|---|---|
| Cooling rate | Calculated cooling gradient (° C./min) | Tmax Treactor | start at . . . (° C.) Treactor | start at . . . (° C.) Tjacket | start cooling (° C.) Treactor | dl10 (μm) | dl50 (μm) | dl90 (μm) |
| 1° C./min | 0.95 | 78 | 63.5 | 60.2 | 77.5 | 156 | 65 | 16 |
| ASAP | 3.2 | 75.7 | 61.2 | 17.5 | 75 | 119 | 36 | 9.2 |
| 0.5° C./min | 0.48 | 75.7 | 63.8 | 62.7 | 75 | 192 | 80 | 20 |

TABLE 1-continued

| Cooling rate | Crystallization: Calculated cooling gradient (° C./min) | Tmax Treactor | start at . . . (° C.) Treactor | start at . . . (° C.) Tjacket | start cooling (° C.) Treactor | Particle size distribution: dl10 (μm) | dl50 (μm) | dl90 (μm) |
|---|---|---|---|---|---|---|---|---|
| 0.5° C./min | 0.48 | 75.7 | 63.8 | 62.7 | 75 | 189 | 81 | 23 |
| 0.7° C./min | 0.81 | 75.7 | 61.7 | 58.9 | 75 | 113 | 41 | 11 |
| 1° C./min | 0.92 | 75.7 | 62.1 | 54.9 | 75 | 128 | 52 | 13 |

b) Formulation of Composition

Table 2 provides the formulation for the F013 formulation. The F011 formulation contained the same ingredients, with the exception of citric acid and NaOH, which were not present in the F011 formulation. Since the F011 formulation does not contain NaOH or citric acid, they are not part of the aqueous phase that is added to the milled concentrate of the F011 formulation. Therefore, the concentration of buffer salts in the aqueous phase of the F011 formulation is slightly different to make the formulation isotonic.

TABLE 2

| Name | Amount Required: Per ml | Amount Required: Quantity for 24 L |
|---|---|---|
| Paliperidone palmitate (sterile grade) | 156 mg | 3.744 kg |
| Polysorbate 20 parenteral | 12 mg | 288 g |
| Citric acid monohydrate parenteral | 5 mg | 120 g |
| Disodium hydrogen phosphate anhydrous parenteral | 5 mg | 120 g |
| Sodium dihydrogen phosphate monohydrate parenteral | 2.5 mg | 60 g |
| Sodium Hydroxide all use | 2.84 mg | 68 g |
| Polyethylene Glycol 4000 parenteral | 30 mg | 720 g |
| Water for injections q.s. ad | 1000 μl | 24 L |

Equipment

stainless steel (SS) containers

Grinding media (Zirconium beads)+stainless steel (SS) grinding chamber

0.2 μm filters

40 μm filter

Filling unit

Autoclave

Dry heat oven

Manufacturing

Zirconium beads were cleaned and rinsed using water for injections and then depyrogenised by dry heat (120 min at 260° C.). Water for injections was transferred into a SS container. Polysorbate 20 was added and dissolved by mixing. The solution was sterilized by filtration through a sterile 0.2 μm filter into a sterilized SS container. Paliperidone palmitate ester (sterile grade) as prepared in the previous examples was dispersed into the solution and mixed until homogeneous. The suspension was milled aseptically in the grinding chamber using Zirconium beads as grinding media until the required particle size was reached. The suspension was filtered aseptically through a 40 μm filter into a sterilized SS container

Water for injections was transferred into a SS container, citric acid monohydrate parenteral, disodium hydrogen phosphate anhydrous, sodium dihydrogen phosphate monohydrate, sodium hydroxide all use, polyethylene glycol 4000 were added and mixed until dissolved. This solution was sterilized by filtration through a sterile 0.2 μm filter and transferred aseptically into the suspension. The final suspension was mixed until homogeneous. The suspension was filled aseptically into sterile syringes. The target dose volume was between 0.25 ml and 1.50 ml depending on the dose needed.

TABLE 3

| Dose volume | Target limit | lower limit | upper limit |
|---|---|---|---|
| 0.25 ml-1.00 ml | identical to dose volume | target limit − (target limit × 0.05) | target limit × 1.05 |
| 1.25 ml-1.50 ml | identical to dose volume | target limit − (target limit × 0.025) | target limit × 1.025 |

Sterilization

All aseptic manipulations and sterilization processes were carried out according to FDA and European regulatory guidelines.

Apparatus

Sterilization was done by steam sterilization ($F_0 \gtrsim 15$ of following equipment:

SS containers

Zirconium beads+grinding chamber

0.2 μm filters

40 μm filter

filling pump

Immediate Container

1 ml long transparent plastic (COC) syringe with luer lock.

rubber tip cap, FM257/2 dark grey

rubber plunger stopper, 1 ml long, 4023/50, Fluorotec B2-40

2.25 ml transparent plastic (COC) syringe with luer lock.

rubber tip cap, FM257/2 dark grey

rubber plunger stopper, 1-3 ml, 4023/50, Fluorotec B2-40

The empty syringes with pre-assembled tip-caps were sterilized by gamma-irradiation (dose ≥25 kGy). The rubber plunger stoppers were sterilized by means of steam sterilization ($F_0 \gtrsim 1$□.

EXAMPLE 2

Evaluation of the Pharmacokinetic Profile of Gluteal Versus Deltoid Intramuscular Injections of Paliperidone Palmitate 100 mg Equivalent in Patients with Schizophrenia

This study was performed to characterize and compare the pharmacokinetic profile of paliperidone palmitate (formu-

lated as described above) following four intramuscular injections in the deltoid or gluteal muscle.

Method

In this multiple-dose, open-label, parallel-group study, patients with schizophrenia were randomized to receive four consecutive intramuscular injections (days 1, 8, 36 and 64) of paliperidone palmitate 100 mg-eq. administered into either the deltoid (n=24) or gluteal muscle (n=25). Plasma samples for pharmacokinetic analyses were collected. The total paliperidone concentration was calculated as the sum of both enantiomers.

Results

The median $C_{max}$ for paliperidone was higher in the deltoid versus the gluteal muscle after the second (31.3 versus 24.1 ng/mL) and fourth (23.7 versus 22.3 ng/mL) injections. After four injections, median $AUC_{\infty}$ was similar for both injection sites; $C_{max}$ and $AUC_{\tau}$ for paliperidone were 30% (90% CI=100.56%-168.93%) and 20% (90% CI=93.09%-154.69%) higher in deltoid versus gluteal muscle, respectively. Median $T_{max}$ was similar between injection sites after the second (10 day versus 10 day) and fourth injections (5 versus 6.5 days). After four injections, the median peak-to-trough ratio was higher (2.3 versus 1.9), with a larger intersubject variability for deltoid versus gluteal injection. An increase in median predose plasma concentration between days 8, 36 and 64 for both sites suggested subjects were not completely at steady state after four injections. Relative exposure after the fourth injection was slightly lower than after the second injection in both the deltoid and gluteal muscle. Most commonly reported adverse events (combined injection sites) were orthostatic hypotension (24%), hypotension (14%), diastolic hypotension (12%) and injection site pain (14%). There were four serious adverse events (worsening of psychosis) that led to discontinuations. There were no deaths in the study. Paliperidone palmitate was well tolerated with more favorable local tolerability profile in the gluteal versus deltoid; mean injection site pain VSA score was 3.3 for gluteal versus 10.8 for deltoid muscle (day 1, 8 hours after injection.

Conclusion

Paliperidone palmitate 100 mg-eq. injections resulted in an increased $AUC_{\tau}$ higher $C_{max}$, greater FI, but similar $T_{max}$ following four consecutive injections into the deltoid versus gluteal muscle. Paliperidone palmitate 100 mg-eq. was systemically and locally well tolerated in this study.

## EXAMPLE 3

### Assessment of the Dose Proportionality of Paliperidone Palmitate 25, 50, 100, and 150 mg eq. Following Administration in the Deltoid or Gluteal Muscles

This study evaluated dose proportionality of paliperidone palmitate injections when administered into either the gluteal or deltoid muscle.

Method

A single-dose, open label, parallel-group study of 201 randomized schizophrenia subjects was performed. The subjects were assigned into eight treatment groups: paliperidone palmitate 25 (n=48), 50 (n=50), 100 (n=51) or 150 (n=52) mg-eq. injected into either the deltoid or gluteal muscle. Serial plasma samples were collected for pharmacokinetic evaluation over 126-day period. The total paliperidone concentration was calculated as the sum of both enantiomers. Dose proportionality was assessed by linear regression model, for each injection site, with log-transformed dose-normalized $AUC_{\infty}$ and $C_{max}$ as dependent variables and log-transformed dose as predictor, respectively of $C_{max}$ and $AUC_{\infty}$ ratios of the enantiomers were documented.

Results

Slopes for log-transformed dose-normalized $AUC_{\infty}$ were not significantly different from zero for deltoid (slope −0.06; p=0.036) and gluteal injections (slope −0.02; p=0.760 indicating a dose-proportional increase in $AUC_{\infty}$, $T_{max}$, was comparable between doses but slightly earlier for deltoid (13-14 days) versus gluteal injections (13-17 days). Median $C_{max}$ was higher with deltoid (range 5.3-11.0 ng/mL) versus gluteal (range 5.1-8.7 ng/mL) injections except for the 100 mg-eq. deltoid (slope −0.22, p=0.0062) and gluteal (slope −0.31; p<0.0001) injections, indicating a less than dose-proportional increase in $C_{max}$. Results of $C_{max}$ and AUC were confirmed using pairwise comparisons. Plasma concentrations of (+)-enantiomer were consistently higher than (−)-enantiomer; (+)/(−) plasma concentrations ratio was approximately 2.4 shortly after administration and decreased to ~1.7 for both injection sites, independent of dose. After a single dose of paliperidone palmitate, subjects received concomitant oral antipsychotics. Treatment-emergent AEs (TEAs) included tachycardia (10%), headache (7%), schizophrenia (6%), insomnia (5%). Only 2% of subjects discontinued due to TEAs. No deaths were reported.

Conclusion

$AUC_{\infty}$ increased proportionality with increasing paliperidone palmitate doses (5-150 mg-eq.), regardless of gluteal or deltoid injection. Overall, deltoid injection was associated with a higher $C_{max}$(except for 100 mg-eq.) and slightly earlier $T_{max}$ compared with gluteal injections.

## EXAMPLE 4

### Comparison of the PK Profile in the Deltoid to that in the Gluteal

The plasma concentration-time profile of paliperidone after single i.m. injection of the paliperidone palmitate formulation at 25-150 mg-eq. has been documented in several studies (Table 4). Details of how the comparison of injection sites study and the dose proportionality studies were performed are provided in Examples 2 and 3.

TABLE 4

Table of Clinical Studies Summarized

| Study | Design/Treatment/PK Objective |
|---|---|
| | PHASE 1 STUDIES IN SUBJECTS WITH SCHIZOPHRENIA |
| R092670-INT-12 (dose-proportionality) | S.D., OL, parallel group/single i.m. injection of F011*, 25, 50, 100 or 150 mg eq./document PK of the F011* formulation at different doses, enantiomer disposition |

JANUS00000016

DTX-1.0016

TABLE 4-continued

| Table of Clinical Studies Summarized | |
|---|---|
| Study | Design/Treatment/PK Objective |
| PHASE 1 STUDIES IN SUBJECTS WITH SCHIZOPHRENIA | |
| R092670-USA-3 | M.D., OL, randomized, parallel groups/2 i.m. injections of R092670 (F011*) 25 or 150 mg eq., gluteal or deltoid, separated by 1 week/ compare the PK after deltoid and gluteal injections, explore the relationship between R092670 PK parameters and CYP P450 genotypes |
| R092670-PSY-1001 (comparison of injection site) | M.D., OL, randomized, parallel groups/4 i.m. injections of R092670 (F013) 100 mg eq. in the gluteal or deltoid muscle (on Day 1, 8, 36 and 64)/compare the PK at steady state between deltoid and gluteal injection sites |
| R092670-PSY-1004 (dose-proportionality) | S.D., OL, randomized, parallel groups/single i.m. injection of R092670 (F013) 25, 50, 100 or 150 mg eq. in the gluteal or deltoid muscle/evaluate dose proportionality of F013 formulation over a dose range of 25-150 mg eq., compare the PK after deltoid and gluteal injections |

S.D.: single dose; M.D.: multiple dose; OL: open-label; DB: double blind; PK: pharmacokinetic; PC: placebo-controlled; AC: active-controlled; pali ER: paliperidone extended release; pali IR: paliperidone immediate release
F011*: Sterilized by gamma-irradiation. Otherwise, sterilized by aseptic crystallization.

The total exposure ($AUC_\infty$) of paliperidone increased proportionally with dose after single-dose injections of 25 to 150 mg eq. paliperidone palmitate in both the deltoid and gluteal muscle. The increase in $C_{max}$ was slightly less than dose proportional for both injections sites at doses greater than 50 mg eq. The apparent half-life (reflecting the absorption rate for this type of formulations) increased with dose from 25 days (median) after the 25 mg eq. dose to 40-49 days (median) after the 100 and 150 mg eq. dose, for both injection sites. The $C_{max}$ of paliperidone was generally higher after single-dose injection of paliperidone palmitate in the deltoid muscle compared to the gluteal muscle (geometric mean ratio ranging from 108.75% to 164.85%) whereas this was much less pronounced for $AUC_\infty$ (geometric mean ratio ranging from 103.00% to 117.83%). The median apparent half-life was comparable between injection sites.

## EXAMPLE 5

### Description of the PK Profile in the Gluteal After Multiple Administrations

Paliperidone palmitate is a long-acting i.m. injectable, intended to release over a period of 1 month. In order to attain this long injection interval, an ester of paliperidone was prepared that has a limited solubility in a physiological environment. The ester was subsequently formulated as an aqueous suspension for i.m. injection. The rate of dissolution is governed by the particle size distribution whereby it was experimentally determined that an optimal particle size range is contained within xx-yy microm ($d_{50v}$). In fact, the rate of dissolution (and thus the particle size distribution) fully determines the in vivo behaviour, as was nicely demonstrated in study PSY-1002. It was found that the median $C_{max}$ increases and $t_{max}$ shortens with decreasing particle size, which is consistent with the hypothesis that particle size is driving the release rate. The point estimates suggest that paliperidone exposure (AUC, $C_{max}$) after injection of paliperidone palmitate is similar between the to-be-marketed formulation F013 and formulation F011.

TABLE 5

| Table of Clinical Studies Summarized in Module 2.7.2 | |
|---|---|
| Study | Design/Treatment/PK Objective |
| PHASE 1 STUDIES IN SUBJECTS WITH SCHIZOPHRENIA | |
| R092670-BEL-4 (pilot, dose-proportionality) | M.D., OL, sequential, parallel groups/4-6 monthly i.m. injections of F004, 50 mg eq. or 100 mg eq. or 150 mg eq./explore M.D. PK and dose-proportionality |
| R092670-BEL-7 (dosing regimen) | M.D., OL, parallel groups/F004 formulation: Panel I: 100 mg eq. i.m. followed by 3 monthly i.m. injections of 50 mg eq.; Panel II: 200 mg eq. i.m. followed by 3 monthly i.m. injections of 100 mg eq.; Panel III: 300 mg eq. i.m. followed by 3 monthly i.m. injections of 150 mg eq.; Panel IV: 50 mg eq. i.m. followed by 1 week later by 4 monthly i.m. injections of 50 mg eq.; Panel V: 150 mg eq. i.m. followed by 1 week later by 4 monthly i.m. injections of 150 mg eq./ explore the M.D. PK with various dosing regimens |
| R092670-INT-11 (compare F004 and F011) | M.D., DB, randomized, 4-group 2-way cross-over/4 monthly i.m. injections of F004 or F011*, 2 × 50 and 2 × 150 mg eq./compare PK of F004 and F011* formulations; compare S.D. and M.D. PK of both formulations |
| R092670-PSY-1002 (IVIVC) | S.D., OL, randomized, parallel groups/single i.m. injections of 1 mg paliperidone IR, followed by single i.m. injection of 50 mg eq. R092670: 1 of 4 F013 formulations with different particle sizes, or |

TABLE 5-continued

| Table of Clinical Studies Summarized in Module 2.7.2 | |
|---|---|
| Study | Design/Treatment/PK Objective |
| | PHASE 1 STUDIES IN SUBJECTS WITH SCHIZOPHRENIA |
| | F011 formulation with medium particle size/explore IVIVC of 4 F013 formulations, compare the PK of F011 and F013 formulations |
| R092670-PSY-1001 (comparison of injection site) | M.D., OL, randomized, parallel groups/4 i.m. injections of R092670 (F013) 100 mg eq. in the gluteal or deltoid muscle (on Day 1, 8, 36 and 64)/compare the PK at steady state between deltoid and gluteal injection sites |

S.D.: single dose; M.D.: multiple dose; OL: open-label; DB: double blind; PK: pharmacokinetic; PC: placebo-controlled; AC: active-controlled; pali ER: paliperidone extended release; pali IR: paliperidone immediate release
F011*: Sterilized by gamma-irradiation. Otherwise, sterilized by aseptic crystallization.

Pharmacokinetic theory also implies that for a formulation with such a long apparent half-life it takes 4-5 times this half-life for steady-state to be achieved. For individual patients, this means that following the first few injections, only subtherapeutic plasma concentrations are achieved. In order to overcome this problem, a loading dose regimen was developed (BEL-7), that was subsequently used in phase 2 and 3 of drug development. The dosing regimen consisting of two initial i.m. injections separated by one week followed by subsequent doses at monthly intervals resulted in a faster attainment of apparent steady state compared with a dosing regimen of one initial injection of twice the monthly dose followed by subsequent doses at monthly intervals. Somewhat higher peak-to-through fluctuations were observed with the first dosing regimen as compared with the latter one. The dosing regimen consisting of two initial i.m. injections separated by one week followed by subsequent doses at monthly intervals was selected for further studies and is also the recommended regimen for treatment.

EXAMPLE 6

Description of the Exposure Range Needed for Efficacy Using Invega Data

All antipsychotic drugs currently on the market have one feature in common: they antagonize the $D_2$ receptor at the level of the brain. It has been empirically derived and is currently widely excepted that 65-70% occupancy is needed for antipsychotics to show clinical efficacy (Farde et al.), i.e. improvement on the PANSS scale. A too high occupancy (80-85%) will typically increase the risk to develop EPS. In order to determine the central $D_2$ occupancy, PET trials in human healthy volunteers are typically performed. Two such studies have been done for paliperidone: SWE-1 and SIV-101, showing that the $K_D^{app}$ for $D_2$ occupancy was ranging from 4.4 to 6.4 ng/mL. Using the 65-85% occupancy window, it can be calculated that the exposure range for efficacy without an increased risk to develop EPS as compared to placebo (<5% difference in probability) is contained in the window of 7.5-40 ng/mL.

In addition, based on the results of the phase 3 program of 6 mg paliperidone ER, in which plasma samples were collected at several time points, a plasma concentration of 7.5 ng/mL was identified as the cut-off value above which 90% of the plasma concentrations were observed. The risk to develop EPS was clearly higher for dose above 9 mg Invega. Calculating back, this roughly corresponds to an exposure level of 35-40 ng/mL at steady-state. This implies that there is ample evidence to support a target exposure efficacy range of 7.5-40 ng/mL. This should be the target exposure range for paliperidone after injection of the paliperidone palmitate formulation.

EXAMPLE 7

Optimal Way of Dosing

During the development of paliperidone palmitate, as the result of an extensive population PK analysis (refer to popPK report for paliperidone palmitate), several factors were found to slow down the release of paliperidone from the formulation, resulting in a slower build-up of plasma concentrations at the start of therapy and in more time required to reach steady-state. One factor was body mass index: the higher the BMI, the slower the dissolution (probably related to local physiological factors such as diminished blood flow at the site of injection); the other one being volume administered: the higher the volume injected, the slower the dissolution (probably related to the nonlinear relationship between surface area and volume). This has resulted in a lower than expected exposure using the originally proposed loading dose regimen, and the need to come up with an improved loading dose scheme for all patients irrespective of BMI in order to avoid drop-out due to lack of efficacy at the start of therapy. The aim was to get patients as quickly as possible above the 7.5 ng/mL, certainly after 1 week for all doses considered (25 mg-eq. and above).

Simulation scenarios with the statistically significant covariates from the population PK analysis revealed the following features about the paliperidone PK after injection of paliperidone palmitate:

Compared to deltoid injections, repeated administration in the gluteal muscle resulted in a delayed time to achieve steady-state (~4 wk longer), but did not influence the overall exposure (in terms of steady-state concentrations) to paliperidone.

Deltoid injections resulted in a faster rise in initial plasma concentrations, facilitating a rapid attainment of potential therapeutic plasma concentrations. The deltoid injection site is therefore recommended as the initiation site for dosing paliperidone palmitate.

Higher doses, associated with larger injection volumes, increased the apparent half-life of paliperidone, which in turn increased the time to achieve steady-state.

Needle length was an important variable for the absorption kinetics from the deltoid injection-site and it is recommended to use a longer 1.5-inch needle for deltoid administration in heavy subjects (≥90 kg). Simulations indicated that the use of a longer needle in the deltoid muscle for the heavy individuals might be associated with an initial faster release of paliperidone

into the systemic circulation, which could help overcome the slower absorption observed in heavier individuals described below.

The body size variable BMI was another important covariate for paliperidone palmitate. A slower rise in initial concentrations was observed in the obese population, which possibly occurred due to the reduced speed of initial influx from the injection site. Initiating the first two injections in the deltoid muscle and using a longer 1.5-inch needle for deltoid injection in heavy subjects can mitigate this effect. These observations are consistent with the expectation that in heavy subjects, administration into the adipose layer of the deltoid muscle can be avoided with the use of a longer injection needle.

Summarize what the optimized loading dose regimens would be here:

150 deltoid (day 1), 100 mg deltoid (day 8), then every 4 weeks maintenance (gluteal or deltoid) (PSY-3006, simulations—popPK report palmitate)

100 deltoid (day 1), 100 mg deltoid (day 8), then every 4 weeks maintenance (gluteal or deltoid) (simulations—popPK report palmitate, proposed for the label)

150 mg deltoid day 1, maintenance dose day 8 and then every 4 weeks (gluteal or deltoid) (PSY-3007)

## EXAMPLE 8

Title of Study:

A Randomized, Double-Blind, Placebo-Controlled, Parallel-Group, Dose-Response Study to Evaluate the Efficacy and Safety of 3 Fixed Doses (25 mg eq., 100 mg eq., and 150 mg eq.) of Paliperidone Palmitate in Subjects With Schizophrenia

Phase of Development:

Phase 3

Objectives:

The primary objectives of this study were to evaluate the efficacy and safety of 3 fixed doses of paliperidone palmitate administered intramuscularly (i.m.) after an initial dose of 150 mg equivalent (eq.) in the deltoid muscle followed by either deltoid or gluteal injections for a total of 13 weeks of treatment as compared with placebo in subjects with schizophrenia.

The secondary objectives were to:

Assess the benefits in personal and social functioning (key secondary endpoint) associated with the use of paliperidone palmitate compared with placebo;

Assess the global improvement in severity of illness associated with the use of paliperidone palmitate compared with placebo;

Assess the dose-response and exposure-response relationships of paliperidone palmitate.

Methods:

This was a randomized, double-blind, placebo-controlled, parallel-group, multicenter, dose-response study of men and women, 18 years of age and older, who had a Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) diagnosis of schizophrenia. The study included a screening period of up to 7 days and a 13-week double-blind treatment period. The screening period included a washout of disallowed psychotropic medications.

Subjects without source documentation of previous exposure to at least 2 doses of oral risperidone or paliperidone extended-release (ER), at least 1 dose of i.m. RISPERDAL® CONSTA® or paliperidone palmitate, or who were not currently receiving an antipsychotic medication were given 4 to 6 days of paliperidone ER 6 mg/day (or the option of oral risperidone 3 mg/day for subjects in Malaysia) for tolerability testing. Subjects who had source documentation of previous exposure to the above medications and were currently taking another antipsychotic regimen continued their current treatment through Day-1. At the beginning of the double-blind treatment period, subjects were randomly assigned in a 1:1:1:1 ratio to 1 of 4 treatment groups: placebo or paliperidone palmitate 25 mg eq., 100 mg eq., or 150 mg eq. Study medication was administered as 4 doses: an initial i.m. injection of 150 mg eq. of paliperidone palmitate or placebo followed by 3 fixed i.m. doses of placebo or paliperidone palmitate [25, 100, or 150 mg eq.] on Days 8, 36, and 64. The initial injection of study medication was given in the deltoid muscle. Subsequent injections were given either in the deltoid or gluteal muscle at the discretion of the investigator. Randomized subjects were to remain in the study for 28 days after the last injection on Day 64 with the end of study visit scheduled for Day 92 during the double-blind period. The entire study, including the screening period, lasted approximately 14 weeks. Samples for pharmacokinetic (PK) evaluation were collected on Day 1, prior to the first injection and on Days 2, 4, 6, 8, 15, 22, 36, 64 and 92. Efficacy and safety were evaluated regularly throughout the study. A pharmacogenomic blood sample (10 mL) was collected from subjects who gave separate written informed consent for this part of the study. Participation in the pharmacogenomic research was optional. Approximately 105 to 115 mL of whole blood was collected during the study.

Number of Subjects (Planned and Analyzed):

It was planned to include approximately 644 men and women in this study. A total of 652 eligible subjects from 72 centers in 8 countries were randomized and received at least 1 dose of double-blind study medication (safety analysis set); 636 subjects had both baseline and post baseline efficacy data (intent-to-treat analysis set).

Diagnosis and Main Criteria for Inclusion:

Male or female subjects ≥18 years of age who met the DSM-IV diagnostic criteria for schizophrenia for at least 1 year before screening, had a Positive and Negative Syndrome Scale (PANSS) total score at screening of between 70 and 120, inclusive, and at baseline of between 60 and 120, inclusive, and had a body mass index (BMI) of >17.0 $kg/m^2$ to <40 $kg/m^2$ were eligible.

Test Product, Dose and Mode of Administration, Batch No.:

Paliperidone ER was supplied as a 6-mg capsule-shaped tablet for the oral tolerability test (batch number 0617714/F40). Paliperidone palmitate was supplied as 25, 100, or 150 mg eq. injectable suspension (batch numbers 06K22/F13 and 07D23/F13). For the oral tolerability test, a 6-mg tablet of paliperidone ER (or the option of oral risperidone 3 mg/day for subjects in Malaysia) was administered daily for 4 to 6 days. On Day 1 of the double-blind treatment period, 150 mg eq. of paliperidone palmitate was injected in the deltoid muscle followed by 25, 100, or 150 mg eq. i.m. injections of paliperidone palmitate on Days 8, 36, and 64, injected into the deltoid or gluteal muscle at the investigator's discretion.

Reference Therapy, Dose and Mode of Administration, Batch No.:

Placebo was supplied as 20% Intralipid (200 mg/mL) injectable emulsion (batch numbers 06K14/F00 and 07F12/F00). An injection was given on Days 1, 8, 36 and 64.

Duration of Treatment:

The study consisted of a screening and washout phase of 7 days and a double-blind treatment period of 13 weeks, starting with the first injection in the deltoid muscle followed by a second injection 1 week later. All injections after Day 1 were given in either the deltoid or the gluteal muscle at the discretion of the investigator. Two subsequent injections were given at 4-week intervals.

Criteria for Evaluation:

Pharmacokinetic Evaluations:

A sparse blood sampling procedure was followed to study the paliperidone concentration-time profiles. Paliperidone plasma concentration-time data were subject to population PK analysis using nonlinear mixed-effects modeling, and details are described in a separate report.

Efficacy Evaluations/Criteria:

The primary endpoint was the change in the PANSS total score from baseline (i.e., the start of double-blind treatment, Day 1) to the end of the double-blind treatment period (i.e., Day 92 or the last post baseline assessment). The key secondary efficacy endpoint was the change in the Personal and Social Performance Scale (PSP) from baseline to the end of the double-blind treatment period. The other secondary efficacy endpoint was the change in the Clinical Global Impression-Severity (CGI-S) scores from baseline to the end of the double-blind treatment period. Other endpoints included the change from baseline in subject ratings of sleep quality and daytime drowsiness using a visual analogue scale (VAS), the onset of therapeutic effect, responder rate, and the change from baseline to end point in PANSS subscales and Marder factors.

Safety Evaluations:

Safety was monitored by the evaluation of adverse events, extrapyramidal symptom (EPS) rating scales (Abnormal Involuntary Movement Scale [AIMS], Barnes Akathisia Rating Scale [BARS], Simpson and Angus Rating Scale [SAS]) scores, clinical laboratory test results, vital signs measurements, electrocardiograms (ECGs), and physical examination findings. In addition, the tolerability of injections was assessed; the investigators evaluated injection sites and the subjects assessed injection pain.

Statistical Methods:

All randomized subjects who received at least 1 dose of double-blind study drug and had both baseline and at least one post baseline efficacy measurement (PANSS, PSP, or CGI-S) during the double-blind treatment period were included in the intent-to-treat efficacy analyses. The overall type I error rate for testing all paliperidone palmitate doses versus placebo for both the primary endpoint (change in PANSS total score at end point) and the key secondary efficacy endpoint (change in PSP total score at end point) was controlled at the 2-sided 0.05 significance level. The 2 families of hypotheses (in each family, 3 comparisons for each of the paliperidone palmitate doses versus placebo) were tested using a parallel gatekeeping procedure that adjusts for multiplicity using Dunnett's method in each family of hypotheses and using Bonferroni's inequality between different families of hypotheses. This procedure is referred to as the Dunnett-Bonferroni-based parallel gatekeeping procedure.

The change from baseline in PANSS total score at each visit and at end point was analyzed using an analysis of covariance (ANCOVA) model. The last observation carried forward (LOCF) method was used. The model included treatment and country as factors and baseline PANSS total score as a covariate. Treatment effect was based on the difference in least-squares mean change. Dunnett's test was used to adjust for multiple comparisons of the 3 paliperidone palmitate dosages versus placebo. Unadjusted 2-sided 95% confidence intervals were presented for the difference in least-squares mean change of each paliperidone palmitate dosage group compared with placebo. Treatment-by-country and treatment-by-baseline PANSS total score interactions were explored using the same ANCOVA model as the one for the analysis of the primary endpoint. If either term was statistically significant at the predefined 2-sided significance level of 0.10, further evaluations of the effect of other covariates were to be performed to assess the nature of the interaction and identify possible causes. In addition, to address the dose-response relationship and to facilitate the discussion of dosage selection, an analysis to compare the 3 active paliperidone palmitate dosages with each other was performed without adjustment for multiple comparisons.

The analysis of the key secondary endpoint, change in PSP score at end point, was conducted by means of an ANCOVA model with treatment and country as factors and the baseline score as the covariate. The Dunnett-Bonferroni-based parallel gatekeeping approach was used to adjust for multiple testing.

Between-group comparisons of CGI-S were performed by using an ANCOVA model on the ranks of change from baseline, with treatment and country as factors and the baseline score as the covariate.

Change from baseline over time (observed case) in the PANSS total score was explored using mixed effects linear models for repeated measures with time, treatment, country, and treatment-by-time as factors and baseline score as a covariate.

The number and percentage of subjects with treatment-emergent adverse events were summarized. Adverse events of potential clinical interest were summarized separately, including events related to EPS or changes in serum glucose or prolactin levels.

Changes from baseline in clinical laboratory tests, vital sign measurements, ECGs, body weight, BMI, and EPS scale scores were summarized by treatment group. Prolactin levels were summarized by sex. Subjects with potentially abnormal values or changes in clinical laboratory tests, vital signs, orthostatic parameters, and ECG parameters were summarized based on predefined criteria. Frequency distributions were presented for the investigator's evaluation of the injection site, and descriptive statistics were presented for VAS scores corresponding to the subject's evaluation of injection pain.

Results:

The majority of subjects in the paliperidone palmitate treatment groups (56%-61%) received all 4 injections compared with 48% of the placebo-treated subjects. Completion rates were also higher for the paliperidone palmitate groups (52%-55%) than for the placebo group (43%). More subjects were discontinued for lack of efficacy in the placebo group (27%) compared with the paliperidone palmitate groups (14%-19%).

Demographic and Baseline Characteristics:

The double-blind treatment groups were well matched with respect to demographic and baseline disease characteristics and psychiatric history. The 636 subjects who comprised the intent-to-treat analysis set were mainly male (67%), racially diverse (54% White, 30% Black, 14% Asian, 1% other races), and predominately between the ages of 26 and 50 years (75%). Most subjects had a primary diagnosis of paranoid schizophrenia (88%), and were highly symptomatic as indicated by a mean PANSS total score of 87.1 at baseline. There were notable differences between countries with respect to BMI and gender, with subjects enrolled at centers in the U.S. being more likely to be male and obese (i.e., BMI≥30 kg/m$^2$) than those from centers in other countries.

Pharmacokinetics:

A total of 488 subjects who were randomly assigned to receive paliperidone palmitate treatment had scheduled pharmacokinetic blood samples taken over the course of the study. The median paliperidone predose concentration for the 25 mg eq. treatment group was highest on Day 8, which is the result of the initial 150 mg eq. dose on Day 1. After

Day 8, paliperidone concentrations decreased and seemed to reach steady state levels on Day 92 based on visual inspection. The median paliperidone predose concentration for the 100 mg eq. treatment group remained in the same range from Day 8 onwards. The median predose concentration for the 150 mg eq. treatment group seemed to increase up to the last study day, Day 92. The median paliperidone plasma concentrations on Day 8 were lower in subjects with high BMI (≥25 to <30 kg/m$^2$ and ≥30 kg/m$^2$; overweight/obese) compared to subjects with low BMI (<25 kg/m$^2$) for the 3 dose groups. After Day 8, no consistent trends were observed for the 3 paliperidone palmitate dose groups with respect to paliperidone plasma concentrations as a function of baseline BMI classification.

The mean and median paliperidone plasma concentrations on Day 64 for the 100 mg eq. treatment group were approximately 2-fold higher than those for the 25 mg eq. treatment group. Thus, the PK profile for the 25 mg eq. and 100 mg eq. dose groups appeared to be less than dose proportional, which is the result of the initial paliperidone palmitate 150 mg eq. injection on Day 1 in all active treatment groups. The mean and median paliperidone plasma concentrations on Day 64 for the 100 mg eq. dose were apparently dose proportional compared to the 150 mg eq. dose. A high inter-subject variability was observed in the paliperidone plasma concentrations on Days 1 and 2 with a % CV of 118.9% (Day 1) and 153.1% (Day 2). After Day 2, the inter-subject variability decreased and the % CV ranged from 50.4 to 83.4%.

Primary Efficacy Analysis:

Adult subjects with schizophrenia achieved statistically significant improvements in the PANSS total score (primary efficacy endpoint) with all 3 doses of paliperidone palmitate compared to placebo (25 mg eq.: p=0.034; 100 mg eq.: p<0.001; 150 mg eq.: p<0.001) based on the intent-to-treat LOCF analysis and the Dunnett's test to control for multiplicity.

exploratory analysis additionally provided no statistical evidence for a BMI effect on treatment.

All 3 paliperidone palmitate dose groups showed a statistically significant improvement over placebo in the change in PANSS total score as of Day 22 and at every subsequent time point, and as early as Day 8 in the paliperidone palmitate 25 mg eq. and 150 mg eq. groups.

The mean improvements in the PSP score from baseline to end point, the key secondary efficacy outcome measure, showed a dose response among the 3 paliperidone palmitate groups (25 mg eq.: 2.9; 100 mg eq.: 6.1; 150 mg eq.: 8.3); all were numerically higher than the mean improvement in the PSP score seen in the placebo group (1.7). Based on the intent-to-treat LOCF analysis of this key secondary efficacy variable, using the Dunnett-Bonferroni-based parallel gatekeeping procedure to adjust for multiplicity, the improvement in the paliperidone palmitate 100 and 150 mg eq. treatment groups reached statistical significance (100 mg eq.: p=0.007; 150 mg eq.: p<0.001) when compared with the placebo group.

The paliperidone palmitate 100 mg eq. and 150 mg eq. groups were statistically significantly superior to placebo in improving the CGI-S scores from baseline to end point (LOCF) (without multiplicity adjustment, 100 mg eq.: p=0.005; 150 mg eq.: p<0.001). Significantly more subjects treated with paliperidone palmitate 25 mg eq. (33.5%; p=0.007), 100 mg eq. (41.0%; p<0.001), and 150 mg eq. (40.0%, p<0.001) achieved responder status (30% or larger decrease on PANSS total scores) than with placebo (20.0%).

Based on the intent-to-treat LOCF analysis of the change from baseline to end point without statistical adjustment for multiplicity, the paliperidone palmitate 100 and 150 mg eq. groups were statistically significantly superior to the placebo group for all 5 PANSS Marder factors (p<0.010). The improvements in both negative symptoms and disorganized thoughts factor scores were statistically significantly greater in the paliperidone palmitate 25 mg eq. group compared with placebo (p=0.032).

Positive and Negative Syndrome Scale for Schizophrenia (PANSS) Total Score - Change from Baseline to End Point-LOCF with the Dunnett-Bonferroni-Based Parallel Gatekeeping Procedure (Study R092670-PSY-3007: Intent-to-Treat Analysis Set)

| | Placebo (N = 160) | R092670 25 mg eq. (N = 155) | R092670 100 mg eq. (N = 161) | R092670 150 mg eq. (N = 160) |
|---|---|---|---|---|
| Baseline Mean (SD) | 86.8 (10.31) | 86.9 (11.99) | 86.2 (10.77) | 88.4 (11.70) |
| End point Mean (SD) | 83.9 (21.44) | 78.8 (19.88) | 74.6 (18.06) | 75.2 (18.59) |
| Change from Baseline | | | | |
| Mean (SD) | −2.9 (19.26) | −8.0 (19.90) | −11.6 (17.63) | −13.2 (18.48) |
| P-value (minus Placebo)[a] | | 0.034 | <0.001 | <0.001 |
| Diff of LS Means (SE) | | −5.1 (2.01) | −8.7 (2.00) | −9.8 (2.00) |

[a]Based on analysis of covariance (ANCOVA) model with treatment (Placebo, R092670 25 mg eq., R092670 100 mg eq., R092670 150 mg eq.) and country as factors, and baseline value as a covariate. P-values were adjusted for multiplicity for comparison with placebo using Dunnett's test.

Note:

Negative change in score indicates improvement.

Other Efficacy Results:

There was a dose-response pattern with respect to the primary efficacy variable, with the mean decreases (improvement) in the PANSS total score at end point (LOCF).

Prespecified treatment-by-country and treatment-by-baseline PANSS total score interactions in the primary efficacy model were not statistically significant at the 0.10 level. An

Based on the intent-to-treat LOCF analysis using an ANCOVA model with no adjustment for multiplicity, the mean improvement in sleep quality in the paliperidone palmitate 100 mg eq. and 150 mg eq. groups were statistically significant (p<0.001 and p=0.026, respectively) when compared with placebo. The mean changes in daytime drowsiness in the paliperidone palmitate treatment groups were not statistically significantly different from that in the

placebo group (25 mg eq.: p=0.541; 100 mg eq.: p=0.340; 150 mg eq.: p=0.261).

Safety Results:

Paliperidone palmitate, injected at a dose of 150 mg eq. into the deltoid muscle followed by 3 i.m. injections at fixed doses of 25 mg eq., 100 mg eq., or 150 mg eq. on Days 8, 36, and 64, was generally well tolerated by adult subjects with schizophrenia during this 13-week study. Overall, the safety and tolerability results were consistent with previous clinical studies involving paliperidone palmitate, and no new safety signals were detected.

The overall summary of treatment-emergent adverse events is given below.



The incidence of treatment-emergent EPS-related adverse events was low and comparable to placebo. Akathisia was the most frequently reported EPS-related adverse event (4.9% for the placebo group and 1.3%, 4.8%, 5.5% for the paliperidone palmitate 25, 100, and 150 mg eq. groups, respectively). None of the EPS-related adverse events reported in subjects receiving paliperidone palmitate were serious or treatment limiting, and only 1 was severe (musculoskeletal stiffness). Results of EPS rating scales and use of anti-EPS medication were consistent in indicating that paliperidone palmitate was associated with a low incidence of EPS.

Overall Summary of Treatment-Emergent Adverse Events
(Study R092670-PSY-3007: Safety Analysis Set)

| | Placebo (N = 164) n (%) | R092670 25 mg eq. (N = 160) n (%) | R092670 100 mg eq. (N = 165) n (%) | R092670 150 mg eq. (N = 163) n (%) | Total (N = 652) n (%) |
|---|---|---|---|---|---|
| TEAE | 107 (65.2) | 101 (63.1) | 99 (60.0) | 103 (63.2) | 410 (62.9) |
| Possibly related TEAE[a] | 47 (28.7) | 45 (28.1) | 49 (29.7) | 51 (31.3) | 192 (29.4) |
| TEAE leading to death | 0 | 0 | 0 | 1 (0.6) | 1 (0.2) |
| 1 or more serious TEAE | 23 (14.0) | 15 (9.4) | 22 (13.3) | 13 (8.0) | 73 (11.2) |
| TEAE leading to permanent stop | 11 (6.7) | 10 (6.3) | 10 (6.1) | 13 (8.0) | 44 (6.7) |

[a]Study drug relationships of possible, probable, and very likely are included in this category.
Adverse events are coded using MedDRA version 10.1

There was 1 death in a subject in the paliperidone palmitate 150 mg eq. group after withdrawal from the study due to an adverse event (cerebrovascular accident) that began during the study. This subject received 2 injections of study medication, with the last injection administered approximately 2 weeks before the subject died. While this event was assessed as doubtfully related to study treatment by the investigator, an unblinded review by the sponsor assessed this event to be possibly related to study treatment.

The number of subjects who experienced treatment-emergent serious adverse events was higher in the placebo group than in any of the paliperidone palmitate groups (see table above). Most serious adverse events in all treatment groups were psychiatric disorders (e.g., schizophrenia, psychotic disorder) that were likely the result of the natural course of the underlying schizophrenia. Adverse events leading to study discontinuation occurred at a similar low incidence across treatment groups.

Common treatment-emergent adverse events (≥2% of subjects in any treatment group) that occurred more frequently in the total paliperidone palmitate group (all 3 active dose groups combined) than in the placebo-treated subjects (i.e., ≥1% difference between the combined paliperidone palmitate group and the placebo group) were: injection site pain, dizziness, sedation, pain in extremity, and myalgia. An examination of treatment-emergent adverse events of potential clinical importance revealed no reports of seizure or convulsion, tardive dyskinesia, dermatologic events, neuroleptic malignant syndrome, hyperthermia, anaphylactic reaction, rhabdomyolysis, syndrome of inappropriate secretion of antidiuretic hormone, ventricular tachycardia, ventricular fibrillation, or torsades de pointes.

In general, the type and incidence of treatment-emergent adverse events did not differ as a function of baseline BMI categories (normal: <25 kg/m$^2$; overweight: ≥25 to <30 kg/m$^2$; obese: ≥30 kg/m$^2$).

No clinically relevant mean changes from baseline to end point in supine or standing pulse rates were apparent for any of the paliperidone palmitate doses. A similar, low percentage of subjects had pulse rate of ≥100 bpm with an increase of ≥15 bpm in the placebo and paliperidone palmitate groups (6% to 11% for standing measurements; 2% to 5% for supine measurements).

Assessment of ECG data did not demonstrate evidence of clinically significant QTc prolongation with paliperidone palmitate at doses up to 150 mg eq. No subject had a maximum QTcLD value >480 ms or a maximal change in QTcLD >60 ms during the study.

The increases in body weight with paliperidone palmitate over the 13-week double-blind treatment period were modest in a dose-related manner, averaging 0.4, 0.7, and 1.4 kg for the 25 mg eq., 100 mg eq., and 150 mg eq. groups, respectively (−0.2 kg for placebo); corresponding mean changes in BMI from baseline to end point were 0.1, 0.3, and 0.5 kg/m$^2$, respectively (−0.1 kg/m$^2$ for placebo). A clinically relevant weight increase of at least 7% relative to baseline was seen in 13% of subjects receiving the highest dose of paliperidone palmitate (compared with 5% for placebo).

Consistent with the known pharmacology of paliperidone, increases in prolactin levels were observed with greater frequency in subjects who received paliperidone palmitate, with the largest increase seen in the 150 mg eq. group. Overall, there was a low incidence of potentially prolactin-related adverse events, despite the known propensity of paliperidone palmitate to increase serum prolactin levels. This suggests that the clinical importance of this increase in serum prolactin levels is of questionable clinical significance.

Based on mean changes from baseline to end point and the occurrence of treatment-emergent markedly abnormal laboratory test values and adverse events related to abnormal laboratory analyte findings, except for prolactin, the effects

of paliperidone palmitate on the results of chemistry and hematology laboratory tests (including liver and renal function tests, serum lipid levels, and glucose levels) did not show clinically relevant differences from those of placebo.

Local injection site tolerability was good. Occurrences of induration, redness, or swelling as assessed by blinded study personnel were infrequent, generally mild, decreasing over time, and similar in incidence for the paliperidone palmitate and placebo groups. Investigator ratings of injection pain were similar for the placebo and paliperidone palmitate groups.

Study Limitations:

This study investigated the efficacy and safety of paliperidone palmitate for acute treatment of schizophrenia over 13 weeks and does not provide information on longer term treatment. The study was not designed to detect differences between doses of paliperidone palmitate; thus, dose-related trends in efficacy and safety can only be described descriptively. The study was also not designed to demonstrate efficacy for specific subgroups of subjects, such as those from a particular country. An independent, centralized blinded rating service was used for performing all ratings of PANSS, PSP and CGI-S for all subjects enrolled at U.S. sites. The investigators at these sites did not complete any of the ratings, which would have provided a reference for ratings provided by the rating service. Thus, data from this study cannot be used to fully evaluate the utility of using blinded independent raters for detecting treatment differences.

Conclusion:

All 3 doses of paliperidone palmitate tested in this study—25, 100, and 150 mg eq.—were efficacious in adult subjects with schizophrenia who were experiencing acutely exacerbated schizophrenia. Specifically, the results of the primary efficacy endpoint (change from baseline to end point in PANSS total score) demonstrated statistical superiority of paliperidone palmitate 25 mg eq., 100 mg eq., and 150 mg eq. over placebo. Significantly greater improvement in subjects' personal and social functioning (as measured by the PSP score) was also seen for the paliperidone palmitate 100 mg eq. and 150 mg eq. doses compared with placebo, and global improvement was validated by a favorable and statistically significant CGI-S change for these 2 dose groups. There was a dose response in the primary and secondary efficacy endpoints (PANSS, PSP, and CGI-S). All 3 doses of paliperidone palmitate, including the highest dose of 150 mg eq., were well tolerated, suggesting a positive benefit-risk ratio across the dose range currently studied. No new safety signal was detected.

## FIGURES

FIGS. **1-3** graphically presents the observed versus population pharmacokinetics model simulation for plasma paliperidone concentrations. The line indicates the median values calculated from population pharmacokinetic simulation. The shading indicates 90% prediction interval representing the between and within subject, variability obtained using the population pharmacokinetic simulation. The circles indicate observed plasma paliperidone concentrations. The arrows indicate the days when paliperidone palmitate injection was given. As is apparent from the Figures the plasma profiles provided by initiating paliperidone with 150 mg eq. followed by a subsequent dose of 100 or 150 for days 1-36 provide a rapid rise to a therapeutic dose levels. Most preferably the dosing of paliperidone to patients should be maintained within ±25%, preferably 20% of the median plasma concentrations provided in these figures for days 1-36. For patients whose dosing continues at 100 mg eq. the preferably the dosing of paliperidone to patients should be maintained within ±25%, preferably 20% of the median plasma concentrations provided in FIG. **2** for days 1-64. For patients whose dosing continues at 150 mg eq. the preferably the dosing of paliperidone to patients should be maintained within ±25%, preferably 20% of the median plasma concentrations provided in FIG. **3** for days 1-64.

We claim:

**1**. A dosing regimen for administering paliperidone palmitate to a psychiatric patient in need of treatment for schizophrenia, schizoaffective disorder, or schizophreniform disorder comprising

(1) administering intramuscularly in the deltoid of a patient in need of treatment a first loading dose of about 150 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;

(2) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of about 100 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the 6th to about 10th day of treatment; and

(3) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 150 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation a month (±7 days) after the second loading dose.

**2**. The dosing regimen of claim **1** wherein after administration of the first maintenance dose, subsequent maintenance doses of from about 25 mg-eq. to 150 mg-eq. are administered in the deltoid or gluteal muscle of the psychiatric patient in need of treatment at monthly (±7 days) intervals.

**3**. The dosing regimen of claim **1** wherein the sustained release formulation is an aqueous nanoparticle suspension.

**4**. A dosing regimen for administering paliperidone palmitate to a psychiatric patient in need of treatment for psychotic disorder comprising

(a) administering intramuscularly in the deltoid of a patient in need of treatment a first loading dose of about 150 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;

(b) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of about 100 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the eighth day of treatment; and

(c) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 150 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation a month (±7 days) after the second loading dose.

**5**. The dosing regimen of claim **4** wherein the sustained release formulation is an aqueous nanoparticle suspension.

**6**. The dosing regimen of claim **4** wherein the psychiatric patient is in need of treatment for psychotic disorder wherein the psychotic disorder is schizophrenia.

**7**. The dosing regimen of claim **4** wherein the psychiatric patient is in need of treatment for a psychotic disorder wherein the psychotic disorder is schizoaffective disorder.

**8**. A dosing regimen for administering paliperidone palmitate to a renally impaired psychiatric patient in need of

treatment for schizophrenia, schizoaffective disorder, or schizophreniform disorder comprising

(a) administering intramuscularly in the deltoid of a renally impaired psychiatric patient in need of treatment a first loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;

(b) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the 6th to about 10th day of treatment; and

(c) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 75 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation a month (±7 days) after the second loading dose.

**9**. The dosing regimen of claim **8** wherein after the first maintenance dose, subsequent maintenance doses of from about 25 mg-eg. to 150 mg-eg. are administered in the deltoid or gluteal muscle of the psychiatric patient in need of treatment of monthly (±7) intervals.

**10**. The dosing regimen of claim **8** wherein the sustained release formulation is an aqueous nanoparticle suspension.

**11**. A dosing regimen for administering paliperidone palmitate to a renally impaired psychiatric patient in need of treatment for psychotic disorder comprising

(a) administering intramuscularly in the deltoid of a renally impaired psychiatric patient in need of treatment a first loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;

(b) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the eighth day of treatment; and

(c) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 50 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation a month (±7 days) after the second loading dose.

**12**. The dosing regimen of claim **11** wherein the sustained release formulation is an aqueous nanoparticle suspension.

**13**. The dosing regimen of claim **11** wherein the psychiatric patient is in need of treatment for of a psychotic disorder wherein the psychotic disorder is schizophrenia.

**14**. The dosing regimen of claim **11** wherein the psychiatric patient is in need of treatment for a psychotic disorder wherein the psychotic disorder is schizoaffective disorder.

**15**. The dosing regimen of claim **4** wherein after administration of the first maintenance dose, subsequent maintenance doses of from about 25 mg-eq. to 150 mg-eq. are administered in the deltoid or gluteal muscle of the psychiatric patient in need of treatment at monthly (±7 days) intervals.

**16**. The dosing regimen of claim **11** wherein after administration of the first maintenance dose, subsequent maintenance doses of from about 25 mg-eq. to 150 mg-eq. are administered in the deltoid or gluteal muscle of the psychiatric patient in need of treatment at monthly (±7 days) intervals.

**17**. The dosing regimen of claim **1**, **4**, **8** or **11** wherein the formulation is an aqueous nanoparticle suspension comprises

(a) from 3 to 20% (w/v) of the paliperidone palmitate having an average particle size (d50) of from about 1600 nm to about 900 nm;

(b) from 0.5 to 3% (w/v) of a wetting agent wherein the wetting agent is polysorbate 20;

(c) one or more buffering agents sufficient to render the composition neutral to very slightly basic (pH 8.5);

(d) from 0.5 to 3% (w/v) of a suspending agent wherein the suspending agent is polyethylene glycol 4000; and

(e) up to 2% (w/v) preservatives; and

(f) water q.s. ad 100%.

**18**. The dosage regimen of claim **17** wherein the concentration of paliperidone palmitate is 156 mg/ml in the aqueous nanoparticle suspension.

**19**. The dosing regimen of claims **1**, **4**, **8** or **11** wherein the sustained release depot formulation is an aqueous nanoparticle suspension consists essentially of

(a) 156 mg/ml of the paliperidone palmitate having an average particle size (d50) of from about 1600 nm to about 900 nm;

(b) 12 mg/ml of polysorbate 20;

(c) one or more buffering agents sufficient to render the composition neutral to very slightly basic (pH 8.5);

(d) 30 mg/ml of a suspending agent wherein the suspending agent is polyethylene glycol 4000; and

(f) water q.s. ad 100%.

**20**. The dosage regimen of claim **19** wherein in the buffering agents contained in the aqueous nanoparticle suspension are citric acid monohydrate, disodium hydrogen phosphate anhydrous, sodium dihydrogen phosphate monohydrate, sodium hydroxide.

**21**. The dosage regimen of claim **19** wherein in the pH of the aqueous nanoparticle suspension is in the range of pH 7 to 7.5.

* * * * *

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitations of the Federal Rules of Appellate Procedure and the Rules of this Court. According to the system used to prepare it, the brief contains 13,998 words.

/s/ *John C. O'Quinn*