**2025-1228, -1252**

IN THE

# United States Court of Appeals

**FOR THE FEDERAL CIRCUIT**

JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA NV,

*Plaintiffs-Appellees,*

—v.—

TEVA PHARMACEUTICALS USA, INC.,

*Defendant-Appellant.*

JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA NV,

*Plaintiffs-Appellees,*

—v.—

MYLAN LABORATORIES LIMITED,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY,
JUDGE CLAIRE C. CECCHI
2:18-CV-734-CCC-LDW, 2:19-CV-16484-CCC-LDW

**CORRECTED BRIEF FOR PLAINTIFFS-APPELLEES**

BARBARA L. MULLIN
ARON R. FISCHER
ANDREW D. COHEN
ZHIQIANG LIU
J. JAY CHO
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiffs-Appellees*

**U.S. PATENT NO. 9,439,906 CLAIMS 1, 2, 8, 10, 11, 13, 19, 20, AND 21 (APPX174-175)**

For purposes of trial, the parties agreed to litigate five representative claims: claims 2, 10, 13, and multiple dependent claims 20-21 (as they depend from claims 1 or 8). Appx1061.

**1.** A dosing regimen for administering paliperidone palmitate to a psychiatric patient in need of treatment for schizophrenia, schizoaffective disorder, or schizophreniform disorder comprising

(1) administering intramuscularly in the deltoid of a patient in need of treatment a first loading dose of about 150 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;

(2) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of about 100 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the 6th to about 10th day of treatment; and

(3) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 150 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation a month (±7 days) after the second loading dose.

**2.** The dosing regimen of claim 1 wherein after administration of the first maintenance dose, subsequent maintenance doses of from about 25 mg-eq. to 150 mg-eq. are administered in the deltoid or gluteal muscle of the psychiatric patient in need of treatment at monthly (±7 days) intervals.

**8.** A dosing regimen for administering paliperidone palmitate to a renally impaired psychiatric patient in need of treatment for schizophrenia, schizoaffective disorder, or schizophreniform disorder comprising

(a) administering intramuscularly in the deltoid of a renally impaired psychiatric patient in need of treatment a first loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;

(b) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the 6th to about 10th day of treatment; and

(c) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 75 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation a month (±7 days) after the second loading dose.

**10.** The dosing regimen of claim 8 wherein the sustained release formulation is an aqueous nanoparticle suspension.

**11.** A dosing regimen for administering paliperidone palmitate to a renally impaired psychiatric patient in need of treatment for psychotic disorder comprising

(a) administering intramuscularly in the deltoid of a renally impaired psychiatric patient in need of treatment a first loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the first day of treatment;

(b) administering intramuscularly in the deltoid muscle of the patient in need of treatment a second loading dose of from about 75 mg-eq. of paliperidone as paliperidone palmitate formulated in a sustained release formulation on the eighth day of treatment; and

(c) administering intramuscularly in the deltoid or gluteal muscle of the patient in need of treatment a first maintenance dose of about 25 mg-eq. to about 50 mg-eq. of paliperidone as paliperidone palmitate in a sustained release formulation a month (±7 days) after the second loading dose.

**13.** The dosing regimen of claim 11 wherein the psychiatric patient is in need of treatment for of a psychotic disorder wherein the psychotic disorder is schizophrenia.

**19.** The dosing regimen of claims 1, 4, 8 or 11 wherein the sustained release depot formulation is an aqueous nanoparticle suspension consists essentially of

(a) 156 mg/ml of the paliperidone palmitate having an average particle size (d50) of from about 1600 nm to about 900 nm;

(b) 12 mg/ml of polysorbate 20;

(c) one or more buffering agents sufficient to render the composition neutral to very slightly basic (pH 8.5);

(d) 30 mg/ml of a suspending agent wherein the suspending agent is polyethylene glycol 4000; and

(f) water q.s. ad 100%.

**20.** The dosage regimen of claim 19 wherein in the buffering agents contained in the aqueous nanoparticle suspension are citric acid monohydrate, disodium hydrogen phosphate anhydrous, sodium dihydrogen phosphate monohydrate, sodium hydroxide.

**21.** The dosage regimen of claim 19 wherein in the pH of the aqueous nanoparticle suspension is in the range of pH 7 to 7.5.

## CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellees Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica, NV certifies the following:

1. **Represented Entities (Fed. Cir. R. 47.4(a)(1)):** Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica NV

2. **Real Party in Interest (Fed. Cir. R. 47.4(a)(2)):** N/A

3. **Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)):** Johnson & Johnson

4. **Legal Representatives (Fed. Cir. R. 47.4(a)(4)):**

   **Robinson Miller LLC**: Keith J. Miller, Michael James Gesualdo

   **Patterson Belknap Webb & Tyler LLP**: Joyce Nadipuram, Collin Hong, Meghan R. Larywon, A. Rob Quirk, Margaret O'Neil, Jeffrey Hughes, Anna Boltyanskiy, Gregory L. Diskant, Lachlan Campbell-Verduyn

   **Akin Gump Strauss Hauer & Feld LLP**: Angela Verrecchio, Matthew Alan Pearson

5. **Related Cases (Fed. Cir. R. 47.5(a)).** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)? **Yes.** A separate Notice of Related Case Information has been filed under Rule 47.5(b).

6. **Organizational Victims and Bankruptcy Cases (Fed. R. App. P. 26.1(b)-(c)):** N/A

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST .......... iv

TABLE OF AUTHORITIES .......... ix

GLOSSARY OF ABBREVIATIONS .......... xiv

STATEMENT OF RELATED CASES .......... xv

INTRODUCTION .......... 1

COUNTER-STATEMENT OF THE ISSUES .......... 4

COUNTER-STATEMENT OF THE CASE .......... 5

A. Schizophrenia and its Treatment .......... 5

B. The State of the Art at the Time of the Invention .......... 5

C. Invention of the Claimed Dosing Regimens .......... 7

1. Development of the Formulation .......... 7

2. Early Clinical Trials .......... 8

3. The Failed Phase III Trials .......... 8

4. Discovery of a New Loading Dose Concept .......... 10

5. The Claimed Dosing Regimens Achieved Rapid and Sustained Efficacy Without Oral Supplementation .......... 12

D. The ’906 Patent .......... 13

1. Specification .......... 13

2. Representative Claims .......... 14

E. Invega Sustenna .......... 14

F. Teva’s Obviousness Case .......... 15

1. The ’544 Patent .......... 16

**TABLE OF CONTENTS**
(continued)

Page


2. WO’384 ... 17

3. The ’548 Protocol ... 18

4. Ereshefsky and Karagianis ... 19

G. Procedural History ... 21

1. Original District Court Proceedings ... 21

2. This Court’s Remand ... 21

3. The District Court’s Remand Decision ... 22

SUMMARY OF THE ARGUMENT ... 22

STANDARD OF REVIEW ... 24

ARGUMENT ... 25

I. Teva Failed to Prove Claim 2 Obvious ... 25

A. Claim 2 Is Not Presumptively Obvious ... 25

1. There Is No Presumption of Obviousness Because the Differences Between Claim 2 and the Prior Art Are Not Overlapping Ranges ... 25

2. Teva Failed to Prove a Routine Optimization Theory ... 29

3. Any Presumption of Obviousness Would Be Rebutted by Unexpected Results ... 31

B. Teva Failed to Prove Its Theories of Motivation or Reasonable Expectation of Success ... 35

1. The District Court Properly Required Teva to Prove That the Differences Between Claim 2 and the Prior Art Would Have Been Obvious ... 36

# TABLE OF CONTENTS
(continued)

Page


2. The District Court Correctly Found That Teva Failed to Prove Motivation....38

3. The District Court Properly Analyzed Reasonable Expectation of Success....46

II. Teva Failed to Prove Claims 10, 13 and 20-21 Obvious....50

A. Teva Failed to Prove the Renal Impairment Claims (Claims 10 and 13) Obvious....50

1. The District Court Properly Observed That Teva Ignored Claim 13....51

2. The District Court Correctly Found Teva's Obviousness Evidence Insufficient....51

3. The District Court Did Not Rely on Teaching Away for the Renal Impairment Claims....54

B. Teva Failed to Prove the Formulation Claims (Claims 20-21) Obvious....54

1. The District Court Correctly Found That the '544 Patent Discourages Use of Formulation B....55

2. The Fact That Invega Sustenna Practices the '544 Patent Is Irrelevant to Teaching Away....58

3. Claims 20-21 Are Nonobvious Regardless of Teaching Away....59

III. The Objective Evidence Supports Nonobviousness....61

**TABLE OF CONTENTS**
(continued)

Page

A. Long-Felt Need and Commercial Success Support Nonobviousness and Rebut Any Presumption of Obviousness ..........62

B. Skepticism and Industry Praise Relate Directly to the Claimed Invention and Further Support Nonobviousness ..................................65

CONCLUSION ..........................................................................................................68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*,
903 F.3d 1310 (Fed. Cir. 2018) ....................63, 64

*In re Aller*,
220 F.2d 454 (CCPA 1955) ....................26

*Allergan, Inc. v. Sandoz Inc.*,
726 F.3d 1286 (Fed. Cir. 2013) ....................47

*Allergan, Inc. v. Sandoz, Inc.*,
796 F.3d 1293 (Fed. Cir. 2015) ....................34, 35, 58

*Almirall, LLC v. Amneal Pharms. LLC*,
28 F.4th 265 (Fed. Cir. 2022) ....................29

*Amado v. Microsoft Corp.*,
517 F.3d 1353 (Fed. Cir. 2008) ....................52

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ....................26

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ....................*passim*

*Astellas Pharma, Inc. v. Sandoz, Inc.*,
117 F.4th 1371 (Fed. Cir. 2024) ....................1

*AstraZeneca AB v. Mylan Pharms., Inc.*,
19 F.4th 1325 (Fed. Cir. 2021) ....................57, 58

*In re Brimonidine Patent Litig.*,
643 F.3d 1366 (Fed. Cir. 2011) ....................53

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*,
752 F.3d 967 (Fed. Cir. 2014) ....................34

**TABLE OF AUTHORITIES**
(continued)

Page

*Chemours Co. FC, LLC v. Daikin Indus.*,
4 F.4th 1370 (Fed. Cir. 2021) ....................63

*Christian Legal Soc'y Chapter v. Martinez*,
561 U.S. 661 (2010)....................59

*Concrete Pipe & Prods. of Cal. v. Constr. Laborers*,
508 U.S. 602 (1993)....................36

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
849 F.2d 1430 (Fed. Cir. 1988) ....................62

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*,
881 F.3d 1354 (Fed. Cir. 2018) ....................28

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
8 F.4th 1331 (Fed. Cir. 2021) ....................48

*In re Entresto*,
125 F.4th 1090 (Fed. Cir. 2025) ....................25

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*,
918 F.3d 928 (Fed. Cir. 2019) ....................32, 46

*Galderma Lab'ys L.P. v. Tolmar, Inc.*,
737 F. 3d 731 (Fed. Cir. 2013) ....................55, 63

*Garmin Int'l, Inc. v. LoganTree, LP*,
825 F. App'x 894 (Fed. Cir. 2020) ....................51

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics*,
655 F.3d 1291 (Fed. Cir. 2011) ....................29

*Henny Penny Corp. v. Frymaster LLC*,
938 F.3d 1324 (Fed. Cir. 2019) ....................66

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V.*,
865 F.3d 1348 (Fed. Cir. 2017) ....................47

**TABLE OF AUTHORITIES**
(continued)

Page

*Institut Pasteur v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013) ....................49

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge, Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................47, 53

*Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*,
392 F.3d 1317 (Fed. Cir. 2004) ....................59

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
571 F. Supp. 3d 281 (D.N.J. 2021)....................21

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
97 F.4th 915 (Fed. Cir. 2024) ....................*passim*

*Janssen Pharms., Inc. v. Tolmar, Inc.*,
718 F. Supp. 3d 394 (D. Del. 2024)....................*passim*

*Janssen Pharms., Inc. v. Tolmar, Inc.*,
No. 21-CV-1784, 2024 WL 2972832 (D. Del. June 13, 2024) ....................33, 34

*KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007). 97 F.4th ....................21

*In re Kumar*,
418 F.3d 1361 (Fed. Cir. 2005) ....................26

*Leo Pharm. Prods., Ltd. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013) ....................46, 62

*Medtronic, Inc. v. Intermedics, Inc.*,
799 F.2d 734 (Fed. Cir. 1986) ....................61

*Merck Sharp & Dohme Corp. v. Hospira, Inc.*,
874 F.3d 724 (Fed. Cir. 2017) ....................63

*ModernaTx, Inc. v. Arbutus Biopharma Corp.*,
18 F.4th 1364 (Fed. Cir. 2021) ....................35, 36, 60

**TABLE OF AUTHORITIES**
(continued)

Page

*Neptune Generics, LLC v. Eli Lilly & Co.*,
921 F. 3d 1372 (Fed. Cir. 2019) ....................66, 67

*Orexo AB v. Actavis Elizabeth LLC*,
903 F.3d 1265 (Fed. Cir. 2018) ....................37

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006) ....................25, 26

*OSI Pharms., LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019) ....................47

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ....................32, 47

*Pfizer, Inc. v. Sanofi Pasteur, Inc.*,
94 F.4th 1341 (Fed. Cir. 2024) ....................29

*Pharmacyclics LLC v. Alvogen, Inc.*,
No. 2021-2270, 2022 WL 16943006 (Fed. Cir. Nov. 15, 2022)....................26, 27

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007) ....................59

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ....................54, 59

*Regents of Univ. of Cal. v. Broad Inst., Inc.*,
903 F.3d 1286 (Fed. Cir. 2018) ....................50

*Salix Pharms., Ltd. v. Norwich Pharms., Inc.*,
98 F.4th 1056 (Fed. Cir. 2024) ....................25, 49, 50

*Sanofi v. Watson Lab'ys Inc.*,
875 F.3d 636 (Fed. Cir. 2017) ....................48

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms., Inc.*,
748 F.3d 1354 (Fed. Cir. 2014) ....................33, 62

## TABLE OF AUTHORITIES
(continued)

Page

*Sanofi-Synthelabo v. Apotex, Inc.*,
550 F.3d 1075 (Fed. Cir. 2008) ....................26

*Standard Oil Co. v. Am. Cyanamid Co.*,
774 F.2d 448 (Fed. Cir. 1985) ....................50

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
18 F.4th 1377 (Fed. Cir. 2021) ....................48

*Valeant Pharms. Int'l v. Mylan Pharms., Inc.*,
955 F.3d 25 (Fed. Cir. 2020) ....................27, 29

*Vanda Pharms., Inc. v. West-Ward Pharms. Int'l, Ltd.*,
887 F. 3d 1117 (Fed. Cir. 2018) ....................41

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ....................65, 66

*In re Woodruff*,
919 F.2d 1575 (Fed. Cir. 1990) ....................27

**Statutes**

35 U.S.C. § 103 ....................21

35 U.S.C. § 112 ....................21

**Note: All quoted emphasis is added unless otherwise indicated**

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ’544 Patent | U.S. Patent No. 6,555,544 |
| ’548 Protocol | Study No. NCT00210548, “A Study to Evaluate the Effectiveness and Safety of 3 Doses of Paliperidone Palmitate in Treating Subjects with Schizophrenia” ClinicalTrials.gov archive (printed Mar. 8, 2018) |
| ’906 Patent | U.S. Patent No. 9,439,906 |
| ANDA | Abbreviated New Drug Application |
| Br. | Appellant’s Brief |
| BMI | Body Mass Index |
| Cleton 2007 | Cleton, A. (2007) PII-46 “Effects of renal impairment on the pharmacokinetic profile of paliperidone extended-release tablets,” Clinical Pharmacology & Therapeutics, 81(1): S63 |
| Ereshefsky | Ereshefsky, L. (1990) “Kinetics and Clinical Evaluation of Haloperidol Decanoate Loading Dose Regimen,” Psychopharmacology Bulletin 26(1): 108-14<br><br>Ereshefsky, L. (1993) “A Loading-Dose Strategy for Converting from Oral to Depot Haloperidol,” H&CP, 44(12):1155-61 |
| FDA | United States Food & Drug Administration |
| HLD | Haldol (haloperidol) Decanoate |
| Janssen | Janssen Pharmaceutica NV and Janssen Pharmaceuticals, Inc. |
| Karagianis | Karagianis, J.L. (2001) “Rapid Tranquilization with Olanzapine in Acute Psychosis: A Case Series”, J. Clin. Psychiatry 62 (suppl 2):12-16 |
| LAI | Long-Acting Injectable |
| Mylan | Mylan Laboratories Limited |
| NDA | New Drug Application |
| POSA | Person of Ordinary Skill in the Art |
| PTO | United States Patent & Trademark Office |
| PTAB or Board | Patent Trial and Appeal Board |
| Teva | Teva Pharmaceuticals USA, Inc. |
| WO’384 | International Patent Publication No. WO2006/114384 |

**STATEMENT OF RELATED CASES**

This is the second consolidated appeal from *Janssen Pharmaceuticals., Inc. v. Teva Pharmaceuticals USA, Inc.*, No. 18-CV-734 (D.N.J.). In the first appeal, Nos. 2022-1258 and 2022-1307, in an opinion by Judge Prost, joined by Judges Dyk and Hughes, this Court affirmed in part, and vacated and remanded in part, the district court's decision. *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 918 (Fed. Cir. 2024). The current consolidated appeals, Nos. 2025-1228 and 2025-1252, follow the district court's decision on remand. Appx1-62.

Appellees are asserting the patent at issue in this case, U.S. Patent No. 9,439,906, against other parties in the following pending cases: *Janssen Pharmaceuticals, Inc. v. Pharmascience Inc.*, No. 19-CV-21590 (D.N.J.); *Janssen Pharmaceuticals, Inc. v. Accord Healthcare Inc.*, No. 22-CV-856 (D.N.J.), and *Janssen Pharmaceuticals, Inc. et al. v. Qilu Pharmaceutical Co., Ltd.*, No. 24-CV-7094 (D.N.J.).

Appellees also asserted the patent at issue in this case in *Janssen Pharmaceuticals, Inc. v. Tolmar, Inc.*, No. 21-CV-1784 (D. Del.), now on appeal to this Court as Nos. 24-1699, -1700, -1980, -2020 (consolidated). In *Tolmar*, a district court in the District of Delaware (Bryson, J., sitting by designation) issued an order upholding the nonobviousness of the '906 Patent claims and entered an

injunction preventing Tolmar from launching its generic product. *Janssen Pharms., Inc. v. Tolmar, Inc.*, 718 F. Supp. 3d 394, 429 (D. Del. 2024) ("*Tolmar I*"). After this Court's opinion in the first appeal, reconsideration was denied. *See Janssen Pharms., Inc. v. Tolmar, Inc.*, No. 21-CV-1784, 2024 WL 2972832, at *1-4 (D. Del. June 13, 2024) ("*Tolmar II*").

These cases may directly affect or be directly affected by this Court's decision in this appeal.

# INTRODUCTION

The dosing regimens claimed in the '906 Patent are innovative and nonobvious. That is why the district court, after hearing 11 days of evidence, concluded that Teva failed to meet its burden of proving obviousness, and then, after carefully considering this Court's instructions and the parties' briefing on remand, reached the same conclusion again. It is also why a Delaware district court (Bryson, J., sitting by designation), as well as two courts in Canada, rejected separate obviousness challenges to the claimed invention after multi-day trials. But the question on this appeal is simply whether Teva "carr[ied] its burden of establishing, in [this] particular case, invalidity by clear and convincing evidence." *Astellas Pharma, Inc. v. Sandoz, Inc.*, 117 F.4th 1371, 1377 (Fed. Cir. 2024). The district court correctly concluded that Teva failed to do so.

Teva's arguments on appeal cannot overcome its failure to present sufficient evidence at trial that the claims of the '906 Patent would have been obvious to a POSA. For its case-in-chief, Teva relied on a single expert witness, Dr. Daniel Wermeling, whose obviousness opinions were rejected by the district court as not credible. For example, he testified that a POSA's motivation to arrive at the claimed dosing regimen would have been to treat an "acutely agitated" patient facing "life-threatening circumstance[s]." Appx10321(321:1-22); Appx10426(426:2-8). But LAIs are not used in these circumstances—a point

confirmed not only by Janssen's experts but by Teva's own psychiatrist expert. This was just one of many shortcomings in Teva's obviousness evidence that led the district court to observe that Teva's post-trial arguments "are unsupported by the record, contradicted by the prior art and inconsistent with its own expert's testimony." Appx19.

Seeking to circumvent its failure of proof, Teva contends that some of the asserted claims should have been presumed obvious because they overlap with prior-art ranges. But the key differences between the prior art and the claims are not overlapping ranges, and the record shows they were not subject to routine optimization. As a result, no presumption of obviousness applies. Furthermore, any such presumption would be rebutted by the objective facts. The record clearly establishes that the claimed dosing regimens achieved unexpected benefits that enabled Janssen's Invega Sustenna to fulfill critical unmet clinical needs. Both district courts to hear the evidence have found this to be true.

As this Court explained in its prior opinion, Teva was entitled to ***argue*** that POSAs would have considered the differences between the claims and prior art insignificant and obvious based on ordinary creativity and the prior art's combined teachings. But this Court never questioned that Teva was required to ***prove*** those arguments. The problem for Teva is that neither Wermeling nor any other trial witness credibly substantiated the assertions about the teachings of the

prior art and the knowledge and skill of POSAs that Teva has advocated in briefing before the district court and on appeal. That is fatal to Teva's obviousness case.

Affirming the district court's fact-findings would not thwart competition, much less provide a "roadmap" for others to do so. Br. 2-3. To the contrary, the FDA recently approved a competing LAI paliperidone palmitate product, Erzofri, under section 505(b)(2) of the Hatch-Waxman Act, with no legal challenge by Janssen. Teva, Mylan, or anyone else is free to compete with Janssen by developing alternative dosing regimens. But they are properly barred, for a limited time, from copying the precise dosing regimens that are unique to Invega Sustenna, that took years to develop, and that, as two district courts have found, are nonobvious and critical to that product's sustained commercial success. Teva and other generic challengers have had every opportunity to challenge Janssen's patent rights, but the '906 Patent's claims have repeatedly held up to scrutiny. There is a reason for that: they claim a genuine, beneficial, and commercially successful invention. The judgments should be affirmed.

## COUNTER-STATEMENT OF THE ISSUES

1. Did the district court err in concluding that claim 2 is not presumptively obvious, or clearly err in finding that Teva failed to prove a motivation to arrive at claim 2 with a reasonable expectation of success?

2. Did the district court clearly err in finding that Teva failed to prove motivation to arrive at the renal impairment claims (claims 10 and 13), or that the prior art taught away from the formulation claims (claims 20-21)?

3. Did the district court clearly err in finding that unexpected results and other objective indicia reinforced its conclusion of nonobviousness and rebutted any presumption of obviousness?

## COUNTER-STATEMENT OF THE CASE

### A. Schizophrenia and its Treatment

Schizophrenia is a debilitating illness that has no cure. Appx11875-11878(1875:19-1878:16); Appx10083-10084(83:2-84:21). The symptoms can be treated with antipsychotic medications. Appx10084(84:22-24); Appx11886-11887(1886:14-1887:10). But if not properly treated, the "brain pays a price," with successive psychotic episodes leading to progressive and permanent damage. Appx11885-11886(1885:21-1886:13); Appx11887-11889(1887:14-1889:20).

A critical challenge in effective treatment of schizophrenia is adherence; the disease symptoms often render patients unwilling or unable to take their medication regularly. Appx11887-11889(1887:14-1889:20). LAI antipsychotics, by requiring less frequent dosing, address adherence challenges. Appx10085-10086(85:17-86:4); Appx10090-10091(90:6-91:15); Appx11889-11890(1889:21-1890:7).

### B. The State of the Art at the Time of the Invention

At the time of the invention, more than 20 first-generation (or "typical") antipsychotics and over a dozen second-generation (or "atypical") antipsychotics were available in the United States in short-acting form. Appx55992-55993. Yet there were only two first-generation LAIs and one second-generation LAI, Appx55994, collectively comprising less than 4% of the total antipsychotic market, Appx56078.

LAIs were rarely used because they did not meet certain critical clinical needs. First, because high doses of LAI antipsychotics risk severe and extended side effects, the conventional wisdom was to "start low, go slow"—i.e., start with a low dose and gradually adjust upwards. Appx11899-11902(1899:11-1902:7); Appx11932(1932:2-11); Appx56120; Appx50031. But this meant that, at the beginning of LAI treatment, patients needed to take oral medication to control their symptoms, which undermined the adherence benefits of LAIs. Appx11082(1082:3-19); Appx11899-11900(1899:11-1900:21); Appx11904-11906(1904:20-1906:10).

Second, two of the only three available LAIs were first-generation antipsychotics. Appx11906(1906:4-7); Appx12388(2388:2-7); Appx12409(2409:10-19). These drugs are associated with severe side-effects. Appx7; Appx11893-11895(1893:5-1895:22); Appx12393(2393:2-21); Appx12399(2399:13-24). By 2007, second-generation antipsychotics, which have less severe (though still significant) side effects, were the standard of care for most schizophrenia patients. Appx11903-11904(1903:17-1904:19). But there was only one second-generation LAI.

That LAI, Risperdal Consta® (risperidone), had several limitations. Appx11904-11906(1904:17-1906:10). Risperdal Consta was dosed according to the "start low, go slow" paradigm, required oral supplementation, and had a

"narrow" two-week dosing interval. Appx11904-11905(1904:17-1905:19); Appx11918(1918:8-18); Appx17941; Appx10168-10169(168:19-169:5). This limited its ability to meaningfully improve patient adherence. Appx11904-11905(1904:17-1905:19).

### C. Invention of the Claimed Dosing Regimens

Recognizing these unmet clinical needs, Janssen sought to develop a second-generation LAI that could deliver rapid and sustained efficacy without oral supplementation. Appx8; Appx10751(751:1-20); Appx10753-10754(753:9-754:2); Appx20677. Teva's principal prior art references are publications from Janssen's own development process, but none discloses the critical innovations that led to the claimed invention.

#### 1. Development of the Formulation

Janssen's early development of paliperidone palmitate formulations is reflected in the '544 Patent, filed in 1998. Appx20047-20053. It took Dr. Alfons Wouters, an inventor of the '906 Patent, seven additional years to develop the formulation of claims 20 and 21 of the '906 Patent. Appx10762-10763(762:9-763:5); Appx11611-11614(1611:25-1614:19); Appx54684. The composition of the final formulation—without particle size—was disclosed in WO'384. Appx13299-13323; Appx11544-11545(1544:24-1545:1).

### 2. Early Clinical Trials

Neither WO'384 nor the '544 Patent disclose any multi-dose regimen for initiating patients on paliperidone palmitate. Appx10506-10507(506:24-507:4); Appx10511(511:15-17). Janssen developed such dosing regimens through a decade-long clinical program. Appx10757-10758(757:23-758:2). A Phase I clinical trial demonstrated, surprisingly, that deltoid injections led to a 45% increase in peak plasma concentration. Appx10770-10771(770:13-771:18); Appx20703. Considering this undesirable because of the risk of side effects, Janssen chose the gluteal injection site for further clinical trials. Appx8; Appx10771-10772(771:7-772:19). A successful Phase II trial studied equal doses of 100mg-eq or 50mg-eq injected in the gluteal muscle on days 1, 8, and 36. Appx9; Appx10774(774:7-17); Appx10776(776:7-21); Appx27042. The 150mg-eq dose, which was eventually chosen for the initiation of treatment, was not studied in Phase II. Appx10773-10774(773:14-774:14).

### 3. The Failed Phase III Trials

In 2004-2005, Janssen initiated three Phase III trials modeled on the successful Phase II trial: PSY-3002, PSY-3003, and PSY-3004. Appx10778-10779(778:19-779:22); Appx11054-11055(1054:2-1055:3). A summary of the PSY-3003 protocol, without results, is NCT00210548 (the "'548 Protocol"). Appx13244-13245. Collectively, the trials studied administering equal doses of

paliperidone palmitate (25mg-eg, 50mg-eq, 100mg-eq or 150mg-eq) into the gluteal muscle on days 1, 8, 36, and 64 of treatment. Appx11050-11051(1050:4-1051:23); Appx33982-33986; Appx36398-36401. The trials cost tens of millions of dollars, and each took years to complete. Appx11108(1108:3-10); Appx10778-10779(778:19-779:22); Appx10783-10784(783:24-784:4).

These Phase III trials failed to achieve the results needed to meet clinical needs or obtain FDA approval. Appx9; Appx11055-11056(1055:4-1056:18); Appx11061(1061:12-24). Although paliperidone palmitate showed some efficacy by study end in the PSY-3004 trial, it did not achieve rapid efficacy, and critically there was no efficacy for U.S. subjects. Appx11060-11061(1060:7-1061:11); Appx22782-22785. Similarly, the PSY-3003 study did not achieve rapid efficacy or efficacy for U.S. subjects, and only one of the three tested doses showed any efficacy by study end. Appx22786-22792. Although a randomization error prevented efficacy results for the 150mg-eq dose, pharmacokinetic data showed that median plasma concentrations by day 8 for the 150mg-eq dose were beneath the estimated 7.5-10ng/mL threshold for therapeutic effect, and lower than for the 100mg-eq dose. Appx36464; *see* Appx56123.

As Janssen's clinicians observed at the time, the tested dosing regimens were "not getting sufficient numbers of subjects into a therapeutic range early enough," and would "not lead to the efficacy that this product needs," which

was "about 80% of subjects . . . exceed[ing] the threshold for therapeutic effect" of "7.5 or 10ng/mL" by day 8. Appx56123. Based on these results, Janssen estimated only a 16% chance of FDA approval. Appx11068(1068:3-11); Appx22815.

#### 4. Discovery of a New Loading Dose Concept

The failure of the Phase III trials was a "crisis moment" for Janssen. Appx10784-10785(784:1-785:18). To address the crisis, Janssen convened a cross-disciplinary task force of scientists to identify the root cause of the problem and devise a solution. Appx10786-10789(786:3-789:4); Appx22747-22748. Inventor Dr. An Vermeulen, in one of the most "complex" and "difficult" statistical challenges of her 30-year career, Appx10799-10800(799:4-800:17); Appx10812-10813(812:23-813:11), used a sophisticated technique called population pharmacokinetic modeling to discover that a BMI effect was slowing efficacy, particularly affecting the U.S. patient population who had higher BMI. Appx10794-10796(794:21-796:4). Vermeulen's modeling also showed that deltoid injections, previously shelved for safety reasons, could now be part of the solution, helping to rapidly achieve therapeutic blood levels without a BMI effect. Appx10796-10798(796:5-798:8).

Based on Vermeulen's work, the task force recommended a new "LOADING DOSE CONCEPT" where, in contrast to the equal-dose, gluteal

regimens previously tested, all patients would receive an initial 150mg-eq dose in the deltoid, followed by varying doses thereafter. Appx23027. In February 2007, Janssen presented this recommendation to a panel of outside experts. Despite reviewing Janssen's proprietary data and analysis, they thought Janssen's initial 150mg-eq dose was "risky" and pressed Janssen to "go for a lower [initial] dose." Appx11073-11075(1073:20-1075:16); Appx11082-11083(1082:3-1083:5); Appx20280-20283.

Undeterred, inventor Dr. Srihari Gopal designed two additional multi-million-dollar Phase III clinical trials—PSY-3006 and PSY-3007—based on Vermeulen's new loading dose concept. Appx10820(820:4-22); Appx11066-11069(1066:8-1069:19); Appx22752. Then, in spring 2007, after the new trials had begun, results from the third Phase III trial, PSY-3002, showed an outright failure, with paliperidone palmitate performing worse than Risperdal Consta. Appx10821-10823(821:14-823:2); Appx11086-11087(1086:21-1087:14); Appx24819-24820. Gopal halted enrollment in the ongoing studies to consider further modifications to the "current dosing regimen." Appx24817.

Meanwhile, inventor Dr. Mahesh Samtani improved Vermeulen's population pharmacokinetic model. Appx10797-10798(797:24-798:2); Appx11343-11344(1343:10-1344:18). His work revealed that the paliperidone palmitate formulation exhibited "biphasic" absorption, initially fast and then slow.

Appx11351-11352(1351:6-1352:21). Based on this insight, Samtani determined that a 150mg-eq day 1/100mg-eq day 8 deltoid dosing regimen was optimal for rapid and sustained efficacy. Appx11358-11360(1358:12-1360:13); Appx26817-26820. Through modeling and simulation, Samtani also identified a dosing regimen for renally impaired patients, in work the FDA later praised as exemplary. Appx11388-11390(1388:3-1390:17); Appx47967-47976.

Gopal revised the PSY-3006 protocol to require the 150/100 deltoid loading-dose regimen identified by Samtani. Appx11091-11094(1091:19-1094:13); Appx24834-24835. This became the patented and FDA-approved regimen. Appx11106(1106:10-22). It was not chosen for "regulatory and business" reasons, Br. 19, but because it was demonstrably better. It would fulfill unmet clinical needs and provide the "most benefit" to patients. Appx11460(1460:1-17); Appx11103-11106(1103:10-1106:9).

#### 5. The Claimed Dosing Regimens Achieved Rapid and Sustained Efficacy Without Oral Supplementation

Unlike the earlier failed Phase III trials, the new trials showed rapid efficacy. Appx11098-11100(1098:3-1100:22); Appx39137-39155; Appx11106-11107(1106:20-1107:25); Appx42046-42052. The claimed 150/100 deltoid loading dose sequence rapidly obtained therapeutic blood levels, which "remained in the same range from Day 8 onwards." Appx171-172(26:65-27:7); Appx42046-42048; Appx11361-11362(1361:9-1362:18); Appx11373-11374(1373:13-1374:22).

Pharmacokinetic data and modeling confirmed that the claimed dosing regimens resulted in 84% of subjects reaching a therapeutic paliperidone blood concentration range within one week and remaining there, Appx41907; Appx11431(1431:1-19), exceeding the 80% threshold Janssen had identified as critical, Appx56123, and ultimately leading to the success of Invega Sustenna®, Appx11104-11106(1104:22-1106:9).

### D. The ’906 Patent

#### 1. Specification

The ’906 Patent claims priority to December 2007. Appx152. The specification discloses that “up to 75%” of schizophrenia patients “have difficulty adhering to a daily oral treatment regimen,” and that “[p]roblems with adherence” lead to adverse consequences such as “worsening of symptoms” and “frequent relapses and re-hospitalizations.” Appx159(1:50-57). To improve adherence, the inventors pursued dosing regimens for monthly paliperidone palmitate that could not only “provide sustained plasma concentrations of paliperidone when administered once monthly,” but also achieve “rapid attainment of potential therapeutic concentrations.” Appx159(1:58-61); Appx160-161(4:64-5:5).

Early clinical trials demonstrated that the absorption of paliperidone was “far more complex than was originally anticipated.” Appx159(1:64-67). An “extensive analysis of the clinical data” revealed that the claimed dosing regimens

can "facilitate patients' attaining a rapid therapeutic concentration of paliperidone." Appx160-161(4:64-6:16). As the inventors discovered, "attaining a potential therapeutic plasma level of paliperidone" was "dependent on the site of injection until steady state concentration is reached." Appx159(1:67-2:3).

### 2. Representative Claims

Claim 2 recites the loading-dose concept that arose from Janssen's crisis: a 150mg-eq first loading dose in the deltoid on day 1, followed 6-10 days later by a second loading dose of 100mg-eq in the deltoid, and then monthly maintenance doses of 25-150mg-eq in the deltoid or gluteal muscle. Appx174(32:15-36). Claims 10 and 13 claim administering to renally impaired patients deltoid loading doses "of from about" 75mg-eq on days 1 and 6-10, and maintenance doses of 25-75mg-eq (claim 10) or 25-50mg-eq (claim 13). Appx174-175(32:66-33:52). Claims 20-21 are multi-dependent claims that detail the aqueous nanoparticle suspension used in the claimed dosing regimens, including an "average particle size (d50) of from about 1600 nm to about 900 nm." Appx175(34:36-37).

## E. Invega Sustenna

Invega Sustenna's clinical and commercial success are directly related to the claimed dosing regimens and the rapid and sustained efficacy they provide, which enable the drug to be used without oral supplementation. Appx49-52;

Appx11914-11916(1914:21-1916:14); Appx12542-12543(2596:1-2597:3); Appx12564(2618:2-15); Appx12798-12799(2852:17-2853:12). Notably, Invega Sustenna's LAI market share (30.9%) is vastly larger than oral paliperidone's (1.0%), demonstrating that the claimed dosing regimen rather than the underlying molecule is responsible for its success. Appx12544-12546(2598:21-2600:20); Appx56436. Invega Sustenna leads a "competitive market" in which six new LAI antipsychotics were launched between 2009 and 2019, some of which seek to copy Invega Sustenna's benefits. Appx12528(2582:1-13); Appx12555-12558(2609:11-2612:25). There have been additional approvals since trial, including Erzofri, an LAI paliperidone palmitate product approved under the 505(b)(2) pathway with a later-invented dosing regimen.[1]

### F. Teva's Obviousness Case

At trial, Teva's obviousness case-in-chief consisted of the testimony of a single witness, Wermeling. Wermeling opined that the representative claims would have been obvious based principally on three publications arising out of Janssen's own development work: the '544 Patent, WO'384, and the '548 Protocol. Appx10319-10326(319:9-326:3). For alleged motivation to modify these references, Wermeling relied on several non-paliperidone-palmitate references

[1] *See* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/216352Orig1s000ltr.pdf; U.S. Patent No. 12,128,049.

including Ereshefsky[2] and Karagianis for the claimed loading doses, and the Invega ER label and Cleton 2007 for dosing renally impaired patients. Appx10312-10314(312:7-314:22); Appx10320(320:5-12); Appx10321(321:11-22).

**1. The ’544 Patent**

The ’544 Patent, which addresses formulations for paliperidone palmitate, teaches that "plasma levels above a minimal therapeutic concentration but below a side-effect producing threshold value" are "basic requirements that a contemporary depot formulation should fulfill in order to be acceptable for the intended patients." Appx13238(2:60-64). To fulfill these "requirements" a "pharmaceutical composition . . . should comprise" a formulation with certain characteristics including an "effective average particle size [d90] of less than 2,000 nm." Appx13239(3:11-45); Appx13240(5:16-18). The patent identifies four formulations, A-D. Appx13242(9:24-33). Only two (C and D) have effective average particle sizes d90 less than 2,000 nm. Formulation B, the only one whose particle size d50 falls within the ’906 Patent claims, has a particle size d90 of 6,830 nm, far above the ’544 Patent's threshold for an "acceptable" formulation. *Id.*

The formulation can be administered every "three weeks" to "1 month" and doses should "range from about 2 to 4 mg/kg body weight."

[2] Ereshefsky 1990 and Ereshefsky 1993 are referred to collectively as "Ereshefsky."

Appx13238(2:42-43); Appx13241(8:17-20). These doses are for "a maintenance regimen." Appx11550-11551(1550:25-1551:6). The '544 Patent "does not teach loading doses to initiate treatment, discuss a multi-dose regimen or address the complexities that present themselves when administering multiple doses of varying amounts at different times." Appx15-16; Appx10506-10507(506:24-507:1); Appx11538-11539(1538:2-1539:2); Appx12256(2256:12-14). The '544 Patent discloses a dog study but no human data. Appx16; Appx13242(9:48-51). At trial, Wermeling relied on the '544 Patent only for its disclosure of particle size and maintenance dosing; he did not opine it would have motivated a POSA to arrive at the claimed loading doses. Appx10319-10325(319:9-325:25); Appx10506-10507(506:24-507:1).

**2. WO'384**

WO'384, filed in 2006, discloses paliperidone palmitate formulations in pre-filled syringes with target volumes of 0.25-1.50mL, corresponding to 25-150mg-eq of paliperidone palmitate. It provides no new information about particle size and no human or animal experiments. Appx13299-13323; Appx11544-11545(1544:24-1545:1). Nor does it disclose a multi-dose dosing regimen or an initiation method for paliperidone palmitate. Appx11548-11549(1548:23-1549:5); Appx11550-11551(1550:25-1551:6); Appx16. Wermeling did not rely on WO'384 for motivation to arrive at the claimed loading doses. Appx10511-10512(511:15-

17; 512:21-24). When asked whether WO'384 "give[s] you a reason to give a Day 1 dose of 150 mg equivalents in the deltoid and a second dose in the deltoid of 100 mg equivalents on Day 6 to 10," Wermeling answered, "It does not." Appx10512(512:4-7).

### 3. The '548 Protocol

The '548 Protocol is a summary protocol for a Phase III clinical trial, without results or data. *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 922 (Fed. Cir. 2024); Appx11578(1578:13-24); Appx13244-13245. The '548 Protocol describes three "fixed dose" paliperidone palmitate dosing regimens, in which equal injections of 150, 100 or 50mg-eq were to be administered gluteally on days 1, 8, 36 and 64. Appx11579-11580(1579:17-1580:1); Appx13244. Although each study group received a different dose, every patient received the same dose throughout the study. Appx11579(1579:1-7). The study's "hypothesis" was that, by study end, each regimen would be more effective than placebo. Appx11578-11579(1578:25-1579:3); Appx13244-13245. The '548 Protocol corresponds to the PSY-3003 trial, discussed above. Appx11164(1164:20-25).

As Wermeling acknowledged at trial, the '548 Protocol does not provide a motivation to arrive at the claimed dosing regimens. He testified that his opinion that it would have been obvious to "give unequal loading doses on Day 1

and Day 8" was not based on "any reason" provided by the '548 Protocol but instead arose from "other art." Appx10479(479:5-13).

### 4. Ereshefsky and Karagianis

The art Wermeling relied on for motivation to modify the loading doses of the '548 Protocol consisted of non-paliperidone palmitate prior art references, Ereshefsky and Karagianis. Appx10312-10314(312:7-314:22); Appx10320(320:5-12); Appx10321(321:11-22); Appx10479(479:5-13).

#### a. Ereshefsky

The Ereshefsky references are two articles involving HLD, a first-generation LAI. Appx10513(513:17-21). Unlike paliperidone palmitate, HLD is delivered in a sesame oil-based solution instead of an aqueous suspension. Appx11898(1898:19-23); Appx11534(1534:7-17). As Wermeling explained, paliperidone palmitate and HLD are "inherently" different because "one is a solution and one is a particle, so you have different rate processes." Appx27; Appx10515(515:6-21); *see also* Appx11566-11568(1566:18-1568:4).

As a motivation to select 150mg-eq as the first loading dose, Wermeling testified that Ereshefsky taught using maximum doses of an LAI antipsychotic to treat an "acutely agitated" patient in "life-threatening circumstances." Appx10321(321:11-22). He returned to this point repeatedly, testifying "I would want to use the maximum safe and effective dose to treat an

acutely agitated patient," Appx10426(426:6-8), and a "POSA would know, for an acutely agitated patient that's a danger to themselves or others, that the higher dose would be the appropriate one," Appx10475(475:10-17). Wermeling is a pharmacist, not a psychiatrist, and his testimony was contradicted by both parties' psychiatrist experts. *See infra* pp. 21, 42. The district court correctly found this alleged motivation not credible because LAIs are not suitable for acutely agitated patients. Appx21-22.

#### b. Karagianis

Wermeling also relied on Karagianis, which Teva incorrectly asserts discloses "using a high loading dose with a second-generation ***LAI*** antipsychotic, olanzapine." Br. 15. Karagianis discloses use of ***oral***, not LAI, olanzapine. Appx16199; Appx10525(525:14-25). Karagianis teaches treating "patients who were acutely agitated" with high oral doses of olanzapine "in a manner loosely akin" to "rapid neuroleptization," Appx16199-16200; Appx10314(314:13-22), i.e.., "rapid use of oral" or "short-acting" antipsychotics, Appx12383-12384(2383:18-2384:11). Wermeling testified that Karagianis was "relevant" to "loading strategies" in the claimed dosing regimen. Appx10313(313:16-22). But Teva's psychiatric expert, Dr. René Kahn, testified that rapid neuroleptization using short-acting antipsychotics "has nothing to do with the use of long-acting injectables." Appx12382-12384(2382:8-2384:11).

### G. Procedural History

#### 1. Original District Court Proceedings

Teva and Mylan filed ANDAs for generic versions of Invega Sustenna, leading to the underlying district court litigations. Mylan agreed to be bound by the Teva litigation. After Teva stipulated to infringement, the case proceeded to an 11-day bench trial in October 2020 on Teva's validity challenges. The district court concluded that Teva failed to prove any claim of the '906 Patent invalid under 35 U.S.C. § 103 and/or § 112. *See Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 571 F. Supp. 3d 281 (D.N.J. 2021). Teva and Mylan appealed.

#### 2. This Court's Remand

On April 1, 2024, this Court affirmed no invalidity under § 112, but vacated and remanded to the district court for further proceedings on Teva's obviousness challenge. 97 F.4th at 918. First, this Court concluded that the district court erroneously imported unclaimed limitations into the claims, requiring (i) generalized or population-wide dosing for all the claims and (ii) a "mild" renal impairment limitation for the renal impairment claims. *Id.* at 925-27. Second, this Court concluded that the district court's analysis of the prior art did not "giv[e] the needed weight to the perspective of a POSA capable of deducing what references fairly suggest or employing ordinary creativity" as required by *KSR International Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007). 97 F.4th at 928. Third, this Court directed the district court to "reassess the significance of the secondary

considerations as part of its renewed obviousness analysis," *id.* at 932, identifying specific errors in the court's analysis of unexpected results, industry praise nexus, and blocking patents, *id.* at 932-36.

### 3. The District Court's Remand Decision

On remand, the parties agreed that the trial record did not need to be supplemented and submitted extensive briefing addressing this Court's remand instructions. On November 21, 2024, the district court issued a 62-page opinion reassessing obviousness as framed in this Court's opinion. Appx1-62. After correcting the errors identified by this Court, the district court found that Teva still failed to meet its burden to prove, by clear and convincing evidence, that any claim of the '906 Patent is obvious. That decision is the subject of this appeal.

## SUMMARY OF THE ARGUMENT

**I.A.** Claim 2 is not presumptively obvious because the differences between the claim and the prior art—unequal, decreasing loading doses and the deltoid injection site—are not numerical values overlapping with prior-art ranges. Even if a presumption were legally permissible, it would not apply on this record because Teva failed to prove the claimed dosing regimen could have been achieved through routine optimization. In any event, any such presumption would be rebutted by the fact that the claimed dosing regimen unexpectedly achieves rapid

efficacy for the vast majority of patients, leading directly to Invega Sustenna's clinical and commercial success.

**I.B.** The district court did not clearly err in finding that Teva failed to prove a POSA would have been motivated to arrive at claim 2 with a reasonable expectation of success. Properly focusing on the evidence Teva presented at trial, including Wermeling's discredited testimony that a desire to treat "acutely agitated" patients in "life-threatening circumstances" would have motivated a POSA to use a high first LAI loading dose, the court correctly found that Teva's obviousness theories for claim 2 "are unsupported by the record, contradicted by the prior art and inconsistent with its own expert's testimony," and therefore insufficient to meet its burden. Appx19. Furthermore, the district court properly considered the unpredictability of the art and the limited teachings of the '548 Protocol in finding that Teva failed to prove reasonable expectation of success.

**II.A.** The district court also did not clearly err in finding that Teva failed to prove motivation and reasonable expectation of success for the renal impairment claims. It correctly found that Wermeling's opinions regarding mild renal impairment were contradicted by the prior art and by Dr. Patrick Sinko's credible testimony that the proper adjustment for renally impaired patients would have been nonobvious to a POSA. And it correctly observed that Teva's attorney arguments regarding moderate and severe renal impairment lacked record support.

**II.B.** With respect to the particle size claims (20-21), Teva concedes that the district court recited the right legal test for teaching away. The court's fact-findings were not clearly erroneous. The '544 Patent teaches that the only formulation meeting the d50 limitations of claims 20-21 has a particle size d90 that is not "acceptable" and was not selected for further testing. The district court properly credited Sinko's testimony that this would discourage a POSA from pursuing such a formulation. Furthermore, Teva failed to prove that a POSA would have arrived at claims 20-21 by routine optimization since the record shows that interactions between the many variables in these claims were unpredictable.

**III.** The objective indicia of nonobviousness reinforce the district court's conclusion that Teva failed to prove its case and rebut any presumption of obviousness. On appeal, Teva does not dispute the district court's well-supported findings that the claimed dosing regimens fulfilled a long-felt, unmet clinical need for a second-generation LAI that could achieve both rapid and sustained efficacy without oral supplementation thereby fueling Invega Sustenna's commercial success. Although Teva contends that alleged blocking patents neutralize these objective indicia of non-obviousness, it fails to identify record evidence to support its position.

## STANDARD OF REVIEW

Obviousness must be proven by clear and convincing evidence.

This Court reviews the district court's "overall determination" of obviousness "de novo and the underlying factual findings for clear error." 97 F.4th at 925. "Whether a [POSA] would have been motivated to combine the prior-art references to arrive at the claimed invention is a factual question" reviewed "for clear error." *In re Entresto*, 125 F.4th 1090, 1100 (Fed. Cir. 2025). "Whether or not there would have been a reasonable expectation of success" is also "review[ed] for clear error." *Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, 98 F.4th 1056, 1061 (Fed. Cir. 2024).

# ARGUMENT

## I. TEVA FAILED TO PROVE CLAIM 2 OBVIOUS

### A. Claim 2 Is Not Presumptively Obvious

In the prior appeal, Teva contended that a presumption of obviousness applied, Teva Opening Br. at 52, No. 22-1258 (May 13, 2022), ECF No. 28; Appx70008(4:14-17); Appx70012(8:7-25); Appx70013-70014(9:21-10:4); Appx70040-70042(36:18-38:1), but this Court did not endorse that position. On remand, the district court properly rejected Teva's argument that claim 2 was presumptively obvious. Appx38.

#### 1. There Is No Presumption of Obviousness Because the Differences Between Claim 2 and the Prior Art Are Not Overlapping Ranges

When a "claimed range overlaps with a range disclosed in the prior art," this establishes a rebuttable "presumption of obviousness." *Ormco Corp. v.*

*Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006). But as a panel of this Court recently concluded, this presumption applies "when the ***only*** difference from the prior art is a difference in the range or value of a particular variable," *Pharmacyclics LLC v. Alvogen, Inc.*, No. 2021-2270, 2022 WL 16943006, at *9 (Fed. Cir. Nov. 15, 2022) (quoting *In re Kumar*, 418 F.3d 1361, 1366 (Fed. Cir. 2005)), and not when there are "additional differences between the prior art and [the] claim," *id.* The district court in *Tolmar* concluded that claim 2 of the '906 Patent is not presumptively obvious because its differences with the prior art are not limited to overlapping ranges. *Janssen Pharms., Inc. v. Tolmar, Inc.*, 718 F. Supp. 3d 394, 429 (D. Del. 2024) ("*Tolmar I*"). The district court correctly reached the same conclusion here. Appx37.

Teva contends that the district court committed legal error because *Kumar* did not "limit" the number of differences that can create a presumption of obviousness. Br. 34. But while it is true that multiple overlapping ranges can be presumptively obvious (as in *In re Aller*, 220 F.2d 454, 456 (CCPA 1955) and *In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012)), ***non-numerical*** claim features are not "claimed range[s]" capable of overlapping with prior-art ranges. *Ormco*, 463 F.3d at 1311. Because the "determination of obviousness is made with respect to the subject matter as a whole, not separate pieces of the claim," *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1086 (Fed. Cir. 2008), a

claim cannot be presumed obvious when its differences with the prior art are not limited to overlapping ranges, *Pharmacyclics*, 2022 WL 16943006, at *9.

None of Teva's cases are to the contrary. *In re Woodruff*, 919 F.2d 1575, 1577-78 (Fed. Cir. 1990), affirmed the PTO's rejection of claims that were anticipated except for "overlapping or adjacent ranges"; the other asserted difference was "merely discovering" a "new benefit of an old process," which is not patentable. And in *Valeant Pharmaceuticals International v. Mylan Pharmaceuticals*, *Inc.*, 955 F.3d 25, 32-33 (Fed. Cir. 2020), the court relied on case law concerning prima facie obviousness "for chemical compound claims" to find that prior-art pH ranges can ("depend[ing]on the facts") create a presumption of obviousness for pH of "structurally and functionally similar compounds." That does not support applying a presumption of obviousness to claim 2. *See also infra* Section I.A.2.

Here, the differences between claim 2 and the prior art are not overlapping ranges. As Teva acknowledges, they include that claim 2 requires (1) deltoid rather than gluteal injections and (2) a specific sequence of unequal, decreasing loading doses of 150-100mg-eq. Br. 31. Even accepting that patient preference would have motivated using deltoid injections for some patients, Appx35-36; Br. 35-36, this does not mean the deltoid injection site is not a difference or is a "claimed range" subject to a presumption of obviousness. *See*

*Tolmar I*, 718 F. Supp. 3d at 429 ("[T]here can be no prima facie case of obviousness because the claimed method requires administration to the deltoid rather than to the gluteal muscle.").

Furthermore, claim 2's structure of unequal, decreasing loading doses does not overlap with any prior-art range. Appx38; *see Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1358-59 (Fed. Cir. 2018) (rejecting argument that patent was presumptively obvious because it "merely reorders the steps employed by the prior art"). Teva points to this Court's observation that "the loading dosage ***amounts*** were undisputedly disclosed in the prior art, both as a particular dose and as a point within a disclosed range" to suggest that this Court's prior decision supports prima facie obviousness. Br. 33 (quoting 97 F.4th at 926 (emphasis original)). But the quoted passage draws an explicit distinction between the claimed dose ***amounts*** and the claimed "***unequal*** loading doses." 97 F.4th at 926. The latter difference requires "assessing whether a POSA would be motivated to use unequal loading doses." *Id.*; *accord id.* at 930. By instructing the district court to address motivation on remand, this Court implicitly rejected Teva's presumption-of-obviousness theory.

Teva cannot rely on overlapping ranges to overcome its failure to prove that "a POSA would be motivated to use unequal loading doses." *Id.* at 926. In cautioning the district court not to "presum[e] significance" of the unequal,

decreasing loading doses of claim 2, this Court did not instruct the court to presume the opposite and deem claim 2 prima facie obvious. *Id.* at 930; Br. 36. The district court correctly declined to do so.

### 2. Teva Failed to Prove a Routine Optimization Theory

Moreover, Teva failed to prove that claim 2 is obvious under an overlapping-range theory as a matter of fact. Overlapping ranges are "merely one aspect of a broader routine optimization analysis." *Pfizer, Inc. v. Sanofi Pasteur, Inc.*, 94 F.4th 1341, 1347 (Fed. Cir. 2024). Whether routine optimization leads to obviousness is a question of fact. In *Valeant*, for example, the court reversed summary judgment of nonobviousness and instructed that prima facie obviousness would "depend[] on the facts of record." *Valeant*, 955 F.3d at 33. In *Almirall, LLC v. Amneal Pharmaceuticals LLC*, 28 F.4th 265, 272-73 (Fed. Cir. 2022), the court concluded that the PTAB "did not err in applying a presumption of obviousness of overlapping ranges" because the "decision sets forth factual findings" that "support its conclusion," and the Board "credited expert testimony" establishing the prerequisites for prima facie obviousness to apply. And in *Genetics Institute, LLC v. Novartis Vaccines & Diagnostics*, 655 F.3d 1291, 1306 (Fed. Cir. 2011), there was no presumption of obviousness because "the typical desire of scientists to find an optimum value within a narrow disclosed range" did "not apply to the facts of this case."

Here, Teva failed to prove facts supporting a routine optimization theory. During cross-examination, Wermeling expressly disclaimed the theory, testifying it was "not correct" that he believed the claimed dosing regimens could have been developed "through routine optimization," Appx10361-10362(361:25-362:5), and acknowledging the '548 Protocol itself provided no reason to use the claimed loading doses, Appx10479(479:5-13). Misleadingly, Teva points to Sinko's testimony that "a POSA would 'be able to figure out what an optimal dosing regimen [would] be,'" Br. 34, but fails to mention that this related to the maintenance doses of the '544 Patent and that nothing in that patent "taught or suggested to a skilled artisan to use a loading dose regimen" such as in claim 2. Appx19-20; Appx12202(2202:9-19); Appx12254(2254:14-25); Appx12255-12256(2255:22-2256:14); *see* Appx11743(1743:2-23). The credible evidence was that multi-dose regimens such as claim 2 were too "complex" and "unpredictable" to be routinely optimized. Appx32; Appx11597-11600(1597:21-1600:10); Appx11631-11632(1631:18-1632:5).

Notably, at the time of the invention, LAI paliperidone palmitate was an experimental compound; there was no commercial formulation or published data on its effects in humans. *See, e.g.*, Appx13279; Appx10314-10315(314:25-315:12); Appx11581-11582(1581:20-1582:8). As the district courts here and in *Tolmar* correctly found, routine optimization is especially ill-suited to these facts,

where evidence showed that POSAs would have needed to rely on time-consuming and expensive formulation work and clinical testing to develop a dosing regimen. Appx18; *Tolmar I*, 718 F. Supp. 3d at 428; Appx10205-10207(205:22-207:23); Appx10368(368:7-19); Appx11631-11632(1631:18-1632:5). The fact that the closest prior art (the ’548 Protocol) discloses a hypothesis without data makes this an “unusual case” in which a POSA’s ability to fill in gaps in the prior art would be especially limited. *Tolmar I*, 718 F. Supp. 3d at 426; Appx11583-11584(1583:24-1584:16). Teva failed to prove that the prior art or the knowledge of a POSA support prima facie obviousness.

#### 3. Any Presumption of Obviousness Would Be Rebutted by Unexpected Results

A presumption of obviousness would, in any event, be rebutted by evidence of unexpected results and “other pertinent secondary considerations.”[3] Appx38. The district court carefully followed this Court’s instructions, assessing unexpected results by comparing: (1) “expectations” based on the closest prior art (the ’548 Protocol) and “information available to a POSA” at the ’906 Patent’s priority date; and (2) “the claimed regimens’ results.” 97 F.4th at 935; *see id.* at 933-34. It correctly found that the results achieved by claim 2 would have been unexpected to POSAs. Appx53-57.

---

[3] Objective indicia other than unexpected results are discussed in Section III below.

Contrary to Teva's contention, the district court did not find that POSAs would have "expected nothing" from the prior art. Br. 39-40. The explicit hypothesis of the '548 Protocol was that each of the three equal dose, gluteally-injected dosing regimens would be superior to placebo ***by day 64*** of the trial. Appx13244-13245; Appx11578-11579(1578:25-1579:3). The district court found that Janssen's hypothesis would have set the expectations of a POSA for the '548 Protocol. Appx54; Appx11583-11584(1583:24-1584:16). Teva does not contend that POSAs would have expected more from claim 2. Unlike in *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1371 (Fed. Cir. 2007), the record was not "devoid" of "evidence of what the skilled artisan would have expected." *Accord Forest Lab'ys, LLC v. Sigmapharm Lab'ys, LLC*, 918 F.3d 928, 937 (Fed. Cir. 2019) ("nothing in the prior art" established POSAs' expectations). The district court's findings on expectations came directly from the prior art.

In contrast to POSAs' prior-art-based expectations, the claimed dosing regimen fulfilled a long-unmet need by achieving rapid and sustained efficacy. Appx54-55. It brought the vast majority of patients into the therapeutic window "within a week" and sustained them there until the maintenance doses began. Appx55-56; Appx172(27:3-5); Appx11361-11362(1361:17-1362:11); Appx11431(1431:1-19); Appx26901-26902. These results, which are based on

hard data not mere "predictions,"[4] Br. 37, arose from discoveries that were entirely unknown to POSAs: (1) Samtani's discovery that the absorption of paliperidone palmitate is biphasic: for the first two weeks, there is a steady, fast input into the blood then a "slow process takes over," Appx10; Appx11351-11352(1351:6-1352:21); and (2) Vermeulen's discovery that the unexpected faster absorption of a deltoid injection could be a benefit rather than a liability, Appx9; Appx56; Appx161(5:2-5); Appx10796-10798(796:5-798:8). The district court correctly found that these discoveries yielded unexpected results. *See also Janssen Pharms., Inc. v. Tolmar, Inc.*, No. 21-CV-1784, 2024 WL 2972832, at *3 (D. Del. June 13, 2024) ("*Tolmar II*").

Unable to dispute these facts, Teva relies on non-prior-art internal Janssen data concerning the results of the '548 Protocol regimens to argue that the benefits of claim 2 are matters of "degree" not "kind." Br. 37-38. Teva justifies relying on non-prior-art comparators by observing that Janssen cited the same evidence to establish unexpected results. Br. 40. But this misses the point of this Court's remand instructions. Although non-prior art information can be used to show the "later-discovered" ***results of the claimed invention***, *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharmaceuticals, Inc.*, 748 F.3d 1354, 1360 (Fed.

---

[4] Appx11363-11364(1363:12-1364:18); Appx11098-11100(1098:3-1100:22); Appx11106-11107(1106:20-1107:25); Appx39137-39155; Appx42046-42052.

Cir. 2014) (collecting cases), it cannot establish the previous ***expectations*** of a POSA, 97 F.4th at 935. By comparing POSAs' prior-art based expectations to the results of claim 2, the district court addressed the "proper question." Br. 39.

In any event, the results of claim 2 were unexpectedly different from the closest prior art in kind, not degree, regardless of what evidence is considered. Janssen's discovery that deltoid injections resulted in markedly superior absorption for an LAI was qualitatively new, given the district court's finding that POSAs would have considered gluteal and deltoid injections "interchangeable." Appx56; Appx161(5:2-5); Appx11533-11536(1533:23-1536:21); Appx10796-10798(796:5-798:8); Appx10770-10771(770:13-771:14). That is a classic difference in kind. *See Allergan, Inc. v. Sandoz, Inc.*, 796 F.3d 1293, 1306 (Fed. Cir. 2015) (difference in kind when prior art taught that change "would either have no impact" on permeability "or decrease it" and "inventors surprisingly determined that the opposite was true"); *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014) (discovery of "new property" is difference in kind); *Tolmar II*, 2024 WL 2972832, at *3.

Claim 2's superior results to the prior art's equal-dose, gluteal regimens were also more than mere differences in degree. If non-public data is considered, as Teva suggests, the non-public history of Janssen's clinical trials confirms that the invention represents the "difference between an effective and safe

drug" and one whose insufficient efficacy "caused many patients to discontinue treatment," which is "an unexpected difference in kind." *Allergan*, 796 F.3d at 1307; *see* Appx10791-10792(791:21-792:5); Appx10793-10794(793:12-794:5); Appx36446-36447; Appx34027-34028; *supra* pp. 12-13. Pharmacokinetic data and modeling confirmed that claim 2's dosing regimen rapidly obtained therapeutic blood levels for 84% of the patient population, surpassing the 80% threshold Janssen had previously identified as critical, and representing a major improvement over the fixed-dose, gluteal, prior-art regimens. Appx41907; Appx56123; Br. 37-38. The invention's benefits were even more pronounced in high-BMI patients, enabling Janssen to "substantially reduce the influence of BMI." Appx41871; Appx11380-11381(1380:7-1381:2). The ability to successfully treat thousands of additional patients rather than consigning them to ineffective treatment and likely relapse is a difference in kind. Appx11426(1426:8-23); Appx11434-11435(1434:9-1435:13); *cf.* Appx11106(1106:1-9).

### B. Teva Failed to Prove Its Theories of Motivation or Reasonable Expectation of Success

Without a presumption of obviousness, it was Teva's burden to prove motivation and reasonable expectation of success. *See ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1364, 1375 (Fed. Cir. 2021). Because these are factual questions reviewed for clear error, this Court must have a "definite and firm

conviction" that the district court erred in order to reverse its findings. *Concrete Pipe & Prods. of Cal. v. Constr. Laborers*, 508 U.S. 602, 622 (1993). The district court correctly found that Teva's obviousness theories "are unsupported by the record, contradicted by the prior art and inconsistent with its own expert's testimony," and therefore insufficient to meet Teva's burden. Appx19.

#### 1. The District Court Properly Required Teva to Prove That the Differences Between Claim 2 and the Prior Art Would Have Been Obvious

The district court did not err by "presum[ing] significance" of claim 2's unequal, decreasing loading doses, nor did it require Teva to prove a singular motivation to combine. Br. 42-45. Teva's contention that unequal loading doses "do not count as 'differences'" is just a reprise of its unfounded presumption-of-obviousness argument. Br. 43-44. Once that argument is set aside, Teva had the burden to show that POSAs would have been motivated to overcome these differences. *ModernaTx*, 18 F.4th at 1375. To be sure, Teva was the master of its case and could have attempted to develop any number of theories for why a POSA would have been motivated to modify the '548 Protocol and arrive at the claimed dosing regimen with a reasonable expectation of success. Br. 44. But Teva failed to prove ***any*** theory at trial.

This is highlighted by the fact that the opening section of Teva's brief attacking the district court's motivation analysis cites ***nothing*** from the factual

record. Br. 42-45. Teva thus points out that "claim 2 includes regimens where the maintenance doses are the same as ***a*** loading dose," such that changing a single loading dose from the '548 Protocol could lead to claim 2's loading doses (though not the deltoid injection site). Br. 43. But this observation establishes neither obviousness nor error by the district court. The district court properly required Teva to prove that a "POSA would be motivated to modify the '548 Protocol to achieve the high, unequal, decreasing loading dose regimen (150/100 mg-eg) of Claim 2." Appx19. Although the court correctly observed that the claimed maintenance doses are independent of the two loading doses, whereas the '548 Protocol's fixed doses are equal for each patient, Appx18, it did not add a separate "independence" requirement to the claim.

The district court also did not require Teva to show that a POSA would "choose the claimed regimens *over others*." Br. 44 (emphasis original). Notwithstanding Teva's italics, those words—either literally or in substance—do not appear in the court's opinion. To the contrary, it repeatedly acknowledged that POSAs "can be motivated to do more than one thing." Appx23n.20; Appx35 (citing 97 F.4th at 930). Teva was entitled to advocate non-exclusive motivations; but in the end it bore the burden to prove ***some*** motivation to "achieve the specific sequence and dosing amounts" of claim 2. Appx27; Appx18n.9. *See Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1273 (Fed. Cir. 2018) (the "question is . . .

whether the prior art suggested the selection and combination" claimed in the patent such that "the ***specified elements*** should be selected and combined"). As set forth below, when Teva finally turned to the proof, it failed to meet this burden.

Despite the absence of prior-art data on paliperidone palmitate at any dosage strength, Teva contends that "[i]t is enough that the highly-developed prior art" would "render obvious most or all regimens that use doses of between 50 and 150 mg-eq on days 1, 8, 36, and 64." Br. 45. But again, while Teva was entitled to argue this, it cites no testimony or other record evidence ***proving*** it as a matter of fact. *Id.*; *supra* Section I.A.2; *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1360-61 (Fed. Cir. 2017) (*KSR* factors such as "the knowledge, skill, and creativity of the ordinarily skilled artisan" are "entirely factual determinations to which deference must be given"). Teva's unsupported arguments are no substitute for its failure of proof at trial.

### 2. The District Court Correctly Found That Teva Failed to Prove Motivation

After carefully considering each of the alleged motivations to combine that Teva presented at trial, the district court found them unsupported, inconsistent, and insufficient to meet Teva's burden. Appx19-30. The fact that the court discussed Teva's arguments one by one does not mean the court "siloed" the prior art or failed to consider their cumulative effect. Br. 46-55. To the contrary,

the district court expressly did so. Appx29-30. It correctly found Teva's evidence unpersuasive.

**a. The WO'384 and '544 Patent**

Teva contends that the district court made an "egregious" error by failing to find that WO'384 and the '544 Patent would have motivated the loading dose regimen of claim 2. Br. 46-48. But at trial, Teva's obviousness expert, Wermeling, did not even assert that these references would have provided a motivation to arrive at the claimed loading doses. To the contrary, he admitted that WO'384 would ***not*** "give you a reason" to select the claimed loading doses. Appx10511-10512(511:22-512:7). Likewise, he relied on the '544 Patent only for its disclosure of particle size and maintenance dosing, never opining that it would have motivated a POSA to arrive at the loading doses of claim 2. Appx10319-10325(319:9-325:25); Appx10506-10507(506:24-507:1).

As Teva notes, Sinko agreed that a POSA could calculate a dosing regimen from the '544 Patent. Br. 48. But he also made clear, immediately after the passage cited by Teva, that this was only true for "maintenance" dosing, not loading doses. Appx11743-11744(1743:24-1744:14); Appx13241(8:17-20). It is not enough that the prior art discloses a "sustained or delayed release (depot) formulation" of paliperidone palmitate for monthly dosing and, in WO'384, a "dosing range" of 25 to 150mg-eq. Br. 47. No record evidence supports Teva's

argument that this would have given POSAs reason to arrive at the loading doses of claim 2.

### b. Ereshefsky and Karagianis

At trial, Wermeling testified that a POSA "would start with the '548 regimens," and modify them based on the loading dose teachings of Ereshefsky and Karagianis. Appx10320-10326(320:5-326:3); Appx10312-10314(312:7-314:22). The district court correctly discredited this testimony. Appx20-28.

***Ereshefsky.*** Wermeling testified that "if you chose the Ereshefsky method for looking at this, you would use the Day 1 [dose] as the maximum because you want to treat someone who is acutely agitated" and in "a life-threatening circumstance." Appx10321(Tr. 321:11-22). Wermeling returned to this point repeatedly at trial. Appx10426(426:6-8); Appx10475(475:10-17).

But as the district court explained, Wermeling, a professor of pharmacy with no experience treating psychiatric patients, was simply wrong about how patients with schizophrenia are treated. Appx20-22. As Teva's own psychiatrist expert Kahn testified, LAIs "are not designed to be used in emergency situations" because they "don't work fast enough." *See* Appx10090(90:12-19). Janssen's psychiatrist expert, Dr. Christian Kohler, agreed that "acute agitation" is "always" treated with "short-acting medications." Appx11931-11932(1931:23-1932:1). The prior art corroborated this testimony. Appx20127; Appx50018

(Haldol immediate release indicated for "prompt control of the acutely agitated schizophrenic patient"; no such indication for LAI HLD). Based on this evidence, the district court found that Wermeling's testimony was "both contradicted and unpersuasive" and that "[w]ithout credible evidence, Teva's motivation theories as to the first loading dose are unavailing." Appx21.

Teva attacks this credibility finding by pointing to testimony from Kahn and Gopal, but it fails to excuse Wermeling's error. Br. 49-50. Gopal testified that emergencies can result from insufficient efficacy, not that LAIs are used in emergencies. Appx11212(1212:10-16). And Teva's citation to Kahn's testimony truncates his answer to omit that he was talking about ***oral*** antipsychotics. Appx12379-12380(2379:4-2380:6). "[R]eject[ing] the testimony" of an expert "as not credible" can "virtually never be clear error." *Vanda Pharms., Inc. v. West-Ward Pharms. Int'l, Ltd.*, 887 F. 3d 1117, 1132 (Fed. Cir. 2018). Here, the district court's credibility finding was clearly correct.

With Wermeling's "acute agitation" theory discredited, Teva tries to recast it as "speeding onset of efficacy." Br. 49-50. But while this may be a general rationale for using loading doses, Teva failed to show it provided a motivation to ***modify*** the equal loading doses of the '548 Protocol to arrive at the unequal, decreasing loading doses of claim 2. Appx22-24. Lacking credible testimony on this point, Teva observes that one patient in Ereshefsky was given an

HLD LAI injection "stat" (i.e., immediately). Br. 50. This factoid, addressed by no trial witness, does not help Teva's case, much less establish clear error by the district court. To the contrary, that patient's first LAI dose ***was lower, not higher***, than their second dose, so on its face it undermines Teva's obviousness theories. Appx14117.

The use of oral haloperidol in Ereshefsky also undermined Teva's obviousness theories. Appx22; Appx14125; Appx11568-11569(1568:21-1569:13). The district court did not suggest that conversion from oral haloperidol taught away from LAI loading doses as Teva contends. Br. 50. What it found is that because plasma concentration of haloperidol dropped "in the first 14 days" of LAI conversion even ***with*** Ereshefsky's loading-dose regimen, Appx14125, a POSA would not have believed HLD worked fast enough to motivate increasing the ***first*** loading dose to obtain rapid efficacy. Appx22.

On this point, Teva distorts Sinko's testimony that a higher LAI dose can reach a therapeutic window faster. Br. 54. In the question posed, Sinko was directed to assume that a high single dose would reach blood levels within the therapeutic window, whereas a lower dose would not. Appx12112(2112:8-15); Appx12113(2113:19-23). Under these circumstances, the higher single dose would necessarily reach the therapeutic window faster, because the lower dose would not reach it at all. Appx12113(2113:19-23). But as Sinko explained, while

a higher single dose LAI results in a higher maximum concentration ($C_{max}$), it would ***not*** be expected to promote faster absorption (shorter $T_{max}$). Appx12108-12110(2108:13-2110:7); Appx11592-11594(1592:22-1594:24). That is because it is the formulation that controls release rate, not the dose. Appx11536(1536:8-17). Because of this, POSAs would not have expected that larger first LAI loading doses could accelerate efficacy. Appx23-24.

Finally, the district court did not "dismiss" the teachings of Ereshefsky that maintenance doses can be reduced in the second or third month. Br. 51. The district court considered these teachings and correctly found they would not have led POSAs to claim 2. Appx24-26. Ereshefsky teaches that monthly maintenance doses for HLD can be lower than the total loading-dose amount given in the first month—not that a second loading dose should be smaller than the first. Appx14124-14125; Appx10322-10323(322:17-323:1). As the district court correctly found, Wermeling provided no persuasive explanation why this was relevant to modifying the paliperidone palmitate loading doses of the '548 Protocol to arrive at claim 2. Appx24-25.

***Karagianis.*** Teva repeatedly mischaracterizes Karagianis as teaching a prior-art, high-loading-dose, second-generation "***LAI***." Br. 15, 53. In fact, Karagianis discloses administering olanzapine "***orally***." Appx10313(313:16-22). Wermeling testified that Karagianis is "relevant" to LAI dosing because it teaches

"rapid[]" dosing strategies for oral olanzapine, which Karagianis refers to as "akin" to "rapid neuroleptization." Appx10313-10314(313:16-314:22); Appx16199-16200. But as Kahn explained, "rapid neuroleptization" is the "rapid use of oral" or "short-acting" antipsychotics and "has nothing to do with the use of long-acting injectables." Appx12383-12384(2383:18-2384:11); Appx22.

Attempting to rehabilitate Wermeling's discredited opinions, Teva now contends he was simply defining "rapid neuroleptization," not relying on it for obviousness. Br. 54. This is not a plausible reading of his testimony. *See* Appx10314(314:2-22). Whatever Wermeling meant, Karagianis's teachings regarding the rapid dosing of oral olanzapine are irrelevant to obviousness. Appx12383-12384(2383:18-2384:11); Appx11566-11567(1566:2-1567:11). The district court correctly found that "Dr. Kahn's testimony and the prior art undermine Dr. Wermeling's theory" regarding Karagianis. Appx22.

**c. HLD Label**

The district court also correctly rejected Teva's belated arguments regarding the HLD label. Because this reference was not included in Teva's pre-trial disclosures of obviousness theories, Wermeling's expert report, Teva's case-in-chief, or Sinko's cross-examination, Appx1063; Appx26n.21; Appx27, the record lacks expert evidence on point. It was not error for the district court to

consider what the document actually says rather than uncritically accepting Teva's unsupported arguments about its teachings. Appx26-29; Br. 52.

As the district court observed, the HLD label discloses: (1) using a 20x dose multiplier as a loading dose to convert patients on "higher doses" of oral haloperidol to HLD; and (2) that the first HLD dose should not exceed 100mg. Appx29; Appx16651-16652. Based on the second point, Teva argues that for "any patient who initially needs between 100 and 199 mg," applying the 100mg maximum dose recommendation would result in a second loading dose that is lower than the first. Br. 51-52. But the HLD label only recommends the 20x loading dose if a patient is receiving ***more than*** 10mg oral haloperidol. Appx16651. This means their total 20x conversion dose is more than 200mg, and their 100mg first dose is necessarily ***lower*** than their second. Appx29.

Meanwhile, patients on oral doses "up to 10 mg/day" do not receive loading doses at all; they receive the same dosage in their first month of LAI treatment as in the maintenance phase. Appx16652.[5] Thus, Teva is simply mistaken that the district court "dismissed" an "unequal, decreasing loading dose teaching" in the HLD label. Br. 52. The court correctly found that the label

---

[5] For this reason, the district court correctly discounted a hypothetical posed to Kohler on cross-examination that assumed, contrary to the label, that the 20x multiplier would be used for a patient getting less than 10mg/day. Appx28-29.

contains no such teaching. Appx29. The "concept of dose variation" the HLD label teaches, 97 F.4th at 930—limiting rather than maximizing the initial loading dose—is the opposite of claim 2. The novel loading dose concept of claim 2 comes from unknown and unexpected properties of paliperidone palmitate discovered by the inventors. *Supra* p. 33.

****

Ultimately, Teva's failure to prove that POSAs would have been motivated to arrive at claim 2 is not surprising. Wermeling's theories for modifying the '548 Protocol's loading doses relied on non-paliperidone-palmitate references that, although properly considered for the "concept[s]" they disclosed, 97 F.4th at 930, did not teach POSAs how to dose paliperidone palmitate, Appx27; Appx10515(515:9-21); Appx11566-11567(1566:18-1567:11). As the evidence showed, the "claimed dosing regimen solved a 'problem . . . not known in the art,' and the solution to the unknown problem would not have been obvious." *Tolmar I*, 718 F. Supp. 3d at 428 (quoting *Forest Lab'ys*, 918 F.3d at 935 and citing *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1356-57 (Fed. Cir. 2013)); *supra* pp. 33-36.

### 3. The District Court Properly Analyzed Reasonable Expectation of Success

The district court correctly found that Teva failed to prove reasonable expectation of success. Appx30-34. This finding was not necessary to its

decision, since Teva's failure to prove motivation was fatal to its case. Appx30; *see Intelligent Bio-Sys., Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1367-68 (Fed. Cir. 2016). Nevertheless, Teva fails to identify error in the district court's analysis.

First, Teva mischaracterizes the case law when it contends that the difficulty and unpredictability of drug development "do[] not count" for reasonable expectation of success. Br. 56. The cited cases hold that "obviousness cannot be avoided ***simply*** by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013) (quoting *Pfizer, Inc.*, 480 F.3d at 1364). But unpredictability is ***relevant*** to assessing whether success was probable. *See, e.g., Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V.*, 865 F.3d 1348, 1355 (Fed. Cir. 2017) (the "Board erred in dismissing Honeywell's evidence of unpredictability in the art" in assessing reasonable expectation of success); *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1384-85 (Fed. Cir. 2019) (no reasonable expectation of success because creating drugs to treat cancer is a "highly unpredictable art"). This remains true for inventions, like claim 2, directed to treating individual patients. *See OSI Pharms.*, 939 F.3d at 1378 (claim directed to treating "a mammal"); *cf. Allergan*, 726 F.3d at 1289, 1291-92 (explaining

"FDA approval may be relevant to the obviousness analysis" for claim directed to treating "a person").

Second, the district court correctly found that WO'384 and the '544 Patent, which disclose only single or maintenance doses, do not establish a reasonable expectation of success for the multi-dose regimen of claim 2. Appx32-33; *see Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021) (factfinder is "required to frame its reasonable-expectation-of-success analysis around [the] specific dosage" claimed). Teva argues that the multi-dose nature of claim 2 is not "dispositive," Br. 57, but it cannot show the district court's factual findings are clearly erroneous or legally irrelevant to the reasonable-expectation-of-success analysis, Appx33.

Third, the district court was correct to find that the teachings of the "'548 Protocol *alone*" are "limited" because it contains no data. Br. 57 (emphasis original); Appx33; *Tolmar I*, 718 F. Supp. 3d at 427-28. Teva contends that the district court erred by citing *Tolmar* because Teva relies on additional prior art. Br. 57-58. But the finding relates specifically to the '548 Protocol and is legally and factually correct. *See Sanofi v. Watson Lab'ys Inc.*, 875 F.3d 636, 641, 647-50 (Fed. Cir. 2017) (publication describing "rationale and design" of Phase III trial and stating that success was "expected" did not establish reasonable expectation of success); *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1340-43,

1346-47 (Fed. Cir. 2021) (lack of prior-art efficacy data relevant to reasonable expectation of success of method-of-treatment claims that did "not require" a "clinical result").

Fourth, the district court correctly rejected Teva's contention that if a POSA would have reasonably expected the '548 Protocol to succeed, that expectation would extend to claim 2. Br. 57-58; Appx32. When POSAs have no data and must rely on a "hypothesis," *Tolmar I*, 718 F. Supp. 3d at 426, they cannot reasonably assume that modifications to the tested methods will be successful. *See Salix*, 98 F.4th at 1062 (clinical trial plan insufficient to establish reasonable expectation of success where claimed dosage totaled 1650mg daily and protocol dosing regimens totaled 550-2200mg daily). Moreover, the '548 Protocol hypothesized day-64 efficacy, Appx13244-13245, not rapid efficacy, which is the motivation Teva alleged for modifying the '548 Protocol, *supra* Section I.B.2.b. A POSA would not have expected modifications to the '548 Protocol to achieve rapid efficacy. Appx10479(479:5-13); *supra* Section I.B.2; *see Institut Pasteur v. Focarino*, 738 F.3d 1337, 1346 (Fed. Cir. 2013) ("expectation-of-success must match" the "goal" that "motivate[s]" a POSA).

Fifth, it was not error for the district court to consider the entire record, including Kahn's testimony that the standard approach to dosing LAI antipsychotics was to start low and adjust upward as needed. Appx33-34.

Although the fact that start-low-go-slow was standard practice does not preclude obviousness of claim 2, Br. 58, the conventional wisdom of POSAs is relevant to reasonable expectation of success. *See Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1294 (Fed. Cir. 2018) (affirming finding of no reasonable expectation of success based on "record evidence, which includes expert testimony, contemporaneous statements made by skilled artisans, statements by the UC inventors themselves, and prior art failures"); *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985) (a POSA is "presumed to be one who thinks along the line of conventional wisdom in the art").

Finally, it is notable that, as elsewhere in its brief, Teva cites no record evidence in support of its reasonable-expectation-of-success arguments. Br. 55-58. Reasonable expectation of success is a question of fact. *Salix*, 98 F.4th at 1061. Teva fails to identify any factual error, much less clear error, in the district court's finding that Teva failed to prove reasonable expectation of success. Appx30-34.

## II. TEVA FAILED TO PROVE CLAIMS 10, 13 AND 20-21 OBVIOUS

### A. Teva Failed to Prove the Renal Impairment Claims (Claims 10 and 13) Obvious

The district court also correctly concluded that Teva failed to prove obviousness of claim 10 or 13. Appx39-43.

### 1. The District Court Properly Observed That Teva Ignored Claim 13

The district court did not, as Teva contends, take a "siloed and inflexible approach" in its analysis by observing that a 50% reduction to the '548 Protocol's 150/150/150/150 regimen would not lead to claim 13. Br. 60-61. The court was simply explaining that ***Teva's argument*** that a 50% reduction across the board would render claims 10 and 13 obvious does not work for claim 13. Appx39; Appx2345. Claim 13 recites two loading doses of 75mg-eq followed by a 50mg-eq maintenance dose, so a 50% reduction from the '548 Protocol does not lead to claim 13. It was not error for the district court to point out this defect. *See Garmin Int'l, Inc. v. LoganTree*, *LP*, 825 F. App'x 894, 897-98 (Fed. Cir. 2020) (no error where Board "simply identified a fatal flaw in Garmin's obviousness argument").

### 2. The District Court Correctly Found Teva's Obviousness Evidence Insufficient

Contrary to Teva's argument, the district court did not require Teva to identify specific prior-art references that exactly matched the claimed dose reduction for renally impaired patients. Br. 60-61. Rather, it analyzed Teva's obviousness theories and rejected them as "unconvincing." Appx40-41; Appx11586(1586:14-20).

Referring to the portion of the Invega ER label disclosing a 50% reduction of the maximum oral paliperidone dose for patients with mild renal impairment, Appx56240, Wermeling testified that a POSA would apply this 50% dose reduction to paliperidone palmitate for patients with mild renal impairment, but that "patients with moderate to severe renal impairment are not to receive this medicine," Appx10332(332:10-15). The district court did not violate this Court's mandate by focusing on Wermeling's mild-renal-impairment theory. Br. 62. "The mandate rule does not . . . affect issues that have been 'explicitly reserved or remanded.'" *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1364 (Fed. Cir. 2008). This Court remanded for the district court to "analyze obviousness without a 'mild' limitation added to the renal-impairment claims" and it expressly did so. 97 F.4th at 927; Appx39. Nothing in the Court's mandate prevented the district court from addressing the obviousness theories Teva's expert put forward.

Teva contends that Wermeling was referring to the Invega Sustenna label, not the Invega ER label, when he stated the drug is not used for moderate to severe renal impairment. Br. 63. But Wermeling said nothing about the Invega Sustenna label at trial. Appx10331-10332(331:15-332:15). If he did have it in mind, that would be erroneous, since the label is not prior art and has no place in an obviousness analysis. Whatever Wermeling meant, he clearly testified that a POSA's motivation to arrive at claims 10 and 13 would be to treat patients with

mild renal impairment. Appx10332(332:10-15); Appx10333(333:6-12). The district court did not err by rejecting Wermeling's obviousness theory. *See Intelligent-Bio*, 821 F.3d at 1368.

In any event, the district court fully addressed Teva's evidence and arguments regarding mild, moderate, and severe renal impairment. Appx42-43. The court credited Sinko's "persuasive and credible" testimony that "differences in the formulation" between orals and LAIs make it "difficult to predict renal dosing" for a depot formulation based on oral data, a principle Wermeling did not dispute. Appx41; Appx11589(1589:7-12); Appx11567-11568(1567:2-1568:8); *see* Appx10532(532:18-21). The district court analyzed Teva's references, identified conflicts and discrepancies in the prior art teachings Teva relied on, and ultimately concluded that the prior art would not motivate a POSA to claims 10 and 13, properly construed. Appx40-43.

Teva does not challenge these underlying fact-findings on appeal but argues generally, without record citations, that the court's analysis was too rigid. Br. 60-61. But with no expert testimony to support Teva's attorney argument that any combination of doses from 25 to 75mg would have been obvious for renally impaired patients, Br. 61, the district court did not err in finding that Teva failed to meet its burden of proving obviousness. Appx41n.26; Appx43; *see, e.g.*, *In re Brimonidine Patent Litig.*, 643 F.3d 1366, 1376 (Fed. Cir. 2011) (holding that "it is

well within a trial judge's discretion to require expert testimony supporting technical references that are relied on to establish obviousness").

### 3. The District Court Did Not Rely on Teaching Away for the Renal Impairment Claims

Finally, Teva's argument that the district court erroneously found "teaching away" as a basis for rejecting Teva's obviousness theories mischaracterizes the court's opinion. Br. 64-66. Although the district court cited some case law that discussed teaching away, its finding was that Teva "fail[ed] to meet its burden to prove a motivation to combine." Appx42. Even assuming, as Teva contends, that Sinko's renal-impairment testimony does not establish teaching away, Br. 65, crediting Sinko's testimony properly led the court to conclude that Teva failed to prove obviousness. Appx41-42. In reviewing that conclusion, nothing turns on whether the evidence rises to the level of teaching away. *See, e.g.*, *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069-70 (Fed. Cir. 2018) (even without teaching away, a reference's "statements regarding preferences" are relevant to motivation); *Arctic Cat*, 876 F.3d at 1360, 1363 (similar).

## B. Teva Failed to Prove the Formulation Claims (Claims 20-21) Obvious

Because the formulation claims (20-21) are multiple-dependent claims, Teva's obviousness challenge to them fails because Teva failed to prove obviousness of claims 2, 10, and 13. Appx43-44. Teva also failed to prove that

the particle-size limitations of claims 20-21 would have been obvious.

#### 1. The District Court Correctly Found That the ’544 Patent Discourages Use of Formulation B

Claims 20-21 recite an average particle size ***d50*** of between 1600 and 900 nm. The essence of Teva’s obviousness argument is that, because the ’544 Patent describes one example of a formulation meeting this limitation, the district court erred in finding the ’544 Patent teaches away from the claimed particle size. Br. 67. The test for teaching away is whether the claimed d50 value “was ‘criticized, discredited, or otherwise discouraged.’” 97 F.4th at 932 (quoting *Galderma Lab’ys L.P. v. Tolmar, Inc.*, 737 F. 3d 731, 739 (Fed. Cir. 2013)). As Teva acknowledges, the district court “recited the right test this time,” Br. 68, and found teaching away, Appx45-47. These findings were not clearly erroneous.

The ’544 Patent discloses and claims an effective average particle size ***d90*** of less than 2,000 nm. Appx13239(3:11-17); Appx13242(10:25-29). Contrary to Teva’s argument, the ’544 Patent does not merely describe this particle size as “preferred.” Br. 68. It teaches that such a formulation is necessary to meet the “basic requirements that a contemporary depot formulation should fulfill in order to be ***acceptable*** for the intended patients.” *See* Appx13238(2:60-64); Appx13239(3:11-45) (to “fulfil[] the above mentioned requirements . . . a pharmaceutical composition . . . should comprise” an “effective average particle

size [d90] of less than 2,000 nm"); Appx11522-11523(1522:22-1523:21); Appx11547(1547:3-14).

The '544 Patent identifies four formulations (A-D) of which only Formulation B has a particle size d50 that falls within the '906 Patent claims. Br. 68; Appx13242(9:25-32). But Formulation B has a d90 of 6.83 micrometers (6,830 nm), more than three times the maximum "acceptable" particle size taught by the '544 Patent. Appx13242(9:25-32); Appx13238(2:60-64); Appx13239(3:11-45); Appx11522-11523(1522:22-1523:21); Appx11547(1547:3-14).

Based on the teachings of the '544 Patent, Formulation B is not a "lesser preferred but still workable option." Br. 69. Rather, as Sinko credibly testified, a POSA reviewing the '544 Patent would "exclude" and "eliminate" Formulation B because it failed to meet the "critical parameters" described in the patent as necessary for the formulation to be "acceptable for the intended patients." *See* Appx13238(2:60-64); Appx13239(3:11-45); Appx11784-11785(1784:2-1785:1); Appx46. Corroborating this assessment, the '544 Patent teaches that only Formulations C and D were advanced to stability testing, which is another prerequisite for use. Appx13242(9:33-44); Appx11529-11530(1529:24-1530:8); *see* Appx13239(3:8-10) ("depot formulations should be stable"). In other words, the '544 Patent itself eliminated Formulation B from further consideration, as Sinko testified a POSA would do.

Sinko's testimony establishes that the '544 Patent implicitly "criticize[s], discredit[s], or otherwise discourage[s]" a formulation with the particle size of claims 20-21. 97 F.4th at 932. With nothing but a conclusory statement from Wermeling to counterbalance Sinko's testimony, Appx46-47; Appx10546(546:6-9), the district court did not clearly err in crediting Sinko. The law is clear that factfinders may "properly rel[y] on expert testimony regarding how a skilled artisan would interpret the [prior art] to find implicit" teaching away. *AstraZeneca AB v. Mylan Pharms., Inc.*, 19 F.4th 1325, 1337 (Fed. Cir. 2021). Indeed, in *AstraZeneca*, as here, the court found teaching away based on expert testimony that a POSA would have been discouraged from using prior-art formulations based on their "particle size" and "therefore would not have any reason to use these . . . formulations as a basis for experimentation." *Id.*

Attempting to distinguish *AstraZeneca*, Teva notes that the expert testimony there was that prior-art formulations were "unsuitable," as opposed to Sinko's testimony that a POSA would "eliminate" them because they were not acceptable. Br. 70. This is a distinction without a difference because both statements establish that POSAs would be "discouraged" from pursuing the relevant formulations based on the disclosures in the reference. 97 F.4th at 932. "[W]hether the prior art teaches away from the claimed invention is a question of

fact." *Allergan*, 796 F.3d at 1305 (internal quotation marks and citation omitted). Teva fails to identify error in the district court's fact-findings.

Lacking persuasive testimony from its own expert, Teva contends that Sinko "effectively admitted" there was no teaching away. Br. 70. But he only acknowledged that the '544 Patent dose not ***explicitly*** "say Formulation B cannot be used." Appx13242(9:45-55). That is not an admission. *See, e.g.*, *AstraZeneca*, 19 F.4th at 1337 (reference need not "contain explicit disparagement" to establish teaching away); *Arctic Cat*, 876 F.3d at 1360 (teaching away "need not" be explicit). Neither is Sinko's testimony that "outside of this patent" a POSA could "try" Formulation B or any other "formulation that they want to try." Appx11785(1785:7-13). As Sinko testified immediately thereafter, "***within the bounds of the '544 patent***," Formulation B "would be excluded." *Id.* That is the essence of teaching away. *See AstraZeneca*, 19 F.4th at 1337 (a reference teaches away when "a skilled artisan ***upon reading the reference***, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken in the claim") (cleaned up).

### 2. The Fact That Invega Sustenna Practices the '544 Patent Is Irrelevant to Teaching Away

Teva's argument that there can be no finding of teaching away because the '544 Patent claims cover Invega Sustenna is contrary to the law. Br. 67-68, 70. As the example of Formulation B demonstrates, a formulation having

the claimed d50 between 1600 and 900 nm does not necessarily have a d90 less than 2000 nm. Appx13242(9:25-32). The fact that it can, as illustrated by the ***non-prior art*** example of Invega Sustenna, does not render claims 20-21 obvious or foreclose teaching away. *See, e.g.*, *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1321 (Fed. Cir. 2004) ("[S]imply because an invention falls within a range disclosed by the prior art does not necessarily make it per se obvious. Both the genus and species may be patentable."). Because there is no contradiction between Janssen's stipulation and its nonobviousness arguments, the case law Teva relies on is inapposite. *See Christian Legal Soc'y Chapter v. Martinez*, 561 U.S. 661, 676-78 (2010); *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007).

#### 3. Claims 20-21 Are Nonobvious Regardless of Teaching Away

As this Court previously noted, teaching away makes it "unnecessary to address" Teva's argument about optimization of a result-effective variable. 97 F.4th at 932; Appx47n.34; Br. 71. But even if it does not qualify as "teaching away," Sinko's testimony is strong evidence that a POSA would not have been motivated to the particle size of claim 2 based on the '544 Patent. *See Polaris*, 882 F.3d at 1069-70 (Fed. Cir. 2018); *Arctic Cat*, 876 F.3d at 1360, 1363. Teva failed to prove that claims are 20-21 obvious under a routine optimization theory. Br. 71.

Because they are dependent claims, arriving at claims 20-21 through routine optimization would require simultaneously optimizing dose amount, dose sequence, injection site, renal adjustment, and particle size. Even if these variables were separately optimizable, "evidence that the components 'interacted in an unpredictable or unexpected way could render the combination nonobvious.'" *ModernaTx*, 18 F.4th at 1375-76 (upholding nonobvious determination where patent challenger "failed to address the interdependence of the claimed lipid components and how adjustments would affect the [claimed] particle as a whole").

As the district court found, the effects of a multi-dose LAI regimen are unpredictable, Appx32; Appx11597-11600(1597:21-1600:10), the effects of injection site on LAI absorption were unexpected, s*upra* pp. 33-35, and the prior art lacked clear teachings on how, or even whether, to adjust doses for renally impaired patients, *supra* pp. 52-55. Adding the optimization of particle size to this multi-variable problem would render the claimed solutions even more nonobvious. *See Tolmar I*, 718 F. Supp. 3d at 428 (explaining that "guess-and-check approach" to obviousness "is especially unsuitable" in the "pharmaceutical arts, where testing individual modifications to known prior art formulations typically involves the commitment of substantial time and resources"); Appx10205-10207(205:22-207:23); Appx10368(368:7-19); Appx11631-11632(1631:18-1632:5).

Illustrating the unpredictability of the task, the testimony of Teva's own experts shows that a POSA seeking to optimize particle size from the '544 Patent would have been led away from claims 20-21. *See Arctic Cat*, 876 F. 3d at 1363. Wermeling testified that "if you wanted to impart changes in the pharmacokinetics, you could change the particle size to make them smaller than what was previously studied." Appx10291(291:12-19); Appx13239(3:53-55); *accord* Appx10581-10582(581:24-582:3). The import of this testimony is that if POSAs wanted to make the '544 Patent's monthly formulations more rapidly acting, as Wermeling testified they would, Appx10311(311:18-23), they would have further ***reduced*** the particle sizes of the formulations disclosed in the '544 Patent. But the "lead" formulations (C and D) in the '544 Patent have average particle sizes d50 that are already below the range of claims 20-21. Appx13242(9:25-32); Appx11529-11530(1529:24-1530:8). Optimizing them to achieve a more rapid effect would have resulted in even smaller particle sizes – i.e., sizes even further away from the range claimed in the '906 Patent. Teva failed to prove it would have been obvious to arrive at claims 20-21 through routine optimization from these disclosures.

## III. THE OBJECTIVE EVIDENCE SUPPORTS NONOBVIOUSNESS

Although the absence of objective indicia would not support obviousness, *Medtronic, Inc. v. Intermedics, Inc.*, 799 F.2d 734, 739 n.13 (Fed.

Cir. 1986), their presence can be among the "most probative evidence of nonobviousness," Appx48 (quoting *Leo Pharms.*, 726 F.3d at 1358). The district court correctly found that objective indicia, including unexpected results discussed *supra* Section I.A.3, "reinforce[]" nonobviousness and would rebut any presumption of obviousness. Appx48; Appx38.

### A. Long-Felt Need and Commercial Success Support Nonobviousness and Rebut Any Presumption of Obviousness

On appeal, Teva does not challenge the district court's findings that the claimed dosing regimens solved a "long-standing need for a second-generation LAI antipsychotic that could initiate treatment without requiring oral medication," Appx49,[6] that the "solution to the long-felt need results from the claimed and novel dosing regimens" such that a "nexus to the claimed invention is established," Appx50, or that the commercial "success of Invega Sustenna is closely tied to its unique dosing features," Appx52. These uncontested facts are highly relevant to nonobviousness. Given that Invega Sustenna's clinical and commercial success arise directly from the unexpected benefits of the claimed dosing regimens, *see*

[6] Although Teva argued below that these benefits are irrelevant because they are not required by the claims, Appx2601-2604, objective indicia of nonobviousness do not need to be expressly claimed, or even known at the time of the invention, *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988); *Sanofi-Aventis*, 748 F.3d at 1360. Teva does not dispute this point on appeal.

*supra* p. 15, they constitute "pertinent secondary considerations" that would rebut any presumption of obviousness. *Galderma*, 737 F.3d at 738; Appx38.

These objective indicia cannot be discounted based on Teva's contention that they have "little force" in Hatch-Waxman cases where there are earlier Orange Book patents. Br. 76. The "point" of the blocking patent doctrine is to consider whether clinical and commercial success are "due to the qualities" of the patented invention or "to the fact that [patentee] had control of another patent that precluded competition from others." *Merck Sharp & Dohme Corp. v. Hospira, Inc.*, 874 F.3d 724, 730 (Fed. Cir. 2017). Where, as here, the evidence shows that these achievements ***are*** due to the qualities of the invention, then the "*merits of the invention*" can give rise to an "inference of nonobviousness, even given the existence of other relevant patents." *Id.* at 731 (emphasis original).

Teva barely attempts to identify error in the district court's "fact-specific" determination that blocking patents do not override the objective indicia of nonobviousness on this record. 97 F.4th at 935-36 (citing *Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1339 (Fed. Cir. 2018)). As the district court noted, the question is whether competitors would have been deterred from "investing the resources needed to make, develop, and market" the later-developed invention as of the priority date. *Chemours Co. FC, LLC v. Daikin Indus.*, 4 F.4th 1370, 1379 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 1418 (2022). Here, both

parties' expert witnesses ***agreed*** that there "would be an incentive to conduct R&D in paliperidone palmitate as of December 2007," the patent's priority date. Appx61 (quoting Appx12775(2829:4-10)). In fact, Teva itself filed a U.S. provisional patent application for paliperidone palmitate in January 2008. Appx56125-56147. Although Teva attempts to downplay this work because it took place in Israel, Br. 78, the fact Teva is an Israeli company hardly suggests it lacks incentives to develop products for the U.S. market, as evidenced by this case.

Instead of seriously challenging the district court's findings, Teva effectively contends that "the mere existence or sheer number of blocking patents" defeats commercial success. *Acorda*, 903 F.3d at 1338; *see* Br. 77-79. This ignores the "inquiry" into the ***effects*** of these patents called for by the case law and by this Court's remand decision. 97 F.4th at 935-36. Neither the district court's findings, nor the Delaware district court's findings in *Tolmar* based on similar evidence, rest on the existence of a statutory safe harbor "alone" as Teva contends. 97 F.4th at 936; Br. 79; *Tolmar I*, 718 F. Supp.3d at 430. Teva simply fails to grapple with the record evidence on which the district court relied. Appx12574-12577(2628:3-2631:5); Appx12775(2829:4-10); Appx12786(2840:8-20); Appx56125-56147; Appx12570-12574(2624:11-2628:2); Appx12583-12584(2637:5-2638:15). Teva's threadbare arguments neither "undermine[]" nor "negate[]" the district court's findings that long-felt need and commercial success

are significant objective indicia of nonobviousness. Br. 79.

### B. Skepticism and Industry Praise Relate Directly to the Claimed Invention and Further Support Nonobviousness

In addition to finding that long-felt but unsolved need, commercial success, and unexpected results were "particularly" probative of nonobviousness, Appx48, the district court also correctly found that skepticism and industry praise were directly related to the claimed invention and further supported nonobviousness, Appx57-59.

"If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1335 (Fed. Cir. 2016). Janssen "proffered ample evidence" that POSAs were skeptical of the claimed dosing regimens. Appx58. Even after reviewing Janssen's non-prior art data regarding the invention's potential to meet the clinical need for a rapidly effective LAI, an international panel of outside experts, the FDA, and the psychiatric community at large worried that the loading doses Janssen was pursuing were too high. Appx58-59. Since "this skepticism was aimed directly" at Janssen's loading-dose regimen, there was clearly a nexus with the claimed invention. Appx59. These facts were established through credible trial testimony and contemporaneous documents that Teva does not seriously challenge on appeal.

Appx20280; Appx20375; Appx11073-11075(1073:20-1075:16); Appx11082-11083(1082:3-1083:5); Appx11907-11908(1907:7-1908:4).

Instead, Teva contends that because the prior-art ’548 Protocol taught administering two 150mg-eq doses, there could not have been skepticism. Br. 75-76. But the evidence shows that there was. The fact that these doses were being tested in clinical trials did not prevent POSAs from being skeptical, nor does it prevent skepticism from being relevant to nonobviousness. *See WBIP*, 829 F.3d at 1330-31 (noting that in combination inventions, “proof of nexus is not limited to only when objective evidence is tied to the supposedly ‘new’ feature(s)”); *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1333-34 (Fed. Cir. 2019) (objective indicia evidence is “probative of nonobviousness even if it was not precisely limited to the point of novelty of the claimed combination”).

Teva’s remaining arguments on skepticism are also contrary to the facts and law. The evidence cited above shows that skepticism came from external, not “[i]nternal,” sources, and that these POSAs were not merely “suggesting alternatives.” Br. 76. The fact that the skepticism related in part to concerns about FDA approval does not make it irrelevant to nonobviousness, even recognizing that, as this Court has instructed, the claims are directed to administering the claimed dosing regimens to “a patient.” *See Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F. 3d 1372, 1377-78 (Fed. Cir. 2019) (holding that “the

FDA's concerns" about clinical trial constituted skepticism); *id.* at 1374 (claim directed to "method for administering" treatment to "a patient").

With respect to industry praise, Teva reiterates points the district court fully addressed. Br. 73-75; Appx57-58. The *Neuropsychiatric Disease* article is relevant because it states that "the novel dose initiation procedure that provides rapid onset of action without the need for oral antipsychotic supplementation" is an "[a]dvantage[]" of Invega Sustenna. Appx20544; Appx57. The *Psychiatric News* article reports that Invega Sustenna was superior to oral antipsychotics "due in part to better adherence rates of the medication." Appx20542. As the district court found, there was a nexus between these results and the invention because credible expert testimony established that improved adherence is a benefit of the claimed dosing regimen. Appx58; Appx11910-11912(1910:7-1912:13).[7]

****

Ultimately, Teva fails to seriously confront the extensive record evidence demonstrating that the claimed dosing regimens have brought unexpected real-world benefits to patients in the face of skepticism and that this has

---

[7] Confusing the two articles, Teva wrongly asserts that the authors of the *Psychiatric News* article "recognized" that more than half of healthcare providers do not use the claimed deltoid site for the first loading dose. Br. 75. The citation is to the *Neuropsychiatric Disease* article, which says nothing about loading doses. Appx20560. Teva also cites an internal Janssen document from 2016 which has nothing to do with industry praise. *See also* Appx11193-11194(1193:6-1194:4); Appx11955-11956(1955:22-1956:4); Appx11956-11957(1956:25-1957:13).

contributed to Invega Sustenna's clinical and commercial success. Appx49-61. This evidence reinforces the conclusion that Teva failed to meet its burden of proving obviousness.

## CONCLUSION

This Court should affirm the district court's judgments.

Dated: February 5, 2025

Respectfully submitted,

*/s/ Barbara L. Mullin*
Barbara L. Mullin
Aron Fischer
Andrew D. Cohen
Zhiqiang Liu
J. Jay Cho
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
bmullin@pbwt.com
*Attorneys for Plaintiffs-Appellees Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica, NV*

**CERTIFICATE OF SERVICE**

I certify that, on February 5, 2025, this brief was electronically filed with the Clerk of Court using the CM/ECF system and thereby served on all parties.

*/s/ Barbara L. Mullin*
Barbara L. Mullin

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. Cir. R. 32(b). This brief contains 13,948 words, excluding the parts of the brief exempted by Fed. Cir. R. 32(b)(2) and Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Times New Roman font.

Dated: February 5, 2025

*/s/ Barbara L. Mullin*
Barbara L. Mullin